# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| WILLIAM N. TURK, CARLITA B. TURK, and NORMAN RADOW, on behalf of themselves and all others similarly situated,<br><br>       *Plaintiffs*,<br><br>v.<br><br>MORRIS, MANNING & MARTIN, LLP; TIMOTHY POLLOCK; LARGE & GILBERT, INC.; CONSERVATION PAYS, LLC; JOSEPH C. SKALSKI; ATLANTIC COAST CONSERVANCY , INC.; ATLANTIC COAST CONSERVANCY PROPERTIES, LLC; ENVIRONMENTAL RESEARCH AND MAPPING FACILITY, LLC; THE GEORGIA TUITION ASSISTANCE PROGRAM, INC.; ROBERT D. KELLER; BENNETT THRASHER, LLC; ORNSTEIN-SCHULER INVESTMENTS LLC; ORNSTEIN-SCHULER CAPITAL PARTNERS LLC; CONSERVATION SAVES, LLC; CONSERVATION MATTERS, LLC; WEIBEL & ASSOCIATES, INC.; CLAY WEIBEL; LUCUS MASON, INC.; LUCUS VON ESH; RUSSELL BENNETT; CARLTON WALSTAD; GREENCONE INVESTMENTS, LLC; | CASE NO. _____<br><br><br><br><br><br><br>**JURY DEMAND** |

BLETHEN MINE CONSULTANTS,           )
LLC; MARVIN BLETHEN; GALT           )
MINING INVESTMENTS, LLC; THE        )
NATIONAL WILD TURKEY                )
FEDERATION RESEARCH                 )
FOUNDATION, INC.; AMERICAN          )
UPLAND TRUST, LLC; DONALD R.        )
SKLAR; PARTNERSHIP TAX              )
SOLUTIONS, INC.; AARON              )
KOWAN; and THE PRIVATE              )
CLIENT LAW GROUP;                   )
                                    )
        *Defendants.*                 )
                                    )

## ORIGINAL CLASS ACTION COMPLAINT

William N. Turk, Carlita B. Turk and Norman Radow (collectively "Plaintiffs") file this Original Class Action Complaint to assert claims, on behalf of themselves and all others similarly situated, against Defendants Morris, Manning & Martin, LLP; Timothy Pollock; Large & Gilbert, Inc.; Conservation Pays, LLC; Joseph C. Skalski; Atlantic Coast Conservancy, Inc.; Atlantic Coast Conservancy Properties, LLC; Environmental Research and Mapping Facility LLC; The Georgia Tuition Assistance Program, Inc.; Robert D. Keller; Bennett Thrasher, LLC; Ornstein-Schuler Investments LLC; Ornstein-Schuler Capital Partners LLC; Conservation Saves, LLC; Conservation Matters, LLC; Weibel & Associates, Inc.; Clay Weibel; Lucus Mason, Inc.; Lucus Von Esh; Russell Bennett; Carlton Walstad; Greencone Investments, LLC; Blethen Mine Consultants, LLC; Marvin Blethen; Galt Mining Investments, LLC; The National Wild Turkey Federation, Inc.; American Upland Trust LLC; Donald R. Sklar; Partnership Tax Solutions, Inc.; Aaron Kowan; and Private Client Law Group, PC (collectively "Defendants") and state as follows:

1.     This case involves the development and implementation of a fraudulent scheme to sell a flawed and defective tax-savings strategy: a Syndicated Conservation Easement Strategy (the "SCE Strategy").

2.      Conservation easements are encumbrances placed on real estate to preserve property for conservation purposes.  When such easements are placed on property in strict compliance with Section 170(h) of the Internal Revenue Code (the "Code"), donors of such easements may realize a noncash charitable contribution deduction for the value by which the easement impairs the fair market value of the property.  When properly implemented, conservation easements can and do confer legitimate tax advantages to the donor.

3.      In this case, however, Defendants' SCE Strategy—developed by the Morris Manning Defendants —was fatally flawed from the outset.  Rather than guide Plaintiffs through a legitimate conservation easement transaction, the Defendants utilized a prepackaged collection of misrepresentations, omissions, deficient form documents, faulty conservation easement deeds, and bogus appraisals to promote, sell and implement the SCE Strategy, which the Internal Revenue Service (the "IRS") has determined, as structured and implemented, does not comply with the requirements of Section 170(h) of the Code and other applicable laws and, therefore, does not and cannot provide the promised legitimate charitable contribution deduction from the conservation easement donation.

4.      The Defendants' numerous errors and omissions in this regard were egregious.  In working together to implement the SCE Strategy, including drafting

various documents necessary to implement the SCE Strategy, the Defendants ignored controlling law and directives from the IRS.  As explained in detail herein, the Defendants wholly failed to satisfy *inter alia* the IRS's requirements for the Conservation Easement Deeds, the Appraisals, and the Baseline Documentation Reports.  These requirements were clear and unambiguous and the Defendants knew or should have known that (1) these crucial aspects of the SCE Strategy failed to comply with the applicable requirements and law and (2) each one of these failures, ***standing alone***, prevented the SCE Strategy from generating a legitimate and legal charitable contribution deduction from a conservation easement donation.

5.      In addition, as detailed herein, the Defendants hand-picked the appraisers to be used for the SCE Strategy.  These appraisers (the "SCE Appraisers")[1] cast aside their professional obligations and duties.  Indeed, the appraisals used in connection with the SCE Strategy were a complete sham and, as determined by the IRS, contained grossly inflated valuations.  All of the Defendants (including the Appraiser Defendants) knew that these grossly inflated appraisals would be unknowingly used by the Plaintiffs and the Class to claim charitable contribution deductions from the SCE Strategy that, unbeknownst to Plaintiffs and the Class, were completely unsupportable.

---

[1] The SEC Appraisers include, but are not limited to, the Appraiser Defendants defined at Note 6 herein.

6.      The accounting firms and accountants that were part of the conspiracy alleged herein (the "Return Preparers"), including but not limited to the Large & Gilbert Defendants[2] and the Sklar Defendants, prepared the partnership tax returns for the Syndicates (described at Paragraphs 53 and 57 herein) used in the SCE Strategy, as well as the Schedule K-1s ("K-1s") that were issued to each of the Plaintiffs and members of the Class containing their proportionate share of their respective Syndicate's charitable contribution deduction resulting from the SCE Strategy.   The Return Preparers prepared the K-1s with the intent that each Plaintiff and member of the Class would utilize their respective K-1 to claim a charitable contribution deduction from the SCE Strategy.   And, in fact, the Return Preparers instructed Plaintiffs and members of the Class to report the amount set out in the K-1 as a charitable contribution deduction on their individual tax returns. The Return Preparers were by no means independent accountants, but were, in fact, part of the conspiracy that designed, promoted, sold, and implemented the SCE Strategy and knew or should have known that the charitable contribution deductions the Return Preparers reported on the partnership returns and, in turn, the K-1s were neither legally nor factually supportable.   Indeed, the Return Preparers purported to conduct their own due diligence on the SCE Strategy and

---

[2]  Although included within the definition of the Return Preparers, the Large & Gilbert Defendants played a much larger role in the conspiracy to develop, promote, sell, and implement the SCE Strategy, as set out in detail at Paragraphs 71-72 and 98-103 herein.

were well aware that the partnership returns and K-1s were going to be used by Plaintiffs and members of the Class to claim the charitable contribution deductions from the SCE Strategy on their tax returns.

7.    Based on the IRS's clear warnings to professional advisors and promoters, the Defendants knew the IRS would conclude that the promised tax benefits of the SCE Strategy, as structured and implemented, were improper, and yet Defendants continued to market, sell and profit from the SCE Strategy well after these warnings.  The Defendants convinced hundreds, if not thousands, of clients to execute the SCE Strategy, which generated substantial tax deductions on the part of their trusting clients that the IRS has now disallowed at the partnership level and indicated its intent to disallow at the individual level.[3]

8.    To deliver these bogus tax benefits to Plaintiffs and the Class, Defendants employed and organized entities and individuals to execute their pre-planned scheme to convince clients to participate in the SCE Strategy.  Defendants and their co-conspirators used the mail and/or wires to develop, promote, sell, and implement the SCE Strategy, which Defendants knew to be fatally flawed.  This association of entities and individuals to promote and implement the SCE Strategy thereby constitutes a racketeering enterprise.

---

[3] Further, in IR-2020-130, issued on June 25, 2020, for the purpose of offering a "global settlement," the IRS proclaimed that "[t]he IRS will continue to disallow the claimed tax benefits, asserting civil penalties to the fullest extent, considering criminal sanctions in appropriate cases, and continuing to pursue litigation of the cases that are not otherwise resolved administratively."

9.     This racketeering enterprise injured Plaintiffs and the Class by causing them to pay substantial fees and transaction costs, be exposed to back-taxes, interest and penalties, lose the substantial tax benefits that would have resulted from a properly implemented conservation easement transaction, and incur additional accounting and legal fees and expenses to deal with the IRS fallout, all resulting from Plaintiffs and the Class claiming charitable contribution deductions on their federal and state tax returns based on the defective SCE Strategy and Defendants' advice, recommendations, and assistance in connection therewith.

10.     There were only minor, if any, variations in the misrepresentations by the Defendants about the effect of applicable tax law standards to the members of the Class.  And while there are numerous Defendants participating in this unlawful enterprise, the invalidity of the SCE Strategy under these tax provisions, the defects in the SCE Strategy, and the misrepresentations by Defendants and their co-conspirators about the SCE Strategy predominate.  Herein, Plaintiffs do not simply allege negligence—they allege a pre-planned fraudulent scheme in which all Defendants knew the SCE Strategy, as structured and implemented, would fail if challenged by the IRS despite Defendants' representations to the contrary.

# I.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) because the Class Action Fairness Act of 2005 confers diversity jurisdiction upon this Court, as at least one member of the proposed Class is a citizen of a state that is different from at least one Defendant's state of citizenship, and the aggregate amount in controversy exceeds $5,000,000.  In addition, this Court has jurisdiction over Plaintiffs' claims based on 28 U.S.C. § 1331 and/or 28 U.S.C. § 1337, which provide jurisdiction for violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1961 *et seq*.; and 29 U.S.C. § 1367, which provides jurisdiction for supplemental state claims, including common-law fraud and conspiracy claims.

12.     Personal jurisdiction comports with due process under the United States Constitution, the long-arm statute of Georgia, and the provisions of 18 U.S.C. § 1965(b) and (d).

13.     Without limiting the generality of the foregoing, each Defendant (directly or through agents who were at the time acting with actual and/or apparent authority and within the scope of such authority) has:

    a.      transacted business in Georgia;

    b.      contracted to supply or obtain services in Georgia;

c.      availed themselves intentionally of the benefits of doing business in Georgia;

d.      produced, promoted, sold, marketed, and/or distributed their products or services in Georgia and, thereby, have purposefully profited from their access to markets in Georgia;

e.      caused tortious damage by act or omission in Georgia;

f.      caused tortious damage in Georgia by acts or omissions committed outside such jurisdiction while (i) regularly doing business or soliciting business in such jurisdiction, and/or (ii) engaging in other persistent courses of conduct within such jurisdiction, and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in such jurisdiction;

g.      committed acts and omissions that Defendants knew or should have known would cause damage (and, in fact, did cause damage) in Georgia to Plaintiffs and members of the Class while (i) regularly doing or soliciting business in such jurisdiction, and/or (ii) engaging in other persistent courses of conduct within such jurisdiction, and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in such jurisdiction;

    h.      engaged in a conspiracy with others doing business in Georgia that caused tortious damage in Georgia; and/or

    i.      otherwise had the requisite minimum contacts with Georgia such that, under the circumstances, it is fair and reasonable to require Defendants to come to Court to defend this action.

14.    Venue is proper under 28 U.S.C. § 1391, because, *inter alia*, a substantial part of the events or acts giving rise to the causes of action alleged in this Complaint arose in, among other places, this District, and the harmful effects of Defendants' fraud and wrongful conspiracy were felt in, among other places, this District.  In addition, venue is proper under 18 U.S.C. § 1965 because all Plaintiffs reside in this District.

## II.

## PARTIES

15.    Plaintiff William N. Turk is an individual and a citizen of Habersham County, Georgia.  This Plaintiff resides in Demorest, Georgia within this District.

16.    Plaintiff Carlita B. Turk is an individual and a citizen of Habersham County, Georgia.  This Plaintiff resides in Demorest, Georgia within this District. William and Carlita Turk are collectively referred to herein as the "Turk Plaintiffs."

17.     Plaintiff Norman Radow ("Radow") is an individual and a citizen of Fulton County, Georgia. This Plaintiff resides in Atlanta, Georgia within this District.

18.     Defendant Morris, Manning & Martin, LLP ("Morris Manning") is a limited liability partnership organized and existing under the laws of Georgia with its principal place of business at 1600 Atlanta Financial Center, 3343 Peachtree Road NE, #1600, Atlanta, Georgia 30326.  In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. §1965.

19.     Defendant Timothy Pollock ("Pollock") is an individual and, upon information and belief, resides at 3827 Rockhaven Court, Marietta, Georgia 30066. This Defendant is or was during the relevant period a partner in Morris Manning. In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.  Morris Manning and Pollock are referred to herein as the "Morris Manning Defendants."

20.     Defendant Large & Gilbert, Inc. ("Large & Gilbert") is a professional corporation incorporated in the State of Georgia with its principal place of business at 6849 Peachtree Dunwoody Road, NE, Building A-2, Atlanta, Georgia 30328. In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. §1965.  This Defendant can be served through its registered agent:

Large & Gilbert, P.C., 6849 Peachtree Dunwoody Road NE, Building A-2, Atlanta, Georgia 30328.

21.    Defendant Conservation Pays, LLC ("Conservation Pays") is a limited liability company organized in the State of Georgia with its principal place of business at 6849 Peachtree Dunwoody Road, Building A-2, Atlanta, Georgia 30328. In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U. S.C. §1965.   This Defendant may be served through its registered agent:  Gary Fortier, 6849 Peachtree Dunwoody Road, Building A-2, Atlanta, Georgia 30328.

22.    Defendant Joseph C. Skalski ("Skalski") is an individual and, upon information and belief, resides at 4601 Chardonnay Court, Dunwoody, Georgia 30338. This Defendant is or was during the relevant period a partner in Large & Gilbert.  In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.  Large & Gilbert, Conservation Pays, and Skalski are referred to herein as the "Large & Gilbert Defendants."

23.    Defendant Atlantic Coast Conservancy, Inc. ("ACC") is a nonprofit corporation organized and existing under the laws of Georgia with its principal place of business at 72 South Main Street, Jasper, Georgia 30143.  In addition, venue and jurisdiction as to this Defendant are proper in this District under 18

U.S.C. § 1965.  This Defendant may be served with process through its registered agent: Robert D. Keller at 72 South Main Street, Jasper, Georgia 30143.

24.    Defendant Atlantic Coast Conservancy Properties, LLC ("Atlantic Properties") is a limited liability company organized and existing under the laws of Georgia with its principal place of business at 72 South Main Street, Jasper, Georgia 30143.  In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.  This Defendant may be served with process through its registered agent: Phil M. Landrum, III, 95 Stegall Drive, Jasper, Georgia  30143.

25.    Defendant Environmental Research and Mapping Facility LLC ("ERMF") is a limited liability organized and existing under the laws of Georgia with its principal place of business at 4805 Highway 53 West, Jasper, Georgia 30143.  In addition, jurisdiction and venue as to this Defendant are proper in this District under 18 U.S.C. §1965.  This Defendant may be served through its registered agent:   Robert D. Keller, 4805 Highway 53 West, Jasper, Georgia 30143.

26.    Defendant The Georgia Tuition Assistance Program, Inc. ("GTAP") is a nonprofit corporation organized and existing under the laws of Georgia with its principal place of business at 535 Coldstream Court NW, Atlanta Georgia 30328. In addition, jurisdiction and venue as to this Defendant are proper in this District

under 18 U.S.C. §1965.  This Defendant may be served through its registered agent:  Michael Bean, 535 Coldstream Court NW, Atlanta, Georgia 30328.

27.    Defendant Robert D. Keller ("Keller") is an individual and, upon information and belief, resides at 4805 Highway 53 West, Jasper, Georgia  30143. This Defendant is or was during the relevant period an employee and/or principal of ACC, Atlantic Properties, and/or ERMF.  In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.  ACC, Atlantic Properties, ERMF, GTAP and Keller are referred to herein as the "ACC Defendants."

28.    Defendant Bennett Thrasher, LLC ("Bennett Thrasher") is a limited liability company organized and existing under the laws of Georgia with its principal place of business at 3625 Cumberland Blvd., Suite 1000, Atlanta, Georgia 30339.  In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. §1965.  This Defendant can be served through its registered agent:  Thomas Raines, PC, 3740 Da Vinci Court, Suite 430, Norcross, Georgia  30092.

29.    Defendant Ornstein-Schuler Investments LLC ("OSI") is a limited liability company organized and existing under the laws of Georgia with its principal place of business at 4355 Cobb Parkway, Suite J555, Atlanta, Georgia 30339.  In addition, venue and jurisdiction as to this Defendant are proper in this

District under 18 U.S.C. §1965.   This Defendant can be served through its registered agent:   National Registered Agents, Inc., 289 S. Culver Street, Lawrenceville, GA  30046.

30.   Defendant Ornstein-Schuler Capital Partner LLC ("OSCP") is a limited liability company organized and existing under the laws of Georgia with its principal place of business at 1266 W. Paces Ferry Rd. #181, Atlanta, Georgia 30327.  In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. §1965.   This Defendant can be served through its registered agent:  Scott Withrow, 3379 Peachtree Road NE, Suite 970, Atlanta, Georgia  30326.  OSI and OSCP are collectively referred to herein as the "OSI Defendants."

31.   Defendant Conservation Saves, LLC ("Conservation Saves") is a limited liability company is organized and existing under the laws of Georgia with its principal place of business at 1266 West Paces Ferry Road, #181, Atlanta, Georgia 30327.  In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. §1965.  This Defendant may be served through its registered agent:  Matthew Ornstein, 1266 West Paces Ferry Road, #181, Atlanta, Georgia  30327.

32.   Defendant Conservation Matters, LLC ("Conservation Matters") is a limited liability company organized and existing under the laws of Georgia with its

principal place of business at 14618 GA Highway 83 North, Monticello, Georgia 31064.  In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. §1965.  This Defendant may be served through its registered agent:  Kristina Sorenson, 14618 GA Highway 83 North, Monticello, Georgia 31064.

33.     Defendant Weibel & Associates, Inc. ("Weibel Firm") is a corporation organized and existing under the laws of Georgia with its principal place of business at 3778 LaVista Road, Suite 200, Tucker, Georgia 30084.  In addition, jurisdiction and venue as to this Defendant are proper in this District under 18 U.S.C. §1965.  This Defendant may be served through its registered agent:  Clay M. Weibel, 3778 Lavista Rd., Suite 200, Tucker, Georgia  30084-5607.

34.     Defendant Clay Weibel ("Weibel") is an individual and, upon information and belief, resides at 1909 Breckinridge Drive, Atlanta, Georgia 30345. This Defendant is an employee of Weibel Firm. In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. §1965. Weibel Firm and Weibel are referred to herein as the "Weibel Defendants."

35.     Defendant Lucus Mason, Inc. ("Lucus Mason") is a corporation organized and existing under the laws of Georgia with its principal place of business at 6890 Ridgefield Drive, Alpharetta, Georgia 30005.  In addition, jurisdiction and venue are proper in this District under 18 U.S.C. §1965.  This

Defendant may be served through its registered agent:  Melissa O. Coleman, 945 E. Paces Ferry Road, 17th Floor, Atlanta, GA  30326.

36.    Defendant Lucus Von Esh ("Esh") is an individual and, upon information and belief, resides at 6890 Ridgefield Drive, Alpharetta, Georgia 30005.  In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. §1965.  Lucus Mason and Esh are referred to herein as the "Lucus Defendants."

37.    Defendant Russell Bennett ("Bennett") is an individual and, upon information and belief, resides at 134 Highway 78 NW, Monroe, Georgia 30655. In addition, jurisdiction and venue as to this Defendant are proper in this District under 18 U.S.C. §1965.

38.     Defendant Carlton Walstad ("Walstad") is an individual and, upon information and belief, resides at 4620 Ponte Vedra Drive, Marietta, Georgia 30067.  In addition, jurisdiction and venue as to this Defendant are proper in this District under 18 U.S.C. §1965.

39.    Defendant Greencone Investments LLC ("Greencone") is a limited liability company organized and existing under the laws of Georgia with its principal place of business at 4620 Ponte Vedra Drive, Marietta, Georgia  30067. In addition, jurisdiction and venue as to this Defendant are proper in this District under 18 U.S.C. §1965.  This Defendant may be served through its registered

agent:  Carlton Walstad, 4620 Ponte Vedra Drive, Marietta, Georgia  30067.
Bennett, Walstad, and Greencone are collectively referred to herein as the
"Greencone Defendants."

40.    Defendant Blethen Mine Consultants LLC ("Blethen Mine") is a
limited liability company organized and existing under the laws of New Jersey
with its principal place of business at 217 West Commerce Street, Bridgeton, New
Jersey, 08302.  This Court has personal jurisdiction over this Defendant pursuant
to the Constitution and laws of the United States and the State of Georgia.   At all
relevant times, this Defendant has done and is doing business in the State of
Georgia, but does not maintain a regular place of business or current designated
agent upon whom service may be made in this civil action.  As described hereafter,
this Defendant has contracted with a Georgia resident, and either party was to
perform the contract in whole or in part in the State of Georgia.  Additionally, this
Defendant has committed torts, in whole or in part, in the State of Georgia,
including intentional tortious acts directed at a resident of the State of Georgia,
where the brunt of the harm was felt.  This Defendant's conduct in the State of
Georgia has been committed by officers, directors, employees, and/or agents of
this Defendant acting within the scope of their employment or agency.  This
Defendant has purposefully availed itself of the benefits and protections of the
laws of the State of Georgia and could reasonably anticipate being subject to the

jurisdiction of courts of the State of Georgia.  This suit against this Defendant will not offend traditional notions of fair play and substantial justice and is consistent with due process of law.  In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

41.    Defendant Marvin Blethen ("Blethen") resides at 217 W. Commerce Street, Bridgeton, New Jersey, 08302.  This Court has personal jurisdiction over this Defendant pursuant to the Constitution and laws of the United States and the State of Georgia.   At all relevant times, this Defendant has done and is doing business in the State of Georgia, but does not maintain a regular place of business or current designated agent upon whom service may be made in this civil action.  As described hereafter, this Defendant has contracted with a Georgia resident, and either party was to perform the contract in whole or in part in the State of Georgia.  Additionally, this Defendant has committed torts, in whole or in part, in the State of Georgia, including intentional tortious acts directed at a resident of the State of Georgia, where the brunt of the harm was felt.  This Defendant has purposefully availed himself of the benefits and protections of the laws of the State of Georgia and could reasonably anticipate being subject to the jurisdiction of courts of the State of Georgia.  This suit against this Defendant will not offend traditional notions of fair play and substantial justice and is consistent with due process of law.  In addition, venue and jurisdiction as to this Defendant are proper in this

District under 18 U.S.C. § 1965.  Blethen Mine and Blethen are referred to herein as the "Blethen Defendants."

42.     Defendant Galt Mining Investments, LLC ("Galt Mining") is a limited liability company organized and existing under the laws of Georgia with its principal place of business at 4355 Cobb Parkway, Suite J555, Atlanta, Georgia 30339.  In addition, jurisdiction and venue as to this Defendant are proper in this District under 18 U.S.C. §1965.   This Defendant may be served through its registered agent:   National Registered Agents, Inc., 289 S. Culver Street, Lawrenceville, Georgia  30046.

43.     Defendant The National Wild Turkey Federation, Inc. ("Wild Turkey Federation") is a foreign nonprofit corporation organized and existing under the laws of Virginia with its principal place of business at 770 Augusta Road, Edgefield, South Carolina, 29824.  This Court has personal jurisdiction over this Defendant pursuant to the Constitution and laws of the United States and the State of Georgia.   At all relevant times, this Defendant has done and is doing business in the State of Georgia, but does not maintain a regular place of business or current designated agent upon whom service may be made in this civil action.   As described hereafter, this Defendant has contracted with a Georgia resident, and either party was to perform the contract in whole or in part in the State of Georgia.  Additionally, this Defendant has committed torts, in whole or in part, in the State

of Georgia, including intentional tortious acts directed at a resident of the State of Georgia, where the brunt of the harm was felt.  This Defendant's conduct in the State of Georgia has been committed by officers, directors, employees, and/or agents of this Defendant acting within the scope of their employment or agency. This Defendant has purposefully availed itself of the benefits and protections of the laws of the State of Georgia and could reasonably anticipate being subject to the jurisdiction of courts of the State of Georgia.  This suit against this Defendant will not offend traditional notions of fair play and substantial justice and is consistent with due process of law.  In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.  This Defendant may be served through its registered agent:  Registered Agent Solutions, Inc., 900 Old Roswell Lake Pkwy., Suite 310, Roswell, Georgia 30076.

44.    Defendant American Upland Trust LLC ("American Upland") is a limited liability company organized and existing under the laws of South Carolina with its principal place of business at 770 Augusta Road, Edgefield, South Carolina, 29824.  This Court has personal jurisdiction over this Defendant pursuant to the Constitution and laws of the United States and the State of Georgia.   At all relevant times, this Defendant has done and is doing business in the State of Georgia, but does not maintain a regular place of business or current designated agent upon whom service may be made in this civil action.  As described hereafter,

this Defendant has contracted with a Georgia resident, and either party was to perform the contract in whole or in part in the State of Georgia.  Additionally, this Defendant has committed torts, in whole or in part, in the State of Georgia, including intentional tortious acts directed at a resident of the State of Georgia, where the brunt of the harm was felt.  This Defendant's conduct in the State of Georgia has been committed by officers, directors, employees, and/or agents of this Defendant acting within the scope of their employment or agency.  This Defendant has purposefully availed itself of the benefits and protections of the laws of the State of Georgia and could reasonably anticipate being subject to the jurisdiction of courts of the State of Georgia.  This suit against this Defendant will not offend traditional notions of fair play and substantial justice and is consistent with due process of law.  In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

45.    Defendant Donald R. Sklar ("Sklar") is an individual and, upon information and belief, resides at 558 Tenby Lane, Marietta, Georgia 30068. This Defendant is or was during the relevant period an employee, officer and/or director of Partnership Tax Solutions, Inc.  In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

46.    Defendant Partnership Tax Solutions, Inc. ("Partnership Tax Solutions") is a corporation organized and existing under the laws of Georgia with

its principal place of business at 2440 Sandy Plains Road, Suite 300, Building 24, Marietta, Georgia 30066.  In addition, jurisdiction and venue as to this Defendant are proper in this District under 18 U.S.C. §1965.  Sklar and Partnership Tax Solutions are collectively referred to herein as the "Sklar Defendants."

47.    Defendant Aaron Kowan ("Kowan") is an individual and, upon information and belief, resides at 670 Park Drive, Atlanta, Georgia 30306.  This Defendant is or was during the relevant period an employee, officer and/or director of Private Client Law Group, PC.  In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

48.    Defendant Private Client Law Group, PC ("PCLG") is a professional corporation organized and existing under the laws of Georgia with its principal place of business at 75 14th Street, Suite 2200, Atlanta, Georgia 30309.  In addition, jurisdiction and venue as to this Defendant are proper in this District under 18 U.S.C. §1965.  This Defendant may be served through its registered agent:  Midtown Registered Agent Services, Inc., 75 14th Street, Suite 2200, Atlanta, Georgia 30309.  Kowan and PCLG are collectively referred to herein as the "PCLG Defendants."

### III.
### FACTUAL BACKGROUND

49.    Plaintiffs, on their own behalf and on behalf of the Class, as herein defined, bring this action against Defendants seeking the recovery of damages that

Plaintiffs and the Class sustained in connection with their participation in the SCE Strategy. Plaintiffs, on their own behalf and on behalf of the Class, bring claims for breach of fiduciary duty, negligence, negligent misrepresentation, disgorgement, fraud, violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§1961–1968, violations of the Georgia RICO statute, O.C.G.A. § 16-4-1, *et seq*., aiding and abetting, and civil conspiracy. Plaintiffs and the Class seek compensatory and punitive/enhanced damages against Defendants for damages arising from the SCE Strategy the Defendants and Other Participants[4] jointly and in concert developed, promoted, sold, and implemented.

**A.      The History and Purpose of Conservation Easements.**

50.      A conservation easement is an agreement between a landowner and another party, generally a land trust or government agency, that permanently restricts the development and/or use of land with the purpose of achieving certain conservation or preservation goals.

51.      In the federal tax context, while a taxpayer may take a deduction for any charitable contribution made during the taxable year (subject to certain limitations), a deduction is generally not allowed for a taxpayer's contribution of a partial interest in property. The Code provides for certain exceptions where a

---

[4] The "Other Participants" include individuals and entities such as managers, appraisers, attorneys, accountants, brokers, referral sources, engineers, consultants and others not named as Defendants herein who assisted Defendants in the design, structure, promotion, sale, and/or implementation of the SCE Strategy.

deduction for the donation of a partial interest in property is permitted, one of which is for the donation of a "qualified conservation contribution."

52.    A "qualified conservation contribution" is defined as a contribution (1) of a qualified real property interest, (2) to a qualified organization, (3) made exclusively for conservation purposes.  Before a deduction can be claimed, however, certain criteria must be met.  As set out herein, the SCE Strategy failed to comply with the requirements necessary to create a qualified conservation contribution.

**B.**    **The SCE Strategy**

    **1.**    **The Structure of the SCE Strategy**

53.    The SCE Strategy involves the use of an entity taxed as a partnership under subchapter K of the Code (*i.e.*, the "<u>Syndicates</u>").  To achieve this end, Defendants formed the Syndicates as limited liability companies ("<u>LLCs</u>") under state law, which are taxed as a partnership (*i.e.* a pass-through entity) for federal tax purposes.  Defendants' use of an entity taxed as a partnership allowed Defendants to market and sell the SCE Strategy, and the promised tax deductions, to clients who would otherwise be unable to participate.

54.    An entity taxed as a partnership (like an LLC) is not liable for income tax.  Instead, its partners are liable for income tax in their separate or individual capacities based on the income, losses, deductions, or credits that flow through to

them from the partnership. Charitable contributions are one item that flows through to the individual partners under the Code.

55.    Although a partnership does not pay federal income tax, it still has filing and reporting requirements. Specifically, a partnership is required to file an annual return (*i.e.*, Form 1065) that reports the partnership's income, deductions, gain, losses, etc. The partnership is also required to furnish statements, known as Schedule K-1s, to its members (and the IRS) that report each member's distributive share of partnership income or loss and separately stated items, among other things.

56.    The members then report on their individual tax returns their share of partnership income, loss and/or separately stated items, as they are contained on the Schedule K-1 provided to them by the partnership. In the case of the SCE Strategy, the Plaintiffs and the Class (*i.e.*, the members of the Syndicate) reported the charitable deductions from the SCE Strategy based on the Schedule K-1 received from the respective Syndicate in which they were a member, as they are required by law to do. The Return Preparers prepared the Syndicate returns and the Schedule K-1s, as discussed further herein, in furtherance of and pursuant to the conspiracy between all of the Defendants and the Other Participants.

57.    The Defendants planned the steps of the SCE Strategy in advance and these steps were uniform across the Plaintiffs and the Class in virtually every material way:

    a. First, a "Sponsor" (including but not limited to the OSI Defendant or an OSI-owned affiliate) obtains a majority interest in property from a third party ("Landowner").   This is accomplished through a series of steps:  (1) the Sponsor creates a limited liability company ("PropCo"); (2) at the time PropCo is formed, Landowner is the 100% owner of PropCo and Landowner then deeds land into PropCo; and (3) the Sponsor (or its affiliate) purchases a majority interest (usually around 98%) in PropCo from Landowner.

    b. Second, prior to completing the purchase of the majority interest, the Sponsor (or its affiliate) conducts a "due diligence" period during which it obtains an initial appraisal ("Initial Appraisal") of the land from one of its hand-picked appraisers (the "Primary Appraiser") and engages a consultant (*e.g.*, a mining engineer, land development consultant, and/or conservation consultant) to assess the land for its alleged intended purpose, as explained below.  The Initial Appraisal

purports to provide a valuation based on the "Highest and Best Use" of the land.  The Primary Appraisers were fully aware the Initial Appraisals would be used to promote and sell the SCE Strategy to potential participants, including Plaintiffs and members of the Class.

c.  During the due diligence period, other consultants purportedly assist with conservation management, determine Highest and Best Use of the Property, and other services in connection with and support of the "Conservation Easement Option" discussed later herein.

d.  Third, the Sponsor (or its affiliate) forms a second limited liability company (the "Syndicate") and sends marketing materials (the "Promotional Materials") to potential participants.  These Promotional Materials include the Initial Appraisal and are intended to lure potential targets into participating in the SCE Strategy.   In the Promotional Materials, the Defendants also specifically tout the tax benefits of a conservation easement for potential participants (the "Conservation Easement Option"), promising them a return of more than 2.5 times the amounts paid into the Syndicate(s).

27

e.  Fourth, after the participants join their respective Syndicate, the Sponsor (or its affiliate) offers all but 0.5% of its interest in PropCo to the Syndicate in exchange for cash.  The end-result is PropCo (which holds the critical property) is owned 97.5% by the Syndicate, 0.5% by the Sponsor (or its affiliate), and 2% by Landowner.

f.  Fifth, the Sponsor (or its affiliate) obtains a second appraisal or an appraisal review from another one of its hand-picked appraisers ("Secondary Appraiser")(the Primary Appraisers and Secondary Appraisers are included within the definition of "SCE Appraisers" set out at Paragraph 5 herein).  Once again, the appraisals obtained by the Sponsor (or its affiliate) purport to value the land at its "Highest and Best Use."

g.  Sixth, the Defendants prepare a Conservation Easement Deed.

h.  Seventh, the Defendants prepare a Baseline Documentation Report for the Syndicate, which ascertains the conservation values, substantiates the purported conservation purpose, and establishes the condition of the property at the time of the gift.

i.  Eighth, PropCo then donates a conservation easement to a land trust (the "Land Trust") and the remaining fee simple interest in

the land to an affiliate of the Land Trust ("Land Trust Affiliate").

58.     The donation of the conservation easement is reported as a charitable contribution and valued by the Syndicate according to the Appraisal.  The value of the charitable contribution is reported as a charitable contribution deduction on the Syndicate's tax return (prepared by the Return Preparers).  The amount of the charitable contribution deduction reported on the Syndicate's tax return equals the purported decrease in the property's appraised value resulting from the alleged restriction placed on the property as a result of the conservation easement.  This deduction is then allocated to each Syndicate member based on their respective ownership interests in the Syndicate.  Each Syndicate member reports their allocated deduction on their individual tax return.

59.     Defendants (either directly or indirectly) promised, represented to, and assured the Plaintiffs and the Class that these tax deductions were in full compliance with Section 170(h) of the Code and all other relevant and applicable laws, rules and regulations.

60.     The Syndicate members' ability to elect to use the subject property in a variety of different ways was intended to establish the *bona fides* of the arrangement.  However, in accordance with the Defendants' pre-planned scheme, all of the Syndicates used in the SCE Strategy selected the "Conservation

Easement Option" as the use of the subject property because in reality the purported commercial viability of the other options was nonexistent or *de minimis*.

61.   In reality (and unbeknownst to Plaintiffs and the Class), the SCE Strategy, as developed by the Morris Manning Defendants and structured and implemented by Defendants, amounts to nothing more than a sale of grossly overvalued and ineffectively structured and supported federal tax deductions that the IRS was already carefully scrutinizing and indicating to professional advisors it would disallow.

62.   In developing, promoting, selling, and implementing the SCE Strategy, Defendants made (or caused others to make) uniform written statements about the allowance and amount of federal and state tax deductions the Plaintiffs and the Class were legally entitled to claim based on their participation in the SCE Strategy.   These statements were false, as set out in detail further below.   As a result of these false statements made by or caused to be made by Defendants, the Plaintiffs and the Class unwittingly claimed wholly improper tax deductions on their federal and state tax returns.   Defendants made these statements, and caused others to make these statements, to Plaintiffs and the Class despite the fact that Defendants knew or had reason to know they were false.

63.   As part of their pre-planned scheme, the Defendants' hand-picked SCE Appraisers prepared and provided grossly overvalued and flawed appraisals.

These valuations were then used to claim the large tax deductions that flowed through the Syndicates to the Plaintiffs and the Class.  The SCE Appraisers, including but not limited to the Appraiser Defendants, were in no way independent and did not prepare independent, good faith appraisals.  The other Defendants worked closely with the SCE Appraisers to prepare the Appraisals, including determining the "Highest and Best Use" of the property, the value of the donated property interests, the fair market value of the conservation easements, and the amount of the charitable contribution deduction.

64.    The Defendants and Other Participants knew or should have known that the IRS would conclude that the charitable contribution deductions from the SCE Strategy were improper, as structured and implemented, due to *inter alia* the lack of support for the inflated appraisals of the donated property interests, the failure to substantiate a valid conservation purpose, defective Conservation Easement Deeds, defective Baseline Documentation Reports, the promise of legal charitable contribution tax deductions worth many times more than the amount paid into the Syndicates, and the Defendants' other failures to comply with the necessary requirements for proper conservation easement charitable contribution deductions.  Despite these issues, the Defendants and the Other Participants continued to promote, sell and implement the SCE Strategy and advise Plaintiffs and the Class that the SCE Strategy and its tax benefits were legal and legitimate.

65.     It was not reasonable to expect that Plaintiffs and the Class were knowledgeable and they were not, in fact, knowledgeable about complex tax matters and tax planning.  Indeed, that is why Plaintiffs and members of the Class relied on and trusted the Defendants and the Other Participants – *i.e.*, the purported experts.  Plaintiffs and the Class detrimentally relied on Defendants and the Other Participants and upon Defendants' and the Other Participants' repeated unequivocal representations that the SCE Strategy was a completely legal tax-advantaged charitable contribution within the meaning of Code § 170(h), which specifically provides that conservation easements, *if done properly and legally*, create legitimate charitable contributions for income tax purposes.

66.     Unbeknownst to Plaintiffs and the Class, the Defendants and the Other Participants entered into undisclosed, improper business arrangements with each other.   These arrangements destroyed their independence and resulted in the Defendants and Other Participants working in furtherance of their own best interests rather than the best interests of their clients.  Each of the Defendants and the Other Participants knew or should have known that the IRS would determine that the SCE Strategy, as structured and implemented, did not comply with §170(h) of the Code and other applicable laws and was, in reality, nothing more than an illegal and abusive tax shelter.

67.     As part of and in furtherance of the Defendants' scheme, the Return Preparers prepared the Syndicates' tax returns, which reported the total amount of charitable deductions.  The Return Preparers then determined the amount of each Plaintiff's and Class member's charitable deductions, issued a K-1 to each Plaintiff and Class member, and advised Plaintiffs and the Class to report the charitable deductions on their federal and state tax returns for the years in question.  Plaintiffs and the Class followed the Return Preparers' advice and instructions (which mirrored the advice and representations from the other Defendants) and signed and filed their tax returns reporting the charitable deductions.

68.     The Defendants and the Other Participants held themselves out as experts in the area of conservation easements and complex tax matters and planning and, therefore, by providing false and inaccurate information to Plaintiffs and the Class, the Defendants and the Other Participants ensured that Plaintiffs and the Class would sign and file federal and state tax returns using and reporting the charitable deductions purportedly generated by the SCE Strategy.  Despite the fact the Defendants and the Other Participants knew the IRS was heavily scrutinizing and challenging syndicated conservation easements for potential abuse, the Defendants and the Other Participants forged ahead and continued to advise, promote, and encourage Plaintiffs and the Class to utilize the SCE Strategy to offset income on their tax returns.

## 2.    The SCE Strategy "Players"

69.    <u>The Morris Manning Defendants:</u>  The Morris Manning Defendants, and specifically Pollock, were the architect and developer of the SCE Strategy. These Defendants were intimately involved in every aspect of each Syndicate's transaction and worked with each of the Defendants to implement each Syndicate's transaction.  To illustrate, these Defendants worked on the following aspects of each Syndicate's transaction:  acquisition of real estate and preparation of all legal documents related thereto; preparation of the legal documents used to implement the transaction;  preparation of the Promotional Materials; promotion and sale of the SCE Strategy to potential participants, including advising Pollock's referral sources to refer clients to the OSI Defendants and discussions with potential participants and/or their advisors to convince the potential client to participate; preparation of legal opinions issued to Syndicates; review and approval of the reports from the Consultants; structure of the conservation easement; preparation of the conservation easement deed, Baseline Documentation Report, Appraisals (including the Appraisal methods, Highest and Best Use, and valuation of the property and conservation easement), and Appraisal Summary (Form 8283); and review and approval of the reporting of the charitable contribution deduction on the partnership returns and K-1s.

70.     Morris Manning was paid a flat fee for each Syndicate.  In addition, Morris Manning was paid an hourly fee for the time it spent providing advice and services.  The PropCo (described below) also paid a fixed fee for advice and services the Morris Manning Defendants performed for the PropCo including due diligence and preparation of a legal opinion.

71.     <u>The Large & Gilbert Defendants</u>:  The Large & Gilbert Defendants had multiple roles and responsibilities.  From 2012 through 2015, these Defendants provided accounting and tax advice and services to each Syndicate, including the preparation of each Syndicate's tax return and K-1s that were issued to Plaintiffs and each Class Member.  In addition, these Defendants, and specifically Skalski, served as the "operations manager" for OSI on each Syndicate's transaction.  As the operations manager, they were responsible for making sure every aspect of each Syndicate's transaction was properly and timely completed.   These Defendants were intimately involved in every aspect of each Syndicate's transaction.  To illustrate, these Defendants worked on the following aspects of each Syndicate's transaction: acquisition of real estate and preparation of all legal documents related thereto; preparation of the legal documents used to implement the transaction; preparation of the Promotional Materials; promotion and sale of the SCE Strategy to potential participants; review and approval of the reports from the Consultants; structure of the conservation easement; preparation of the

conservation easement deed, Baseline Documentation Report, Appraisals (including the Appraisal methods, Highest and Best Use, and valuation of the property and conservation easement), and Appraisal Summary (Form 8283); and providing accounting and tax advice and services, including preparation of partnership return and K-1s.

72.    Large & Gilbert was paid an hourly fee for the accounting and tax advice and services, including preparation of the partnership tax return and K-1s, provided to each Syndicate through the first quarter of 2015. In addition, Large & Gilbert, through Conservation Pays, was paid a flat fee on each Syndicate.

73.    The OSI Defendants:  The OSI Defendants served as the "Sponsor" and manager of each Syndicate's transaction.   These Defendants were also involved in virtually every aspect of each Syndicate transaction.   The OSI Defendants also created multiple consulting companies who purported to provide independent advice and services, but were in reality completely controlled and/or directed by the OSI Defendants.  As the Sponsor and manager of each Syndicate, these Defendants were involved in virtually every aspect of each Syndicate and responsible for making sure every aspect of each Syndicate's transaction was properly and timely completed.  To illustrate, these Defendants worked on the following aspects of each Syndicate's transaction: acquisition of real estate and preparation of all legal documents related thereto; formation of the necessary

entities for the implementation of the SCE Strategy; formation of various consulting companies (*i.e.*, "Consultants") to provide services to each Syndicate; preparation of the legal documents used to implement the transaction; preparation of the Promotional Materials; promotion and sale of the SCE Strategy to potential participants; review and approval of the reports from the Consultants; structure of the conservation easement; preparation of the conservation easement deed, Baseline Documentation Report, and Appraisal Summary (Form 8283); and review and approval of the reporting of the charitable contribution deduction on the partnership returns and K-1s.

74.    The OSI Defendants received substantial fees for sponsoring and managing each Syndicate, as well as through the various "consultants" owned by or affiliated with the OSI Defendants that provided services for each Syndicate.

75.    <u>The SCE Appraisers:</u>    The SCE Appraisers, including but not limited to Weibel and Associates, Inc., Clay Weibel,[5] Lucus Mason, Inc., and Lucus Von Esch[6] provided the following services to each Syndicate: provided the Appraisals to support the valuation of the conservation easement and the charitable contribution deduction taken by each Syndicate (which, in turn, flowed through to each member in the Syndicates); permitted the front-line promoters of the SCE

---

[5] Weibel and Associates, Inc. and Clay Weibel are collectively referred to herein as the "<u>Weibel Defendants</u>."
[6] Lucus Mason, Inc. and Lucus Von Esch are collectively referred to herein as the "<u>Lucus Defendants</u>."  The Weibel Defendants and the Lucus Defendants are collectively referred to herein as the "<u>Appraiser Defendants</u>."

Strategy to utilize their Appraisals in the Promotional Materials for the purpose of convincing potential participants that the SCE Strategy provided legal and legitimate tax savings through the contribution of a conservation easement; and signed the Appraisal Summary (Form 8283) as the appraiser declaring the legitimacy of the claimed charitable contribution deduction in the years in which their appraisal was used to support the charitable contribution deduction provided by the SCE Strategy.

76.   The Land Trusts:  The "Land Trusts" are the land trusts (*i.e.*, ACC and Wild Turkey Federation) to which the Syndicates donated their conservation easements and the affiliates of the land trusts (*i.e.*, GTAP, Atlantic Properties, and American Upland) to which the Syndicates donated the remaining fee simple interests.  They provided the following services to each Syndicate:  worked with the Morris Manning, Large & Large & Gilbert, and OSI Defendants to prepare the Conservation Easement Deeds; prepared preliminary studies and inspections that concluded that each respective property would satisfy one or more of the "conservation purposes" defined under § 170 of the Code; allowed the other Defendants to use the conclusions reached in these preliminary studies in the Promotional Materials sent to potential participants; worked with the other Defendants to prepare the Baseline Documentation Reports, which were filed with each Syndicate's Appraisal Summaries (Form 8283) and tax return; provided a

letter to each Syndicate confirming the donation and representing that the Syndicate would receive a full tax deduction for the value of the conservation easement donated; and countersigned the Appraisal Summaries (Form 8283) verifying that the charitable contribution deduction complied with Code Section 170(h) of the Code.

77.    <u>The PCLG Defendants:</u>   PCLG is a law firm that performed two distinct roles in connection with the SCE Strategy:

- recruited clients to buy into a fund for purposes of participating in the SCE Strategy and provided these clients with legal opinion letters regarding the SCE Strategy; and

- provided legal advice and services to the OSI Defendants and members of the SCE Syndicates (*i.e.*, Plaintiffs and members of the Class) regarding all aspects of the SCE Strategy, including document preparation, review, and analysis and due diligence on the bona fides of the purported tax benefits of the SCE Strategy.

78.    <u>Bennett Thrasher:</u> Bennett Thrasher is an accounting firm that performed several roles in connection with the SCE Strategy including the following:

- referred its own clients to participate in the SCE Strategy and, in doing so, utilized its clients' confidential financial information to identify potential targets;

- provided advice and recommendations to the OSI Defendants regarding the SCE Strategy, including with respect to structure, valuation, and the use of properties with underlying mineral assets; and

- performed its own "due diligence" on the SCE Strategy *for each separate client* and then charged each separate client a fee for this due diligence (in addition to the fee that Bennett Thrasher charged each client for preparation of the client's individual tax return and each Syndicate for preparation of the partnership returns and K-1s).[7]

79.    The Greencone Defendants:    Bennett Thrasher introduced the OSI Defendants to Walstad and Bennett (the son of Rick Bennett of Bennett Thrasher) who, in turn, introduced the OSI Defendants to both the concept of using mining as the basis for valuation of properties and Bennett and Walstad's hand-picked mining consultant, the Blethen Defendants.  Walstad and Bennett also formed

---

[7] Of course, once Bennett Thrasher conducted its initial due diligence, there was no legitimate reason for Bennett Thrasher to "re-invent the wheel" and conduct the same due diligence for each successive client and, in fact, Bennett Thrasher did not conduct any additional due diligence for its clients.  The fee Bennett Thrasher charged each client for due diligence was simply a "money grab" and served no purpose other than to generate more revenue for Bennett Thrasher at the expense of the clients who trusted Bennett Thrasher.

Greencone to purportedly provide consulting services for the SCE Strategy and share in the fees generated therefrom.

80.     The "Return Preparers":  These are the accounting firms/accountants who prepared the partnership returns for each of the Syndicates used in the SCE Strategy, as well as the K-1s that were sent to each Plaintiff and member of the Class that set forth each such individual's proportionate share of the Syndicate's charitable contribution deduction to be reported on their individual tax returns. These Defendants prepared these partnership tax returns and K-1s with full knowledge of the fact that these documents were being used in connection with the SCE Strategy and would result in the Plaintiffs and members of the Class claiming charitable contribution deductions from the SCE Strategy on their individual tax returns.  The Return Preparers include but are not limited to the Large & Gilbert and Sklar Defendants.

81.     The "PropCos":  These are the entities that purchased the real estate used in the SCE Strategy.  All of the PropCos were originally formed by OSI or its affiliates.  The PropCos for the transactions in which the Plaintiffs participated were Lakepoint Land II, LLC; Industrial S&G, LLC; and Gulf Land Aggregates, LLC.

82.     The "Syndicates": These are the entities through which Plaintiffs and the Class participated in the SCE Strategy.  All of these Syndicates were originally

formed by OSI or one of its affiliates.  The Syndicates for the transactions in which the Plaintiffs participated were Lakepoint Land Group LLC; Industrial S& G Partners LLC; and Gulf Land Aggregates Group LLC.

83.     The "Managers": These were all entities created by, affiliated with, and controlled by OSI or one of its affiliates to act as managers for each Syndicate and take the necessary actions on behalf of each such Syndicate to effect the steps of the SCE Strategy.  The Managers for the transactions in which the Plaintiffs participated were Big Escambia Ventures, FASMO, LLC, and Galt Holdings, LLC.

84.     The "Consultants": These are the consultants that purportedly completed assessments of certain parcels of land used in the SCE Strategy to determine the merits of conservation of each such parcel and/or to Support the "Highest and Best Use" for the property.  The Consultants for the transactions in which the Plaintiffs participated were Conservation Saves, Conservation Pays, Conservation Matters, the Blethen Defendants, Galt Mining, and the Greencone Defendants.  Conservation Saves, Conservation Pays, Conservation Matters purported to provide consulting services in connection with assessing the property to determine if there were valid conservation purposes and advising on the feasibility of such purposes.  The Blethen Defendants, Galt Mining, and the Greencone Defendants purported to provide consulting services in connection with

the Highest and Best Use of the subject properties for mining in the OSI Defendants' SCE Strategy transactions from 2014-2018.

85.    In accordance with their pre-planned scheme, the Defendants and Other Participants worked together to promote and sell the SCE Strategy to potential clients, including Plaintiffs and the Class Members, and then jointly worked together to execute the steps of the SCE Strategy.  The Defendants and the Other Participants never disclosed to Plaintiffs that they had conspired to fraudulently, recklessly, or negligently design, promote, sell, and implement the SCE Strategy.  Nor did they disclose to the Plaintiffs that they were in no way independent from each other.

### 3.    The Scheme to Develop, Promote, Sell, and Implement the SCE Strategy.

1.    <u>The Morris Manning Defendants – the architect and developer of the SCE Strategy.</u>

86.    The Morris Manning Defendants, and specifically Pollock, are the architects of the SCE Strategy.  In approximately 2008, Pollock developed a tax product that used a partnership with third-party members to monetize deductions and state tax credits from the donation of a conservation easement on real estate property owned by the partnership.  This tax product was the SCE Strategy. According to Pollock, "if a land owner does not have taxable income sufficient to utilize the full benefit of a conservation easement, the unused deductions and state

tax credits can be converted into cash by creating a partnership with third-party investors or admitting investors into an existing partnership that owns the land and specially allocating the deductions and credits to the investors."

87.    After developing the SCE Strategy, the Morris Manning Defendants aggressively promoted it to landowners, professional advisors who could serve as referral sources, and potential participants in the SCE Strategy.   The Morris Manning Defendants promoted Pollock as the creator and preeminent expert of the SCE Strategy and Morris Manning as the "go to" law firm for the SCE Strategy. Their promotion efforts were overwhelmingly successful, and the Morris Manning Defendants created a robust market for the SCE Strategy.   The SCE Strategy generated large revenues every year for Morris Manning from approximately 2009 through 2018.

88.    As part of these promotion efforts, the Morris Manning Defendants organized and participated in seminars and workshops on the SCE Strategy for the specific purpose of finding landowners who could provide property for the SCE Strategy, professional advisors (*e.g.*, accountants, lawyers, and investment brokers) who would refer their clients to participate in the SCE Strategy, and individuals with an interest in participating in the SCE Strategy.

89.    Pollock, as the architect and self-proclaimed leading expert of the SCE Strategy, had a crucial role in organizing these seminars and workshops.   He

also had a prominent speaking role at each of the seminars and workshops. Pollock was billed at these workshops and seminars as the "structuring lawyer" and his presentations usually focused on the SCE structure and implementation of the SCE Strategy and how the SCE Strategy complied with the specific provisions of the Tax Code and other applicable law.

90.    Importantly, other speakers at these seminars and workshops were all part of the team that Pollock put together to work on the SCE Strategy. For instance, Skalski (of Large & Gilbert), Keller (of ACC) and Weibel (of Weibel Firm) gave presentations on specific aspects of the SCE Strategy. Each of these speakers were likewise presented as experts with respect to the SCE Strategy.

91.    In addition, these seminars and workshops were sponsored by Morris Manning, ACC, Large & Gilbert, Weibel Firm, and other firms who worked with the Morris Manning Defendants on the SCE Strategy. Each of these speakers and their firms were interrelated and worked together at these seminars and workshops to convince landowners to provide the real estate for the SCE Strategy; to convince professional advisor referral sources to refer their clients to participate in the SCE Strategy; and to convince individuals to participate in the SCE Strategy. By doing so, the Defendants generated a substantial amount of business and revenue working together on the SCE Strategy.

92.     Pollock also developed a large referral network of lawyers, accountants, investment advisors, real estate advisors, and other professionals. He identified these potential referral sources and met with them to promote the SCE Strategy, the Morris Manning Defendants' expertise, and the team of advisors Pollock put together to work with the Morris Manning Defendants on the SCE Strategy. This robust and diverse referral network was a large factor in creating the thriving market for the SCE Strategy. It also resulted in substantial client referrals for the Defendants.

93.     Pollock also identified, targeted and convinced numerous firms to become Sponsors of the SCE Strategy. The Morris Manning Defendants used the Sponsors to promote, sell and implement the SCE Strategy. The OSI Defendants were one of the Sponsors that Pollock convinced to promote, sell, and implement the SCE Strategy.

94.     Pollock structured the SCE Strategy to use Syndicates as the vehicle through which individuals participated. Each Syndicate executed the SCE Strategy and the charitable contribution deductions generated by the SCE Strategy were allocated to the members of the Syndicate. Although there were different Syndicates, they all executed the same strategy through the same, uniform steps.

95.     While the Morris Manning, Large & Gilbert and OSI Defendants worked closely with one another and each of the other Defendants and Other

Participants to implement the SCE Strategy transactions, the Morris Manning Defendants, and specifically Pollock, reviewed and approved every aspect of each Syndicate's transaction.   Not one aspect of the Syndicate's transaction was finalized without the Morris Manning Defendants' approval.   In addition, the Morris Manning Defendants provided legal opinions to Syndicates to support the tax benefits promised from the SCE Strategy.

96.    When OSI or another referral source had trouble convincing a client to participate in the SCE Strategy, Pollock would personally meet with these potential participants and/or his/her advisor to convince the individual to participate in the SCE Strategy.  The Morris Manning Defendants also allowed, and even encouraged, the OSI Defendants to tout the OSI Defendants' relationship with the Morris Manning Defendants when the OSI Defendants promoted the SCE Strategy to their referral sources or potential clients.

97.    Pollock also personally participated in the SCE Strategy.  In fact, he was a member in several Syndicates alongside other members whom the Defendants had convinced to participate.  Despite this clear conflict of interest, Pollock did not disclose to participants of the SCE Strategy that he was also a participant alongside of them.  In addition, Pollock took affirmative steps to conceal his personal involvement as a member in the Syndicate for which he provided purportedly independent opinion letters.  Obviously, Pollock was

concerned that disclosing this fact would cause others to believe his opinions were biased, based on self-interest, and motivated by his desire to make sure the Syndicates raised the funds necessary to close.

        2.     <u>The Large and Gilbert Defendants profit heavily from their structure, promotion, sale and implementation of the SCE Strategy.</u>

98.    The Large & Gilbert Defendants worked closely with the Morris Manning Defendants on the SCE Strategy from approximately 2008 through at least the first quarter of 2015.  The Large & Gilbert Defendants, and specifically Skalski, were key members of the team that Pollock put together to work with the Morris Manning Defendants on the SCE Strategy.  Skalski was the partner at Large & Gilbert primarily responsible for the firm's SCE Strategy practice and relationship with the Morris Manning Defendants.

99.    The Large & Gilbert Defendants, and specifically Skalski, worked on Pollock's team from the moment the Morris Manning Defendants started promoting the SCE Strategy.  Pollock and Skalski worked together to structure, promote, sell and implement the SCE Strategy offered by various Sponsors, including the OSI Defendants.  The Large & Gilbert Defendants provided accounting and tax advice and services, including the preparation of each Syndicate's tax returns and K-1s for each Syndicate.  In addition, the Large & Gilbert Defendants served as the "operations manager" for each Sponsor's

program.  And in this capacity, the Large & Gilbert Defendants were responsible for overseeing and managing each Syndicate's transaction and ensuring that every step of the SCE Strategy followed every step as structured and designed by Pollock, which purportedly complied with the requirements of Section 170(h) of the Code and other applicable law.

100.  Large & Gilbert quickly realized that the SCE Strategy business would generate substantial revenue for the firm.  As a result, Large & Gilbert shifted its business more and more to syndicated conservation easements and even decided to promote and sell the SCE Strategy to their own clients.  To this end, the Large & Gilbert Defendants set up their own Syndicates to implement the SCE Strategy.  The Morris Manning and Large & Gilbert Defendants worked closely together to structure, promote, sell and implement the SCE Strategy to these Large & Gilbert clients.

101. In approximately May 2009, at the very beginning of their involvement with the Morris Manning Defendants and the SCE Strategy, the Large & Gilbert Defendants formed Conservation Pays, which they used for their SCE Strategy business.  Conservation Pays was formed as a result of the substantial amount of business and revenue that Skalski, as the leader of the firm's SCE Strategy business, was producing for Large & Gilbert from his work with the Morris Manning Defendants on the SCE Strategy.

3.   The Morris Manning and Large & Gilbert Defendants recruit the OSI Defendants to become a Sponsor for the SCE Strategy.

102.   Pollock and Skalski met with Schuler of the OSI Defendants in 2012 to discuss the OSI Defendants serving as a Sponsor and working with the Morris Manning and Large & Gilbert Defendants on the SCE Strategy.   The OSI Defendants did not have any experience with or knowledge about syndicated conservation easements before meeting with Pollock and Skalski.   Pollock and Skalski convinced the OSI Defendants to join their SCE Strategy team as a Sponsor, and the OSI Defendants began serving as a Sponsor and working with the Morris Manning and Large & Gilbert Defendants at some point in 2012.   From late 2012 through 2016, the OSI Defendants were a Sponsor and worked with the Morris Manning Defendants on every SCE Strategy transaction in which the OSI Defendants were involved.   The Large & Gilbert Defendants also worked with the OSI Defendants on the SCE Strategy transactions from 2012 through the first quarter of 2015.   From that point on through approximately 2018, the Sklar Defendants began working with the Defendants and took over the role of providing accounting and tax advice and services, including preparation of the partnership tax returns and K-1s, for each Syndicate.

103.   Beginning in approximately 2017, the OSI Defendants continued to be a Sponsor for SCE Strategy transactions but did not work with the Morris Manning Defendants.   However, the OSI Defendants continued to work with the team that

Pollock had put together, and the SCE Strategy transactions in 2017 and 2018 were the same SCE Strategy transactions Pollock developed and that the OSI Defendants served as a Sponsor for from approximately 2012 through the end of 2016.  Indeed, the SCE Strategy transactions sponsored by the OSI Defendants in 2017 and 2018 used the template Promotional Materials and transaction documents that had been developed jointly by the Morris Manning, Large & Gilbert, and OSI Defendants when they first began collaborating in 2012.

> 4.   Bennett Thrasher's prominent role in the conspiracy to promote, sell, and implement the SCE Strategy.

104.   Bennett Thrasher and the OSI Defendants worked closely together on the SCE Strategy from approximately 2012 through 2018.  In approximately 2012, Bennett Thrasher contacted the OSI Defendants and requested that the OSI Defendants give a presentation on the SCE Strategy to Bennett Thrasher.  The OSI Defendants gave a presentation to Bennett Thrasher as requested.   Shortly thereafter, Bennett Thrasher advised the OSI Defendants that it wanted to refer its clients to the OSI Defendants for participation in the SCE Strategy.   Bennett Thrasher, however, advised the OSI Defendants that before it would agree to refer clients to the OSI Defendants, the OSI Defendants had to agree to pay Bennett Thrasher to perform its own purported due diligence on the SCE Strategy. Because Bennett Thrasher had represented to the OSI Defendants that it would refer large numbers of clients every year to participate in the SCE Strategy, the

OSI Defendants agreed to Bennett Thrasher's demands.  Each year before Bennett Thrasher referred clients to the OSI Defendants to participate in the SCE Strategy, Bennett Thrasher purportedly performed due diligence on the SCE Strategy.  And, every year, the OSI Defendants paid a lump sum "due diligence fee" to Bennett Thrasher.

105.   Bennett Thrasher aggressively promoted the SCE Strategy to its clients.  Bennett Thrasher touted the expertise and experience of the team of advisors their clients would be working with – namely the Morris Manning, Large & Gilbert, and OSI Defendants.  Bennett Thrasher emphasized to its clients that it had performed due diligence on the SCE Strategy and concluded that the SCE Strategy complied with the applicable laws and the tax benefits generated in the SCE Strategy were specifically allowed in the Tax Code.  Bennett Thrasher was able to convince large numbers of their clients to participate in the SCE Strategy as a result of the existing relationship of trust these clients already had with Bennett Thrasher.  From approximately 2012 through 2018, Bennett Thrasher referred a large number of clients every year to the OSI Defendants to participate in the SCE Strategy.  In addition, Bennett Thrasher provided advice and recommendations to the OSI Defendants regarding various aspect of the SCE Strategy, including with respect to the structure, valuations, and the use of property with underlying mineral assets in the SCE Strategy.

5.    <u>Bennett Thrasher connects the OSI Defendants to the
Greencone Defendants and the OSI Defendants begin focusing
the SCE Strategy on mining transactions.</u>

106.   In early 2014, Bennett Thrasher met with OSI to discuss Bennett

Thrasher's recommendation to begin using property with underlying mineral assets

in the SCE Strategy.   At this meeting, Bennett Thrasher introduced OSI to the

Greencone Defendants.    Bennett Thrasher and Greencone advised the OSI

Defendants that, based on their analysis, the SCE Strategy should be using

properties with underlying mineral assets because the "Highest and Best Use" of

these properties provided a much greater valuation than the property currently

being used.  Bennett Thrasher and the Greencone Defendants emphasized that the

use of property with mineral assets would generate substantially more revenue for

all the Defendants.   The Greencone Defendants advised OSI that it already

possessed property with mineral assets that could be used in 2014 and also had a

mining expert, Blethen Mines, that could be used to consult with OSI.   Shortly

thereafter, Bennett Thrasher and the Greencone Defendants met with the Morris

Manning and OSI Defendants to further discuss the use of property with mineral

assets in the SCE Strategy.  Bennett Thrasher's advice and recommendations were

accepted by the Morris Manning, Large & Gilbert and OSI Defendants and the

SCE Strategy began using property with underlying mineral interests exclusively

for all SCE Strategy transactions from 2014 through 2018 and also began paying

consulting fees to the Greencone and Blethen Defendants in connection therewith. Moreover, based on Bennett Thrasher's advice and recommendations, the Greencone Defendants' properties were used for the 2014 transactions. Finally, based on OSI's relationship with Bennett Thrasher, OSI and the Greencone Defendants actually formed a partnership, which required OSI and the Greencone Defendants to split the profits for 2014.

> 6.   The PCLG Defendants' role in the conspiracy to promote, sell and implement the SCE Strategy.

107.   PCLG was one of Pollock's important referral sources.  Accordingly, the Morris Manning Defendants had a close working relationship with PCLG and its partners, including Kowan and another partner Jason Cordon.  In fact, Cordon (one of the attorneys at PCLG who was involved with the SCE Strategy) worked at Morris Manning for several years before leaving to join PCLG in 2014.

108.   The PCLG Defendants performed several distinct roles in connection with the promotion, sale and implementation of the SCE Strategy.  First, they recruited their own clients to buy into a fund, which was either owned by or affiliated with PCLG or its partners, for the purpose of participating in the SCE Strategy.  The fund was the member of the Syndicate.  The PCLG Defendants provided these clients with legal opinion letters regarding their participation in the SCE Strategy.  Second, the PCLG Defendants served as legal counsel for certain Syndicates.  In this role, the PCLG Defendants provided legal advice and services

to the OSI Defendants and members of the Syndicates (*i.e.*, Plaintiffs and Members of the Class) regarding the SCE Strategy, including document preparation, review, and analysis and due diligence on the bona fides of the purported tax benefits of the SCE Strategy.

> 7.   The Morris Manning Defendants recruit the SCE Appraisers to join the conspiracy to promote, sell, and implement the SCE Strategy.

109.   The Morris Manning Defendants worked closely with the SCE Appraisers to ensure that each Appraisal supported the Syndicate's transaction. The SCE Appraisers allowed the Morris Manning Defendants to control the Appraisals.   These Defendants analyzed and selected appraisal methods and selected the "Highest and Best Use" to be used in the appraisal.   In fact, the Morris Manning Defendants closely reviewed each Appraisal to ensure that it could be used to support the SCE Strategy transaction and, if necessary, instructed the appraiser to make changes to the Appraisal.   The Appraisal was not considered final for use in the SCE Strategy unless and until Pollock and his team gave final approval on it.

> 8.   The Morris Manning and Large & Gilbert Defendants recruit the Land Trusts to join the conspiracy to promote, sell, and implement the SCE Strategy.

110.   The Morris Manning and Large & Gilbert Defendants also worked closely with the Land Trusts (*i.e.*, ACC and Wild Turkey Federation) to prepare

the Baseline Documentation Report and Conservation Easement Deed for each Syndicate's transaction.  Pollock hand-picked each of the "Land Trusts" that were to receive the conservation easement donation on each Syndicate's transaction. Each of the "Land Trusts" on Pollock's team allowed the Morris Manning, Large & Gilbert, and OSI Defendants to control the preparation of the Baseline Documentation Report and Conservation Easement Deed.  The Morris Manning Defendants, and specifically Pollock, reviewed, revised, and gave final approval to the Baseline Documentation Report, ensuring that the Baseline Documentation Report fully supported the Syndicate's transaction, including the conservation purpose for the conservation easement donation.  Likewise, the Morris Manning, Large & Gilbert, and OSI Defendants worked closely with the "Land Trusts" to prepare the Conservation Easement Deed for each Syndicate's transaction.  The Morris Manning Defendants, and specifically Pollock, reviewed and revised each and every Conservation Easement Deed.  And, most importantly, the Conservation Easement Deed was not considered final unless and until Pollock approved it.

111.   The Morris Manning, Large & Gilbert, and OSI Defendants and the Land Trusts also jointly worked on the Appraisal Summaries (Form 8283).

112.   Pollock and Keller began working together on the SCE Strategy in approximately 2009 and continued through approximately 2018.  In approximately 2010, Keller formed Atlantic Coast Conservancy to be specifically used for the

SCE Strategy. Based on information and belief, the Atlantic Coast Conservancy's business from approximately 2010 through 2018 was almost exclusively related to Syndicated Conservation Easements in general and the SCE Strategy in particular. Pollock hand-picked Keller and Atlantic Coast Conservancy as one of the "Land Trusts" to work on Pollock's team.   Keller, the Director of the Atlantic Coast Conservancy, realized how lucrative working with Pollock's team on the SCE Strategy could be for him personally.   As a result, Keller would not allow the Atlantic Coast Conservancy to receive any conservation easement donation unless Pollock agreed that Keller's other company, ERMF, was allowed to prepare would prepare each and every Baseline Documentation Report and ERMF, instead of the ACC, and receive payment for those services.   In other words, Keller had a "side hustle" that generated substantial revenue for his own personal benefit that would have otherwise gone to the ACC.   Of course, Pollock agreed to Keller's demand.

> 9.   <u>The Morris Manning, Large & Gilbert and OSI Defendants recruit the Consultants to join the conspiracy to promote, sell, and implement the SCE Strategy.</u>

113.   Each Syndicate retained Consultants to, *inter alia*, assess the Syndicate's property to determine the merits of conservation of each such parcel and/or to determine the "Highest and Best Use" of each parcel.   The Morris Manning, Large & Gilbert, and OSI Defendants worked closely with each of these Consultants in connection with this assessment to ensure that the assessments and

conclusions reported by the Consultants supported the Syndicate's transaction. Each of these Consultants played a specific role in the implement of the SCE Strategy. *See* Paragraph 84 herein.

### 4.    The IRS Warns the Defendants Regarding Potential Abuses of Syndicated Conservation Easements.

114.    As early as 1984, the IRS warned professional advisors and promoters of conservation easements that the overvaluation of charitable contributions was improper and would not be tolerated.  (IRS News Release, IR-81-122).  The Senate Finance Committee was aware of and concerned about tax shelter promoters exploiting opportunities to offset income through inflated valuations of donated property.  Congress recognized that tax shelter promoters knew it was not possible for the IRS to detect most instances of excessive deductions.  And because of the subjective nature of valuation, tax shelter promoters could promote and sell transactions that claim excessive charitable deductions and attempt to rely on the "audit lottery" to conceal the inflated charitable contribution deduction from the IRS.  Because of these concerns, the Senate Finance Committee made it clear to professional advisors that stronger substantiation and overvaluation provisions should be applicable to charitable contributions of property.

115.    Congress took action to address the problem of overvaluing charitable contributions in the Deficit Reduction Act of 1984 ("DEFRA").  DEFRA set forth specific provisions for the substantiation of charitable contributions, including

instructing the Secretary to prescribe regulations under §170(a)(1) of the Code to require any individual, closely held corporation or personal service corporation claiming a deduction under §170 of the Code for charitable contributions to obtain a Qualified Appraisal for the property contributed and to attach an Appraisal Summary (Form 8283) to the return on which the deduction is first claimed for such contribution; such Qualified Appraisal was to specifically disclose the cost basis, acquisition date of the contributed property, and such additional information as the Secretary may prescribe in such regulations.

116.   The Secretary complied with Congress' mandate by promulgating regulations pursuant to DEFRA §155(a).  The relevant regulation reiterates that no deduction under §170 shall be allowed with respect to a charitable contribution unless the substantiation requirements are met.   These Treasury Regulations require a fully completed Appraisal Summary (Form 8283) to be attached to the return and provides a list of what the Appraisal Summary (Form 8283) must include, specifically including the identification of the cost basis of the property.

117.   These regulations made it clear to professional advisors and promoters/sponsors of conservation easements that their failure to comply with the substantiation requirements would result in the disallowance of the claimed deduction and expressly requires that a charitable deduction may be allowed only if the contribution is verified in the manner specified by the Treasury Regulations.

118.  In 2004,[8] the IRS officially identified conservation easements as purportedly generating deductions that the IRS would carefully scrutinize and eventually disallow if certain circumstances were present, including *inter alia*, failure to substantiate the fair market value of the tax benefit and other valuation issues.  At that time, the IRS advised professional advisors and promoters that it would aggressively pursue back-taxes and enormous penalties from taxpayers who claimed disallowed deductions from conservation easements.

119.  In 2006, the IRS officially put professional advisors and promoters of conservation easements on notice of what constitutes a "Qualified Appraisal" and a "Qualified Appraiser," including, for example, requiring a Qualified Appraisal to be consistent with the substance and principles of the Uniform Standards of Professional Appraisal Practice ("USPAP") as developed by the Appraisal Standards Board of the Appraisal Foundation.

120.  Even in the face of these warnings, the Defendants and the Sponsors continued to aggressively promote and heavily profit from conservation easements. In fact, Defendants eventually moved into syndicated conservation easements, which greatly expanded the "market" for these Defendants by now making the SCE Strategy available to individuals who were not individually able to participate in a capital-heavy conservation easement transaction.

---

[8] *See* IRS Notice 2004-41 (July 12, 2004).

121.   In 2016, the IRS once again advised professional advisors that it was heavily scrutinizing these transactions and would disallow tax deductions if certain circumstances existed, and taxpayers who claimed disallowed deductions would pay a heavy price.   In December 2016, the IRS issued Notice 2017-10, which designated certain syndicated conservation easements (like the SCE Strategy) as listed transactions.   Specifically, the Notice listed transactions where members in pass-through entities receive promotional materials offering the possibility of a charitable contribution deduction worth at least two and a half times their contribution.

122.  By  2019,  the  IRS  added  syndicated  conservation  easement transactions (like the SCE Strategy) to its "Dirty Dozen" list of tax scams to avoid.[9]

## C.   THE PLAINTIFFS ENGAGE IN THE SCE STRATEGY.

### 1.  <u>Each Plaintiff Received Written Promotional Materials Containing a Promise Regarding the Purported Tax Benefits of the SCE Strategy.</u>

123.   Pursuant to and in furtherance of the conspiracy alleged herein, the Morris Manning, Large & Gilbert, and OSI Defendants collaborated to prepare the Promotional Materials for each of the Syndicates that were, in turn, provided to

---

[9]   *See*   https://www.irs.gov/newsroom/abusive-tax-shelters-trusts-conservation-easements-make-irs-2019-dirty-dozen-list-of-tax-scams-to-avoid

Plaintiffs and members of the Class in connection with the respective Syndicate in which each of them participated.

124.   These Defendants collaborated to prepare the Promotional Materials with full knowledge and the intent that these Promotional Materials would be used to promote and sell the SCE Strategy.  The Defendants provided the Promotional Materials to potential participants in the SCE Strategy and the Promotional Materials were designed to convince these individuals that the SCE Strategy would be able to generate legitimate charitable contribution deduction that would be in full compliance with Section 170(h) of the Code.

125.   In the Promotional Materials, these Defendants notified potential participants of the amount of the Primary Appraisal performed by one of their hand-picked SCE Appraisers and the steps of the SCE Strategy ultimately leading to the contribution of the conservation easement to a Land Trust and the remaining fee simple interest to an affiliate of the Land Trust.  The Promotional Materials also represent that the donation of the conservation easement to a charity was one of several options for what the Syndicate could do with the subject property. However, the manner in which the SCE Strategy ultimately played out adequately demonstrates that the real purpose of the Syndicates was to implement the SCE Strategy and generate charitable contribution deductions from the donation of conservation easements.

126. In the Promotional Materials, these Defendants specifically represented to potential participants that in the event the Syndicate donates a conservation easement, the amount of the charitable deduction for the Syndicate (that would then flow through proportionately to each Plaintiff and Class member) would be based on the valuation set forth in the Initial Appraisal, which in all cases would lead to a charitable deduction for each participant in the Syndicate of more than 2.5 times that amount paid into the Syndicate.

**2.   The Plaintiffs Engage in the SCE Strategy.**

**a.   Radow engages in the Lakepoint Syndicate Transaction in 2013.**

**i.   The Steps of the Lakepoint Syndicate Transaction.**

127.   In 2013, OSI (through FASMO, LLC) facilitated the acquisition of an interest in real estate located in Georgia and obtained an Initial Appraisal of the real estate from the Weibel Defendants.  As part of the "diligence period" (and afterward as well), the OSI, Morris Manning, and Large & Gilbert Defendants purported to also receive advice and consultation from Conservation Saves and Conservation Pays LLC for the purpose of supporting the *bona fides* of a charitable contribution deduction from the donation of a conservation easement to a land trust.  These consultants were paid by Lakepoint Land Group LLC (discussed below) or another OSI affiliated entity.

128.   Radow received Promotional Materials from OSI (directly or through one of OSI's affiliated entities) about participating in the SCE Strategy through Lakepoint Land Group LLC (the "Lakepoint Syndicate"), a company formed and managed by FASMO LLC (an OSI affiliated entity).  The Promotional Materials invited potential participants, including Radow, to purchase an ownership interest in the Lakepoint Syndicate and informed them that the Lakepoint Syndicate would, in turn, purchase an ownership interest in Lakepoint Land II, LLC (the "Lakepoint PropCo").

129.   The Promotional Materials informed Plaintiffs that the Lakepoint Syndicate could choose from one of three options for use of the subject property: (1) market the property for sale or development, (2) hold the property for long-term investment, or (3) conserve the property by contributing a conservation easement to a tax-exempt land trust and/or contributing a fee simple interest to a tax-exempt entity resulting in a charitable contribution deduction equal to more than 2.5 times the amount Radow paid into the Lakepoint Syndicate (*i.e.*, the Conservation Easement Option).

130.   The Promotional Materials were designed to convince potential participants that the SCE Strategy, through the Lakepoint Syndicate, provided a legal and legitimate way to save on taxes through a conservation easement that would be structured and implemented in full compliance with Section 170(h) of the

Code.   The sole purpose of the Promotional Materials, which the Defendants jointly prepared, was to convince potential participants to participate in the SCE Strategy through the Lakepoint Syndicate, thus generating enormous fees for the Defendants and Other Participants.

131.   The Promotional Materials included an Initial Appraisal prepared by the Weibel Defendants, which provided a valuation of the real estate of its purported Highest and Best Use.

132.   Based on the Promotional Materials, including the Initial Appraisal, and the Defendants' advice and representations, Radow purchased an ownership interest in the Lakepoint Syndicate.   Radow paid a total of $150,000 into the Lakepoint Syndicate.

133.   The Lucus Defendants provided an Appraisal Review on or about December 11, 2013, to further support the valuation of the land for its purported Highest and Best Use.

134.   The Lakepoint Syndicate then voted to place a conservation easement on the entirety of the real estate and to donate the conservation easement to ACC and the fee simple interest to the GTAP.

135.   The Conservation Deed, dated December 12, 2013, was jointly prepared and approved by the Morris Manning, Large & Gilbert, OSI, and ACC

Defendants.  The Conservation Easement Deed was verified and signed by Clay Weibel (as the appraiser) and by Robert Keller of ACC (on behalf of ACC).

136.  On or about December 12, 2013, ACC prepared and provided a Baseline Documentation Report to the Lakepoint Syndicate, which was verified as accurate by ACC and the Lakepoint Syndicate, and filed with the Appraisal Summary (Form 8283) and the Lakepoint Syndicate's tax return.  The purpose of this report is to ascertain the conservation values of the property at the date of donation and to substantiate the purported conservation purpose.  ACC set out the conditions on the property that will be preserved by the conservation easement and concluded that these conditions met the conservation purpose of § 170(h) of the Code.  ACC concluded in this report that it is in the best interest of the Lakepoint Syndicate to place a conservation easement on the property and to donate the easement as a charitable gift to ACC.

137.  The Lakepoint Syndicate conveyed the conservation easement to ACC and the remaining fee simple interest to the Georgia Tuition Assistance Program, Inc. on December 16, 2013 and December 19, 2013, respectively.

138.  On December 12, 2013, ACC provided the Lakepoint Syndicate with a letter documenting the conveyance and advising the Lakepoint Syndicate that its contribution to ACC "is fully tax deductible."  Large & Gilbert filed this letter with

the Lakepoint Syndicate's tax return, along with the Baseline Documentation Report and Appraisal Summary (Form 8283).

139.   On or about December 26, 2013, the Weibel Defendants prepared the Appraisal Summary (Form 8283) and, as required, Large & Gilbert attached it to the Lakepoint Syndicate's tax return.   Clay Weibel (as the appraiser) and a representative of ACC (on behalf of ACC) verified the Appraisal Summary (Form 8283) as accurate and signed it.  The Defendants advised Radow that the Appraisal Summary (Form 8283) would substantiate the charitable contribution deduction and allow Radow to claim the charitable contribution deduction on his individual tax returns.

140.  As a result of these donations, charitable contribution deductions flowed through and were allocated to each of the participants in the Lakepoint Syndicate (including Radow) in proportion to their relative ownership interest in the Lakepoint Syndicate.

141.   The charitable contribution that was allocated to Radow was more than 2.5 times the amount he paid into the Lakepoint Syndicate.

142.   The Morris Manning, Large & Gilbert, and OSI Defendants selected the Weibel Appraisal to be used to support a charitable contribution deduction for the Lakepoint Syndicate.  As required, Large & Gilbert attached this Appraisal to the tax return it prepared for Lakepoint Syndicate.

143.   On or about March 27, 2014, the Large & Gilbert Defendants prepared the tax return for the Lakepoint Syndicate.   The tax return reported a charitable contribution deduction of $21,750,000 from the donation of the conservation easement.   As required, the Large & Gilbert Defendants attached to the Lakepoint Syndicate's return a copy of the Weibel Appraisal, the Appraisal Summary (Form 8283), the Baseline Documentation Report, and the ACC letter confirming the donation.

144.   The Large & Gilbert Defendants prepared a K-1 for each member of the Lakepoint Syndicate, including Radow, which reported the amount of charitable contribution deduction allocated to each of the members of the Lakepoint Syndicate.   The K-1 prepared for Radow reported a charitable contribution deduction of $394,194.   The Large & Gilbert Defendants advised Radow to report this charitable contribution deduction on his individual tax returns for 2013.

145.   Radow followed the advice of the Defendants and reported the charitable contribution deduction of $394,194 on his individual tax returns for 2013.

ii.   **The 2013 Lakepoint Syndicate Tax Return is Audited and the IRS Disallows the Charitable Contribution Deduction at the Partnership Level.**

68

146.   On or about March 16, 2016, the Lakepoint Syndicate received an IRS Notice indicating that the Lakepoint Syndicate partnership tax return for the 2013 tax year was selected for audit.

147.   On or about March 27, 2017, the IRS issued an FPAA for the Lakepoint Syndicate's tax return for the 2013 tax year.  The FPAA disallowed the charitable contribution deduction from the Industrial Syndicate SCE Strategy transaction for a variety of reasons, including: (i) the lack of a valid conservation purpose, (ii) failure to properly substantiate a conservation purpose in the Conservation Easement Deed and/or the Baseline Documentation Report, (iii) an improper extinguishment proceeds clause causing the gift to not be in perpetuity, (iv) an improper appraisal method resulting in a grossly inflated valuation of the charitable gift, and (v) failure to submit qualified appraisal from a qualified appraiser.   This further evidences the IRS's intent to similarly disallow the charitable contribution deduction at the individual level for members of the Industrial Syndicate.[10]

148.   A Tax Court petition was filed by the Lakepoint Syndicate on June 22, 2017.

_____

[10] In the FPAA for the Lakepoint Syndicate, the IRS adopted the IRS's finding and conclusions from its Revenue Agent Report.

### b. **The Turk Plaintiffs engage in the Industrial Syndicate Transaction in 2014.**

#### i. The steps of Industrial Syndicate Transaction.

149.   In 2014, OSI (through Industrial S&G LLC) acquired an interest in real estate located in Alabama and obtained an Initial Appraisal of the real estate from the Weibel Defendants.  As part of the "diligence period" (and afterward as well), the Morris Manning, Large & Gilbert, and OSI Defendants purported to also receive advice and consultation from Conservation Saves, Conservation Pays, Conservation Matters, and Blethen Mine for the purpose of supporting the *bona fides* of a charitable contribution deduction from the donation of a conservation easement to a land trust.  These Consultants were paid by Industrial S&G Partners LLC (discussed below) or another OSI affiliated entity.

150.   The Turk Plaintiffs received Promotional Materials from OSI (directly or through one of OSI's affiliated entities) about participating in the SCE Strategy through Industrial S&G Partners LLC (the "Industrial Syndicate"), a company formed and managed by Big Escambia Ventures, LLC (an OSI affiliated entity). The Promotional Materials invited potential participants, including the Turk Plaintiffs, to purchase an ownership interest in the Industrial Syndicate and informed them that the Industrial Syndicate would, in turn, purchase an ownership interest in Industrial S&G LLC (the "Industrial PropCo").

151.   The Promotional Materials informed Plaintiffs that the Industrial Syndicate could choose from one of six options for use of the subject property, one of which was to conserve the property by contributing a conservation easement to a tax-exempt land trust and/or contributing a fee simple interest to a tax-exempt entity resulting in a charitable contribution deduction equal to more than 2.5 times the amount the Turk Plaintiffs paid into the Industrial Syndicate (*i.e.*, the Conservation Easement Option).[11]

152.   The Promotional Materials were designed to convince potential participants that the SCE Strategy, through the Industrial Syndicate, provided a legal and legitimate way to save on taxes through a conservation easement that would be structured and implemented in full compliance with Section 170(h) of the Code.   The sole purpose of the Promotional Materials, which Defendants jointly prepared, was to convince potential participants to participate in the SCE Strategy through the Industrial Syndicate, thus generating enormous fees for the Defendants and Other Participants.

153.   The Promotional Materials included an Initial Appraisal prepared by the Weibel Defendants, which provided a valuation of the real estate for its purposed Highest and Best Use.

---

[11] The other five options were purportedly (1) market the property for lease or sale in the near term, (2) hold for long term investment, (3) alternating use and investment proposals for generating long-term investment gains, (4) leasing to third party for mining and extraction of surface minerals, and (5) operating the property for mining, extraction, and sale of surface minerals.

154.   Based on the Promotional Materials, including the Initial Appraisal, and the Defendants' advice and representations, the Turk Plaintiffs purchased an ownership interest in the Industrial Syndicate.  The Turk Plaintiffs paid a total of $75,031 into the Industrial Syndicate.

155.   The Lucus Defendants then provided a Secondary Appraisal to further support the valuation of the land for its purported Highest and Best Use – mining/mineral extraction.

156.   The Industrial Syndicate then voted to place a conservation easement on the entirety of the real estate and to donate the conservation easement to Wild Turkey Federation and the remaining fee simple interest to American Upland.

157.   The Conservation Deed, dated December 15, 2014, was jointly prepared and approved by the Morris Manning, Large & Gilbert, OSI, and Wild Turkey Federation Defendants.  The Conservation Easement Deed was verified and signed by a representative of Wild Turkey Federation.

158.   On or about December 15, 2014, Wild Turkey Federation and Conservation Matters prepared and provided a Baseline Documentation Report to the Industrial Syndicate, which was verified as accurate by Wild Turkey Federation and the Industrial Syndicate, and filed with the Appraisal Summary (Form 8283) and the Industrial Syndicate's tax return.  The purpose of this report is to ascertain the conservation values of the property at the date of donation and to

substantiate the purported conservation purpose.  Wild Turkey Federation set out the conditions on the property that will be preserved by the conservation easement and concluded that these conditions met the conservation purpose of § 170 of the Code.  Wild Turkey Federation concluded in this report that it is in the best interest of the Industrial Syndicate to place a conservation easement on the property and to donate the easement as a charitable gift to Wild Turkey Federation.

159.   The Industrial Syndicate conveyed the conservation easement to Wild Turkey Federation and the remaining fee simple interest to American Upland on December 15, 2014 and December 22, 2014, respectively.

160.   On December 22, 2014, Wild Turkey Federation provided the Industrial Syndicate with a letter documenting the conveyance and advising the Industrial Syndicate that its contribution to Wild Turkey Federation "is fully tax deductible."  Large & Gilbert filed this letter with the Industrial Syndicate's tax return, along with the Baseline Documentation Report and Appraisal Summary (Form 8283).

161.   The Morris Manning, Large & Gilbert, and OSI Defendants selected the Weibel Appraisal to be used to support a charitable contribution deduction for the Industrial Syndicate.  As required, Large & Gilbert attached this Appraisal to the tax return it prepared for the Industrial Syndicate.

162.   As a result of these donations, charitable contribution deductions flowed through and were allocated to each of the participants in the Industrial Syndicate (including the Turk Plaintiffs) in proportion to their relative ownership interest in the Industrial Syndicate.

163.   The charitable contribution that was allocated to the Turk Plaintiffs was more than 2.5 times the amount they paid into the Industrial Syndicate.

164.   On or about January 12, 2015, the Weibel Defendants and Large & Gilbert Defendants prepared the Appraisal Summary (Form 8283) and, as required, attached it to the Industrial Syndicate's tax return.  Clay Weibel (as the appraiser) and a representative of Wild Turkey Federation verified the Appraisal Summary (Form 8283) as accurate and signed it.  These Defendants then advised the Turk Plaintiffs that the Appraisal Summary (Form 8283) would substantiate the charitable contribution deduction and allow the Turk Plaintiffs to claim the charitable contribution deduction on their individual tax returns.

165.   On or about February 20, 2015, the Large & Gilbert Defendants prepared the tax return for the Industrial Syndicate.  The tax return reported a charitable contribution deduction of $15,154,598. As required, the Large & Gilbert Defendants attached to the Industrial Syndicate's return a copy of the Weibel Appraisal, the Appraisal Summary (Form 8283), the Baseline Documentation Report, and the Wild Turkey Federation letter confirming the donation.

166.   In addition, the Large & Gilbert Defendants prepared a K-1 for each of the participants in the Industrial Syndicate, including the Turk Plaintiffs, which reported the amount of charitable contribution deduction allocated to each of the members of the Industrial Syndicate.  The K-1 prepared for the Turk Plaintiffs reported a charitable contribution deduction of $246,808.  The Large & Gilbert Defendants advised the Turk Plaintiffs to report this charitable contribution deduction on their individual tax returns for 2014.

167.   The Turk Plaintiffs followed the advice of the Defendants and reported the charitable contribution deduction of $246,808 on his individual tax returns for 2014.

ii.     **The 2014 Industrial Syndicate Tax Return is Audited and the IRS Disallows the Charitable Contribution Deduction at the Partnership Level.**

168.   On or about January 31, 2017, the Industrial Syndicate received an IRS Notice indicating that the Industrial Syndicate partnership tax return for the 2014 tax year was selected for audit.

169.   On or about February 14, 2019, the IRS issued an FPAA for the Industrial Syndicate's tax return for the 2014 tax year.  The FPAA disallowed the charitable contribution deduction from the Industrial Syndicate SCE Strategy transaction for a variety of reasons, including: (i) the lack of a valid conservation purpose, (ii) failure to properly substantiate a conservation purpose in the

Conservation Easement Deed and/or the Baseline Documentation Report, (iii) an improper extinguishment proceeds clause causing the gift to not be in perpetuity, (iv) an improper appraisal method resulting in a grossly inflated valuation of the charitable gift,  and (v) failure to submit qualified appraisal from a qualified appraiser.  This further evidences the IRS's intent to similarly disallow the charitable contribution deduction at the individual level for members of the Industrial Syndicate.[12]

170.   A Tax Court petition was filed by the Industrial Syndicate on May 13, 2019.

### c. Radow engages in the Gulf Land Syndicate Transaction in 2015.

#### i. The Steps of the Gulf Land Syndicate Transaction.

171.   In 2015, OSI (through Gulf Land Group LLC) acquired an interest in real estate located in Alabama and obtained an Initial Appraisal of the real estate from the Weibel Defendants.  As part of the "diligence period" (and afterward as well), the Morris Manning and OSI Defendants purported to also receive advice and consultation from  Conservation Saves and Galt Mining all for the purpose of supporting the *bona fides* of a charitable contribution deduction from the donation of a conservation easement to a land trust.  All of these Consultants were paid by Gulf Land Group LLC (discussed below) or another OSI affiliated entity.

---

[12] In the FPAA for the Industrial Syndicate, the IRS adopted the IRS's finding and conclusions from its Revenue Agent Report.

172.    Radow received Promotional Materials from OSI (directly or through one of OSI's affiliated entities) about participating in the SCE Strategy through Gulf Land Group LLC (the "Gulf Land Syndicate"), a company formed and managed by Galt Holdings LLC (an OSI affiliated entity).   The Promotional Materials invited potential participants, including Radow, to purchase an ownership interest in the Gulf Land Syndicate and informed them that the Gulf Land Syndicate would, in turn, purchase an ownership interest in Gulf Land S&G LLC (the "Gulf Land PropCo").

173.   The Promotional Materials were designed to convince potential participants that the SCE Strategy, through the Gulf Land Syndicate, provided a legal and legitimate way to save on taxes through a conservation easement that would be structured and implemented in full compliance with Section 170(h) of the Code.   The sole purpose of the Promotional Materials, which Defendants jointly prepared, was to convince potential participants to participate in the SCE Strategy through the Gulf Land Syndicate, thus generating enormous fees for the Defendants and Other Participants.

174.    The Promotional Materials informed Plaintiffs that the Gulf Land Syndicate could choose from one of four options for use of the subject property: (1) holding the property for long term investment, (2) leasing the property to a third party for mining and extraction of surface minerals, (3) operating the property

for mining, extraction, and sale of surface minerals, or (4) conserve the property by contributing a conservation easement to a tax-exempt land trust and/or contributing a fee simple interest to a tax-exempt entity resulting in a charitable contribution deduction equal to more than 2.5 times the amount Radow paid into the Gulf Land Syndicate (*i.e.*, the Conservation Easement Option).

175.   The Promotional Materials included an Initial Appraisal prepared by the Weibel Defendants, which provided a valuation of the real estate for its purported Highest and Best Use.

176.   Based on the Promotional Materials, including the Initial Appraisal, and the Defendants' advice and representations, Radow purchased an ownership interest in the Gulf Land Syndicate.  Radow paid a total of $200,000 into the Gulf Land Syndicate.

177.   The Lucus Defendants then provided a Secondary Appraisal to further support the valuation of the land for its purported Highest and Best Use – mining/mineral extraction.

178.   The Gulf Land Syndicate then voted to place a conservation easement on the entirety of the real estate and to convey the conservation easement to ACC and the remaining fee simple interest to ACC Properties.

179.   The Conservation Easement Deed, dated on or about December 22, 2015, was jointly prepared and approved by the Morris Manning, OSI, Private

Client Law Group, and ACC Defendants.  The Conservation Easement Deed was verified and signed by Weibel (as the appraiser) and by the Deputy Director of ACC (on behalf of ACC).

180.  On December 22, 2015, ACC prepared and provided a Baseline Documentation Report to the Gulf Land Syndicate, which was verified as accurate by ACC and the Gulf Land Syndicate, and filed with the Appraisal Summary (Form 8283) and the Gulf Land Syndicate's tax return.  The purpose of this report is to ascertain the conservation values of the property at the date of donation and to substantiate the purported conservation purpose.  ACC set out the conditions on the property that will be preserved by the conservation easement and conclude that these conditions met the conservation purpose of § 170 of the Code.   ACC concluded in this report that it is in the best interest of the Gulf Land Syndicate to place a conservation easement on the property and to donate the easement as a charitable gift to ACC.

181.  The Gulf Land Syndicate conveyed the conservation easement to ACC and the remaining fee simple interest to ACC Properties on December 22, 2015 and December 28, 2015, respectively.

182.  On December 22, 2015, ACC provided the Gulf Land Syndicate with a letter documenting the conveyance and advising the Gulf Land Syndicate that its contribution to ACC "is fully tax deductible."  Partnership Tax Solutions filed this

letter with the Gulf Land Syndicate's tax return, along with the Baseline Documentation Report and Appraisal Summary (Form 8283).

183.   As a result of these donations, charitable contribution deductions flowed through and were allocated to each of the participants in the Gulf Land Syndicate (including Radow) in proportion to their relative ownership interest in the Gulf Land Syndicate.

184.   The charitable contribution that was allocated to Radow was more than 2.5 times the amount he paid into the Gulf Land Syndicate.

185.   The Morris Manning and OSI Defendants and PCLG selected the Weibel Defendants' Appraisal to be used to support charitable contribution deduction for the Gulf Land Syndicate.  As required, Partnership Tax Solutions attached this Appraisal to the tax return it prepared for the Gulf Land Syndicate.

186.   On or about March 18, 2016, Partnership Tax Solutions and the Weibel Defendants prepared the Appraisal Summary (Form 8283) and, as required, attached it to the Gulf Land Syndicate's tax return.  Weibel (as the appraiser) and a representative of ACC (on behalf of ACC) verified the Appraisal Summary (Form 8283) as accurate and signed it.  The Weibel Defendants and the ACC represented to the IRS in the Appraisal Summary (Form 8283) that the easement was placed on the property to protect the property.  These Defendants then advised the Radow Defendants that the Appraisal Summary (Form 8283) would substantiate the

charitable contribution deduction and allow Radow to claim the charitable contribution deduction on his individual tax returns.

187.  On or about September 1, 2016, Partnership Tax Solutions prepared the tax return for Gulf Land Syndicate.  The tax return reported a charitable contribution deduction from the donation of the conservation easement of $15,982,335.  As required, Partnership Tax Solutions attached to the Gulf Land Syndicate's return a copy of the Weibel Defendants' Appraisal, the Appraisal Summary (Form 8283), the Baseline Documentation Report, and the ACC letter confirming the donation.

188.  In addition, Partnership Tax Solutions prepared a K-1 for each of the participants in the Gulf Land Syndicate, including Radow, which reported the amount of charitable contribution deduction allocated to each of the members of the Gulf Land Syndicate.  The K-1 prepared for Radow reported a charitable contribution deduction of $851,619.  Partnership Tax Solutions advised Radow to report this charitable contribution deduction on his individual tax returns for 2015.

189.  Radow followed the advice of the Defendants and reported the charitable contribution deduction of $851,619 on his individual tax returns for 2015.

ii.    **The 2015 Gulf Land Syndicate Tax Return is Audited and the IRS Disallows the Charitable Contribution Deduction at the Partnership Level.**

190.   On or about October 3, 2017, the Gulf Land Syndicate received an IRS Notice indicating that the Gulf Land Syndicate partnership tax return for the 2015 tax year was selected for audit.

191.   Subsequently, the IRS issued a Revenue Agent Report (the "Gulf Land RAR"), in which the IRS concluded that Gulf Land Aggregates suffered from the same defects as the Industrial Syndicate, including: (i) the lack of a valid conservation purpose, (ii) failure to properly substantiate a conservation purpose in the Conservation Easement Deed and/or the Baseline Documentation Report, (iii) an improper extinguishment proceeds clause causing the gift to not be in perpetuity, (iv) an improper appraisal method resulting in a grossly inflated valuation of the charitable gift, and (v) failure to submit qualified appraisal from a qualified appraiser.

## E.   The SCE Strategy was Fatally Flawed.

192.   The IRS has concluded that the SCE Strategy was fatally flawed from the outset.   The Defendants prepared documents for the structure and implementation of the SCE Strategy that were strewn with errors (as discussed in detail below) and, thus, failed to meet the specific requirements set out in the Code. This critical documents included the Appraisals, Conservation Easement Deeds, and Baseline Documentation Reports.   As purported experts in their respective fields, each of the Defendants and Other Participants was aware or should have

been aware of the plethora of defects and errors that existed in virtually every aspect of the SCE Strategy.

### 1. The SCE Strategy Used Sham Appraisals that Violated USPAP and the Code in Numerous Respect.

193.   The primary factor in appraising a conservation easement is the comparison of the property's fair market value before and after the contribution of a conservation easement based on the property's "highest and best use," defined as the reasonable and probable use that supports the highest present value of the property.

194.   The Defendants and Other Participants, including the SCE Appraisers and the Appraiser Defendants themselves, represented to the Plaintiffs and the Class that the SCE Appraisers were professional appraisers who would provide independent and objective valuations of the conservation easements generated by the SCE Strategy based on their independent determination of the "highest and best use" for each subject property.

195.   In reality, however, the Appraisals were a complete sham.   The Defendants hand-picked the SCE Appraisers, who would send drafts of each Appraisal to Pollock at Morris Manning to review, revise and approve.   Pollock and his team reviewed every aspect of the Appraisals and made revisions to the Appraisal as they deemed necessary.   Then, Pollock would approve the Appraisal. No Appraisal was considered final and usable until Pollock reviewed and approved

it.  This was Pollock's mandate and it was followed.  In these regards, the SCE Appraisers completely shirked their professional duties and obligations.  None of the Defendants and Other Participants ever disclosed to the Plaintiffs and the Class the SCE Appraisers' conflicts of interest and complete dereliction of their professional duties and obligations.

196.  To satisfy the Defendants, and particularly the Morris Manning Defendants, the SCE Appraisers were grossly negligent and intentionally deceitful in each of the Appraisals by making inappropriate assumptions, utilizing inappropriate methodologies, and using various flawed techniques to improperly inflate the value of the conservation easements, as determined by the IRS.  These inflated values, in turn, caused Plaintiffs and the Class to unknowingly claim inflated and improper tax deductions arising from their participation in the SCE Strategy.  By way of example, each of the SCE Appraisers committed *inter alia* the following errors in the Appraisals prepared from 2013-2018:

    a.    Utilizing "comparable sales" that were not in fact comparable;

    b.    Inaccurately reporting the data from the comparable sales that were used;

    c.    Failing to conduct any financial feasibility analysis, supply and demand analysis, or reasonable probability analysis as required by applicable Code provisions and related regulations;

d.  Failing to address the additional requirement that the highest and best use be "reasonably probable";

e.  Failing to consider existing legal or regulatory restrictions on the development and/or use of the subject property;

f.  Failing to properly apply the principle of substitution in valuing the land at its "highest and best use";

g.  Violating numerous standards set by the USPAP; and

h.  Improperly acting as an advocate rather than as an independent appraiser.

197.  With these numerous errors, the SCE Appraisers, including but not limited to the Appraiser Defendants, overstated the fair market value of the conservation easements by millions of dollars, which in turn resulted in the Plaintiffs and the Class unknowingly grossly overstating their tax deduction.

198.  In light of the SCE Appraisers' purported professional experience and education, they knew or should have known that the manner in which they performed the Appraisals and, ultimately, valued the conservation easements was contrary to the regulations promulgated by the Internal Revenue Service, violated the professional standards for real estate appraisers, and resulted in gross valuation overstatements for the easements they appraised.

199.   Under Section 170(f)(11) of the Code, a charitable contribution deduction from the donation of a conservation easement must be supported by a "qualified appraisal."   A "qualified appraisal" is one that "is conducted by a qualified appraiser in accordance with generally accepted appraisal standards and any regulations or other guidance prescribed."   The numerous egregious errors identified above sufficiently demonstrate that the Appraisals had no chance of satisfying the requirements for a "qualified appraisal."   And the Defendants knew or should have known that the IRS would take the position that the charitable contribution deductions generated from the SCE Strategy should be disallowed on that basis alone.

200.   In sum, the SCE Appraisers knowingly performed and prepared the Appraisals for use by the Defendants in marketing and selling the SCE Strategy to participants (*i.e.*, Plaintiffs and the Class) and knowingly allowed the Defendants to improperly guide and direct the SCE Appraisers in performing and preparing the Appraisals for this purpose.   The SCE Appraisers knew that the Syndicates and the SCE Strategy participants would attach their Appraisals to the tax returns of the Syndicates and participants, as required by the Code, to substantiate the charitable contribution deductions reported by the Syndicates and ultimately claimed by the Plaintiffs and the Class Members on their individual tax returns.

2.      **The Conservation Easement Deeds Violated the Code's Specific Requirements.**

201.    The Conservation Easement Deeds were prepared by the Defendants with full knowledge of the requirements of the Code and related Regulations for a legal and legitimate conservation easement donation.  Despite this knowledge and the explicit nature of the requirements of the Code and the IRS's related Regulations, the Defendants failed to prepare the Conservation Easement Deeds to conform to the Code and applicable Regulations. As a result, the SCE Strategy failed to generate legitimate and legal charitable contribution deductions for the Plaintiffs and the Class.

202.    In order for a conservation easement donation to comply with the Code, it must be perpetual, as required by Reg. Section 1.170A-14(g)(6)(i).  Thus, a conservation easement donation may only allow permitted uses of the landowner's retained interests that are consistent with the "conservation purposes" set out in the Conservation Easement Deed.  Here, all of the Conservation Easement Deeds for the Syndicates involved in the Plaintiffs' SCE Strategy transactions permitted retained uses by the landowners that were inconsistent with the stated conservation purposes and, thus, on this basis alone, failed to satisfy the perpetuity requirement, as well as the requirement that the conservation easement donation be exclusively for conservation purposes.

203.   A conservation easement donation can also fail to satisfy the perpetuity requirement when the sales proceeds clause in the Conservation Easement Deed does not ensure that the donee (*i.e.*, the Land Trusts) would receive an amount on any sale of the property at least equal to its proportionate share based on the amount of the charitable deduction as compared to the value of the entire property at the time of the donation.   In drafting the conservation easement deeds for the SCE Strategy, the Defendants made critical errors by deviating from the specific requirements of the IRS regulation and providing that the Land Trusts would get too little of the sales proceeds in the event of a sale.   This resulted in another failure to meet the perpetuity requirement.

204.   The Defendants all worked closely together to draft the language of the Conservation Easement Deeds.   They were aware that the Plaintiffs and the Class desired for the conservation easement donation to result in a legal and legitimate tax deduction.   And Defendants were no doubt aware (or should have been aware) of the perpetuity requirement under the Code and the various ways discussed above by which this requirement could be violated.   The Plaintiffs and the Class relied on the Defendants' experience and expertise in effectuating and implementing the SCE Strategy for a valid tax deduction, including in drafting the Conservation Easement Deeds.

205.   Upon information and belief, every SCE Strategy transaction in 2013 and 2015 (and possibly 2016) suffered from a perpetuity defect that rendered the charitable contribution deduction from the SCE Strategy improper.

### 3.      The Baseline Documentation Reports Were Grossly Deficient.

206.   Where a donor of a conservation easement retains rights to the property subject to the easement, which could impair the conservation interests, the donor is required to document the condition of the property at the time of the gift, commonly referred to as the "baseline documentation," in a way that presents an accurate representation of the protected property at the time of the transfer.

207.   The Baseline Documentation Reports prepared by the Land Trusts for SCE Strategy transactions from 2013 through 2018 (with the direct assistance and guidance of the other Defendants) were deficient in numerous respects and failed to satisfy the IRS's requirements.   These deficiencies include (1) relying on Appraisals that the Defendants knew were a sham to support the conservation value of the subject property and (2) failing to sufficiently substantiate an exclusive conservation purpose.   Based on the Defendants' expertise in their related fields and knowledge of the sham nature of the Appraisals and the numerous problems with the stated conservation purpose for each of the SCE Strategy transactions, there is no reasonable explanation for the Defendants' failure to properly prepare the Baseline Documentation Reports other than an intentional

or grossly negligent act of deceit. Defendants knew these deficiencies would result in the Plaintiffs and the Class claiming charitable contribution deductions on their individual tax returns that the IRS would claim were invalid and disallow.

## IV.

## <u>CONSPIRACY ALLEGATIONS</u>

208. As set out more fully throughout this Complaint, each of the Defendants and the Other Participants (collectively, the "<u>Co-Conspirators</u>") involved in the SCE Strategy executed by Plaintiffs and the Class conspired with one another to design, promote, sell, and implement the SCE Strategy for the purpose of receiving and splitting substantial fees (the "<u>Co-Conspirators'</u> <u>Arrangement</u>"). The receipt of those fees was the Co-Conspirators' primary, if not sole, motive in the development and execution of the SCE Strategy. Further, the amount of fees earned by the Co-Conspirators was not tied to or reflective of the amount of time and effort they expended in providing professional advice and services. The Co-Conspirators designed and structured the SCE Strategy and unlawfully agreed to provide a veneer of legitimacy to each other's opinions on the lawfulness and tax consequences of the SCE Strategy.

209. Each of the Co-Conspirators had particular roles and responsibilities in connection with the design, marketing, sale, and implementation of the SCE Strategy, as discussed at Paragraphs 69-84 and 86-113 herein.

210.   The Co-Conspirators each had a financial, business and property interest in inducing the Plaintiffs and the Class to enter into the SCE Strategy and to do so, fraudulently promised, opined and assured that the SCE Strategy would legally reduce Plaintiffs' and the Class's income taxes.   Further, the Co-Conspirators' Arrangement gave each of the participating Co-Conspirators a significant pecuniary interest in the advice and professional services they would render.

211.   The Co-Conspirators entered into the Co-Conspirators' Arrangement, whereby they agreed and had a meeting of the minds that they would work together as a team - with each team member assigned certain roles and responsibilities - to develop, market, sell, and implement the SCE Strategy.

212.   Here, the Co-Conspirators conspired to perpetrate a fraud on Plaintiffs and the Class and to breach duties owed to Plaintiffs and the Class, each with knowledge of the object of the conspiracy.   In addition, the Co-Conspirators authorized, ratified and/or affirmed the fraudulent misrepresentations and/or omissions made by each of the Co-Conspirators.  Each Co-Conspirator committed at least one overt act in furtherance of the unlawful conspiracy.

213.   The Morris Manning Defendants, with assistance from the Large & Gilbert Defendants, spearheaded the recruitment and organization of the team members   necessary   to   carry   out   the   development,   promotion,   sale,   and

implementation of the SCE Strategy.  The Morris Manning, Large & Gilbert, and OSI Defendants also utilized their connections and networks to identify potential clients as "targets" for the SCE Strategy.

214.  In accordance with the pre-planned scheme, the OSI Defendants effectively owned and/or controlled all PropCos, Managers, and Consultants. Despite this common ownership and control, the OSI Defendants either directly or through an affiliate, paid fees to each of these entities.

215.  As part of this pre-planned scheme, the Morris Manning (through 2016), Large & Gilbert (through the first Quarter of 2015) and OSI Defendants worked together to form each of the Syndicates used in the SCE Strategy.

216.  The Morris Manning Defendants also recruited the SCE Appraisers for their critical role in the SCE Strategy.  Although each of the SCE Appraisers purported to act independently and provide a good faith valuation of the parcels at issue in accordance with applicable professional standards, each of the SCE Appraisers were aware that the Co-Conspirators would use the Appraisals in the promotion, sale, and implementation of the SCE Strategy.  Thus, the SCE Appraisers were in no way independent and willingly joined into the Co-Conspirators' Arrangement.

217.   As part of the pre-planned scheme, the Morris Manning Defendants also recruited the Land Trusts to accept the donation of the easements and fee simple interests in connection with the SCE Strategy.

218.   The Land Trusts knew that the purpose of these donations was to implement the SCE Strategy.  The Land Trusts also knew that the SCE Strategy, as structured and implemented, would not and could not serve its intended purpose of providing a legitimate and legal tax deduction, but nonetheless stood willing and ready to fulfill their role in the Co-Conspirators' Arrangement.

219.   As set out in detail in Paragraphs 69-72, 86-103, and 109-133 herein, the Morris Manning and Large & Gilbert Defendants (through the first Quarter of 2015) were a key component of the Co-Conspirators' Arrangement.   These Defendants worked closely with the other Defendants regarding all aspects of the design and development of the SCE Strategy, the structuring of each Syndicate and transaction, tax compliance, and the purported due diligence on the SCE Strategy and each SCE Strategy transaction in which they participated with the OSI Defendants.  These Defendants also drafted and/or approved the SCE transaction documents beginning with the purchase of property from Landowners, continuing with the Promotional Materials provided to potential participants, and all the documents necessary to complete the SCE Strategy and execute the donations to the Land Trusts, including the Conservation Easement Deeds, Baseline

Documentation Reports, Appraisals, Appraisal Summaries (Form 8283), Syndicate tax returns, and the K-1s issued to each Plaintiff and member of the Class.  As previously mentioned, the OSI Defendant continued to utilize these documents in the SCE Strategy transactions in which the OSI Defendants worked with other professional advisors other than the Morris Manning Defendants.

220.   The Morris Manning Defendants were also involved as promoters of the SCE Strategy, identified potential targets, and made themselves available to speak to any potential participants or referral sources who had questions about the SCE Strategy.

## V.

## CLASS ALLEGATIONS

221.   Plaintiffs bring this action on their own behalf and, pursuant to Rule 23(b)(l)(A), (b)(2), and/or (b)(3) of the Federal Rules of Civil Procedure, as a class action on behalf of themselves and the nationwide class of all persons (the "Class Members," the "Class") defined below against all Defendants:

> All Persons who, from January 1, 2012 to the present, inclusive, have been assessed back-taxes, penalties, and/or interest by the Internal Revenue Service as a result of their involvement, either directly or indirectly through an ownership stake in another entity, in a Syndicated Conservation Easement designed, marketed sold, implemented or managed by the OSI Defendants.  Excluded from the Class are: Defendants; Defendants' parents, subsidiaries, and affiliates; anyone receiving referral fees from the SCE Strategy transactions; and federal governmental entities.

222.   Plaintiffs believe the Class consists of over 1,500 Class Members geographically dispersed throughout the United States such that joinder is impracticable. These Class Members may be identified from information and records maintained by the Defendants or third parties.

223.   The Individual Plaintiffs and the Class Members each and all have tangible and legally protectable interests at stake in this action.

224.   The claims of the Individual Plaintiffs and the Class Members have a common origin and share a common basis. The claims of all Class Members originate from the same fraudulent transaction predicated by the Defendants.

225.   The Individual Plaintiffs state a claim for which relief can be granted that is typical of the claims of the Class Members. Thus, the class representatives have been the victims of the same unlawful acts as each member of the class.

226.   If brought and prosecuted individually, each of the Class Members would necessarily be required to prove the instant claims upon the same material and substantive facts, upon the same remedial theories and would be seeking the same relief.

227.   The claims and remedial theories pursued by the Individual Plaintiffs are sufficiently aligned with the interests of the Class Members to ensure that the universal claims of the alleged class will be prosecuted with diligence and care by the Plaintiffs as representatives of the Class.

228.   There are questions of law and fact common to the alleged class. Such common questions include, *inter alia*:

a.   Whether the Defendants and the Other Participants defrauded Plaintiffs  by advising and recommending that Plaintiffs and members of the Class engage in an illegal and abusive tax shelter, the SCE Strategy;

b.   Whether the Defendants and the Other Participants defrauded Plaintiffs by advising Plaintiffs and members of the Class that all or a portion of the "value" of the donated property interest as set out in the respective Appraisals was deductible as a charitable contribution under the Code;

c.   Whether the Defendants and the Other Participants defrauded Plaintiffs  by advising Plaintiffs and members of the Class that the charitable contribution deductions from the SCE Strategy would comply with Section 170(h) of the Code and therefore would reduce the taxable income of Plaintiffs and the Class;

d.   Whether the Defendants and the Other Participants defrauded Plaintiffs  by advising Plaintiffs and members of the Class that the SCE Strategy complied with the applicable tax laws, rules, regulations, common law doctrines, and published court decisions;

e.   Whether the Defendants and the Other Participants conspired and/or aided and abetted each other in furtherance of the unlawful acts alleged herein and incorporated by reference;

f.   Whether the Defendants and the Other Participants engaged in a pattern of racketeering activity in violation of RICO and/or Georgia's RICO statute ("Georgia RICO") codified at O.C.G.A. §16-4-1, *et seq.* based on the unlawful acts alleged herein and incorporated by reference;

g.   Whether the Defendants' and the Other Participants' overt and/or predicate acts in furtherance of the conspiracy and/or aiding and abetting, based on the unlawful acts alleged herein

and incorporated by reference, resulted in or proximately caused and continues to cause injury to the Plaintiffs' and Class Members' business or property or irreparably harmed and harms the Plaintiffs and the alleged class and if so, the appropriate relief to which they are entitled;

h. Whether the Defendants' and Other Participants' actions, based on the unlawful acts alleged herein and incorporated by reference, constitute mail and/or wire fraud; and

i. Whether the Defendants have been unjustly enriched through the unlawful acts alleged herein and incorporated by reference.

229.   Adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of the other members of the Class who are not parties to the action or could substantially impair or impede their ability to protect their interests.

230.   The Defendants have acted or refused to act on grounds generally applicable to the Class, making appropriate final relief with respect to the Class as a whole. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the alleged Class which would establish incompatible standards of conduct for the party opposing the Class. Such incompatible standards, inconsistent or varying adjudications on what, of necessity, would be the same essential facts, proof and legal theories, would create and allow to exist inconsistent and incompatible rights within the Class. Further, the failure to permit this cause to proceed as a class action under Rule 23(b)(1)(A) would be contrary to

the beneficial and salutary public policy of judicial economy in avoiding a multiplicity of similar actions. The Plaintiffs also allege that questions of law and fact applicable to the Class predominate over individual questions and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Therefore, certification is appropriate under Rule 23(b)(3). Failure to permit this action to proceed under Rule 23 would be contrary to the public policy encouraging the economies of attorney and litigant time and resources.

231.   The named Plaintiffs allege that they are willing and prepared to serve the Court and proposed Class in a representative capacity with all of the obligations and duties material thereto.

232.   The self-interests of the named Class representatives are co-extensive with and not antagonistic to those of the absent Class Members. The proposed representatives will undertake to well and truly protect the interests of the absent Class Members.

233.   The named Plaintiffs have engaged the services of counsel indicated below. Plaintiffs' counsel are experienced in complex class litigation involving *inter alia* tax issues and will adequately prosecute this action and will assert, protect, and otherwise represent well the named Class representatives and absent Class Members.

234.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable. There will be no difficulty in the management of this action as a class action.

235.   The Plaintiffs will fairly and adequately protect the interests of the Class and have no interests adverse to or which directly and irrevocably conflict with the interests of other Class Members.

## VI.

## ALLEGATIONS RELATING TO RICO AND GEORGIA RICO

236.   Plaintiffs are "persons" within the meaning of 18 U.S.C. §1964(c) and O.C.G.A. § 16-14-6(c).

237.   At all times relevant hereto, each of Plaintiffs and the Defendants and Other Participants were and are "persons" within the meaning of 18 U.S.C. §1961(3).

## A.   Enterprise

238.   An enterprise need not be a specific legal entity but rather may be "any union or group of individuals associated in fact although not a legal entity."

239.   In this case, the enterprise ("Enterprise") for RICO and Georgia RICO purposes consists of (1) the Defendants; (2) the Other Participants; and (3) all other persons and entities that associated to solicit persons to participate in the SCE

Strategy for the purpose of generating and sharing fees and commissions generated from the SCE Strategy and alleged tax liability reduction it purported to provide.

240.   These individuals and entities individually and through their agents represented to their victims that the charitable contribution deduction purportedly generated by the SCE Strategy qualified as a *bona fide* conservation easement entitling Plaintiffs and members of the Class to a noncash charitable contribution deduction under Section 170(h) and relevant regulations.  In reality, the noncash charitable contribution deductions purportedly generated by the SCE Strategy did not qualify as legitimate tax deductions under the Code and the SCE Strategy, as structured, could not support the promised tax benefits.  The SCE Strategy and the Co-Conspirators' Arrangement to design, promote, sell, and implement it were devised solely to facilitate the generation of significant fees and commissions to the Defendants without regard to the best interests of their clients (*i.e.*, the Plaintiffs and the Class).  The Defendants and the Other Participants have made millions of dollars orchestrating the Co-Conspirators' Arrangement.

241.   Defendants sought out as clients those persons, like Plaintiffs and other Class Members, that had high taxable income and sufficient cash flow available to participate in the Syndicates; the Defendants and Other Participants then capitalized on the Co-Conspirators' Arrangement to convince the clients to execute the SCE Strategy, for the primary purpose of providing significant revenue

for Defendants.  Unbeknownst to Plaintiffs and the Class, there was no legitimate basis for the large noncash charitable contribution deductions resulting from highly inflated appraisals essential for the success of the Co-Conspirators' Arrangement that purportedly supported the value of the deductions generated by the SCE Strategy.

242.   The Defendants and the Other Participants engaged in a common plan, transaction and course of conduct, as described herein, in connection with the design, promotion, sale and implementation of the SCE Strategy.  The Defendants and the Other Participants knowingly or recklessly engaged in acts, transactions, practices and a course of business that operated as a fraud upon the Plaintiffs and the Class, the primary purpose and effect of which was to generate huge fees and commissions by fraudulently selling a series of transactions under the guise of generating a legal and legitimate noncash charitable contribution deduction.

243.   While the Defendants and the Other Participants participated in the Enterprise and were a part of it, the Defendants and the Other Participants also had an existence separate and distinct from the Enterprise.

244.   Defendants and the Other Participants maintained an interest in and control of the Enterprise and also conducted or participated in the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

245.    Defendants and the Other Participants' control and participation in the Enterprise were necessary for the successful operation of Defendants' scheme. The Enterprise had an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engaged.

## B.    Operation of the RICO Enterprise

246.   Syndicated conservation easement deals caught the attention of unscrupulous professionals for three reasons: (1) these deals purported to generate tax deductions that, due to provisions in the Code, could substantially reduce an individual's tax liability;[13] (2) the rules involved were highly technical and thus unlikely to be understood by laypersons, like the Plaintiffs and members of the Class, who were thus also unlikely to question the advice being offered by reputable professionals who were alleged experts in the area; (3) due to a rampant oversupply of unproductive real estate that was devalued in the 2008-2009 recession, a vast supply of deals was available to participants in a buffet-like fashion[14] and (4) a group of eager under-employed real estate appraisers, short on engagements in the wake of the 2008-2009 recession, that were willing to engage

---

[13] The deduction for a qualified conservation easement under Code Section 170(h) is a noncash charitable contribution deduction. A noncash charitable contribution deduction is unique and especially valuable because, unlike most itemized deductions, it is not subject to the alternative minimum tax ("AMT"), although it is subject to Adjusted Gross Income ("AGI") limitations.

[14] Some states like Georgia also had the presence of a state tax credit for conservation easements. Credits, unlike deductions, offer participants a dollar for dollar reduction of tax.

in fictitious valuations under the guise of a subject property's highest and best use that was wildly inflated.

247.   Tax deductible conservation easements are allowed for taxpayers that meet the requirements of Code Section 170(h).   However, Section 170(h) has a rigorous set of qualification criteria that Defendants did not meet with respect to the SCE Strategy, as set out in detail herein.   Nevertheless, conservation easements are spelled out in the Tax Code itself, specifically Code Section 170(h), giving professional advisors a hook upon which to lure potential investors that would otherwise steer clear of these transactions.   Conservation easement promoters had no difficulty convincing potential participants of the validity of the deduction because they pointed to Code Section 170(h).   This "illusion of validity" is what the Defendants fraudulently used to persuade and mislead the Plaintiffs to agree to participate in SCE Strategy.

248.   The Defendants and the Other Participants had to convince the clients and prospective clients of the validity of the SCE Strategy – which was easy since it is specifically allowed and described in Section 170(h) of the Code, notwithstanding that, unbeknownst to Plaintiffs and the Class, 170(h) of the Code did not contemplate the use of partnerships to realize these tax benefits.

249.   Each of the Defendants were vital to the implementation of the SCE Strategy, played an important role in the success of the Enterprise, and either

controlled the Enterprise or knowingly implemented the decisions of others in the Enterprise, to wit:

a. <u>The Morris Manning and Large & Gilbert Defendants:</u> These Defendants held themselves out as the "experts" in conservation easements (and specifically syndicated conservation easements). These Defendants used this self-promotion not only to ensnare potential participants in the SCE Strategy, but to also build the team of co-conspirators that were necessary to implement the SCE Strategy, resulting in enormous fees and commissions to these Defendants and other members of the conspiracy. In fact, the Large & Gilbert Defendants introduced the Morris Manning Defendants to the OSI Defendants and laid the entire foundation for the SCE Strategy to move forward. Of course, the Morris Manning Defendants were willing and eager to partner with the OSI Defendants to have access to the OSI Defendants' experience with real estate transactions and its huge stable of potential clients. The Morris Manning and Large & Gilbert Defendants played numerous roles in the conspiracy to design, promote, sell and implement the SCE Strategy. First, these Defendants actively sought out firms and professionals to

join their team for purposes of promoting, selling, and implementing the SCE Strategy.   Second, these Defendants directly participated in the preparation, drafting, revision, and ultimate approval of the Promotional Materials and all other documents utilized in the promotion, sale, and implementation of the SCE Strategy, including Appraisals, Conservation Easement Deeds, Appraisal Summaries (Form 8283), and Baseline Documentation Reports.   Third, these Defendants made themselves available to directly answer questions from potential participants in the SCE Strategy.   Fourth, these Defendants prepared (in the case of the Large & Gilbert Defendants), reviewed and approved the tax returns prepared for each of the Syndicates and the K-1s that were ultimately issued to each Plaintiff and member of the Class.   Simply stated, these Defendants played a critical role in the SCE Strategy from the beginning to the end and every point in between.   Plaintiffs incorporate herein Paragraphs 69-72, 86-103, and 109-113 *infra* of the Complaint, which further set out more details of the Morris Manning and Large & Gilbert

Defendants' involvement in the operation of the alleged RICO enterprise.

b. <u>The OSI Defendants:</u>   The   OSI   Defendants   were experienced in syndicated land ownership transactions and they began doing conservation easements in 2012.   The Morris Manning Defendants and the Large & Gilbert Defendants saw the OSI Defendants as a perfect partner for the SCE Strategy due to this prior experience, as well as the OSI Defendants' reputation for finding clients for real estate transactions.   The OSI Defendants were more than willing to serve in this role and act as a Sponsor of the SCE Strategy.   The OSI Defendants also assisted in the preparation of all of the SCE Strategy transaction documents, including the Promotional Materials, Conservation Easement Deeds, Appraisal Summaries (Form 8283), and Baseline Documentation Reports.   The OSI Defendants, with the Morris Manning and Large & Gilbert Defendants' assistance, hand-selected the other "experts" (discussed below) to join the conspiracy to promote and implement the SCE Strategy.   Plaintiffs incorporate herein Paragraphs 73-74, 81-84, 93, 102-106, and 113 *infra* of the Complaint, which further set

out more details of the OSI Defendants' involvement in the operation of the alleged RICO enterprise.

c. <u>The SCE Appraisers:</u>   The SCE Appraisers prepared the Appraisals that purported to support the conservation purpose of the conservation easement donation, as well as the value of the donation.  The SCE Appraisers also prepared the Appraisals with full knowledge and the intent that the valuations contained in the Appraisals would be used by the Plaintiffs to claim charitable contribution deductions on their tax returns.  The SCE Appraisers violated their professional obligations and duties.  The SCE Appraisers further knew that the Appraisals were flawed and the valuations contained therein were grossly inflated, as determined by the IRS.  Plaintiffs incorporate herein Paragraphs 75 and 109 *infra* of the Complaint, which further set out more details of the SCE Appraisers' involvement in the operation of the alleged RICO enterprise.

d. <u>The Return Preparers:</u>   These accounting firms/accountants prepared the partnership returns for each of the Syndicates used in the SCE Strategy, as well as the K-1s that were sent to each Plaintiff and member of the Class that set forth each such

individual's proportionate share of the Syndicate's charitable contribution deduction to be reported on their individual tax returns.   These Defendants prepared these partnership tax returns and K-1s with full knowledge of the fact that these documents were being used in connection with the SCE Strategy and would result in the Plaintiffs and members of the Class claiming charitable contribution deductions from the SCE Strategy on their individual tax returns.   Plaintiffs incorporate herein Paragraphs 6 and 80 *infra* of the Complaint, which further set out more details of the Return Preparers' involvement in the operation of the alleged RICO enterprise.

e.   The PCLG Defendants: The PLCG Defendants performed two distinct roles in connection with the marketing, sale, and implementation of the SCE Strategy.   First, they recruited clients to buy into a fund for purposes of participating in the SCE Strategy and provided these clients with comfort letters in connection with the SCE Strategy.   Second, they provided legal advice and services to the OSI Defendants and members of the SCE Syndicates (*i.e.*, Plaintiffs and members of the Class) regarding all aspects of the SCE Strategy, including document

preparation, review, and analysis and due diligence on the bona

fides of the purported tax benefits of the SCE Strategy.

Plaintiffs incorporate herein Paragraphs 77 and 107-108 *infra*

of the Complaint, which further set out more details of the

PCLG Defendants' involvement in the operation of the alleged

RICO enterprise.

f.  <u>Bennett Thrasher:</u>  Bennett Thrasher is an accounting firm that

performed several roles in connection with the marketing, sale,

and implementation of the SCE Strategy.  First, it referred its

own clients for the SCE Strategy and, in doing so, utilized its

clients' confidential financial information to identify potential

targets.  With respect to these clients. Bennett Thrasher also

purported to conduct its own independent "due diligence" on

the SCE Strategy ***for each separate client*** and charged each

separate client a fee for this due diligence (in addition to the fee

that Bennett Thrasher charged each client for preparation of the

client's individual tax return and each Syndicate for preparation

of the partnership returns and K-1s).  Plaintiffs incorporate

herein Paragraphs 78-79 and 104-106 *infra* of the Complaint,

which further set out more details of Bennett Thrasher's involvement in the operation of the alleged RICO enterprise.

g.  <u>The Greencone Defendants:</u>   Bennett   Thrasher   also introduced the Greencone Defendants to the OSI Defendants. The Greencone Defendants convinced the OSI Defendants to focus on mining as the purported investment use for the properties the OSI Defendants purchased in connection with the SCE Strategy.  The Greencone Defendants, in turn, introduced the OSI Defendants to the Blethen Defendants.   Plaintiffs incorporate herein Paragraphs 79 and 106 *infra* of the Complaint, which further set out more details of Bennett Thrasher's and the Greencone Defendants' involvement in the operation of the alleged RICO enterprise.

h.  <u>The Land Trusts:</u> The Land Trusts assisted in the implementation of the SCE Strategy by providing assistance in drafting the deed language for the donation of the conservation easement and preparing the Baseline Documentation Reports that purported to support the conservation purpose of the conservation easement.  These entities also worked alongside the Morris Manning and Large & Gilbert Defendants and the

Appraiser Defendants in making promotional presentations to prospective clients and referral sources.  These entities profited enormously from the SCE Strategy by accepting huge donations of interests in real estate in connection with the SCE Strategy, together with substantial amounts of cash that were used to compensate the officers of the Land Trusts and affiliated companies.  They also profited from the large fees paid to their affiliates for preparation of Baseline Documentation Reports.  For instance, Keller formed ERMF for the specific purpose of generating enormous fees for each SCE Strategy transaction that involved ACC.  The ACC Defendants required the OSI Defendants to utilize the services of ERMF and to pay a consulting fee to ERMF for each such transaction.  Plaintiffs incorporate herein Paragraphs 76 and 110-112 *infra* of the Complaint, which further set out more details of the Land Trust's involvement in the operation of the alleged RICO enterprise.

i.   The PropCos and the Syndicates:        These    entities    were created by the OSI Defendants as the vehicle through which the

subject property was purchased and the vehicle through which Plaintiffs and the Class participated in the SCE Strategy.

j.  <u>The Managers:</u>  These entities were all created by, affiliated with, and controlled by the OSI Defendants to act as Managers for each Syndicate and take the necessary actions on behalf of each such Syndicate to effect the steps of the SCE Strategy.

k.  <u>The Consultants:</u>  These entities completed assessments of certain parcels of land used in the SCE Strategy to determine the merits of conservation of each such parcel.  These entities also performed market research and analysis, real estate and geotechnical consulting services, conservation consulting, due diligence, and/or mining engineering and consulting services for various parcels of land used in the SCE Strategy to determine the feasibility of operating a mine on and/or developing each such parcel.  These entities also worked as consultants to locate and hire legal and professional advisors to compile necessary documentation for the investments in the Syndicates.  Conservation Pays, Conservation Saves, and Conservation Matters preformed consulting services regarding whether the subject properties could support a valid

conservation purpose and other conservation consulting services. From 2014 through 2018, the Blethen Defendants, Galt Mining, and Greencone Defendants provided geotechnical services and other consulting services in connection with the feasibility of operating a mine on each parcel as the Highest and Best Use. Plaintiffs incorporate herein Paragraphs 84 and 113 *infra* of the Complaint, which further set out more details of the Consultants' involvement in the operation of the alleged RICO enterprise.

250. The Defendants intended to commit wire and/or mail fraud in connection with the design, promotion, sale and implementation of the SCE Strategy because the IRS has made it clear to professional advisors, including the Defendants, that it intends to disallow any deductions for conservation easement donations implemented in the manner the SCE Strategy was implemented, as further set out in detail herein. Defendants' racketeering activity in designing, promoting, selling, and implementing the SCE Strategy involved numerous false and misleading misrepresentations and omissions that amount to a scheme or artifice to defraud.

251. Unfortunately, the IRS has concluded that the charitable deductions at the partnership (*i.e.*, the Syndicate) level are disallowed and made clear its intent to

also disallow the charitable contribution deductions at the individual level and assess Plaintiffs and the Class with back taxes, interest, and penalties.

252. Plaintiffs and the Class, who were fully reliant on the advice and representations of the credentialed professionals like the Defendants, were "collateral damage" of the Co-Conspirators' scheme to extract huge fees and commissions. Plaintiffs trusted they were being advised, counseled and directed by those professionals who represented themselves as experts who were highly experienced with these types of transactions. Defendants and their co-conspirators received large amounts of fees and commissions for personal use/gain while at all times assuring Plaintiffs they were in full compliance with the applicable IRS rules and regulations, and other applicable legal requirements.

### C. Predicate Acts

253. With respect to the activities alleged herein, the Defendants and Other Participants acted at all times with malice toward the Plaintiffs and the Class, intending to engage in the conduct complained of for the benefit of Defendants and their co-conspirators and with knowledge that such conduct was unlawful. Such conduct was done with actionable wantonness and reckless disregard for the rights of Plaintiffs and the Class, as well as the laws to which the Defendants and their co-conspirators are subject, the same amounting to actionable wantonness.

254.   With respect to the activities alleged herein, each Defendant and each of their co-conspirators agreed to the operation of the transaction or artifice to deprive Plaintiffs and the Class of property interests.   In furtherance of these agreements, each Defendant also agreed to interfere with, obstruct, delay or affect interstate commerce by attempting to obtain and/or actually obtaining property interests to which the Defendants were not entitled.

255.   With respect to the overt acts and activities alleged herein, each Defendant conspired with each other, the Other Participants, and with others not named as Defendants herein, to violate 18 U.S.C. §1962(c) and O.C.G.A. §16-4-4(b), all in violation of 18 U.S.C. §1962(d) and Georgia law.   Each Defendant agreed and conspired with each other Defendant and their co-conspirators to participate, directly or indirectly, in interfering with, obstructing, delaying or affecting commerce by attempting to obtain and/or actually obtaining property interests to which the Defendants and their co-conspirators were not entitled.

256.   The numerous predicate acts of wire and/or mail fraud in addition to other fraudulent acts, are part of separate fraudulent transactions by Defendants and their co-conspirators designed to defraud the Individual Plaintiffs and the Class of money and property interests under false pretenses. As victims of these unlawful patterns of illegal activity, Plaintiffs and members of the Class have and continue

to suffer losses as a result of these activities.  The acts that caused injuries to the Plaintiffs and members of the Class were performed for financial gain.

257.   In carrying out the overt acts and fraudulent transactions described above, the Defendants and their co-conspirators engaged in, *inter alia*, conduct in violation of federal laws, including 18 U.S.C. §§1343-1346, and 18 U.S.C. §1961 *et seq*.  *See also* O.C.G.A. §16-4-3(5)(C).

258.   Section 1961(1) of RICO provides that "racketeering activity" means any act indictable under any of the following provisions of Title 18, United States Code: §1341 (relating to mail fraud), §1343 (relating to wire fraud) and §1346 (relating to scheme or artifice to defraud).

259.   Section 16-4-3(5)(C) of the Official Code of Georgia Annotated provides that "racketeering activity" means, *inter alia*, "any conduct defined as 'racketeering activity' under 18 U.S.C. Section 1961(1)."

## D.   Violations of 18 U.S.C. §§ 1341 and 1343.

260.   Plaintiffs repeat and reallege each and every prior allegation in this Complaint as if fully set forth herein.

261.   For the purpose of executing and/or attempting to execute their transaction to defraud and to obtain money by means of false pretenses, representations or promises, the Defendants and their co-conspirators, in violation of 18 U.S.C. §§ 1341 and 1343, transmitted and received by wire and/or mail

matter and things therefrom including but not limited to contracts, instructions, correspondence, and other transmittals.

262.   The Defendants' and their co-conspirators' violations of 18 U.S.C. §§ 1341 and 1343 are too numerous to list exhaustively.  Upon information and belief, the Defendants and Other Participants engaged in predicate act violation as early as 2012 and Plaintiffs will obtain evidence of such violations through discovery in this case.  However, by way of illustration but not limitation, Plaintiffs provide the following representative examples of predicate acts related to these 18 U.S.C. §§ 1341 and 1343 violations of which they currently have knowledge:

(a)   August 5, 2013 email from Matthew Ornstein of OSI to Norman Radow containing promotional material regarding participation in the Lakepoint Syndicate;

(b)   September 24, 2013 email from Matthew Ornstein of Conservation Saves to Norman Radow regarding the Lakepoint Syndicate containing spreadsheets with tax analysis pertaining to the Lakepoint Syndicate;

(c)   October 22, 2013 email from Matthew Ornstein of Conservation Saves to Norman Radow and all potential members of the Lakepoint Syndicate containing Promotional Materials that summarize the Lakepoint Syndicate, its professional advisors and that the tax benefit for the Lakepoint Syndicate is $4.39 for every dollar invested;

(d)   October 31, 2013 emails from Matthew Ornstein of Conservation Saves to Norman Radow asking about sending paperwork for the Lakepoint Syndicate to Norman Radow at his office and instructing Norman Radow to remit payment by November 8, 2013;

(e)     November 13, 2013 delivery of documents to Norman Radow and other Lakepoint Syndicate participants containing Investor Agreement of Lakepoint Land Group LLC for the signature of the participants;

(f)     December 3, 2013 email from Conservation Saves to all Lakepoint Syndicate participants containing a Member Approval Form to adopt the easement strategy;

(g)     December 5, 2013 email from Frank Schuler of Conservation Saves to Norman Radow and all Lakepoint Syndicate participants of the vote to conserve the subject property;

(h)     Letter and email in March 2014 from Large & Gilbert providing Norman Radow and all Lakepoint Syndicate participants with K-1s containing the charitable contribution deduction arising from the Lakepoint Syndicate;

(i)     Letter from Frank Schuler of Conservation Saves to William N. Turk and all Industrial S&G Partners Participants on or about December 5, 2014 containing various documents relating to the Industrial S&G Syndicate containing various documents for execution including an Operating Agreement, Investor Agreement, Member Approval Form, Member Information and pre-addressed FedEx envelope;

(j)     May 8, 2014 email from Matt Ornstein of OSI to Jeff Call of Bennett Thrasher and Norman Radow regarding introduction call;

(k)     Letter dated February 20, 2015 from Large & Gilbert to William N. Turk containing K-1 with a deduction of $246,808 from Industrial S&G Partners;

(l)     December 18, 2015 email from Frank Schuler of OSI to Norman Radow and other participants regarding IRS audit of Lakepoint Syndicate informing the participants that OSI has hired former IRS attorney Randy Bampfield;

(m)     August 18, 2017 email from Matthew Kaynard of OSI to Norman Radow regarding "Reportable Transaction Numbers for Your IRS Forms 8886";

(n)     September 5, 2017 email from Paul Stachiewicz of OSI to Norman Radow regarding OSI client portal for Forms 8886;

(o)     June 4, 2017 email from Matt Ornstein of OSI to Norman Radow regarding audit letters wherein Ornstein indicated stated: "And please rest assured that we have complete confidence in the valuations and have the resources to defend through tax court if we have to;"

(p)     August 18, 2017 emails from Matthew Kaynard of OSI to Norman Radow regarding "Reportable Transaction Numbers for Your IRS Forms 8886;"

(q)     August 23, 2017 email from Matthew Kaynard of OSI to Norman Radow regarding "Corrected Reportable Transaction Numbers Due to IRS Glitch;"

(r)     March 2, 2018 email from OSI to Norman Radow and other "Clients and Advisors" regarding "Ornstein-Schuler Update:  K-1 and Tax Document Delivery Date;"

(s)     Emails from Matt Ornstein of OSI to Norman Radow between May 4, 2018 and May 16, 2018 regarding "Important Update from the Ornstein-Schuler Group;"

(t)     June 15, 2018 email from Matt Ornstein of OSI to Norman Radow regarding "June Update from Ornstein-Schuler;"

(u)     July 19, 2018 email from Matt Ornstein of OSI to Norman Radow regarding "July Update from Ornstein-Schuler;"

(v)     November 1, 2018 email from Matt Ornstein of OSI to Norman Radow regarding "November 1st Update from Ornstein-Schuler;"

(w)     November 12, 2018 email from Matt Ornstein of OSI to Norman Radow regarding "November 12th Update from Ornstein-Schuler;"

(x)     November 19, 2018 email from Matt Ornstein of OSI to Norman Radow regarding "November 19th Update from Ornstein-Schuler;"

(y)   November 26, 2018 email from Matt Ornstein of OSI to Norman Radow regarding "November 26th Update from Ornstein-Schuler;"

(z)   February 5, 2019 email from OSI to Norman Radow regarding "Ornstein-Schuler Update:   K-1 and Tax Document Delivery Timing;"

(aa)   February 13, 2019 email from Matthew Kaynard of OSI to Norman Radow regarding "Important steps regarding your 2018 tax documents;"

(bb)   All K-1s prepared by the Return Preparers for members of any SCE Syndicate sponsored or managed by OSI or any of its affiliates and sent by email or mail to any potential or actual member of such Syndicate;

(cc)   All Appraisals prepared by any of the SCE Appraisers on property owned by any SCE Syndicate sponsored or managed by OSI or any of its affiliates and sent by email or mail to any potential or actual member of such Syndicate;

(dd)   All template Form 8886s sent by email from any Defendant or Other Participant to any member of any SCE Syndicate sponsored or managed by OSI or any of its affiliates;

(ee)   All Form 8886s prepared by any Defendant or Other Participant and transmitted via mail or wire for any SCE Syndicate sponsored or managed by OSI or any of their affiliates;

(ff)   All other mailed or emailed communications between any of the Defendants or Other Participants and any potential or actual member of any SCE Syndicate sponsored or managed by OSI or any of its affiliates regarding the promotion of the SCE Strategy;

(gg)   All other mailed or emailed communications between any of the Defendants or Other Participants and any potential or actual member of any SCE Syndicate sponsored or managed by OSI or any of its affiliates regarding the implementation of the SCE Strategy; and

(hh)   All other mailed or emailed communications between any of the Defendants or Other Participants and any potential or actual member of any SCE Syndicate sponsored or managed by OSI or any of its affiliates regarding the audit of any such Syndicate.

263.   Each of the documents that Defendants and their co-conspirators sent by wire and/or mail to Plaintiffs and members of the Class served at least two roles in the Enterprise.  First, many of these documents, standing alone, were fraudulent. Defendants and their co-conspirators knew the tax treatment contemplated by their communications was inaccurate.  Second, all of these documents were used to advance the fraudulent scheme that Defendants and their co-conspirators perpetrated on Plaintiffs and the Class.

264.   Defendants' and their co-conspirators' efforts in executing or attempting to execute their transactions to defraud and to obtain money by means of false pretenses, representations or promises, including without limitation acts done in violation of 18 U.S.C. §§ 1341 and 1343, also fall within the definition of racketeering activity under O.C.G.A. §16-4-3(5)(C).

265.   In those matters and things sent or delivered by wire, through other interstate electronic media, and/or by mail, Defendants and their co-conspirators falsely and fraudulently misrepresented and fraudulently suppressed material facts from Plaintiffs and the Class as described above, in violation of 18 U.S.C. §§ 1341 and 1343.   These acts, in addition to false and fraudulent misrepresentations communicated outside the interstate wire and mail systems, also fall within the

definition of racketeering activity under O.C.G.A. §16-4-3(5)(C).  Defendants' and

their co-conspirators' fraudulent statements and omissions include but are not

limited to the following:

(1)    Orchestrating from a tax standpoint the design, development, implementation, operation, and management of the SCE Strategy;

(2)    Advising Plaintiffs and the members of the Class to engage in the SCE Strategy in order to receive favorable tax benefits;

(3)    Advising and recommending that Plaintiffs and members of the Class engage in an illegal and abusive tax shelter;

(4)    Failing to advise Plaintiffs and members of the Class that the SCE Strategy was an illegal and abusive tax shelter;

(5)    Failing to disclose existing published authority that indicated the purported tax benefits of the SCE Strategy were improper and not allowable for federal income tax purposes because of the failure of the SCE Strategy to strictly conform to Code Section 170(h);

(6)    Advising Plaintiffs and members of the Class that the SCE Strategy complied with the applicable tax laws, rules, regulations, common law doctrines, and published court decisions;

(7)    Failing to advise Plaintiffs and members of the Class that the SCE Strategy did not comply with the applicable tax laws, rules, regulations, common law doctrines, and published court decisions;

(8)    Failing to advise Plaintiffs and members of the Class that the SCE Strategy did not meet the strict requirements for a qualified conservation easement under Section 170(h) of the Code;

(9)      Advising Plaintiffs and the members of the Class that the donations of the conservation easements met the requirements of Section 170(h) of the Code and therefore provided lawful and legitimate tax benefits for the Plaintiffs and the Class;

(10)    Failing to advise Plaintiffs and the members of the Class that the donations of the conservation easements did not meet the requirements of Section 170(h) of the Code and therefore did not provide lawful and legitimate tax benefits for the Plaintiffs and the Class;

(11)    Advising Plaintiffs and members of the Class that they would receive substantial tax advantages in the form of charitable contribution deductions by engaging in the SCE Strategy;

(12)    Failing to advise Plaintiffs and members of the Class that the IRS had expressed its clear intent to disallow the tax benefits that were promised from the SCE Strategy;

(13)    Advising Plaintiffs and members of the Class that the SCE Strategy complied with Section 170(h) of the Code and therefore the donations of conservation easements would provide legal and allowable tax deductions;

(14)    Failing to advise Plaintiffs and members of the Class that the IRS had expressed its clear intent to conclude that the SCE Strategy did not comply with Section 170(h) of the Code and therefore the donations of conservation easements would not provide legal and allowable tax deductions;

(15)    Failing to advise Plaintiffs and members of the Class that the Appraisals were significantly inflated, thereby grossly inflating the Section 170(h) deduction;

(16)    Advising Plaintiffs and members of the Class that the Appraisals complied with Section 170(h) of the Code, applicable tax laws and regulations, appraisal industry standards, regulations and rules;

(17)     Failing to advise Plaintiffs and members of the Class that the Appraisals did not comply with Section 170 of the Code, applicable tax laws and regulations, and appraisal industry standards, regulations and rules;

(18)     Advising Plaintiffs and the members of the Class to sign and file tax returns reporting the tax deductions and benefits of the SCE Strategy;

(19)     Failing to advise Plaintiffs and the members of the Class not to sign and file tax returns reporting the tax deductions and benefits of the SCE Strategy because the IRS had expressed its clear intent to disallow them as improper and illegal;

(20)     Advising, instructing, and assisting in the preparation of the tax returns for Plaintiffs and members of the Class that reported the donations of the conservation easements as charitable contribution deductions;

(21)     Failing to advise Plaintiffs and members of the Class not to report the donations of the conservation easements as charitable contribution deductions;

(22)     Advising Plaintiffs and members of the Class that their tax returns, which reported the charitable contribution deductions, were prepared pursuant to and/or complied with IRS guidelines and established legal authorities;

(23)     Failing to advise Plaintiffs and members of the Class that their tax returns, which reported the charitable contribution deductions, did not comply with IRS guidelines and established legal authorities;

(24)     Failing to disclose to Plaintiffs and members of the Class that if they filed tax returns that reported the charitable contribution deductions, the IRS would take the position that Plaintiffs and members of the Class would be liable for taxes, penalties and/or interest, if audited;

(25)    Failing to advise Plaintiffs and members of the Class that the tax benefits of the SCE Strategy would be disallowed, if audited;

(26)    Making and endorsing the statements and representations contained in the Defendants' and their co-conspirators' written advice, instructions, and recommendations; and

(27)    Failing to advise Plaintiffs and members of the Class that each of the Defendants and the Other Participants were not "independent" of one another and in fact were involved in a conspiracy to design, market, sell, and implement the SCE Strategy, a strategy that largely depended upon the IRS not auditing a particular transaction for it be successful.

266.   The predicate acts, including the predicate acts of wire and mail fraud, are continuing. The Defendants and their co-conspirators, on their own and as part of a common fraudulent scheme and conspiracy, defrauded Plaintiffs as set out above.

267.   The Defendants and their co-conspirators intentionally and knowingly made these material misrepresentations and intentionally and knowingly suppressed material facts from Plaintiffs and the Class for the purpose of deceiving them and thereby obtaining financial gain. The Defendants and their co-conspirators either knew or recklessly disregarded that the misrepresentations and omissions described above were material. Plaintiffs and the Class were injured as a result of the Defendants' and their co-conspirators' misrepresentations and omissions in carrying out the transactions and subsequently filing tax returns based

on the Defendants' (and their co-conspirators') improper advice and their fraudulent and false misrepresentations and omissions.

268.    The Defendants and their co-conspirators made continual use of wire transmissions, in addition to communications made outside the interstate wire systems, to effectuate their fraudulent scheme.  In addition to using in person, telephonic, and other means of communication to make fraudulent statements, the Defendants and their co-conspirators transmitted numerous specific fraudulent statements to Plaintiffs and the Class through the mail, by fax, and/or by email.

269.    The Defendants and their co-conspirators intentionally and knowingly made these material misrepresentations and intentionally and knowingly suppressed material facts from Plaintiffs and the Class for the purpose of deceiving them and thereby obtaining financial gain. The Defendants and their co-conspirators either knew or recklessly disregarded that the misrepresentations and omissions described above were material. Plaintiffs and the Class were injured as a result of the misrepresentations and omissions in carrying out the SCE Strategy and subsequently filing tax returns based on the Defendants' (and their co-conspirators') fraudulent and false misrepresentations and omissions.

270.    As set forth above, there are numerous specific examples of the predicate acts of fraud, including wire and mail fraud, committed by Defendants and their co-conspirators pursuant to their transactions to defraud Plaintiffs.

271.   Plaintiffs have therefore been injured in their business or property as a result of the Defendants' and their co-conspirators' overt acts and racketeering activities.

### E.   Pattern of Racketeering Activity

272.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

273.   As set forth above, the Defendants and their co-conspirators have engaged in a "pattern of racketeering activity," as defined in §1961(5) of RICO and O.C.G.A. §16-14-3(4), by committing and/or conspiring to commit at least two such acts of racketeering activity, as described above, within the past ten years (and within the past five years with respect to the Georgia RICO Statute).  Each such act of racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results impacting upon similar victims, including Plaintiffs and the Class.

274.   The multiple acts of racketeering activity committed and/or conspired to by Defendants and their co-conspirators, as described above, were related to each other and amount to and pose a threat of continued racketeering activity, and, therefore, constitute a "pattern of racketeering activity," as defined in 18 U.S.C. §1961(5) and O.C.G.A. §16-14-3(4).  Plaintiffs allege that the course of conduct engaged in by the Defendants constituted both "continuity" and "relatedness" of

the racketeering activity, thereby constituting a pattern of racketeering activity, as that term is defined in 18 U.S.C. §1961(5) and O.C.G.A. §16-14-3(4).  Plaintiffs can show the relatedness prong because the predicate acts have "similar purposes, results, participants, or methods of commission or are related to the affairs of the Enterprise."  All predicate acts had the same purpose of utilizing the Enterprise to misrepresent the nature of the transactions underlying the SCE Strategy so that the Defendants and their co-conspirators could defraud Plaintiffs.  Plaintiffs allege that the continuity of the pattern of racketeering activity is "closed-ended" inasmuch as a series of related predicate offenses extended for at least 8 years (a substantial period of time).  Moreover, the continuity of the pattern of racketeering can also be established under "open-ended continuity" as the predicate offenses are part of the Enterprise's regular way of doing business, and the predicate offenses are attributed to Defendants' and their co-conspirators' operations as part of a long-term association that existed for criminal purposes.  Further, the last act of racketeering activity that is alleged as the basis of Plaintiffs' claims occurred within four years of a prior act of racketeering.

275.  Plaintiffs and the Class therefore have been injured in their business or property as a result of Defendants' and their co-conspirators' overt acts and racketeering activities as described above and throughout this Complaint.

**VII.**

**PLAINTIFFS' CLAIMS WERE TIMELY FILED OR, ALTERNATIVELY THE DISCOVERY RULE AND EQUITABLE TOLLING DEFERRED ACCRUAL OF STATUTES OF LIMITATIONS AS TO ALL DEFENDANTS**

276.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

277.   The causes of action asserted by Plaintiffs against Defendants herein are timely filed because Plaintiffs' claims first accrued within the applicable limitation period for each claim.

278.   In the alternative, the causes of action asserted by Plaintiffs against Defendants herein are timely filed as the discovery rule and/or equitable tolling deferred accrual of the respective statutes of limitation for such causes of action.

279.   Plaintiffs did not and could not discover the wrongful acts of the Defendants or the injuries caused by the wrongful acts of the Defendants alleged herein more than 2 years prior to the filing of this lawsuit.

280.   Prior to and up until the timeframe referenced in the immediately preceding paragraphs, Defendants and their co-conspirators continued to advise Plaintiffs that the charitable contribution deductions generated by the SCE Strategy complied with all applicable tax laws and regulations and would be accepted by the IRS.  In making these representations and providing this advice, the Defendants and their co-conspirators made false representations and concealed material facts

relating to Defendants' wrongdoing and the numerous flawed aspects of the SCE Strategy. In reliance on these representations and advice, Plaintiffs and the members of the Class were delayed and deterred from bringing their claims against Defendants at an earlier date. Defendants and their co-conspirators' concealment therefore prevented Plaintiffs and the members of the Class from discovery of the nature of their claims.

281. Plaintiffs and the members of the Class exercised due diligence in pursuing discovery of their claims during the time period that commenced with Defendants rendering faulty advice and continued through the filing of this Complaint.

282. In the alternative, Plaintiffs claims are timely filed under the fraudulent concealment and/or continuing tort/continuous representation doctrines.

## VIII.

## CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF RICO 18 U.S.C. §1962(c)
### (By All Plaintiffs And The Class Against All Defendants)

283. Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

284. Section 1962(c) of RICO provides that it "shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities

of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

285.   Plaintiffs incorporate, as though fully set out herein, their allegations regarding the Enterprise.

286.   Plaintiffs incorporate, as if fully set forth herein, their allegations that Defendants have engaged in a pattern of racketeering activity.

287.   The Defendants, who are associated with and are part of the Enterprise, conduct and have conducted the Enterprise's affairs through a pattern of racketeering activity, as set forth in this Complaint. Through the fraudulent and wrongful conduct described in this Complaint, Defendants seek and have sought to deprive Plaintiffs and members of the Class of money and property rights. In order to successfully execute their scheme in the manner set forth in this Complaint, Defendants must have a system that allows Defendants to access their victims in a manner to effectuate the fraudulent transactions. The Enterprise allows the Defendants this access.

288.   With respect to the activities alleged herein, the Defendants have acted at all times with malice toward Plaintiffs and members of the Class in their efforts to acquire and maintain an interest in an Enterprise that affects interstate commerce.

289.   In carrying out the overt acts and fraudulent scheme described above, the Defendants have engaged in conduct in violation of federal laws, including *inter alia* 18 U.S.C. §§ 1341, 1343 and 1346, and 18 U.S.C. §1961, *et seq.* as set forth more fully above.

290.   Therefore, Defendants have each engaged in "racketeering activity" which is defined in §1961(1) of RICO to mean "any act which is indictable under," *inter alia*, 18 U.S.C. §1341 (relating to mail fraud) and 18 U.S.C. §1343 (relating to wire fraud).

291.   As a proximate result of Defendants' unlawful pattern of illegal fraudulent conduct as described above, Plaintiffs and members of the Class have been injured in their business or property as described above.

### COUNT II
### VIOLATIONS OF RICO 18 U.S.C. §1962(D)
### BY CONSPIRING TO VIOLATE 18 U.S.C. §1962(C)
### (By All Plaintiffs and The Class Against All Defendants)

292.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

293.   This claim for relief arises under 18 U.S.C. §1964(a) of RICO and seeks relief from the Defendants' activities described herein for violations of 18 U.S.C. §1962(d) for their conspiracy to violate 18 U.S.C. §1962(c).

294.   Plaintiffs incorporate, as if fully set forth herein, their allegations regarding the Enterprise.

295.   Plaintiffs incorporate, as if fully set forth herein, their allegations that Defendants have engaged in a pattern of racketeering activity.

296.   Absent Defendants' conspiracy and joint efforts with their co-conspirators, Defendants' scheme would not be successful. Acting jointly, Defendants and their co-conspirators have possessed greater power, have been able to exert greater influence, have been able to successfully engage in the activities set forth herein, and have had greater ability to conceal their activities.

297.   Defendants have also violated §1962(d) by conspiring to violate 18 U.S.C. §1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the §1962(c) Enterprise(s) described previously through a pattern of racketeering activity.

298.   Defendants, their employees, and multiple agents have been joined in the conspiracies to violate 18 U.S.C. §1962(c) in violation of §1962(d) by various third parties not named as Defendants herein, such as the Other Participants.

299.   As demonstrated in detail above, the Defendants and their co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including systemic fraudulent practices designed to defraud the Plaintiffs and the Class of money and other property interests.

300.   The nature of the above described acts, material misrepresentations, and omissions in furtherance of the conspiracy give rise to an inference that Defendants not only agreed to the objective of a violation of 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. §1962(c), but also they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

301.   The Defendants and their co-conspirators have engaged in the commission of and continue to commit overt acts and the following described unlawful racketeering predicate acts that have generated and continue to generate income or proceeds received by Defendants from such pattern of racketeering activity, including:

   a.   Multiple instances of mail fraud violations of 18 U.S.C. § 1341;

   b.   Multiple instances of wire fraud violations of 18 U.S.C. § 1343; and

   c.   Multiple instances of travel in interstate commerce to attempt to and to actually commit mail fraud and wire fraud.

302.   As a proximate result of Defendants' and their co-conspirators' conduct as described above, Plaintiffs and the Class have been injured in their business or property as described herein.

## COUNT III
## VIOLATIONS OF GEORGIA RICO
### (By All Plaintiffs And The Class Against All Defendants)

303.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

304.   O.C.G.A. §§ 16-14-4(a) and (b) provides that "[i]t shall be unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money" and "it shall be unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity."

305.   Plaintiffs incorporate, as though fully set out herein, their allegations regarding the Enterprise.

306.   Plaintiffs incorporate, as if fully set forth herein, their allegations that Defendants have engaged in a pattern of racketeering activity.

307.   The Defendants, who are employed by and/or associated with and a part of the Enterprise, conduct the Enterprise's affairs through racketeering, as set forth in this Complaint. Through the fraudulent and wrongful conduct described in this Complaint, Defendants sought to obtain financial gain by depriving Plaintiffs and the Class of money and property rights. In order to successfully execute their

scheme in the manner set forth in this Complaint, Defendants needed a system that allowed Defendants to access their victims in a manner to effectuate the fraudulent transactions. The Enterprise allowed the Defendants this access.

308.   With respect to the activities alleged herein, the Defendants have acted at all times with malice toward Plaintiffs and the Class in their efforts to acquire and maintain an interest in an Enterprise that affects interstate commerce.

309.   In carrying out the overt acts and fraudulent scheme described above, the Defendants have engaged in conduct in violation of Georgia state law as set forth more fully above.

310.   Therefore, Defendants have each engaged in "racketeering activity" as set out in §16-14-3(5)(C) of Georgia RICO.

311.   As a proximate result of Defendants' unlawful pattern of illegal fraudulent conduct as described above, Plaintiffs and the Class have been injured in their business or property as described above.

## COUNT IV
## CONSPIRACY TO VIOLATE GEORGIA RICO (O.C.G.A. §16-14-4(C))
### (By All Plaintiffs And The Class Against All Defendants)

312.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

313.   This claim for relief arises under and seeks relief from the Defendants' activities described herein as part of their conspiracy to violate O.C.G.A. §§ 16-14-4(a) and (b).

314.   Plaintiffs incorporate, as if fully set forth herein, their allegations regarding the Enterprise.

315.   Plaintiffs incorporate, as if fully set forth herein, their allegations that Defendants have engaged in a pattern of racketeering activity.

316.   Absent Defendants' conspiracy and joint efforts, Defendants' scheme would not be successful. Acting jointly with their co-conspirators, Defendants have possessed greater power, have been able to exert greater influence, have been able to successfully engage in the activities set forth herein, and have had greater ability to conceal their activities.

317.   The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the Enterprise(s) described previously through racketeering activity.

318.   Defendants, their employees, and multiple agents have been joined in the conspiracies to violate O.C.G.A. §§ 16-14-4(a) and (b) by various third parties not named as Defendants herein, such as the Other Participants.

319.   As demonstrated in detail above, the Defendants and their co-conspirators have engaged in numerous overt and predicate fraudulent racketeering

acts in furtherance of the conspiracy, including systemic fraudulent practices designed to defraud the Individual Plaintiffs and the Class of money and other property interests.

320.  The nature of the above described acts, material misrepresentations, and omissions in furtherance of the conspiracy give rise to an inference that Defendants not only agreed to the objective of conspiring to violate the Georgia racketeering statute, but they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

321.  The Defendants have sought to and have engaged in the commission of and continue to commit overt acts and unlawful racketeering predicate acts that have generated and continue to generate income or proceeds received by Defendants from such pattern of racketeering activity, including acts that involve a scheme or artifice to defraud as set forth more fully in Paragraphs 253 through 271 *supra*.

322.  As a proximate result of Defendants' conduct as described above, Plaintiffs and the Class have been injured in their business or property as described herein.

**COUNT V**
**NEGLIGENCE/PROFESSIONAL MALPRACTICE**

**(By All Plaintiffs And The Class Against All Defendants)**

323.   Plaintiffs repeat and reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

324.   As the professional advisors who provided services and advice to Plaintiffs and the members of the Class in connection with the SCE Strategy, the Defendants owed Plaintiffs and the members of the Class a duty to comply with the applicable standards of care and the applicable provisions of their codes of professional responsibility.

325.   The Defendants failed to meet those applicable standards of care.  The Defendants' failure to meet their respective standards of care proximately caused damages to the Plaintiffs as set forth elsewhere in this Complaint.

326.   The Defendants' failures to meet the applicable standards of care constitute negligence.

327.   The Defendants' negligence/gross negligence was a proximate cause of the damages for Plaintiffs and members of the Class.  In reasonable reliance on the Defendants' professional advice regarding the SCE Strategy, Plaintiffs and members of the Class: (1) paid substantial sums of money to participate in the SCE Strategy; (2) paid fees to the Defendants and Other Participants for professional advice and services; (3)  lost the tax savings that could have been provided had the

SCE Strategy been properly implemented in compliance with Section 170(h) of the Code; (4) filed federal and state tax returns that reflected charitable contribution deductions in connection with the SCE Strategy; and (5) failed to file a qualified amended return.

328.   The Defendants' actions rise to the level of gross negligence. Accordingly, Plaintiffs and the members of the Class seek punitive/exemplary damages against the Defendants, jointly and severally.

329.   The Defendants' negligence/gross negligence proximately caused damages to Plaintiffs and members of the Class in that they (1) paid substantial funds to participate in the SCE Strategy, (2) paid significant fees to the Defendants and Other Participants, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties, (4) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; and (5) have incurred and will continue to incur substantial additional costs to rectify the situation.

330.   As a proximate cause of the foregoing, Plaintiffs and members of the Class have been injured in an actual amount to be proven at trial but in excess of $5 million and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## COUNT VI
## NEGLIGENT MISREPRESENTATION
## (By All Plaintiffs And The Class Against
## All Defendants, In The Alternative To The Fraud Claim)

331.   Plaintiffs and members of the Class repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

332.   During the course of their representation of Plaintiffs and members of the Class, Defendants each negligently made affirmative representations, including those misrepresentations and omissions detailed in Count VIII below, that were incorrect, improper, or false; negligently made misleading omissions of material fact; and negligently gave improper, inaccurate, and wrong recommendations, advice, instructions, and opinions to Plaintiffs and members of the Class.   In addition, each Defendant is liable for each negligent misrepresentation and omission made by each of their co-conspirators.

333.   Defendants either knew or reasonably should have known that their representations, recommendations, advice and instructions were improper, inaccurate, or wrong.   Defendants either knew or reasonably should have known that their failures to disclose material information to Plaintiffs and members of the Class were improper and wrong and would mislead Plaintiffs and members of the Class.

334.   Plaintiffs and members of the Class reasonably relied upon the Defendants' misrepresentations and advice.

335.   The Defendants' (and their co-conspirators') negligent and grossly negligent misrepresentations were a proximate cause of the damages of the Plaintiffs and members of the Class.  In reasonable reliance on Defendants' advice regarding the SCE Strategy, Plaintiffs and members of the Class: (1) paid substantial sums to participate in the SCE Strategy; (2) paid substantial fees to the Defendants and Other Participants for professional advice and services; (3) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; (4) filed federal and state tax returns that reflected charitable contribution deductions in connection with the SCE Strategy; (5) did not file a qualified amended return; and (6) spent substantial funds in connection with IRS audits and Tax Court proceedings.

336.   The Defendants' conduct set forth herein proximately caused Plaintiffs and members of the Class to suffer injury in that Plaintiffs and members of the Class (1) paid substantial sums to participate in the SCE Strategy, (2) paid significant fees to the Defendants and Other Participants for advice and services, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties, (4) lost the tax savings that could have been provided had the

SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; and (5) have and will continue to incur substantial additional costs to rectify the situation.

337.   As a proximate cause of the foregoing, Plaintiffs and members of the Class have been injured in an actual amount to be proven at trial but in excess of $5 million and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest and costs.

**COUNT VI**
**BREACH OF FIDUCIARY DUTY**
**(By All Plaintiffs And The Class Against The Morris Manning, Large &**
**Gilbert, OSI, And Return Preparer Defendants)**

338.   Plaintiffs and members of the Class repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

339.   As professional advisors who provided services and advice to Plaintiffs and the members of the Class in connection with the SCE Strategy, the Morris Manning, Large & Gilbert, OSI, and Return Preparer Defendants became fiduciaries of the Plaintiffs and the members of the Class.  Plaintiffs and the members of the Class placed their trust and confidence in these Defendants and these Defendants had influence and superiority over the Plaintiffs and the members of the Class.  Thus, these Defendants owed Plaintiffs and the members of the Class

the duties of honesty, loyalty, care, and compliance with the applicable codes of professional responsibility. These Defendants breached these duties and caused Plaintiffs and members of the Class harm and injury, including but not limited to their failures to disclose their conflicts of interest.

340. These Defendants' breaches were a proximate cause of damages to Plaintiffs and the Class. In reasonable reliance on these Defendants' advice regarding the SCE Strategy, Plaintiffs and the Class: (1) paid substantial sums of money to participate in the SCE Strategy; (2) paid fees to the Defendants and Other Participants for professional advice and services; (3) last the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; (4) filed federal and state tax returns that reflected charitable contribution deductions in connection with the SCE Strategy; and (5) failed to file a qualified amended return.

341. The Defendants' conduct set forth herein proximately caused Plaintiffs and members of the Class to suffer injury in that Plaintiffs and members of the Class (1) paid substantial sums to participate in the SCE Strategy, (2) paid significant fees to the Defendants and Other Participants for advice and services, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties, (4) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with

Section 170(h) of the Code; and (5) have and will continue to incur substantial additional costs to rectify the situation.

342. As a proximate cause of the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial but in excess of $5 million, and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

**COUNT VII**
**DISGORGEMENT**
**(By All Plaintiffs And The Class Against The Morris Manning, Large & Gilbert, OSI, Private Law Group And Return Preparer Defendants)**

343. Plaintiffs and members of the Class repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

344. As a result of these Defendants' breach of their fiduciary duties, including but not limited to their failures to disclose their conflicts of interest, they should be required to disgorge all payments received by them from any party including Plaintiffs, any member of the Class, any other Defendants, and/or any Other Participant for work performed in connection with the SCE Strategy.

345. Accordingly, these Defendants must disgorge all such payments in favor of Plaintiffs and members of the Class in an amount far in excess of $5 million. In addition, Plaintiffs and members of the Class seek an award of attorneys' fees, interest, and costs.

## COUNT VIII
## FRAUD
## (By All Plaintiffs And The Class Against All Defendants)

346.   Plaintiffs and members of the Class repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

347.   In order to induce Plaintiffs and members of the Class to participate in the SCE Strategy and pay substantial fees and other monies to the Defendants and the Other Participants, Defendants directly and indirectly—through the Other Participants—made numerous knowingly false affirmative misrepresentations and intentional omissions of material fact to Plaintiffs and members of the Class, including but not limited to:

(1)     Misstating, in light of published authorities, the tax treatment Plaintiffs and members of the Class would receive from the purported charitable contribution made for tax purposes by each Syndicate in the SCE Strategy;

(2)     Advising Plaintiffs and members of the Class that the donation of the conservation easement is fully tax deductible as a qualified charitable contribution deduction;

(3)     Advising Plaintiffs and members of the Class that the Syndicate contributed a qualified real property interest as required to be a valid "qualified conservation contribution";

(4)     Failing to advise Plaintiffs and members of the Class that the alleged value of the conservation easement and associated tax benefits in the SCE Strategy constituted a gross valuation overstatement, thus subjecting Plaintiffs to penalties;

(5)     Advising Plaintiffs and members of the Class that the appraisal commissioned by the Defendants relied on appropriate assumptions, data, and methodology;

(6)     Failing to advise Plaintiffs and members of the Class that the appraisal commissioned by the Defendants relied on inappropriate assumptions, data, and methodology;

(7)     Advising Plaintiffs and members of the Class that the appraisal commissioned by the Defendants complied with §170 of the Code, applicable regulations thereunder, the USPAP, and with general and substantive real property appraisal standards and practices;

(8)     Failing to advise Plaintiffs and members of the Class that the appraisal commissioned by the Defendants did not comply with §170 of the

Code and regulations thereunder, the USPAP, and with general and substantive real property appraisal standards and practices;

(9)     Advising Plaintiffs and members of the Class that the appraisal commissioned by the Defendants provided accurate valuation statements, including the fair market value of the conservation easement;

(10)    Providing false valuation statements to Plaintiffs and members of the Class, including the fair market value of the conservation easement;

(11)    Failing to advise the Plaintiffs and members of the Class that the Syndicate did not donate a "qualified real property interest" because the property that was the subject of the conservation easement could be modified;

(12)    Failing to advise Plaintiffs and members of the Class that the Syndicates retained or reserved rights to the property that were inconsistent with the conservation purposes of the conservation easement;

(13)    Failing to advise Plaintiffs and members of the Class that the Syndicates did not properly document the condition of the property at the time of the donation;

(14)  Failing to advise Plaintiffs and members of the Class that the SCE Appraisers were not "qualified appraisers" and did not prepare "qualified appraisals" as required by the Code and Regulations thereunder;

(15)  Advising Plaintiffs and members of the Class that the Syndicates donated a "qualified real property interest";

(16)  Advising Plaintiffs and members of the Class that the Syndicates properly documented the condition of the property at the time of the donation;

(17)  Advising Plaintiffs and members of the Class that the SCE Appraisers were "qualified appraisers" and prepared "qualified appraisals" as required by the Code and Regulations thereunder;

(18)  Failing to advise Plaintiffs and members of the Class that the SCE Appraisers relied upon inappropriate assumptions, utilized inappropriate methodology, and used various techniques to improperly inflate the value of the conservation easements;

(19)  Failing to advise Plaintiffs and members of the Class that the SCE Appraisers incorrectly reached unsupportable and/or predetermined Highest and Best Use conclusions;

(20)     Failing to advise Plaintiffs and members of the Class that the SCE Appraisers arrived at the unsupportable Highest and Best Uses by ignoring local zoning rules and other legal restrictions on purported developments, physical feasibility, market conditions, and market data;

(21)     Failing to advise Plaintiffs and members of the Class that the SCE Appraisers ignored the sale of conservation easements in the area of the property in determining the value of the conservation easement;

(22)     Failing to advise Plaintiffs and members of the Class that the SCE Appraisers ignored the proceeds received by the Syndicate by its sale of membership interests to investors in determining the fair market value of the conservation easement contribution;

(23)     Failing to advise Plaintiffs and members of the Class that the SCE Appraisers failed to employ recent, local or similar sales that competed with the subject property or would have been considered "substitutes" for the subject property by potential buyers when employing the "comparable sales method";

(24)     Advising Plaintiffs and members of the Class that the Appraisals conformed with USPAP;

(25)      Failing to advise Plaintiffs and members of the Class that the Appraisals did not follow the USPAP because of the appraisal's flawed methodology, inappropriate data and unsupportable assumptions, among other things;

(26)      Advising Plaintiffs and members of the Class that the Appraisals complied with the Code and Regulations thereunder for valuing conservation easements and preparing qualified appraisals;

(27)      Failing to advise Plaintiffs and members of the Class that the Appraisals failed to comply with the Code and Regulations thereunder for valuing conservation easements and preparing qualified appraisals;

(28)       Advising Plaintiffs and members of the Class that the charitable deduction was based on the fair market value of the conservation easement;

(29)      Failing to advise Plaintiffs and members of the Class that the charitable deduction was not based on the fair market value of the conservation easement;

(30)      Advising Plaintiffs and members of the Class that the property has specific conservation values that satisfy the Code;

(31)      Failing to advise Plaintiffs and members of the Class that the property did not have specific conservation values that satisfy the Code;

(32)    Advising Plaintiffs and members of the Class that the conservation easement restrictions complied with the Code requirement that it must be perpetual;

(33)    Failing to advise Plaintiffs and members of the Class that the conservation easement restrictions did not comply with the Code requirement that it must be perpetual;

(34)    Advising Plaintiffs and members of the Class that the conservation easement met the requirement that it was exclusively for conservation purposes in perpetuity and met at least one of the conservation purposes set out in §170 of the Code;

(35)    Failing to advise Plaintiffs and members of the Class that the conservation easement did not accomplish any of the permissible conservation purposes set out in §170 of the Code and permitted destruction of other significant conservation easements and, as a result, did not meet the requirement that the conservation easement be exclusively for conservation purposes in perpetuity and meet at least one of the conservation purposes set out in §170 of the Code;

(36)    Advising Plaintiffs and members of the Class that the Appraisals met Treasury Regulations that establish the standards for the valuation of

152

conservation easements for the purposes of claiming a non-cash charitable contribution of a partial interest;

(37)     Failing to advise Plaintiffs and members of the Class that the Appraisals did not meet Treasury Regulations that establish the standards for the valuation of conservation easements for the purposes of claiming a non-cash charitable contribution of a partial interest;

(38)     Advising Plaintiffs and members of the Class that the Highest and Best Use of the Property was determined based on the standards for the valuation of a conservation easement for the purposes of claiming a non-cash charitable contribution of a partial interest, when in fact it did not;

(39)     Advising Plaintiffs and members of the Class that the "after easement" analysis met Treasury Regulations establishing the standards for the valuation of conservation easements, when in fact it did not because it (a) used an incorrect and unsupportable Highest and Best Use conclusion; (b) failed to employ recent, local and similar sales; (c) lacked objectivity and appropriate analysis of after easement sales; (d) lacked consideration of easement sales; and (e) advocated a loss in value due to lost development rights when the market data indicates there is no market for the residential development;

(40)     Failing to advise Plaintiffs that the "before value" is hypothetical and unreasonable and is not an estimate of the fair market value of the land at its Highest and Best Use as of the date of the valuation before the easement conveyance;

(41)     Advising Plaintiffs and members of the Class that the appraisal was done by a qualified appraiser when in fact it was not due to the abundant acceptance of direction by the appraiser from the Syndicate which resulted in an inflated fair market value of the conservation easement;

(42)     Advising Plaintiffs and members of the Class that the value of the conservation easement and thus the value of the charitable contribution deduction that should be used on the income tax return was proper;

(43)     Failing to advise Plaintiffs and members of the Class that the value of the conservation easement and thus the value of the charitable contribution deduction to be used on the income tax return was improper;

(44)     Failing to advise Plaintiffs and members of the Class that the "Highest and Best Use" valuation was not financially feasible and, therefore, improper;

(45)   Failing to advise Plaintiffs and members of the Class that the Appraisals did not comply with Notice 2006-96, which provides guidance related to the definition of "qualified appraisal" and "qualified appraiser";

(46)   Failing to advise Plaintiffs and members of the Class that the Appraisals were not qualified appraisals under §170 of the Code because the Highest and Best Use was improperly determined by the property owner's intent and assumption that the property would be developed without any supporting data or any analysis of financial feasibility;

(47)   Failing to advise the Plaintiffs and members of the Class that the Appraisals were not "qualified appraisals" under §170 of the Code because the appraiser did not address nor analyze the likelihood that the property could be utilized according to the appraiser's Highest and Best Use;

(48)   Advising Plaintiffs and members of the Class that the conservation easement substantiated a valid conservation purpose;

(49)   Advising Plaintiffs and members of the Class that the Deed of Conservation Easement substantiated a valid conservation purpose;

(50)     Failing to advise Plaintiffs and members of the Class that the Deed of Conservation Easement did not substantiate a valid conservation purpose;

(51)     Advising Plaintiffs and members of the Class that the Baseline Documentation Report supported a valid conservation purpose on the property;

(52)     Failing to advise Plaintiffs and members of the Class that the Baseline Documentation Report did not support a valid conservation purpose on the property;

(53)     Advising Plaintiffs and members of the Class that the Deed of Conservation protected the land in perpetuity and therefore qualified for a federal charitable deduction;

(54)     Failing to advise Plaintiffs and members of the Class that the Deed of Conservation did not protect the land in perpetuity and therefore did not qualify for a federal charitable deduction;

(55)     Advising Plaintiffs and members of the Class that the Deed of Conservation permits activity that is consistent with a valid conservation purpose, including preserving habitat and open space;

(56)     Failing to advise Plaintiffs and members of the Class that the Deed of Conservation permits activity that is inconsistent with a valid

conservation purpose and therefore did not qualify for a federal charitable deduction;

(57)   Advising Plaintiffs and members of the Class that the substantiation requirements were met and therefore the charitable contribution deduction would be allowed;

(58)   Failing to advise Plaintiffs and members of the Class that the substantiation requirements were not met and, therefore, the charitable contribution deduction would be disallowed;

(59)   Advising Plaintiffs and members of the Class to report the charitable contribution deduction on their individual tax returns;

(60)   Advising Plaintiffs and members of the Class that the K-1 reporting the charitable contribution deduction allocated to each Plaintiff was proper and accurate and should be used to report the deduction on their individual return;

(61)   Failing to advise Plaintiffs and members of the Class that the K-1 reporting the charitable contribution deduction allocated to each Plaintiff was not accurate and should not be relied upon in reporting the charitable contribution deduction on their individual tax return;

(62)   Preparing and signing the Syndicate's tax return and individual investors' K-1s reporting the charitable contribution deduction based

on the fair market value of the conservation easement determination in the appraisal;

(63)    Advising Plaintiffs and members of the Class that the tax benefits of the SCE Strategy would be allowed if audited;

(64)    Failing to advise Plaintiffs and members of the Class that the tax benefits of the SCE Strategy would be disallowed if audited;

(65)    Advising Plaintiffs and members of the Class, both before and after the IRS audit, that the SCE Strategy they executed was different and distinguishable from other SCE Strategies that the IRS and/or Tax Court had disallowed;

(66)    Failing to advise Plaintiffs and members of the Class, both before and after the IRS audit, that the SCE Strategy they executed was not different and distinguishable from other SCE Strategy that the IRS and/or Tax Court had disallowed;

(67)    Advising Plaintiffs and members of the Class that they should challenge the IRS in the audits and/or Tax Court proceedings because Plaintiffs and members of the Class would prevail and the SCE Strategy would be allowed;

(68)    Failing to advise Plaintiffs and members of the Class that they should not challenge the IRS in audits and/or Tax Court proceedings because

Plaintiffs and members of the Class would not prevail and the SCE Strategy would be disallowed;

(69)    Making and endorsing the statements and representations contained in the Defendants' and the Other Participants' written advice, instructions, and recommendations; and

(70)    Failing to advise Plaintiffs and members of the Class that each of the Defendants and the Other Participants were not "independent" of one another and in fact were involved in a conspiracy to design, market, sell, and implement the SCE Strategy.

348.    The above affirmative misrepresentations and/or intentional omissions of material fact made by each Defendant were false when made, and the Defendants knew these representations to be false when made with the intention that Plaintiffs and members of the Class rely upon them to enter into the SCE Strategy, pay substantial funds to participate in the SCE Strategy, and pay substantial fees to the Defendants and the Other Participants.  In addition, the above affirmative misrepresentations and/or intentional omissions of material fact were committed knowingly by the Defendants with the intent to induce Plaintiffs and members of the Class to enter into the SCE Strategy, pay substantial funds to participate in the SCE Strategy, and pay substantial fees to the Defendants and Other Participants.

349. In reasonable reliance on the Defendants' false affirmative misrepresentations and intentional omissions of material facts regarding the SCE Strategy, Plaintiffs and members of the Class engaged in the SCE Strategy, paid substantial sums to participate in the SCE Strategy, paid substantial fees to the Defendants and the Other Participants, lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code, and filed federal and state tax returns that reflected charitable contribution deductions in connection with the SCE Strategy.

350. But for Defendants' intentional misrepresentations and material omissions described above, Plaintiffs and members of the Class would not have hired Defendants and the Other Participants for advice and services on the SCE Strategy, engaged in the SCE Strategy, paid substantial sums to participate in the SCE Strategy, paid substantial fees to the Defendants and the Other Participants in connection with the SCE Strategy, signed and filed federal and state tax returns that reported charitable contribution deductions in connection with the SCE Strategy, failed to file a qualified amended return, and incurred professional fees and expenses in connection with the IRS disputes.

351. As a result of Defendants' conduct set forth herein, Plaintiffs and members of the Class have suffered injury in that they (1) paid substantial funds to

participate in the SCE Strategy, (2) paid significant fees to the Defendants and Other Participants, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties,  (4) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; and (5) incurred professional fees and expenses in connection with the IRS dispute.

352.   As a proximate cause of the foregoing injuries, Plaintiffs and members of the Class have been injured in an actual amount to be proven at trial but in excess of $5 million and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## COUNT IX
## AIDING AND ABETTING
## (By All Plaintiffs And The Class Against All Defendants)

353.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

354.   As described more fully through this Complaint, each of the Defendants aided and abetted the wrongful conduct (including fraud and breaches of fiduciary duty) of each of the other Defendants and Other Participants.  Each Defendant was aware of and agreed to its respective role and responsibility in the overall tortious activity and intentionally provided aid and substantial assistance in the other Defendants' tortious activity.

355.  As a result of Defendants' conduct set forth herein, Plaintiffs and members of the Class have suffered injury in that they (1) paid substantial sums to participate in the SCE Strategy, (2) paid significant fees to the Defendants and Other Participants, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties, (4) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; and (5) have and will continue to incur substantial additional costs to rectify the situation.

356.  As a proximate cause of Defendants' conduct set forth herein, Plaintiffs have suffered injury and damages.  Plaintiffs and members of the Class have been injured in an actual amount to be proven at trial, but in excess of $5 million and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## COUNT X
## CIVIL CONSPIRACY
### (By All Plaintiffs And The Class Against All Defendants)

357.  Plaintiffs and members of the Class repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

358.  As described more fully above, the Defendants and the Other Participants knowingly acted in concert to design, market, sell, and implement the

SCE Strategy. In furtherance of their conspiracy, the Defendants and the Other Participants conspired to perpetrate fraud on the Plaintiffs and members of the Class and to breach fiduciary duties owed to Plaintiffs and members of the Class. In doing so, the Defendants and the Other Participants acted with full knowledge and awareness that the transactions were designed to give the false impression that a complex series of financial transactions were legitimate business transactions, when the transactions in fact lacked those features that were necessary for a legitimate conservation easement charitable contribution deduction.

359. The Defendants and the Other Participants acted in the respective roles as described above according to a predetermined and commonly understood and accepted plan of action to perpetrate fraud on Plaintiffs and to breach fiduciary duties owed to Plaintiffs, all for the purpose of convincing Plaintiffs and members of the Class to participate in the SCE Strategy and pay substantial fees. The Defendants and the Other Participants authorized, ratified, and/or affirmed the fraudulent misrepresentations and omissions of material fact that each Defendant and/or Other Participant made to Plaintiffs and members of the Class.

360. The acts of the Defendants and the Other Participants were contrary to numerous provisions of law, as stated above, and constitute a conspiracy to perpetrate fraud on Plaintiffs and members of the Class and a conspiracy to breach fiduciary duties owed to Plaintiffs and members of the Class.

361.   There was a meeting of the minds between and among the Defendants and the Other Participants to commit the unlawful acts alleged herein, including a conspiracy to perpetrate fraud on and to breach fiduciary duties owed to Plaintiffs and members of the Class.   The conspiracy to commit these unlawful and fraudulent acts proximately caused and continues to cause damages to Plaintiffs and members of the Class as previously set forth herein.

362.   As a result of Defendants' conduct set forth herein, Plaintiffs and members of the Class have suffered injury in that they (1) paid substantial sums to participate in the SCE Strategy, (2) paid significant fees to the Defendants and Other Participants, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties,  (4) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; and (5) have and will continue to incur substantial additional costs to rectify the situation.

363.   Plaintiffs and members of the Class have been injured in an actual amount to be proven at trial but in excess of $5 million and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## XII.   **PRAYER FOR RELIEF**

364.   Based upon the foregoing, Plaintiffs request that Defendants be summoned to appear and answer; that the requested class be certified for trial and/or settlement; and that on final hearing Plaintiffs and the members of the Class have judgment against Defendants, jointly and severally for:

a.      actual, consequential, and incidental damages;

b.      disgorgement;

c.      pre- and post-judgment interest at the highest legal rate allowed by law;

d.      all attorneys' fees and costs in pursuing this matter;

e.      punitive and/or enhanced damages in an amount to be determined at trial; and

f.      such other and further relief, both at law and in equity, to which Plaintiffs and the Class may show themselves to be justly entitled.

Respectfully submitted,

/s/ *Jeven R. Sloan*

David R. Deary (to seek admission *pro hac vice)*
W. Ralph Canada, Jr. (to seek admission *pro hac vice*)
Jeven R. Sloan (GA Bar No. 652727)
**LOEWINSOHN FLEGLE DEARY SIMON LLP**
12377 Merit Drive, Suite 900
Dallas, Texas 75251
(214) 572-1700 Telephone
(214) 572-1717 Facsimile
davidd@lfdslaw.com
ralphc@lfdslaw.com
jevens@lfdslaw.com


Edward J. Rappaport (GA Bar No. 594841)
**THE SAYLOR LAW FIRM LLP**
1201 W. Peachtree Street
Suite 3220
Atlanta, GA 30309
(404) 892-4400 Telephone
erappaport@saylorlaw.com


*Attorneys for Plaintiffs*