# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| WILLIAM N. TURK, CARLITA B. TURK, and NORMAN RADOW, on behalf of themselves and all others similarly situated, )<br><br>*Plaintiffs*, )<br><br>v. )<br><br>MORRIS, MANNING & MARTIN, LLP; TIMOTHY POLLOCK; LARGE & GILBERT, INC.; CONSERVATION PAYS, LLC; JOSEPH C. SKALSKI; ATLANTIC COAST CONSERVANCY, INC.; ATLANTIC COAST CONSERVANCY PROPERTIES, LLC; ENVIRONMENTAL RESEARCH AND MAPPING FACILITY, LLC; ROBERT D. KELLER; BENNETT THRASHER, LLC; ORNSTEIN-SCHULER INVESTMENTS LLC; ORNSTEIN-SCHULER CAPITAL PARTNERS LLC; WEIBEL & ASSOCIATES, INC.; CLAY WEIBEL; LUCUS MASON, INC.; LUCUS VON ESH; BLETHEN MINE CONSULTANTS, LLC; MARVIN BLETHEN; DONALD R. SKLAR; PARTNERSHIP TAX SOLUTIONS, INC.; AARON KOWAN; and THE PRIVATE CLIENT LAW GROUP; )<br><br>*Defendants*. ) | **CASE NO.** 1:20-CV-02815-AT<br><br><br>**THIRD AMENDED CLASS ACTION COMPLAINT**<br><br><br><br>**JURY DEMANDED** |

## THIRD AMENDED CLASS ACTION COMPLAINT

1.      This case involves a multi-year fraudulent scheme by a group of supposedly independent and respected professionals who knowingly conspired to develop, promote, sell and implement a tax-savings strategy, commonly known as a Syndicated Conservation Easement Strategy (the "SCE Strategy").[1]   The Defendants leveraged their purported expertise, experience, and reputation to induce Plaintiffs (and over 2,000 other clients all over the United States) to participate in numerous transactions involving the SCE Strategy by promoting the Strategy as a legitimate tax-savings product.  By design, the SCE Strategy involved complex partnership structures and a series of steps that required specialized knowledge of conservation easements and highly technical tax laws and regulations.  But beneath these complex structures and financial shenanigans hid the truth (which was purposefully obscured from Plaintiffs, other clients, and the Internal Revenue Service ("IRS")):  the SCE Strategy was simply an attempt by Defendants to convey a substantial real estate interest to a co-conspiring charity, after fraudulently and grossly inflating its value, and sell the corresponding tax deduction to Plaintiffs and other clients for lucrative professional fees.  Because

---

[1] The term SCE has been widely used in the popular press, including in Forbes and the Washington Post, as well as in tax publications like Tax Notes and the recent criminal convictions of Atlanta CPAs for selling SCEs.

this complex scheme has been widespread and occurred over a number of years, it is described in this Complaint by way of a few representative examples.

2.      Conservation easements are encumbrances placed on real estate to preserve property for conservation purposes.  Indeed, part of the sales pitch to Plaintiffs and Class Members was the noble goal of preserving valuable land for the greater public good.  When ***properly*** valued and implemented, conservation easements can and do confer legitimate tax advantages to the donor in additional to environmental benefits to the public.  When such easements are placed on property ***in strict compliance*** with Section 170(h) of the Internal Revenue Code (the "Code"), donors of such easements may realize a noncash charitable contribution deduction for the value by which the easement impairs the fair market value of the property.

3.      The SCE Strategy, however, was not properly and legitimately valued or implemented and was never intended to be.  It also intentionally did not comply with Section 170(h) of the Code.  The SCE Strategy was fatally flawed from the outset.  Rather than guide Plaintiffs through a legitimate conservation easement transaction, the Defendants utilized a prepackaged collection of bogus, grossly

inflated appraisals,[2] donations of easements that lacked a valid conservation purpose, deficient form documents, and faulty conservation easement deeds, all delivered via a mountain of misrepresentations and omissions to promote, sell, and implement the SCE Strategy and the tax savings it allegedly would legally provide.

4.      As its name indicates, the SCE Strategy involves the syndication of a conservation easement transactions to multiple investors, which allows those who would be unable to individually participate in an otherwise capital-intensive transaction to do so.  While syndication itself is not problematic *per se*, many unscrupulous professionals like Defendants found ways, such as the SCE Strategy, to exploit for their own gain the tax deductions that could be generated from syndicated conservation easement transactions.

5.      In working together to implement the SCE Strategy, including drafting various documents necessary to implement the SCE Strategy, the Defendants ignored controlling law and directives from the IRS.  The Defendants wholly failed *inter alia* to satisfy the IRS's requirements for the Appraisals, the Conservation Easement Deeds, and the Baseline Documentation Reports.  These

---

[2]  These appraisals included numerous intentional misrepresentations and deficiencies, many of which emanate from a tortured interpretation of "fair market value" that ignores the IRS's valuation standard.  The value of the donated easement must meet the definition of fair market value as defined by Treasury Regulation § 1.170A-1(c)(2):  The fair market value is the price at which the property could change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts.

requirements were clear and unambiguous, and the Defendants knew or should have known that (1) these crucial aspects of any conservation easement transaction failed to comply with the applicable requirements and law and (2) each one of these failures, **standing alone**, prevented the SCE Strategy from generating a legitimate and legal charitable contribution deduction from a conservation easement donation.

6.     The Defendants handpicked the appraisers to be used for the SCE Strategy.  These appraisers (the "SCE Appraisers")[3] cast aside their professional obligations and duties and created sham Appraisals with grossly inflated valuations.  In each of the SCE Strategy transactions, the Promotional Materials contained identical language about the expected tax effects:

> **For every $1.00 of membership share cost, the new member would receive a charitable contribution deduction for approximately $4.39 ($4.38596 to be more exact) that should save the new member approximately $2.00 in taxes.**

And each of the appraisals was conveniently able to deliver on the Promotional Materials' promise (uniform across all the transactions) by coming up with the fraudulently exaggerated valuations that were big enough to result in a tax savings of $2 for every $1 invested.  All of the Defendants (including the Appraisal Defendants) knew that and intended for these grossly inflated appraisals would be

---

[3] The SCE Appraisers include, but are not limited to, the Appraisal Defendants defined at ¶ 71 herein.

unknowingly used by the Plaintiffs and the Class to claim charitable contribution deductions from the SCE Strategy that, unbeknownst to Plaintiffs and the Class, were completely unsupportable and in violation of some of the most basic rules and concepts for land appraisals.

7.     The appraisals were the lynchpin of the SCE Strategy and were egregiously inflated and defective to advance the goals of the scheme.  The most critical element of the bogus appraisals was an insupportable finding of Highest and Best Use ("HBU"). To concoct an HBU that would support the valuation that the OSI and MMM Defendants sought, the SCE Appraisers made false assumptions and ignored inconvenient facts that enabled them to determine a HBU for subject properties for which no objective and competent appraiser would concur. The bogus HBU determined by the SCE Appraisers relied on equally bogus land development and mining reports (prepared by the Blethen Defendants) for the express purpose of assisting with SCE scheme. These reports purported to provide a basis for developing the properties for development or mining purposes, when in reality the development consultants, the Blethen Defendants, and the other Defendants all knew that development or mining was not economically feasible. The SCE scheme participants, including the OSI Defendants, even created a lobbying organization called Partnership For Conservation ("P4C") that was organized in part to disseminate falsehoods about valuation in connection with

SCEs to "gaslight" Congress, the IRS and most importantly, prospective investors. In an article entitled "A Dirty Dozen Myths about Conservation Easements and One Sad Truth," *Tax Notes Federal, April 27, 2020*, by P4C Chair Robert Ramsay, Ramsay claims incredulously that "A conservation easement can have a higher value than the value of the land."[4]  The improper HBU is underlied by the false assumption that the property owner suffered "lost profits" arising from no alteration of the property. All of the foregoing chicanery causes the valuation of a property to be exponentially higher than allowed by the IRS under the "Willing Buyer Willing Seller" test. In one instance that is an excellent example of an outrageous valuation arising from a fictional HBU, appraisers valued a conservation easement at 62 times the value of the entire property arising from a sale that occurred only months earlier.  In another instance, appraisers set the fair market value of a property at $175 million when only a few weeks earlier the promoters of the SCE Strategy had purchased the property for $35 million.  This same property was part of a *larger* tract that was listed for just $12.6 million a year earlier.  Moreover, the State of Florida had purchased a much larger, neighboring property *for conservation purposes* for only $9 million in 2017.   An aerial map

---

[4] Treasury Regulation § 1.170A-1(c)(2) is the "Willing Buyer Willing Seller" test for fair market value notwithstanding Ramsay's outlandish statement to the contrary.

illustrates the locations of the property used in the SCE Strategy and the property

purchased by the State of Florida:



8.     In accordance with the Defendants' pre-planned scheme, the SCE

Appraisers took steps to obscure the inflated nature of the appraisals from

Plaintiffs, the Class, and the IRS by intentionally omitting key facts from the

appraisals (such as recent comparable listings, recent sales, and prior unsuccessful

attempts to develop the land for the same use as set forth in the Appraisals).  The

Defendants' IRS filings further obscured the fact that these alleged valuation

increases took place over a short period of time by fraudulently "tacking" their holding period to that of the prior owner of the same property many years prior and disclosing this falsified, misleading information on Form 8283, which is to be signed by the appraiser under penalties of perjury and attached as a part of the Form 1065 partnership tax return to substantiate the charitable contribution deduction claimed.  The Appraisals, as well as all promotion of the artificially subdivided tracts to Plaintiffs and the Class, failed to disclose the common origin of the tracts or the brief period that the property had been owned by the OSI Defendants or related entity.

9.     Several accounting firms and accountants also were a key part of the conspiracy alleged herein (the "Return Preparers"), including but not limited to the L & G Defendants,[5] the Sklar Defendants, and Partnership Tax Solutions.  The Return Preparers prepared the partnership tax returns for the Syndicates used in the SCE Strategy, as well as the Schedule K-1s ("K-1s") that were issued to each of the Plaintiffs and members of the Class containing what the Return Preparers represented to the IRS, under penalties of perjury, was their proportionate share of their respective Syndicate's charitable contribution deduction resulting from the SCE Strategy.  The Return Preparers prepared the K-1s with the intent that each

---

[5] Although also included within the definition of the Return Preparers, the L & G Defendants played a much larger role in the conspiracy to develop, promote, sell, and implement the SCE Strategy, as set out, *inter alia*, at Paragraphs 67-68, 93, 96-100, 115-17, 121, 166-193, 220-252, 303-10, 338.

Plaintiff and member of the Class would utilize their respective K-1 to claim the grossly exaggerated charitable contribution deduction from the SCE Strategy. The Return Preparers instructed Plaintiffs and members of the Class to report the amount set out in the K-1 as a charitable contribution deduction on their individual tax returns; indeed, Plaintiffs and members of the Class were required to do so by applicable Federal law. Furthermore, the impact of the items from the K-1 on each of Plaintiff's tax returns was so substantial[6] that the Return Preparer for that K-1 and corresponding entity return would be deemed under Federal law as that Plaintiff's "tax return preparer," regardless of whom entered the item on the Plaintiff's Form 1040 or schedules.

10.    Once the IRS began scrutinizing the fraudulent Appraisals and other defects, they determined that the SCE Strategy, as structured and implemented, does not comply with the requirements of Section 170(h) of the Code and other applicable laws and, therefore, does not and was never going to provide the promised legitimate charitable contribution deductions from the conservation easement donations. Now that the United States government has begun peeling back the layers of fraud underpinning the SCE Strategy, it has initiated enforcement actions and conducted criminal prosecutions related to nearly

---

[6] The Court "must compare the length, complexity and tax impact of an individual entry with the length, complexity and tax impact of the return as a whole to determine the substantiality of an entry *vis a vis* the entire return." *Adler & Drobny, Ltd. v. United States*, 9 F.3d 627, 630 (7th Cir. 1993).

identical transactions implemented by other promoters of the SCE Strategy.  *See, e.g., United States v. Zak, et al.*, No. 1:18-cv-05774-AT (N.D. Ga.) (suit filed by the U.S. Department of Justice against several promoters and organizers of other SCE Strategy transactions, seeking permanent injunctions halting these transactions and seeking to disgorge defendants of their ill-gotten gains); *United States v. Stein Agee*, No. 1:20-CR-128 (W.D.N.C.) (criminal case filed against Atlanta CPA who pleaded guilty to knowingly participating in a fraudulent SCE Strategy scheme from 2013 through 2019); *United States v. Corey Agee*, No. 1:20-CR-129 (W.D.N.C.) (same).

11.    As a result of their reliance on Defendants' misrepresentations and omissions, Plaintiffs paid Defendants substantial fees for their participation in the fraudulent SCE Strategy, have been or are being assessed back taxes, penalties, and interest, and have paid significant professional fees in connection with the IRS disputes.  The Defendants also convinced what is believed to be over two thousand other clients to execute the SCE Strategy.  For these Class Members, the IRS has now indicated it will disallow the charitable deductions and, in most instances, has

already disallowed the deductions at the partnership level as well as its intent to disallow them at the individual level.[7]

12.    To deliver these bogus tax benefits to Plaintiffs and the Class, Defendants employed and organized entities and individuals to execute their pre-planned scheme to convince clients to participate in the SCE Strategy.  Defendants and their co-conspirators used the mail and/or wires to develop, promote, sell, and implement the SCE Strategy, which Defendants knew to be fatally flawed.  This association of entities and individuals to structure, promote, sell, and implement the SCE Strategy thereby constitutes a racketeering enterprise.

13.    This racketeering enterprise directly and proximately injured Plaintiffs and the Class by causing them to pay substantial fees and transaction costs, be exposed to back-taxes, interest and penalties, lose the substantial tax benefits that would have resulted from a properly implemented conservation easement transaction, and incur additional accounting and legal fees and expenses to deal with the IRS fallout, all resulting from Plaintiffs and the Class claiming charitable contribution deductions on their federal and state tax returns *based on* the

---

[7] Further, in IR-2020-130, issued on June 25, 2020, for the purpose of offering a "global settlement," the IRS proclaimed that "[t]he IRS will continue to disallow the claimed tax benefits, asserting civil penalties to the fullest extent, considering criminal sanctions in appropriate cases, and continuing to pursue litigation of the cases that are not otherwise resolved administratively."

fraudulent and defective SCE Strategy and the Defendants' advice, recommendations, and assistance in connection therewith.

14.     There were only minor, if any, variations in the misrepresentations by the Defendants about the effect of applicable tax law standards to the members of the Class.  And while there are numerous Defendants participating in this unlawful enterprise, the invalidity of the SCE Strategy under these tax provisions, the defects in the SCE Strategy, and, most importantly, the fraud and misrepresentations by the Defendants and their co-conspirators about the SCE Strategy and its promised tax benefits predominate.  Thus, the Defendants were not simply negligent; they engaged in a pre-planned fraudulent scheme in which all Defendants and others participating knew that the SCE Strategy, as structured and implemented, would fail if challenged by the IRS, despite the Defendants' repeated representations to the contrary.

15.     The Complaint details the specific roles of each Defendant as well as some examples of the many fraudulent acts and RICO predicate acts committed by the Defendants in furtherance of the scheme.  At the "micro" level, this includes examples of four different transactions involving the SCE Strategy: (a) the FG River tract in Polk County, Florida, (b) the Lakepoint land in Bartow County, Georgia, (c) the Gulf Land in Montgomery County, Alabama, and (d) the Industrial S & G land in Escambia County, Alabama.  The Complaint also describes how the

fraud being perpetrated is often at a "macro" level, using for an example the 9 SCE Strategies created with respect to *a portion* of a property in Polk County, Florida, of which the FG River tract is one.

## I.
## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) because the Class Action Fairness Act of 2005 confers diversity jurisdiction upon this Court, as at least one member of the proposed Class (named or unnamed) is a citizen of a state that is different from at least one Defendant's state of citizenship; in fact, the class includes citizens from virtually every state in the country including, but not limited to Alabama, California, Connecticut, Delaware, Georgia, Louisiana, New Jersey, New York, North Carolina, South Carolina and Texas.   Further, the aggregate amount in controversy exceeds $5,000,000.  In addition, this Court has jurisdiction over Plaintiffs' claims based on 28 U.S.C. § 1331 and/or 28 U.S.C. § 1337, which provide jurisdiction for violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq*.; and 29 U.S.C. § 1367, which provides jurisdiction for supplemental state claims, including common-law fraud and conspiracy claims.

17.     Personal jurisdiction comports with due process under the United States Constitution, the long-arm statute of Georgia, and the provisions of 18 U.S.C. § 1965(b) and (d).

13

18.    Without limiting the generality of the foregoing, each Defendant (directly or indirectly) has:

(a)    transacted business in Georgia;

(b)    contracted to supply or obtain services in Georgia;

(c)    availed themselves intentionally of the benefits of doing business in Georgia;

(d)    produced, promoted, sold, marketed, and/or distributed their products or services in Georgia and, thereby, have purposefully profited from their access to markets in Georgia;

(e)    caused tortious damage by act or omission in Georgia;

(f)    caused tortious damage in Georgia by acts or omissions committed outside such jurisdiction while (i) regularly doing business or soliciting business in such jurisdiction, and/or (ii) engaging in other persistent courses of conduct within such jurisdiction, and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in such jurisdiction;

(g)    committed acts and omissions that the Defendants knew or should have known would cause damage (and, in fact, did cause damage) in

14

Georgia to Plaintiffs and members of the Class while (i) regularly doing or soliciting business in such jurisdiction, and/or (ii) engaging in other persistent courses of conduct within such jurisdiction, and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in such jurisdiction;

(h)     engaged in a conspiracy with others doing business in Georgia that caused tortious damage in Georgia; and/or

(i)     otherwise had the requisite minimum contacts with Georgia such that, under the circumstances, it is fair and reasonable to require the Defendants to come to Court to defend this action.

19.     Venue is proper under 28 U.S.C. § 1391, because, *inter alia*, a substantial part of the events or acts giving rise to the causes of action alleged in this Complaint arose in, among other places, this District, and the harmful effects of the Defendants' fraud and wrongful conspiracy were felt in, among other places, this District.  In addition, venue is proper under 18 U.S.C. § 1965 because all Plaintiffs reside in this District.

## II.
## PARTIES

20.     Plaintiff William N. Turk is an individual and a citizen of Habersham County, Georgia.  This Plaintiff resides in Demorest, Georgia within this District.

21.    Plaintiff Carlita B. Turk is an individual and a citizen of Habersham County, Georgia.  This Plaintiff resides in Demorest, Georgia within this District. William and Carlita Turk are collectively referred to herein as the "Turk Plaintiffs."

22.    Plaintiff Norman Radow ("Radow") is an individual and a citizen of Fulton County, Georgia. This Plaintiff resides in Atlanta, Georgia within this District (Radow and the Turk Plaintiffs are collectively referred to herein as the "Plaintiffs").

23.    Defendant Morris, Manning & Martin, LLP ("MMM") is a limited liability partnership organized and existing under the laws of Georgia with its principal place of business in Atlanta, Georgia.  MMM has appeared herein.

24.     Defendant Timothy Pollock ("Pollock") is an individual and, upon information and belief, resides in Marietta, Georgia. This Defendant is or was during the relevant period a partner in MMM.  Pollock has appeared herein. MM and Pollock are referred to herein as the "Morris Manning Defendants."

25.    Defendant Large & Gilbert, Inc. ("L & G") is a professional corporation incorporated in the State of Georgia with its principal place of business in Atlanta, Georgia 30328.   L & G has appeared herein.

26.     Defendant Conservation Pays, LLC ("Conservation Pays") is a limited liability company organized in the State of Georgia with its principal place in Atlanta, Georgia. This Defendant has appeared herein.

27.     Defendant Joseph C. Skalski ("Skalski") is an individual and, upon information and belief, resides in Dunwoody, Georgia.  This Defendant is or was during the relevant period a partner in L & G.  This Defendant has appeared herein. L & G, Conservation Pays, and Skalski are referred to herein as the "L & G Defendants."

28.     Defendant Atlantic Coast Conservancy, Inc. ("ACC") is a nonprofit corporation organized and existing under the laws of Georgia with its principal place of business in Jasper, Georgia.  This Defendant has appeared herein.

29.     Defendant Atlantic Coast Conservancy Properties, LLC ("Atlantic Properties") is a limited liability company organized and existing under the laws of Georgia with its principal place of business in Jasper, Georgia.  This Defendant has appeared herein.

30.     Defendant Environmental Research and Mapping Facility LLC ("ERMF") is a limited liability organized and existing under the laws of Georgia with its principal place of business in Jasper, Georgia.   This Defendant has appeared herein.

31.     Defendant Robert D. Keller ("Keller") is an individual and, upon information and belief, resides in Jasper, Georgia 30143.  This Defendant is or was during the relevant period an employee and/or principal of ACC, Atlantic Properties, and/or ERMF.  This Defendant has appeared herein.  ACC, Atlantic Properties, ERMF, and Keller are referred to herein as the "ACC Defendants."

32.     Defendant Bennett Thrasher, LLC ("Bennett Thrasher") is a limited liability company organized and existing under the laws of Georgia with its principal place of business in Atlanta, Georgia.  This Defendant has appeared herein.

33.     Defendant Ornstein-Schuler Investments LLC ("OSI") is a limited liability company organized and existing under the laws of Georgia with its principal place of business in Atlanta, Georgia.  This Defendant has appeared herein.

34.     Defendant Ornstein-Schuler Capital Partner LLC ("OSCP") is a limited liability company organized and existing under the laws of Georgia with its principal place of business in Atlanta, Georgia.  This Defendant has appeared herein.  OSI and OSCP are collectively referred to herein as the "OSI Defendants."

35.     Defendant Weibel & Associates, Inc. ("Weibel Firm") is a corporation organized and existing under the laws of Georgia with its principal place of business in Tucker, Georgia.  This Defendant has appeared herein.

36.     Defendant Clay Weibel ("Weibel") is an individual and, upon information and belief, resides in Atlanta, Georgia 30345. This Defendant is an employee of Weibel Firm. This Defendant has appeared herein. Weibel Firm and Weibel are referred to herein as the "Weibel Defendants."

37.     Defendant Lucus Mason, Inc. ("Lucus Mason") is a corporation organized and existing under the laws of Georgia with its principal place of business in Alpharetta, Georgia. This Defendant has appeared herein.

38.     Defendant Lucus Von Esh ("Esh") is an individual and, upon information and belief, resides in Alpharetta, Georgia.  This Defendant has appeared herein. Lucus Mason and Esh are referred to herein as the "Lucus Defendants."

39.     Defendant Blethen Mine Consultants LLC ("Blethen Mine") is a limited liability company organized and existing under the laws of New Jersey with its principal place of business at 217 West Commerce Street, Bridgeton, New Jersey, 08302.  This Court has personal jurisdiction over this Defendant pursuant to the Constitution and laws of the United States and the State of Georgia.   At all relevant times, this Defendant has done and is doing business in the State of Georgia, but does not maintain a regular place of business or current designated agent upon whom service may be made in this civil action. As described hereafter, this Defendant has contracted with a Georgia resident, and either party was to

perform the contract in whole or in part in the State of Georgia.  Additionally, this Defendant has committed torts, in whole or in part, in the State of Georgia, including intentional tortious acts directed at a resident of the State of Georgia, where the brunt of the harm was felt.  This Defendant's conduct in the State of Georgia has been committed by officers, directors, employees, and/or agents of this Defendant acting within the scope of their employment or agency.  This Defendant has purposefully availed itself of the benefits and protections of the laws of the State of Georgia and could reasonably anticipate being subject to the jurisdiction of courts of the State of Georgia.  This suit against this Defendant will not offend traditional notions of fair play and substantial justice and is consistent with due process of law.  In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

40.    Defendant Marvin Blethen ("Blethen") resides at 217 W. Commerce Street, Bridgeton, New Jersey, 08302.  This Court has personal jurisdiction over this Defendant pursuant to the Constitution and laws of the United States and the State of Georgia.  At all relevant times, this Defendant has done and is doing business in the State of Georgia, but does not maintain a regular place of business or current designated agent upon whom service may be made in this civil action.  As described hereafter, this Defendant has contracted with a Georgia resident, and either party was to perform the contract in whole or in part in the State of Georgia.

Additionally, this Defendant has committed torts, in whole or in part, in the State of Georgia, including intentional tortious acts directed at a resident of the State of Georgia, where the brunt of the harm was felt.  This Defendant has purposefully availed himself of the benefits and protections of the laws of the State of Georgia and could reasonably anticipate being subject to the jurisdiction of courts of the State of Georgia.  This suit against this Defendant will not offend traditional notions of fair play and substantial justice and is consistent with due process of law.  In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.  Blethen Mine and Blethen are referred to herein as the "Blethen Defendants."

41.    Defendant Donald R. Sklar ("Sklar") is an individual and, upon information and belief, resides in Marietta, Georgia. This Defendant is or was during the relevant period an employee, officer and/or director of Partnership Tax Solutions, Inc.  This Defendant has been served and has appeared herein.

42.    Defendant Partnership Tax Solutions, Inc. ("Partnership Tax Solutions") is a corporation organized and existing under the laws of Georgia with its principal place of business in Marietta, Georgia.  This Defendant has been served and has appeared herein.  Sklar and Partnership Tax Solutions are collectively referred to herein as the "Sklar Defendants."

21

43.     Defendant Aaron Kowan ("Kowan") is an individual and, upon information and belief, resides in Atlanta, Georgia.  This Defendant is or was during the relevant period an employee, officer and/or director of Private Client Law Group, PC.  This Defendant has been served and has appeared herein.

44.     Defendant Private Client Law Group, PC ("PCLG") is a professional corporation organized and existing under the laws of Georgia with its principal place of business in Atlanta, Georgia. This Defendant has been served and has appeared herein. Kowan and PCLG are collectively referred to herein as the "PCLG Defendants."

### III.
### FACTUAL BACKGROUND

45.     Plaintiffs, on their own behalf and on behalf of the Class, seek the recovery of damages that Plaintiffs and the Class sustained in connection with their participation in the SCE Strategy by bringing claims for breach of fiduciary duty, negligence, negligent misrepresentation, fraud, violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, violations of the Georgia RICO statute, O.C.G.A. § 16-4-1, *et seq.*, aiding and abetting breach of fiduciary duty, rescission, and civil conspiracy.  Plaintiffs and the Class seek compensatory and punitive/enhanced damages against Defendants

for damages arising from the SCE Strategy that the Defendants and Other Participants[8] jointly and in concert developed, promoted, sold, and implemented.

## A. The History and Purpose of Conservation Easements.

46.    A conservation easement is an agreement between a landowner and another party, generally a land trust or government agency, that permanently restricts the development and/or use of land with the purpose of achieving certain conservation or preservation goals.

47.    In the federal tax context, while a taxpayer may take a deduction for any charitable contribution made during the taxable year (subject to certain limitations), a deduction is generally not allowed for a taxpayer's contribution of a partial interest in property.  The Code provides for certain exceptions where a deduction for the donation of a partial interest in property is permitted, one of which is for the donation of a "qualified conservation contribution."

48.    A "qualified conservation contribution" is defined as a contribution (1) of a qualified real property interest, (2) to a qualified organization, (3) made

---

[8] The "Other Participants" include individuals and entities such as managers, appraisers, attorneys, accountants, brokers, referral sources, engineers, consultants and others not named as Defendants herein who assisted Defendants (the term "Defendants" refers to the named Defendants in this case) in the design, structure, promotion, sale, and/or implementation of the SCE Strategy.  They include *inter alia*, Galt Mining Investments, LLC ("Galt Mining"); Carlton Walstad; Russell Bennett; Greencone Investments, LLC; Conservation Saves, LLC ("Conservation Saves"); Conservation Matters, LLC ("Conservation Matters"); The National Wild Turkey Federation, Inc. ("Wild Turkey Federation"); American Upland Trust LLC ("American Upland"); and American Upland Trust LLC ("American Upland").

exclusively for conservation purposes. Before a deduction can be claimed, however, certain criteria must be met. As set out herein, the SCE Strategy failed to comply with the requirements necessary to create a qualified conservation contribution.

**B.     The SCE Strategy.**

      **1.     The Structure of the SCE Strategy.**

      49.     The SCE Strategy involves the use of an entity taxed as a partnership under subchapter K of the Code (*i.e.*, the "<u>Syndicates</u>"). To achieve this end, Defendants formed the Syndicates as limited liability companies ("<u>LLCs</u>")[9] under state law, which are taxed as a partnership (*i.e.* a pass-through entity) for federal tax purposes. The Defendants' use of LLCs allowed Defendants to market and sell the SCE Strategy, and the promised tax deductions, to clients who would otherwise be unable to participate in a conservation easement transaction.

      50.     An entity taxed as a partnership (like an LLC) is not liable for income tax. Instead, its partners are liable for income tax in their separate or individual capacities based on the income, losses, deductions, and credits that flow through to

---

[9] Though uniformly employed in the SCE transactions, the LLCs used here were not essential to the conservation easement transactions, which could have been structured differently, such as by using "fractional undivided interests" in the eased real estate. *See Clamping Down on Conservation Easement Shelters*, TAX NOTES (Sept. 8, 2020) ("A partnership is a handy vehicle to whack up ownership of a parcel of land into smaller salable pieces. But there's nothing in a conservation easement shelter that requires a partnership. …. Investors could just as easily accomplish the goal using an agent, or as tenants in common in the parcel.").

the partners from the partnership.  Under the Code, charitable contributions are one item that flow through to the individual partners.

51.    Although a partnership does not pay federal income tax, it still has filing and reporting requirements.  Specifically, a partnership is required to file an annual return on Form 1065 that reports the partnership's income, deductions, gain, losses, etc.  The partnership is also required to furnish statements, called K-1s, to its members (with copies to the IRS) that report *inter alia* each member's distributive share of partnership income or loss and separately stated items.

52.    The members are then required to report on their individual tax returns their share of the partnership income, loss and/or separately stated items, as they are contained on the K-1s provided to them by the partnership.  In the case of the SCE Strategy, the Plaintiffs and the Class (*i.e.*, the members of the Syndicate) reported the charitable deductions from the SCE Strategy based on the K-1 they received from the respective Syndicate in which they were a member, as required by law.  The Return Preparers prepared the Syndicate returns and the K-1s, as discussed further herein, in furtherance of and pursuant to the conspiracy between all of the Defendants and the Other Participants.

53.    The Defendants planned the steps of the SCE Strategy in advance and these steps were uniform across the Plaintiffs and the Class in virtually every material way:

(a)  First, a "Sponsor" (including but not limited to the OSI Defendant or an OSI-owned affiliate) obtains a majority interest in property from a third party ("Landowner").  This is accomplished through a series of steps: (1) the Sponsor creates a limited liability company ("PropCo"); (2) at the time PropCo is formed, Landowner is the 100% owner of PropCo and Landowner then deeds land into PropCo; and (3) the Sponsor (or its affiliate) purchases a majority interest (usually around 98%) in PropCo from Landowner.

(b)  Second, prior to completing the purchase of the majority interest, the Sponsor (or its affiliate) conducts a "due diligence" period during which it obtains an initial appraisal ("Initial Appraisal") of the land from one of its hand-picked appraisers (the "Primary Appraiser") and engages a consultant (*e.g.*, a mining engineer, land development consultant, and/or conservation consultant) to assess the land for its alleged intended purpose, as explained below.  The Initial Appraisal purports to provide a valuation based on the Highest and Best Use (also referred to as the "HBU") of the land.  The Primary Appraisers were fully aware the Initial Appraisals would be used to promote and sell the SCE Strategy to potential participants, including Plaintiffs and members of the Class.

(c)     During the due diligence period, other consultants purportedly assist with conservation management, determining the HBU of the Property, and perform other services in connection with and support of the "Conservation Easement Option" discussed later herein.

(d)     Third, the Sponsor (or its affiliate) hires a consulting firm or consulting firms to purportedly evaluate the potential for development of the Property, which was never economically viable but was used later by the Appraisers to arrive at an overstated HBU.

(e)     Fourth, the Sponsor (or its affiliate) forms a second limited liability company (the "Syndicate") and sends marketing materials (the "Promotional Materials") to potential participants.  These Promotional Materials include the Initial Appraisal and are intended to lure potential targets into participating in the SCE Strategy.   In the Promotional Materials, the Defendants also specifically tout the tax benefits of a conservation easement for potential participants (the "Conservation Easement Option"), promising them a legal return of more than 2.5 times the amounts paid into the Syndicate(s).

(f)     Fifth, after the participants join their respective Syndicate, the Sponsor (or its affiliate) offers all but 0.5% of its interest in PropCo to the Syndicate in exchange for cash.  The end-result is PropCo (which

holds the critical property) is owned 97.5% by the Syndicate, 0.5% by the Sponsor (or its affiliate), and 2% by Landowner.

(g)   Sixth, the Sponsor (or its affiliate) obtains a second appraisal or an appraisal review from another one of its hand-picked appraisers ("Secondary Appraiser") (the Primary Appraisers and Secondary Appraisers are included within the definition of "SCE Appraisers" set out *supra*).  Once again, the appraisals obtained by the Sponsor (or its affiliate) purport to value the land at its HBU.

(h)   Seventh, the Defendants prepare a Conservation Easement Deed.

(i)   Eighth, the Defendants prepare a Baseline Documentation Report for the Syndicate, which ascertains the conservation values, substantiates the purported conservation purpose, and establishes the condition of the property at the time of the gift.

(j)   Ninth, PropCo then donates a conservation easement to a land trust (the "Land Trust") and the remaining fee simple interest in the land to an affiliate of the Land Trust ("Land Trust Affiliate"), thus allowing the Sponsor to not have any continuing obligation with respect to the remaining partnership assets.

54.   The donation of the conservation easement is reported as a charitable contribution and its value reported by the Syndicate according to the Appraisal.

The value of the charitable contribution is reported as a charitable contribution deduction on the Syndicate's tax return (prepared by the Return Preparers). The amount of the charitable contribution deduction reported on the Syndicate's tax return equals the purported decrease in the property's appraised value resulting from the alleged restriction placed on the property by virtue of the conservation easement. This deduction is then allocated to each Syndicate member based on their respective ownership interests in the Syndicate. Each Syndicate member reports their allocated deduction on their individual tax return as reflected in the K-1 they receive from the Syndicate's tax preparer—the L & G and Sklar Defendants.

55.    Defendants (either directly or indirectly) promised, represented to, and assured the Plaintiffs and the Class that these tax deductions from the SCE Strategy were in full compliance with Section 170(h) of the Code and all other relevant and applicable laws, rules and regulations.

56.    The Defendants purported to offer the Syndicate members the opportunity to elect to use the subject property in a variety of different ways other than the Conservation Easement Option. They did so in order to establish the purported *bona fides* of the arrangement, including specifically to reaffirm the fraudulent statements about the property's HBU in the Appraisal (using the reports of the Blethen Defendants and the other consultants) and to mislead the IRS into

believing that the Defendants had not pre-determined how the property would be used from the very outset.  And in accordance with the Defendants' pre-planned scheme, all of the Syndicates used in the SCE Strategy selected the "Conservation Easement Option" as the use of the subject property.

57.    In reality (and unbeknownst to Plaintiffs and the Class), the SCE Strategy, as developed by the Morris Manning Defendants and structured and implemented by all of the Defendants, amounts to nothing more than a sale of grossly overvalued and ineffectively structured federal tax deductions that the IRS was already carefully scrutinizing and indicating to professional advisors it would disallow.

58.    In developing, promoting, selling, and implementing the SCE Strategy, the Defendants made (or caused others to make) uniform written statements, and uniformly omitted material facts, about the allowance and amount of federal and state tax deductions the Plaintiffs and the Class were legally entitled to claim based on their participation in the SCE Strategy.  These statements were false, as set out in detail further below.  As a result of these false statements made by or caused to be made by the Defendants, the Plaintiffs and the Class unwittingly claimed wholly improper tax deductions on their federal and state tax returns.  The Defendants made these statements, and caused others to make these statements, to

Plaintiffs and the Class despite the fact that the Defendants knew or had reason to know they were false.

59.    As part of their pre-planned scheme, the Defendants' hand-picked SCE Appraisers prepared and provided grossly overvalued and flawed Appraisals. These valuations were then used to claim the large tax deductions that flowed through the Syndicates to the Plaintiffs and the Class.   The SCE Appraisers, including but not limited to the Appraisal Defendants, were in no way independent and did not prepare independent, good faith appraisals.   The other Defendants, including *inter alia* the land development consultants, the Blethen Defendants and OSI and MMM) worked closely with the SCE Appraisers to prepare the Appraisals, including determining the HBU of the property, the value of the donated property interests, the fair market value of the conservation easements, and the amount of the charitable contribution deduction.

60.    The Defendants and Other Participants knew or should have known that the IRS would conclude that the charitable contribution deductions from the SCE Strategy were improper, as structured and implemented, due to *inter alia* the lack of support for the inflated appraisals of the donated property interests, the failure to substantiate a valid conservation purpose, defective Conservation Easement Deeds, defective Baseline Documentation Reports, the promise of legal charitable contribution tax deductions worth many times more than the amount

paid into the Syndicates, and the Defendants' other failures to comply with the necessary requirements for claiming proper conservation easement charitable contribution deductions.   Despite these issues, the Defendants and the Other Participants continued to promote, sell and implement the SCE Strategy and advise Plaintiffs and the Class that the SCE Strategy and its tax benefits were legal and legitimate.

61.   It was not reasonable to expect that Plaintiffs and the Class were knowledgeable and they were not, in fact, knowledgeable about complex tax matters and tax planning.  Indeed, that is why Plaintiffs and members of the Class relied on and trusted the Defendants and the Other Participants, *i.e.*, the purported experts.  Plaintiffs and the Class detrimentally relied on Defendants and the Other Participants and upon Defendants' and the Other Participants' repeated unequivocal representations that the SCE Strategy was a completely legal tax-advantaged charitable contribution within the meaning of Code § 170(h), which specifically provides that conservation easements, ***if done properly and legally***, create legitimate charitable contributions for income tax purposes.

62.   Unbeknownst to Plaintiffs and the Class, the Defendants and the Other Participants entered into undisclosed, improper business arrangements with each other.   These arrangements destroyed their independence and resulted in the Defendants and Other Participants working in furtherance of their own best

interests rather than the best interests of their clients.  Each of the Defendants and the Other Participants knew or should have known that the IRS would determine that the SCE Strategy, as structured and implemented, did not comply with § 170(h) of the Code and other applicable laws and was, in reality, nothing more than an illegal and abusive tax shelter.

63.     As part of and in furtherance of the Defendants' scheme, the Return Preparers prepared the Syndicates' tax returns, which reported the total amount of charitable deductions.  The Return Preparers then determined the amount of each Plaintiff's and Class member's charitable deductions, issued a K-1 to each Plaintiff and Class member, and advised Plaintiffs and the Class to report the charitable deductions on their federal and state tax returns for the years in question.  Plaintiffs and the Class followed the Return Preparers' advice and instructions (which mirrored the advice and representations from the other Defendants) and signed and filed their tax returns reporting the charitable deductions.

64.     The Defendants and the Other Participants held themselves out as experts in the areas of conservation easements and complex tax matters and planning and, therefore, by providing false, misleading and inaccurate information to Plaintiffs and the Class, the Defendants and the Other Participants ensured that Plaintiffs and the Class would sign and file federal and state tax returns using and reporting the charitable deductions purportedly generated by the SCE Strategy.

Despite the fact that the Defendants and the Other Participants knew the IRS was heavily scrutinizing and challenging syndicated conservation easements for potential abuse, the Defendants and the Other Participants forged ahead and continued to advise, promote, and encourage Plaintiffs and the Class to utilize the SCE Strategy to offset income on their tax returns.

## 2.    The SCE Strategy "Players."

65.    <u>The MMM Defendants:</u>    The MMM Defendants, and specifically Pollock, were the architect and developer of the SCE Strategy.  These Defendants were intimately involved in every aspect of each Syndicate's transaction and worked with each of the Defendants to implement each Syndicate's transaction; MMM provided due diligence and tax compliance services, including: preparation and approval of the appraisals, Baseline Documentation Reports and Conservation Easement Deeds to ensure that these documents met the requirements of the Internal Revenue Code and the Treasury Regulations with regard to the SCE Strategy.  To further illustrate, these Defendants worked on the following aspects of each Syndicate's transaction:  acquisition of real estate and preparation of all legal documents related thereto; preparation of the legal documents used to implement the transaction; preparation of the Promotional Materials; promotion and sale of the SCE Strategy to potential participants, including advising Pollock's referral sources to refer clients to the OSI Defendants and communications with

potential participants and/or their advisors to convince the potential client to participate; preparation of legal opinions issued to Syndicates; review and approval of the reports from the Blethen Defendants and other consultants; structure of the conservation easement; preparation of the Conservation Easement Deed, Baseline Documentation Report, Appraisals (including the Appraisal methods, HBU, and valuation of the property and conservation easement), and Appraisal Summary (Form 8283); and review and approval of the reporting of the charitable contribution deduction on the partnership returns and K-1s.

66.    Each Syndicate paid MMM a flat fee.  In addition, each Syndicate paid MMM an hourly fee for the time it spent providing advice and services to the Syndicate.  The PropCo (described above) also paid a fixed fee for advice and services the MMM Defendants performed for the PropCo including due diligence and preparation of a legal opinion.

67.    <u>The L & G Defendants</u>:  The L & G Defendants had multiple roles and responsibilities in the SCE Strategy.  From 2012 through 2015,[10] these Defendants provided accounting and tax advice and services to each Syndicate and its members, including the preparation of each Syndicate's tax return and K-1s that were issued to Plaintiffs and each Class Member.  For instance, L & G was the primary preparer of many of the partnership tax returns, including (but not limited

---

[10] This time period and the subsequent reduction in role seems to coincide with the departure of Matt Kaynard from L & G to in-house at OSI.

to) for the Lakeland Syndicate in which Radow participated and the Industrial S & G Syndicate in which Turk participated. In addition, these Defendants, and specifically Skalski, served as the "operations manager" for OSI on each Syndicate's transaction and were paid a separate fee for this work. As the operations manager, they were responsible for making sure every aspect of each Syndicate's transaction was properly and timely completed. Overall, these Defendants were intimately involved in every aspect of each Syndicate's transaction. To illustrate, these Defendants worked on the following aspects of each Syndicate's transaction: acquisition of real estate and preparation of all legal documents related thereto; preparation of the legal documents used to implement the transaction; preparation of the Promotional Materials; promotion and sale of the SCE Strategy to potential participants; review and approval of the reports and business plans from the Blethen Defendants and other consultants; structure of the conservation easement; preparation of the conservation easement deed, Baseline Documentation Report, Appraisals (including the Appraisal methods, HBU, and valuation of the property and conservation easement), and Appraisal Summary (Form 8283); and providing accounting and tax advice and services, including preparation of partnership return and K-1s. Further, Conservation Pays negotiated with third parties on behalf of the Defendants and arranged for consulting services for each Syndicate. Conservation Pays also drafted agreements as needed.

68.     L & G was paid an hourly fee for the accounting and tax advice and services, including preparation of the partnership tax return and K-1s, provided to each Syndicate through the first quarter of 2015.   In addition, L & G, through Conservation Pays, was paid a flat fee on each Syndicate.

69.     <u>The OSI Defendants</u>:  The OSI Defendants served as the "Sponsor" and manager of each Syndicate's transaction.  The OSI Defendants also created multiple consulting companies who purported to provide independent advice and services, but were in reality completely controlled and/or directed by the OSI Defendants.  As the Sponsor and manager of each Syndicate, these Defendants were involved in virtually every aspect of each Syndicate and, along with the MMM and L & G defendants, were responsible for making sure every aspect of each Syndicate's transaction was properly and timely completed.  To illustrate, these Defendants worked on the following aspects of each Syndicate's transaction: acquisition of real estate and preparation of all legal documents related thereto; formation of the necessary entities for the implementation of the SCE Strategy; formation or retention of various consulting companies (such as the Blethen Defendants and other consultants (the "Consultants")) to provide services to each Syndicate; preparation of the legal documents used to implement the transaction; preparation of the Promotional Materials; promotion and sale of the SCE Strategy to potential participants; review and approval of the reports from the Consultants;

structure of the conservation easement; preparation of the Conservation Easement Deed, Baseline Documentation Report, and Appraisal Summary (Form 8283); and review and approval of the reporting of the charitable contribution deduction on the partnership returns and K-1s.

70.    The OSI Defendants received substantial fees for sponsoring and managing each Syndicate, as well as through the various Consultants owned by or affiliated with the OSI Defendants that purportedly provided services for each Syndicate.

71.    The SCE Appraisers:    The SCE Appraisers, including but not limited to the Weibel Defendants and the Lucus Defendants (The Weibel Defendants and the Lucus Defendants are collectively referred to herein as the "Appraisal Defendants") provided the following services to each Syndicate: provided the Appraisals to support the valuation of the conservation easement and the charitable contribution deduction taken by each Syndicate (which, in turn, flowed through to each member in the Syndicates); permitted the front-line promoters of the SCE Strategy to utilize their Appraisals in the Promotional Materials for the purpose of convincing potential participants that the SCE Strategy provided legal and legitimate tax savings through the contribution of a conservation easement; and signed the Appraisal Summary (Form 8283) as the appraiser declaring the legitimacy of the claimed charitable contribution deduction

in the years in which their Appraisal was used to support the charitable contribution deduction provided by the SCE Strategy.

72.    The Appraisal Defendants received substantial fees for their appraisal work and their work on the Forms 8283.

73.    <u>The Land Trusts:</u>  The "Land Trusts" are the land trusts (*i.e.*, the ACC Defendants and Wild Turkey Federation) to which the Syndicates donated their conservation easements and the affiliates of the land trusts (*i.e.*, Georgia Tuition Assistance Program, Inc. ("GTAP"), Atlantic Properties, and American Upland) to which the Syndicates donated the remaining fee simple interests.  They provided the following services to each Syndicate:  worked with the MMM, L & G, and OSI Defendants to prepare the Conservation Easement Deeds; prepared preliminary studies and inspections that concluded that each respective property would satisfy one or more of the "conservation purposes" defined under § 170 of the Code; allowed the other Defendants to use the conclusions reached in these preliminary studies in the Promotional Materials sent to potential participants; worked with the MMM, L & G, and OSI Defendants to prepare the Baseline Documentation Reports, which were filed with each Syndicate's Appraisal Summaries (Form 8283) and tax return; provided a letter to each Syndicate confirming the donation and representing that the Syndicate would receive a full tax deduction for the value of the conservation easement donated; and

countersigned the Appraisal Summaries (Form 8283) verifying that the charitable contribution deduction complied with Code Section 170(h) of the Code.

74.    The ACC Defendants received the conservation easement and fee simple donations for their role in the scheme.

75.    <u>The PCLG Defendants:</u>   PCLG is a law firm that performed two distinct roles in connection with the SCE Strategy:

- recruited clients to buy into a fund for purposes of participating in the SCE Strategy and provided these clients with legal opinion letters regarding the SCE Strategy; and

- provided legal advice and services to the OSI Defendants and members of the SCE Syndicates (*i.e.*, Plaintiffs and members of the Class) regarding all aspects of the SCE Strategy, including document preparation, review, and analysis and due diligence on the *bona fides* of the purported tax benefits of the SCE Strategy.

76.    <u>Bennett Thrasher:</u> Bennett Thrasher is an accounting firm that performed several roles in connection with the SCE Strategy including the following:

- referred its own clients to participate in the SCE Strategy and, in doing so, utilized its clients' confidential financial information to identify potential targets;

- provided advice and recommendations to the OSI Defendants regarding the SCE Strategy, including with respect to structure, valuation, and the use of properties with underlying mineral assets; and

- performed its own "due diligence" on the SCE Strategy *for each separate client* and then charged each separate client a fee for this due diligence (in addition to the fee that Bennett Thrasher charged each client for preparation of the client's individual tax return and each Syndicate for preparation of the partnership returns and K-1s).[11]

77.   The Greencone Consultants:   Bennett Thrasher introduced the OSI Defendants to Carlton Walstad ("Walstad") and Russell Bennett ("Bennett) (the son of Rick Bennett of Bennett Thrasher) who, in turn, introduced the OSI Defendants to both the concept of using mining as the basis for valuation of properties and Bennett and Walstad's hand-picked mining consultant, the Blethen Defendants.   Walstad and Bennett also formed Greencone Investments, LLC ("Greencone") to purportedly provide consulting services for the SCE Strategy and

---

[11] Of course, once Bennett Thrasher conducted its initial due diligence, there was no legitimate reason for Bennett Thrasher to "re-invent the wheel" and conduct the same due diligence for each successive client and, in fact, Bennett Thrasher did not conduct any additional due diligence for its clients.  The fee Bennett Thrasher charged each client for due diligence was simply a "money grab" and served no purpose other than to generate more revenue for Bennett Thrasher at the expense of the clients who trusted Bennett Thrasher.

share in the fees generated therefrom.    Walstad, Bennett, and Greencone are collectively referred to herein as the "Greencone Consultants."

78.    The "Return Preparers":  These are the accounting firms/accountants who prepared the partnership returns for each of the Syndicates used in the SCE Strategy, as well as the K-1s that were sent to each Plaintiff and member of the Class that set forth each such individual's proportionate share of the Syndicate's charitable contribution deduction to be reported on their individual tax returns. These firms/accountants prepared these partnership tax returns and K-1s with full knowledge of the fact that these documents were being used in connection with the SCE Strategy and would result in the Plaintiffs and members of the Class claiming charitable contribution deductions from the SCE Strategy on their individual tax returns.  The Return Preparers include but are not limited to the L & G Defendants, the Sklar Defendants, and Partnership Tax Solutions.

79.    The "PropCos":  These are the entities that purchased the real estate used in the SCE Strategy.  All of the PropCos were originally formed by OSI or its affiliates.   The PropCos for the transactions in which the Plaintiffs participated were FG River Resources, LLC (property in Polk County, Florida); Lakepoint Land II, LLC (property in Bartow County, Georgia); Industrial S&G, LLC (property in Escambia County, Alabama); and Gulf Land Aggregates, LLC (property in Montgomery County, Georgia).

80.     The "Syndicates": These are the entities through which Plaintiffs and the Class participated in the SCE Strategy.  All of these Syndicates were originally formed by OSI or one of its affiliates.  The Syndicates for the transactions in which the Plaintiffs participated were FG River Partners, LLC; Lakepoint Land Group LLC; Industrial S& G Partners LLC; and Gulf Land Aggregates Group LLC.

81.     The "Managers": These were all entities created by, affiliated with, and controlled by OSI or one of its affiliates to act as managers for each Syndicate and take the necessary actions on behalf of each such Syndicate to effect the steps of the SCE Strategy.  The Managers for the transactions in which the Plaintiffs participated were Big Escambia Ventures, FASMO, LLC, and Galt Holdings, LLC.

82.     The "Consultants":These are the consultants that purportedly completed assessments of certain parcels of land used in the SCE Strategy to determine the merits of conservation of each such parcel and/or to Support the HBU for the property (which would be used in the Appraisals and for determining the value of the conservation easement).  The Consultants for the transactions in which the Plaintiffs participated were Conservation Saves, Conservation Pays, Conservation Matters, Site Services Group, LLC, Southwest Capital Management, LLC, the Blethen Defendants, Galt Mining ("Galt Mining"), and the Greencone Consultants.  Conservation Saves, Conservation Pays, and Conservation Matters purported to provide consulting services in connection with assessing the property

to determine if there were valid conservation purposes and advising on the feasibility of such purposes. The Blethen Defendants, Galt Mining, Site Services Group, LLC, Southwest Capital Management, LLC, and the Greencone Consultants purported to provide consulting services in connection with the HBU of the subject properties for mining in the OSI Defendants' SCE Strategy transactions from 2014-2018.

83. In accordance with their pre-planned scheme, the Defendants and Other Participants worked together to promote and sell the SCE Strategy to potential clients, including Plaintiffs and the Class Members, and then jointly worked together to execute the steps of the SCE Strategy. The Defendants and the Other Participants never disclosed to Plaintiffs that they had conspired to fraudulently, recklessly, or negligently design, promote, sell, and implement the SCE Strategy. Nor did they disclose to the Plaintiffs that they were in no way independent from each other.

**C.   The Scheme to Develop, Promote, Sell, and Implement the SCE Strategy.**

   **1.   The MMM Defendants – The Architect and Developer of the SCE Strategy.**

84. In approximately 2008, Pollock developed a tax product that used a partnership with third-party members to monetize deductions and state tax credits from the donation of a conservation easement on real estate property owned by the

partnership.  This tax product was the SCE Strategy.  According to Pollock, "if a land owner does not have taxable income sufficient to utilize the full benefit of a conservation easement, the unused deductions and state tax credits can be converted into cash by creating a partnership with third-party investors or admitting investors into an existing partnership that owns the land and specially allocating the deductions and credits to the investors."

85.    After developing the SCE Strategy, the MMM Defendants aggressively promoted it to landowners and professional advisors who could serve as referral sources, and potential participants in the SCE Strategy.  The MMM Defendants promoted Pollock as the creator and preeminent expert of the SCE Strategy and MMM as the "go to" law firm for the SCE Strategy.  Their promotion efforts were overwhelmingly successful, and the MMM Defendants created a robust market for the SCE Strategy.  The SCE Strategy generated large revenues every year for MMM from approximately 2009 through 2018.

86.    As part of these promotion efforts, the MMM Defendants organized and participated in seminars and workshops on the SCE Strategy for the specific purpose of finding landowners who could provide property for the SCE Strategy, professional advisors (*e.g.*, accountants, lawyers, and investment brokers) who would refer their clients to participate in the SCE Strategy, and individuals with an interest in participating in the SCE Strategy.

87.     Pollock, as the architect and self-proclaimed leading expert of the SCE Strategy, had a crucial role in organizing these seminars and workshops.  He also had a prominent speaking role at each of the seminars and workshops. Pollock was billed at these workshops and seminars as the "structuring lawyer" and his presentations usually focused on the structure and implementation of the SCE Strategy and how the SCE Strategy complied with the specific provisions of the Tax Code and other applicable law.

88.     Importantly, other speakers at these seminars and workshops were all part of the team that Pollock put together to work on the SCE Strategy.   For instance, Skalski (of L & G), Keller (of ACC) and Weibel (of Weibel Firm) gave presentations on specific aspects of the SCE Strategy.  Each of these speakers were likewise presented as experts with respect to the SCE Strategy.

89.     In addition, these seminars and workshops were sponsored by MMM, ACC, L & G, Weibel Firm, and other firms who worked with the MMM Defendants on the SCE Strategy.  Each of these speakers and their firms were interrelated and worked together at these seminars and workshops to convince landowners to provide the real estate for the SCE Strategy; to convince professional advisor referral sources to refer their clients to participate in the SCE Strategy; and to convince individuals to participate in the SCE Strategy.  By doing

so, the Defendants generated a substantial amount of business and revenue working together on the SCE Strategy.

90.     Pollock also developed a large referral network of lawyers, accountants, investment advisors, real estate advisors, and other professionals. He identified these potential referral sources and met with them to promote the SCE Strategy, the MMM Defendants' expertise, and the team of advisors Pollock put together to work with the MMM Defendants on the SCE Strategy. This robust and diverse referral network was a large factor in creating the thriving market for the SCE Strategy. It also resulted in substantial client referrals for the Defendants.

91.     Pollock also identified, targeted and convinced numerous firms to become Sponsors of the SCE Strategy. The MMM Defendants used the Sponsors to promote, sell and implement the SCE Strategy. The OSI Defendants were one of the Sponsors that Pollock convinced to promote, sell, and implement the SCE Strategy.

92.     Pollock structured the SCE Strategy to use Syndicates as the vehicle through which individuals participated. Each Syndicate executed the SCE Strategy and the charitable contribution deductions generated by the SCE Strategy were allocated to the members of the Syndicate. Although there were different Syndicates, they all executed the same strategy through the same, uniform steps.

93.     While the MMM, L & G and OSI Defendants worked closely with one another and each of the other Defendants and Other Participants to implement the SCE Strategy transactions, the MMM Defendants, and specifically Pollock, reviewed and approved every aspect of each Syndicate's transaction.  Not one aspect of the Syndicate's transaction was finalized without the MMM Defendants' approval.  In addition, the MMM Defendants provided legal opinions to Syndicates to support the tax benefits promised from the SCE Strategy.

94.     When OSI or another referral source had trouble convincing a client to participate in the SCE Strategy, Pollock would personally meet with these potential participants and/or their advisor to convince the individual to participate in the SCE Strategy.  The MMM Defendants also allowed, and even encouraged, the OSI Defendants to tout the OSI Defendants' relationship with the MMM Defendants when the OSI Defendants promoted the SCE Strategy to their referral sources or potential clients.

95.     Pollock also personally participated in the SCE Strategy.  In fact, he was a member in several Syndicates alongside other members whom the Defendants had convinced to participate.  Despite this clear conflict of interest, Pollock did not disclose to participants of the SCE Strategy that he was also a participant alongside of them.  In addition, Pollock took affirmative steps to conceal his personal involvement as a member in the Syndicate for which he

provided purportedly independent opinion letters.   Obviously, Pollock was concerned that disclosing this fact would cause others to believe his opinions were biased, based on self-interest, and motivated by his desire to make sure the Syndicates raised the funds necessary to close.

> **2.      The Large and Gilbert Defendants profit heavily from their role in the structure, promotion, sale and implementation of the SCE Strategy.**

96.      The L & G Defendants worked closely with the MMM Defendants on the SCE Strategy from approximately 2008 through at least the first quarter of 2015.  The L & G Defendants, and specifically Skalski, were key members of the team that Pollock put together to work with the MMM Defendants on the SCE Strategy.  Skalski was the partner at L & G primarily responsible for the firm's SCE Strategy practice and relationship with the MMM Defendants.

97.      The L & G Defendants, and specifically Skalski, worked on Pollock's team from the moment the MMM Defendants started promoting the SCE Strategy.  Pollock and Skalski worked together to structure, promote, sell and implement the SCE Strategy offered by various Sponsors, including the OSI Defendants.  The L & G Defendants provided accounting and tax advice and services, including the preparation of each Syndicate's tax returns and K-1s for each Syndicate.   In addition, the L & G Defendants served as the "operations manager" for each Sponsor's program.  And in this capacity, the L & G Defendants were responsible

for overseeing and managing each Syndicate's transaction and ensuring that every step of the SCE Strategy followed every step as structured and designed by Pollock, which purportedly complied with the requirements of Section 170(h) of the Code and other applicable law.

98.     L & G quickly realized that the SCE Strategy business would generate substantial revenue for the firm.  As a result, L & G shifted its business more and more to syndicated conservation easements and even decided to promote and sell the SCE Strategy to their own clients.  To this end, the L & G Defendants set up their own Syndicates to implement the SCE Strategy.  The MMM and L & G Defendants worked closely together to structure, promote, sell and implement the SCE Strategy to these L & G clients.

99.     In approximately May 2009, at the very beginning of their involvement with the MMM Defendants and the SCE Strategy, the L & G Defendants formed Conservation Pays, which they used for their SCE Strategy business.  Conservation Pays was formed as a result of the substantial amount of business and revenue that Skalski, as the leader of the firm's SCE Strategy business, was producing for L & G from his work with the MMM Defendants on the SCE Strategy.

**3.    The MMM and L & G Defendants recruit the OSI Defendants to become a Sponsor for the SCE Strategy.**

100.    Pollock and Skalski met with Schuler of the OSI Defendants in 2012 to discuss the OSI Defendants serving as a Sponsor and working with the MMM and L & G Defendants on the SCE Strategy.  The OSI Defendants did not have any experience with or knowledge about syndicated conservation easements before meeting with Pollock and Skalski, but they did have tremendous experience and contacts in the real estate area that MMM knew would benefit the SCE Strategy team.  Pollock and Skalski convinced the OSI Defendants to join their SCE Strategy team as a Sponsor, and the OSI Defendants began serving as a Sponsor and working with the MMM and L & G Defendants at some point in 2012.  From late 2012 through 2016, the OSI Defendants were a Sponsor and worked with the MMM Defendants on every SCE Strategy transaction in which the OSI Defendants were involved.  The L & G Defendants also worked with the OSI Defendants on the SCE Strategy transactions from 2012 through the first quarter of 2015.  From that point on through approximately 2018, the Sklar Defendants began working with the Defendants and took over the role of providing accounting and tax advice and services, including preparation of the partnership tax returns and K-1s, for each Syndicate.

101.    Beginning in approximately 2017, the OSI Defendants continued to be a Sponsor for SCE Strategy transactions but no longer worked with the MMM

Defendants.  However, the OSI Defendants continued to work with the team that Pollock had put together, and the SCE Strategy transactions in 2017 and 2018 were in essence the same SCE Strategy transactions Pollock developed and that the OSI Defendants served as a Sponsor for from approximately 2012 through the end of 2016.  Indeed, the SCE Strategy transactions sponsored by the OSI Defendants in 2017 and 2018 used the template Promotional Materials and transaction documents that had been developed jointly by the MMM, L & G, and OSI Defendants when they first began collaborating in 2012.

### 4.  Bennett Thrasher's prominent role in the conspiracy to promote, sell, and implement the SCE Strategy.

102.   Bennett Thrasher and the OSI Defendants worked closely together on the SCE Strategy from approximately 2012 through 2018.  In approximately 2012, Bennett Thrasher contacted the OSI Defendants and requested that the OSI Defendants give a presentation on the SCE Strategy to Bennett Thrasher; the OSI Defendants did shortly thereafter.   After this presentation, Bennett Thrasher advised the OSI Defendants that it wanted to refer its clients to the OSI Defendants for participation in the SCE Strategy.  Bennett Thrasher, however, advised the OSI Defendants that before it would agree to refer clients to the OSI Defendants, the OSI Defendants had to agree to pay Bennett Thrasher an annual fee to perform its own purported annual due diligence on the SCE Strategy.   Because Bennett Thrasher had represented to the OSI Defendants that it would refer large numbers

of clients every year to participate in the SCE Strategy, the OSI Defendants agreed to Bennett Thrasher's demands.   Each year (from approximately 2012-2018) before Bennett Thrasher referred clients to the OSI Defendants that particular year to participate in the SCE Strategy, Bennett Thrasher purportedly performed due diligence on the SCE Strategy.  And, every year, the OSI Defendants paid a lump sum "due diligence fee" to Bennett Thrasher.    In any of the Syndicates that Bennett Thrasher was an advisor, it also received a fee from either the Syndicate, OSI, or another OSI entity.

103.   Bennett Thrasher aggressively promoted the SCE Strategy to its clients.   Bennett Thrasher touted the expertise and experience of the team of advisors their clients would be working with, namely the MMM, L & G, and OSI Defendants.  Bennett Thrasher emphasized to its clients that it had performed due diligence on the SCE Strategy and concluded that the SCE Strategy complied with the applicable laws and the tax benefits generated in the SCE Strategy were specifically allowed in the Tax Code.  Bennett Thrasher was able to convince large numbers of their clients to participate in the SCE Strategy as a result of the existing relationship of trust these clients already had with Bennett Thrasher.   From approximately 2012 through 2018, Bennett Thrasher referred a large number of clients every year to the OSI Defendants to participate in the SCE Strategy.

104.   Bennett Thrasher coordinated its solicitation efforts with OSI to ensure their message was consistent.  To induce demand for SCE Strategy investments among its clients, Bennett Thrasher circulated a Power Point presentation prepared for its clients (i) that included an example of an easement transaction for which the ratio of deduction to investment cost "will not exceed $4.40 to $1," (ii)  that showed Bennett Thrasher would charge such SCE Strategy clients a professional fee of $3500 - $5000 for tax projections and "due diligence" and (iii) that represented to their clients that 35-40% of their clients eligible for the SCE Strategy participated in the Strategy.  Bennett Thrasher's client solicitation Power Point presentation bore a striking similarly to OSI's typical offering Power Point that showed a $4.39 charitable contribution deduction for every $1.00 invested in an OSI syndicate.

105.   In addition, Bennett Thrasher had several different roles with respect to the Syndicates.  It was a "CPA Advisor" and provided accounting services to one or more of the SCEs.  In addition, Bennett Thrasher was a consultant that provided material aid, assistance or advice to one or more of the one or more of the SCEs.  In particular, it performed a due diligence review of various materials.  For example, with respect to 2012 C-Palmetto Syndicate, of which Radow was a member, Bennett Thrasher referred clients, as well as served as a "Consulting Advisor" that had the following roles and responsibilities:  provided material aid,

assistance or advice in one or more of the substantially similar transactions by performing a due diligence review of various materials and providing other consulting services.

106.   For the clients it referred into the Syndicates, Bennett Thrasher had numerous interactions and communications with OSI and MMM discussing their concerns and requested changes on the SCE documents, including on the appraisals.  Even though these discussions were about a particular Syndicate that a client had entered into, Bennett Thrasher's comments and advice were generally applicable to all of the Syndicates and as a result were used and applied in all of the Syndicates.   Bennett Thrasher was aware that their advice, opinions and proposed changes would be used on all Syndicates going forward.  And Bennett Thrasher knew that its requests for changes were usually met because it had a large client base that were potential participants in the SCEs and that Bennett Thrasher was very willing to make those clients available for fees agreeable to Bennett Thrasher.

> **5.** **Bennett Thrasher connects the OSI & MMM Defendants to the Greencone Consultants and the Blethen Defendants and the SCE Strategy begins focusing on mining transactions.**

107.   In early 2014, Bennett Thrasher met with OSI to discuss Bennett Thrasher's recommendation to begin using property with underlying mineral assets in the SCE Strategy.   At this meeting, Bennett Thrasher introduced OSI to the

Greencone Consultants.   Bennett Thrasher and Greencone advised the OSI Defendants that, based on their analysis, the SCE Strategy should be using properties with underlying mineral assets because the "HBU" of these properties provided a much greater valuation than the property currently being used.  Bennett Thrasher and the Greencone Consultants emphasized that the use of property with mineral assets would generate substantially more revenue for all of the Defendants. The Greencone Consultants and Bennett Thrasher advised OSI that the Greencone Consultants already possessed property with mineral assets that could be used in 2014 and also had a mining expert, Blethen Mine, that could be used as a consultant on these SCE Strategy transactions.   Shortly thereafter, Bennett Thrasher and the Greencone Consultants met with the MMM and OSI Defendants to further discuss the use of property with mineral assets in the SCE Strategy. Bennett Thrasher's advice and recommendations were accepted by the MMM, L & G and OSI Defendants and the SCE Strategy began using property with underlying mineral interests exclusively for all SCE Strategy transactions from 2014 through 2018.  In addition, the Syndicates began paying consulting fees to the Greencone and Blethen Defendants in connection therewith.  Moreover, based on Bennett Thrasher's advice and recommendations, the Greencone Consultants' properties were used for the 2014 transactions.  Finally, based on OSI's relationship with Bennett Thrasher, OSI and the Greencone Consultants actually formed a

partnership, which required OSI and the Greencone Consultants to split the profits for 2014.

108.   Every year Bennett Thrasher would review the Blethen Defendants' business plans when they did their due diligence. Although Bennett Thrasher gave comments and proposed changes to the work, they never raised any concerns or complained about the Blethen Defendants' work that was incorporated into the appraisals.

### 6.   The PCLG Defendants' role in the conspiracy to structure, promote, sell and implement the SCE Strategy.

109.   The PCLG Defendants were one of Pollock's important referral sources.  Accordingly, the MMM Defendants had a close working relationship with the PCLG Defendants and its partners, including Kowan and Jason Cordon. In fact, Cordon (one of the attorneys at PCLG who was involved with the SCE Strategy) worked at MMM for several years before leaving to join PCLG in 2014.

110.   The PCLG Defendants began putting clients in the OSI SCE Strategy in 2012; for example in that year, it worked to put clients into, and advise, the C-Palmetto Syndicate, which Radow was a member of.  As legal counsel for the Syndicate, the PCLG Defendants provided material aid, assistance or advice concerning complying with relevant Code provisions and Treasure Regulations. MMM was also the Syndicate's legal advisor and the MMM and PCLG Defendants worked together closely to prepare all the relevant documents and

collaborated to review, revise and approve the important documents, including the Conservation Easement Deed, Baseline Documentation Report, Appraisals, and the Consulting expert reports.  Both the PCLG and MMM Defendants made detailed comments and revisions to the Conservation Easement Deeds, appraisals, and Baseline Reports; both the PCLG and MMM Defendants gave their legal advice and opinions on what to do to meet the IRS requirements.  Pollock made the changes to these documents that the PCLG Defendants recommended.

111.   The PCLG Defendants performed distinct roles in connection with the structure, promotion, sale and implementation of the SCE Strategy.  First, they recruited their own clients to buy into a fund, which was either owned by or affiliated with PCLG or its partners, for the purpose of participating in the SCE Strategy.  The fund was the member of the Syndicate.  The PCLG Defendants provided these clients with legal opinion letters regarding their participation in the SCE Strategy.  Second, the PCLG Defendants served as legal counsel for certain Syndicates.  In this role, the PCLG Defendants provided legal advice and services to the OSI Defendants and members of the Syndicates (*i.e.*, Plaintiffs and members of the Class) regarding the SCE Strategy, including document preparation, review, and analysis and due diligence on the *bona fides* of the purported tax benefits of the SCE Strategy.  In any of the Syndicates that the PCLG Defendants were listed

as advisors, they received a fee from either the Syndicate, OSI, or another OSI entity.

112.   The PCLG Defendants prepared and issued at least 21 opinion letters (referred to as "Comfort" letters) to 21 OSI Syndicates from 2013 until early 2016, when Kowan and his partner left PCLG; all of these the PCLG Defendants' opinion letters were virtually identical and are best described as "cookie-cutter." In addition, the PCLG Defendants prepared due diligence reports for the Syndicates, that were sent to Fred Schuler at OSI as the representative of the Syndicate, with the statement that "per [OSI's] request," the PCLG Defendants had performed due diligence on each particular SCE Syndicate deal, including reviewing and evaluating all steps and documents such as marketing materials, the appraisal(s), the Baseline Documentation Report, and the Conservation Easement Deed, and provided opinions and advice from the legal and tax perspective regarding expected tax benefits.   In this connection, the PCLG Defendants (particularly Kowan) had numerous lengthy discussions with Pollock and others at MMM regarding all issues and topics that would normally go into a full-length tax opinion, including all legal and tax requirements of the transaction; the two then collaborated on changes that needed to be made to the various documents.   More particularly, the PCLG Defendants gave advice on changes that should be made to the documents, including advice on language to go into the appraisals by the

appraisers; advice on language to add to the Baseline Documentation Report to better reflect conservation values; and advice on the concerns and changes that needed to be made to the appraisal and valuation.

113.   The PCLG Defendants often expressed concerns with the appraisals and gave changes to MMM and OSI that it believed should be made to give the valuations a better chance to satisfy the IRS.  In addition, Kowan was concerned that the Lucus Defendants' appraisals used data incorrectly and were very similar to the Weibel appraisals—as though one had copied the other.

**7.    The MMM Defendants recruit the SCE Appraisers to join the conspiracy to promote, sell, and implement the SCE Strategy.**

114.   The MMM Defendants hand selected the SCE Appraisers and worked closely with them to ensure that each Appraisal supported the Syndicate's transaction.  The SCE Appraisers allowed the MMM Defendants to control the Appraisals.   These Defendants analyzed and selected appraisal methods and selected the HBU to be used in the appraisal.   In fact, the MMM Defendants closely reviewed each Appraisal to ensure that it could be used to support the SCE Strategy transaction and, if necessary, instructed the appraiser to make changes to the Appraisal.  The Appraisal was not considered final for use in the SCE Strategy unless and until Pollock and his team gave final approval on it.

60

**8.    The MMM and L & G Defendants recruit the Land Trusts to join the conspiracy to promote, sell, and implement the SCE Strategy.**

115.    The MMM and L & G Defendants also worked closely with the Land Trusts (*i.e.*, the ACC Defendants and Wild Turkey Federation) to prepare the Baseline Documentation Report and Conservation Easement Deed for each Syndicate's transaction.  Pollock hand-picked each of the "Land Trusts" that were to receive the conservation easement donation on each Syndicate's transaction. Each of the "Land Trusts" on Pollock's team allowed the MMM, L & G, OSI, PCLG Defendants to control the preparation of the Baseline Documentation Report and Conservation Easement Deed.  These Defendants worked together to review, revise, and prepare the Baseline Documentation Reports for each Syndicate.  And the MMM Defendants, and specifically Pollock, reviewed, revised, and gave final approval to the Baseline Documentation Report, ensuring that the Baseline Documentation Report fully supported the Syndicate's transaction, including the conservation purpose for the conservation easement donation.

116.    Likewise, the MMM, L & G, OSI, and PCLG Defendants worked closely with the "Land Trusts" to prepare the Conservation Easement Deed for each Syndicate's transaction.  These Defendants worked together to review, revise, and prepare the Conservation Easement Deed for each Syndicate.  And, most importantly, the Conservation Easement Deed was not considered final unless and until Pollock approved it.

117.   The MMM, L & G, OSI, PCLG Defendants and the Land Trusts also jointly worked on the Appraisal Summaries (Form 8283).

118.   Pollock and Keller began working together on the SCE Strategy in approximately 2009 and continued through approximately 2018.  In approximately 2010, Keller formed ACC to be specifically used for the SCE Strategy. Based on information and belief, ACC's business from approximately 2010 through 2018 was almost exclusively related to Syndicated Conservation Easements in general and the SCE Strategy in particular, leading him to be labeled by one national publication as the "[m]ost prominent among the renegade land-trust leaders" as well as someone known to accept easements that other groups had refused due to excessive valuations.[12] That same publication indicates that "ACC oversees 80,000 acres of conserved land in 11 states" and that "a sampling of deal documents suggests it took easements and land donations responsible for as much as $1 billion in write-offs in 2017."  Pollock hand-picked Keller and ACC as one of the "Land Trusts" to work on Pollock's team, even though ACC's application to become an accredited member of the Land Trust Alliance was withdrawn. In the words of Keller himself, he withdrew the application because "it was clear 'they were not going to let us through,'" due to disagreements about ACC's failures to question

---

[12]   *See* "The Billion-Dollar Loophole" (December 20, 2017) at https://www.propublica.org/article/conservation-easements-the-billion-dollar-loophole/amp (written in collaboration with *Fortune*) ("Billion Dollar Loophole").

appraisers about excessive valuations being done in a short period time on easements ACC had been accepting.[13]

119.   Keller, the Director of ACC, realized how lucrative working with Pollock's team on the SCE Strategy could be for him personally.   As a result, Keller would not allow ACC to receive any conservation easement donation unless Pollock agreed that Keller's other company, ERMF, was allowed to prepare each and every Baseline Documentation Report and ERMF, instead of ACC, received payment for those services.   In other words, Keller had a "side hustle" that generated substantial revenue for his own personal benefit that would have otherwise gone to ACC.[14]   Of course, Pollock agreed to Keller's demand.

120.   Although ACC apparently made a sufficient application to the IRS to obtain tax exempt status, it has since flouted the applicable provision of the IRS Code and regulations that govern its conduct.   In particular, this is true of Keller's private inurement through ERMF, in explicit violation of IRC § 501(c)(3).   In sum, ACC is a tax-exempt pirate ship whose plunder consists of outlandish fees charged for providing cookie-cutter Baseline Documentation Reports and signing Forms

---

[13] The Billion Dollar Loophole.

[14] The Billion Dollar Loophole indicates that Keller was paid "$156,750 in 2015 [by ACC], tax returns show. But that's dwarfed by the $602,432 he made from Environmental Research and Mapping Facility, a side business he operates that works exclusively for his land trust."

8283 known to them to contain false information to facilitate the abuse of IRC § 170(h) by promoters of the SCE Strategy.

> **9. The MMM, L & G, and OSI Defendants and Bennett Thrasher recruit the Consultants to join the conspiracy to promote, sell, and implement the SCE Strategy.**

121.   Each Syndicate retained Consultants to, *inter alia*, assess the Syndicate's property to determine the merits of conservation of each such parcel and/or to determine the HBU of each parcel.   The MMM, L & G, and OSI Defendants, and Bennett Thrasher worked closely with each of these Consultants to ensure that the assessments and conclusions supported the Syndicate's transaction and the HBU the Appraisers needed to arrive at to support the promised deduction.  Each of these Consultants played a specific role in the implement of the SCE Strategy, as described herein.

**D.    The IRS Warns the Defendants Regarding Potential Abuses of Syndicated Conservation Easements.**

122.   As early as 1984, the IRS warned professional advisors and promoters of conservation easements that the overvaluation of charitable contributions was improper and would not be tolerated (IRS News Release, IR-81-122).  The Senate Finance Committee was aware of and concerned about tax shelter promoters exploiting opportunities to offset income through inflated valuations of donated property.  Congress recognized that tax shelter promoters knew it was not possible for the IRS to detect most instances of excessive deductions.  And because of the

subjective nature of valuation, tax shelter promoters could promote and sell transactions that claim excessive charitable deductions and attempt to rely on the "audit lottery" to conceal the inflated charitable contribution deduction from the IRS.  Because of these concerns, the Senate Finance Committee made it clear to professional advisors that stronger substantiation and overvaluation provisions should be applicable to charitable contributions of property.

123.   Congress took action to address the problem of overvaluing charitable contributions in the Deficit Reduction Act of 1984 ("DEFRA").  DEFRA set forth specific provisions for the substantiation of charitable contributions, including instructing the Secretary to prescribe regulations under § 170(a)(1) of the Code to require any individual, closely held corporation or personal service corporation claiming a deduction under § 170 of the Code for charitable contributions to obtain a Qualified Appraisal for the property contributed and to attach an Appraisal Summary (Form 8283) to the return on which the deduction is first claimed for such contribution; such Qualified Appraisal was to specifically disclose the cost basis, acquisition date of the contributed property, and such additional information as the Secretary may prescribe in such regulations.

124.   The Secretary complied with Congress' mandate by promulgating regulations pursuant to DEFRA § 155(a).  The relevant regulation reiterates that no deduction under IRC § 170 shall be allowed with respect to a charitable

contribution unless the substantiation requirements are met. These Treasury Regulations require a fully completed Appraisal Summary (Form 8283) to be attached to the return and provides a list of what the Appraisal Summary (Form 8283) must include, specifically including the identification of the cost basis of the property.

125. These regulations made it clear to professional advisors and promoters/sponsors of conservation easements that their failure to comply with the substantiation requirements would result in the disallowance of the claimed deduction and expressly requires that a charitable deduction may be allowed only if the contribution is verified in the manner specified by the Treasury Regulations.

126. In 2004,[15] the IRS officially identified conservation easements as purportedly generating deductions that the IRS would carefully scrutinize and eventually disallow if certain circumstances were present, including *inter alia*, failure to substantiate the fair market value of the tax benefit and other valuation issues. At that time, the IRS advised professional advisors and promoters that it would aggressively pursue back-taxes and enormous penalties from taxpayers who claimed disallowed deductions from conservation easements.

127. In 2006, the IRS officially put professional advisors and promoters of conservation easements on notice of what constitutes a "Qualified Appraisal" and a

---

[15] *See* IRS Notice 2004-41 (July 12, 2004).

"Qualified Appraiser," including, for example, requiring a Qualified Appraisal to be consistent with the substance and principles of the Uniform Standards of Professional Appraisal Practice ("USPAP") as developed by the Appraisal Standards Board of the Appraisal Foundation.

128.   Even in the face of these warnings, the Defendants and the Sponsors continued to aggressively promote and heavily profit from conservation easements. In fact, Defendants eventually moved into syndicated conservation easements, which greatly expanded the "market" for these Defendants by now making the SCE Strategy available to individuals who were not individually able to participate in a capital-heavy conservation easement transaction.

129.   In 2016, the IRS once again advised professional advisors that it was heavily scrutinizing these transactions and would disallow tax deductions if certain circumstances existed, and taxpayers who claimed disallowed deductions would pay a heavy price.  In December 2016, the IRS issued Notice 2017-10, which designated certain syndicated conservation easements (like the SCE Strategy) as listed transactions.  Specifically, the Notice listed transactions where members in pass-through entities receive promotional materials offering the possibility of a charitable contribution deduction worth at least two and a half times their contribution.  Although the MMM Defendants did not advise Plaintiffs that they anticipated  the IRS would designate the SCE Strategy as a listed transaction, in

December of 2016, after the Notice was issued, the MMM Defendants, and specifically Tim Pollock, indicated that the "listed transaction announcement was always anticipated."

130.  By 2019, the IRS added syndicated conservation easement transactions (like the SCE Strategy) to its "Dirty Dozen" list of tax scams to avoid.[16]

## E.  Polk County, Florida—A Prototypical Example of the Fraud on a "Macro" Level[17]

### 1.  Summary of Polk County Transactions

131.  The County Line Ranch (sometimes, "Ranch") in Polk County, Florida originally consisted of 3,475 acres.  Beginning in November 2015 and ending in 2016, this property was divided up by conservation easement promoters into 25 parcels for syndication purposes, of which 1,249 acres (the "Property") was syndicated in 2015 into 9 parcels by OSI; this includes the FG River Syndicate in which Radow invested.  The remainder of the Ranch, subsequently divided into 16 parcels, was either syndicated by OSI in 2016 or sold off to another syndicator.  Moreover, an adjoining 792 acres on the west side of the Ranch was syndicated in 2016 and 2017 by OSI as well.

---

[16]  *See*  https://www.irs.gov/newsroom/abusive-tax-shelters-trusts-conservation-easements-make-irs-2019-dirty-dozen-list-of-tax-scams-to-avoid

[17]  The Industrial S & G land in Escambia County is also, like FG River, part of a master tract divided into 10 separate tracts, all of which were the subject of conservation easements (and all of which are now pending in Tax Court).

132. The total syndication of the Ranch and the adjoining undeveloped rural land (totaling 5,200 acres) were valued for syndication purposes in excess of $800 million. To put this in perspective, the Great American Outdoors Act (2020) just made permanent an annual funding for the Land and Water Conservation Fund at $900 million.

133. Further, Florida Forever, a Florida state agency which has a longstanding and continually monitored list of Florida lands to preserve, purchased a conservation easement on 6,000 acres just to the south and east of these properties (almost adjacent) for $9.7 million in December 2017. For appraisals done after this date, this is the best comparable and should have been disclosed under USPAP Standard 1-1(b). None of these syndicated parcels have ever been on Florida Forever's list to preserve.[18]

### 2.    Prior Ownership and Early Mineral Testing

134. In November 2005, an entity called AHP #2 bought the Ranch for approximately $19.5 million or $5,500 per acre. In 2011, APH #2 had the Ranch appraised for a bank loan at a value of $3,000 per acre.

---

[18] "Florida Forever is Florida's premier conservation and recreation lands acquisition program, a blueprint for conserving natural resources and renewing Florida's commitment to conserve the state's natural and cultural heritage…. Since the inception of the Florida Forever program in July 2001, the state has purchased more than 818,616 acres of land with a little over $3.1 billion." *See* https://floridadep.gov/lands/environmental-services/content/florida-forever.

135.   Although prior owners of the Ranch had explored the potential for mining on the Property, there were significant obstacles that prevented mining from being a lucrative venture.  For example, a 1986 detailed study of potential mineral extraction on the Property revealed that (i) no such mines were actually located in Polk County, except in its very northwest corner (the Ranch is in the very southern portion of central Polk County) and (ii) the limestone was impure and there were obstacles to removing it.

136.   Notwithstanding the results of the 1986 mining study, between 2005 and 2007 AHP #2 performed boring and sample testing for minerals and listed the Ranch for sale for the purpose of aggregate mining in 2008 for $34,000,000 or roughly $10,000 per acre. They had no offers. Subsequently, AHP #2 determined mineral extraction on the Ranch was not economically viable and never formally offered the property again for aggregate mining.

137.   The Ranch was re-listed in 2011 for a short time for a price of $25 million, but received and rejected an offer of $5 million ($1,420 per acre) in 2012. It was then re-listed by broker Dean Saunders in 2012 as agricultural/hunting property at the lower price of $12,600,000 or approximately $3,600 per acre.  The Ranch continued to be listed at roughly $3,600 per acre through the Fall of 2015 but received no offers.

### 3.    Activities and Acquisition by OSI

138.   Central Florida is generally known to have underlying limestone formations.  In 2014, OSI had syndicated land in Alabama with a purported HBU of mining aggregate.  It was thus familiar with the requirements for such mining.

139.   OSI held a March 2015 seminar for tax advisors and financial professionals to discuss the Property in Polk County, its acquisition and its use as vehicle for syndicated conservation easements.

140.   In July 2015, OSI engaged Blethen Mine to prepare a Business Plan for the Property.  However, the Blethen Mining Business Plan (dated November 24, 2015) did not rely on any new mineral samples and only discusses certain of the facts originally determined in the 2005-2007 testing.  It ignored the factors affecting the real economics of mining on the Property, including: the land had an average of 35 feet or greater of "overburden"[19] resting above the limestone (too much overburden), the limestone strata is only around 20 feet in depth (too little limestone), the limestone is of varying quality (not the highest grade and sporadic), the limestone strata sits over the water table (making permitting more difficult and causing difficulties while mining), and the location is not near any major metropolitan cities (meaning that high cost of transportation would be a major limiting factor).

---

[19] Overburden is the material that lies above an area that might be mined, such as rock, soil, and ecosystem.

141.   On August 20, 2015, the Weibel Defendants were engaged to provide an Initial Appraisal of the Property, as though it had been divided into 9 parcels, even though this had not yet occurred. One of these parcels is FG River, which ultimately was divided out of the Property as a 122.5 acre parcel.  Despite the fact that the Property had never sold at, let alone received any offer close to the previous asking price of $3,600 per acre, and the prior owner had concluded mineral extraction was not economically viable, the Weibel Defendants appraised the FG River parcel at an astounding $145,000 per acre (approximately) and $126,000 on average for all of the Property.[20]

142.   On October 12, 2015, OSI formed Imperial Aggregates LLC ("Imperial").   On November 15, 2015, AHP #2 ("Seller") "contributed" the Property—1,249 acres out of the County Line Ranch—to Imperial in exchange for membership interests in Imperial, thus qualifying for tax nonrecognition status under Code § 721.[21]   Around the same time, Galt Holdings purchased 96% of Imperial for $7,450,000 ($6,200 per acre).

---

[20] This value manipulation had nothing to do with conservation values and seems clearly designed so that each tract sold provided the same 4X multiple per dollar invested.

[21] A contribution as compared with a sale allows the property's "holding period" for tax purposes to continue from November 2005, the date AHP #2 acquired the property. This is the sole reason all subsequent parcels could qualify for a charitable deduction based on fair market value rather than cost basis; if the holding period is less than one year, the deduction is limited to cost basis.

143.   On December 3, 2015, Imperial contributed all of the Property except 123.3 acres (which it retained for itself) to the 8 new LLC's, including FG River and the other PropCos.  The resulting 9 parcels ranged in size from 122.5 acres to 193.1 acres.

144.   On December 10, 2015, Galt sold (through other OSI affiliates) 95.9% in each of the 9 LLCs/PropCos to Plaintiff Radow and other members of the Class, retaining only 0.1% for itself.  Each LLC/PropCo paid an identical $3,891,766 (an average of $26,000 per acre) despite the differing number of acres distributed to each LLC.

145.   On either that same day or the next, the participants in FG River and the other PropCos were provided a "Ballot" for voting on their "choices." The vote was 100% for "Conservation," on or about the same date the entity acquired the deed to the tract it owned.

### 4.      The Weibel Appraisals, Based on the Blethen Mine Studies

146.   On October 26, 2015, Defendant Weibel issued 9 substantially identical Initial Appraisals of FG River and the adjoining parcels "owned" by the other 8 LLCs (effective as of August 15, 2015).   Weibel published 2-page summaries rather than the report itself, though it offered to provide the report "upon request."  This practice is misleading and in violation of USPAP Ethics Rule

216-226.  Final appraisals to be used with tax returns were issued in late December 2015.

147.   In the FG River Appraisal, Weibel (using the Blethen Mine Business Plans as his basis) projects potential sales of over 1 million tons of aggregate per year after a phase-up over several years. Since all 9 tracts were appraised at the same time, with the same analysis, and reported on the same date, this means Weibel was saying these properties could ultimately sell 10.3 million tons per year, every year for 15 years, with a 3% increase per year.  This would be 50% of the then existing market for limestone in a 75-mile radius around Polk County and a huge multiple of what was then being produced by the one or two mines then operating in Polk County.

### 5.    Involvement of the Land Trusts

148.   Upon information and belief, Defendant Keller assisted before the Property was purchased in identifying the properties to be conveyed to his organization, ACC.   On numerous occasions, Keller has taken credit for the preservation of the properties upon which conservation easements were placed.

149.   In any event, ACC and the other participating land trusts were involved at the outset to confirm that they would accept the Property and thereafter, in all the steps towards that contribution, including their preparation of the cookie-cutter reports (*i.e.*, the Baseline Documentation Reports).

150.   As is obvious from any map of all parcels in a given scheme (such as all the tracts in the former County Line Ranch), the Property as a whole must be preserved—the development or mining of any one parcel would almost certainly upset any conservation value of any of the others.

151.   Thus, the land trusts must have direct confirmation from the sponsor that all parcels will, that year or shortly thereafter, "elect" to conserve. Thus, the idea that there is a true "vote" for any of those parcels as to its intended purpose is simply not true.

152.   Accordingly, there is in reality no true conservation purpose involved in these transactions; indeed, dividing the Property into multiple parcels is contrary to its preservation (due to additional administrative burdens and the possibility of some parcels being used for other purposes).   Instead, ACC and the other land trusts are active participants in helping all SCE Strategy promotors increase their profits. And either ACC directly or through ERMF (which is 100% owned by Keller) are making more money as each cookie-cutter report is prepared and paid for.

153.   ACC's books and tax returns were maintained and prepared by the wife of Defendant Skalski in 2015 and 2016 and Skalski himself was a director of ACC during these years.   In 2017, Bennett Thrasher performed an audit and prepared the tax return for ACC.

### 6.      Fraud and Indicia of Fraud in the Polk County Transactions

154.   The appraised value of the Property at $126,000 (on average) per acre for mining purposes ignored that the Defendants had valued the Property at $26,000 (on average) per acre when it sold it to the Syndicate of which Radow and the Class were members, and had only paid $6,200 per acre for the Property from a "Seller" that had full knowledge of and actually developed the original mining facts and who had concluded after marketing the Property that the HBU of the Property was not mining for aggregate but rather was agriculture/hunting.  It also ignores that the Property was never identified as land to be preserved by Florida Forever's program.

155.   The various legal entities used in the transactions were not formed until October 10, 2015 and OSI had no legal interest in the "Property" until November 10, 2015.  In addition, it means that the boundaries for FG River and the other 8 parcels are merely "hypothetical" as of the date of the Blethen reports and the appraisals.  The omission of these facts from Wiebel's Appraisal is a material omission in violation of USPAP Standard 1-1.

156. None of the documents from the Defendants (Appraisals, etc.) disclose that the total value of conservation easement deductions emanating from the entire Property (all 9 tracts) is $160,000,000, exponentially greater than the

HBU of the Property as a whole, even assuming that mining as the HBU of the Property was rationally arrived at and supportable (which it was not).

157.   The previous owner knew of the limestone deposits, had performed all the borings a decade earlier, and had listed the Property at $10,000 an acre but never had any offers. Further, the $6,200 that OSI actually paid for the Property was an arms' length transaction with a Seller fully knowledgeable of all facts. This actual sale, along with all the previous listings within the last three years, should have been disclosed in Weibel's Appraisal in accordance with the IRS's valuation standard, Treasury Regulation § 1.170A-1(c)(2) of "willing buyer-willing seller," required under the governing rules for appraisals, and the applicable USPAP Standard 1-5(a).

158.   Nonetheless, the Blethen Mine Plan generates discounted cash flows from a preliminary first step "scoping" study and assumes that 100% of the estimated (not "proven") mineral deposits would be mined (and sold). It mentions but does not elaborate on the difficulties in mining on the Property or the FG River parcel, including the 36 feet or more of "overburden" to remove and store just to get to the limestone layer which is only 20+ feet in depth before there is a water table; the Study does not indicate that the overburden could be stored within the Property nor deal with any costs of disposal or dealing with the water table; the study does not explain how ingress and egress will be available to each of the tracts

if a conservation easement is placed on one or more of the tracts.  Further, the Blethen Mine Plan does not note that the FG River parcel is rectangular in shape (long and narrow), with 100-feet borders, which may preclude mining because it is too close to the border of other properties.  Further, it projects only 6-12 months for "permitting"; this fails to take into account that if there are truly environmentally sensitive features of the Property such as to justify a conservation easement either on this parcel or nearby parcels, the permitting process might be much longer and permitting may not occur at all.

159.  As to the ability to mine the Property and Weibel's valuations[22], the previous owner's broker has been quoted as follows:

> Dean Saunders, a commercial broker who listed the County Line Ranch for years, says a previous owner tried to sell it in 2008 as a potential mining site for $10,000 an acre, but found no takers. He "realized the economics didn't justify trying to mine," says Saunders. He calls the $200,000 per acre appraisal "a farce and a travesty and an abuse of the system."[23]

160.  To conceal the grossly inflated appraisal value and to provide the appearance of satisfying IRS holding period requirements, Partnership Tax Solutions and the Weibel Defendants falsely represented in the Appraisal Summaries (Form 8283) filed with each Syndicate's tax returns that each of the

---

[22] Defendant Lucus issued an Appraisal with almost identical conclusions.

[23] The Billion-Dollar Loophole.  Saunders is an accomplished broker who "is a recognized Florida land and conservation authority."  *See* https://www.saundersrealestate.com/author/deansaunders/.

LLCs/PropCos had acquired the underlying Property in November *2005*, when, in fact, they had acquired the Property only a few weeks prior to donating the Property to ACC. If the Appraisal Summary had been filled out as required, then the IRS would have learned that the value of the subject property had allegedly gone up 25X in a few weeks, from November 2015 to the following month. Moreover, each of the members of the Class with interests in Polk County easements would have submitted the Form 8283 with their 2015 tax return and any competent tax return preparer would have questioned how the land could have increased in value that much over a short period of time. Falsely reporting the date of acquisition concealed vital information that would otherwise have caused the scheme to have been revealed earlier.

**F.     The Plaintiffs Engage in the SCE Strategy.**

**1.     Each Plaintiff Received Written Promotional Materials Containing a Promise Regarding the Purported Tax Benefits of the SCE Strategy.**

161.   Pursuant to and in furtherance of the conspiracy alleged herein, the MMM, L & G, and OSI Defendants collaborated to prepare the Promotional Materials for each of the Syndicates that were, in turn, provided to Plaintiffs and members of the Class in connection with the respective Syndicate in which each of them participated.

162.   These Defendants collaborated to prepare the Promotional Materials with full knowledge and the intent that these Promotional Materials would be used to promote and sell the SCE Strategy.  The Defendants provided the Promotional Materials to potential participants in the SCE Strategy and the Promotional Materials were designed to convince these individuals that the SCE Strategy would be able to generate legitimate charitable contribution deductions that would be in full compliance with §170(h) of the Code.

163.   In the Promotional Materials, these Defendants notified potential participants of the amount of the Primary Appraisal performed by one of their hand-picked SCE Appraisers and the steps of the SCE Strategy ultimately leading to the contribution of the conservation easement to a Land Trust and the remaining fee simple interest to an affiliate of the Land Trust, thus allowing OSI to not have any continuing obligation with respect to the remaining partnership assets.  The Promotional Materials also represent that the donation of the conservation easement to a charity was one of several options for what the Syndicate could do with the subject property.  However, the manner in which the SCE Strategy ultimately played out adequately demonstrates that the real purpose of the Syndicates was to implement the SCE Strategy and generate charitable contribution deductions from the donation of conservation easements.

164.   In the Promotional Materials, these Defendants specifically represented to potential participants that in the event the Syndicate donates a conservation easement, the amount of the charitable deduction for the Syndicate (that would then flow through proportionately to each Plaintiff and Class member) would be based on the valuation set forth in the Initial Appraisal, which in all cases would lead to a charitable deduction for each participant in the Syndicate of more than 2.5 times that amount paid into the Syndicate.

165.   In fact, in each of the transactions described herein, the Promotional Materials contained identical language about the expected tax effects:

> **For every \$1.00 of membership share cost, the new member would receive a charitable contribution deduction for approximately \$4.39 (\$4.38596 to be more exact) that should save the new member approximately \$2.00 in taxes.**

And, as implausible as it seems, each of the Appraisals was conveniently able to deliver on the Promotional Materials' promise (uniform across all the transactions) by coming up with valuations just the right size to provide a deduction just big enough to result in a tax savings of \$2 for every \$1 invested.  All of the Defendants (including the Appraisal Defendants) knew that these grossly inflated appraisals would be innocently used by the Plaintiffs and the Class to claim charitable contribution deductions from the SCE Strategy that, unbeknownst to Plaintiffs and

the Class, were completely unsupportable and in violation of some of the most basic rules and concepts for land appraisals.

### 2. The Plaintiffs Engage in the SCE Strategy.

#### a. Radow engages in the Lakepoint Syndicate Transaction in 2013.

##### i. The Steps of the Lakepoint Syndicate Transaction.

166. In 2013, the OSI Defendants (through FASMO, LLC, an OSI-affiliated entity) facilitated the acquisition of an interest in real estate located in Georgia and obtained an Initial Appraisal of the real estate from the Weibel Defendants.  As part of the "diligence period" (and afterward as well), the OSI, MMM, and L & G Defendants purported to also receive advice and consultation from Conservation Saves and Conservation Pays LLC for the purpose of supporting the *bona fides* of a charitable contribution deduction from the donation of a conservation easement to a land trust.[24]   These consultants were paid by Lakepoint Land Group LLC (discussed below) or another OSI affiliated entity.

167. Radow received Promotional Materials from the OSI Defendants (directly or through one of OSI's affiliated entities) via email on or around August 5, 2013 and again on October 22, 2013 about participating in the SCE Strategy through Lakepoint Land Group LLC (the "Lakepoint Syndicate"), a company

---

[24] In addition, land development consultants (Site Services Group, LLC and Southeast Capital Management, LLC) were employed to buttress the bogus findings of the Appraisers that land development was a physically and economically viable option, even though it wasn't.

formed and managed by FASMO LLC.   The Promotional Materials invited potential participants, including Radow, to purchase an ownership interest in the Lakepoint Syndicate and informed them that the Lakepoint Syndicate would, in turn, purchase an ownership interest in Lakepoint Land II, LLC (the "Lakepoint PropCo").

168.   The Promotional Materials informed Plaintiffs that the Lakepoint Syndicate could choose from one of three options for use of the subject property: (1) market the property for sale or development, (2) hold the property for long-term investment, or (3) conserve the property by contributing a conservation easement to a tax-exempt land trust and/or contributing a fee simple interest to a tax-exempt entity resulting in a charitable contribution deduction equal to more than 2.5 times the amount Radow paid into the Lakepoint Syndicate (*i.e.*, the Conservation Easement Option).

169.   The Promotional Materials were designed to convince potential participants that the SCE Strategy, through the Lakepoint Syndicate, provided a legal and legitimate way to save on taxes through a conservation easement that would be structured and implemented in full compliance with Section 170(h) of the Code.   The sole purpose of the Promotional Materials, which the Defendants jointly prepared, was to convince potential participants to participate in the SCE Strategy through the Lakepoint Syndicate, thus generating enormous fees for the

Defendants and Other Participants.   The Promotional Materials showed the "Conservation Easement Team" to include the following:

> **Primary Contact for questions about purchasing membership interests in the LLC:**
>
> Matt Ornstein, Principal and Manager
>
> Managers of Lakepoint Land Group, LLC that will own a 96% interest in the 275 Acres.
> Matthew Ornstein, Manager
> Frank Schuler, Manager
>
> Accounting and Tax Consultants:
> Matt Kaynard, Tax Counsel
> Large and Gilbert, P.C.[25]
>
> Special Tax Counsel:
> Tim Pollock – Partner and Attorney with Morris, Manning, & Martin, LLP:
>
> Land Trust - Atlantic Coast Conservancy
>
> Qualified Conservation Easement Appraisers:
> Clay Weibel – President: Weibel & Associates, Inc.
> Luke Von Esh – President: Lucas Mason, Inc.
>
> Escrow Agent for Membership Interest Purchases:
> Marc Kaufman – Partner and Attorney, The Vandiver and Kaufman Law Firm

170.   Further, the following were OSI's advisors to the transaction:

---

[25] Kaynard was Tax Counsel at Large & Gilbert from July 2010 to February 2015, when he joined OSI as its COO and General Counsel.  This coincided with L & G's reduced role on the Syndicates' "teams" and seemingly allowed OSI to perform some of L & G's prior work "in house."

- ACC - accepted the donation of the conservation easement, provided the baseline documentation report for the property, prepared deeds of conservation easement, signed the Form 8283 and acknowledge acceptance of the donation.

- FASMO– provided transaction advisory services.

- Conservation Saves– assessed the property for conservation purposes and worked to locate and hire the advisors to carry out the SCE Strategy.

- MMM– provided due diligence, reviewed transactional structures, and provided feedback on appraisals, baseline documentation reports, and deeds of conservation easement.

- Sklar & Associates – provided tax preparation services in connection with the transaction.

- The Georgia Tuition Assistance Program – accepted and acknowledged the donation of the fee simple donation of the property.

- Weibel & Associates – provided an appraisal of the property for both the conservation easement donation and the fee simple donation, which appraisal included the conclusions from

Blethen's mining analysis about the highest and best use of the
property.

- Lucus Mason, Inc. – provided an appraisal of the property for
  both the conservation easement donation and the fee simple
  donation, which appraisal included the conclusions from
  Blethen's mining analysis about the highest and best use of the
  property.

- Private Client Law Group – performed due diligence review of
  transactional documents and provided other consulting services
  for the transaction.

- Large & Gilbert – provided tax preparation services in
  connection with the transaction.

171. The Promotional Materials included an Initial Appraisal letter dated
August 3, 2013 prepared and sent by the Weibel Defendants to Lakepoint Land II,
LLC via U.S. mail and/or email. The Initial Appraisal letter provided a valuation
of the real estate at its purported HBU. The Initial Appraisal letter falsely and
materially stated that the conservation easement had a "Fair Market Value" of
$21,780,000, when the Weibel Defendants and the other Defendants knew that the
easement's value was considerably lower than that. The Weibel Defendants and
the other Defendants knew and intended that the potential investors in the

Lakepoint Syndicate, including Radow, would rely on this Initial Appraisal letter in deciding to undertake the SCE Strategy, as evidenced by, among other things, the statement that the "attached report was prepared for your use and for submission to the Internal Revenue Service as evidence of the fair market value of the charitable deduction."

172.   The PCLG Defendants referred clients into the Lakepoint Syndicate. PCLG was a "Consulting Advisor" and the PCLG Defendants performed the following roles and responsibilities:  provided material aid, assistance, consulting services and/or advice in the transaction and, in particular, performed a due diligence review of the various transaction documentation.

173.   Based on the Promotional Materials, including the Initial Appraisal, and the Defendants' advice and representations, Radow purchased an ownership interest in the Lakepoint Syndicate.   Radow paid a total of $150,000 into the Lakepoint Syndicate.

174.   The Weibel Defendants sent a similar Appraisal to Lakepoint Land II, LLC on or around November 17, 2013 via U.S. mail or email with the knowledge and intent that it would be shared with and relied upon by members and prospective members of the Lakepoint Syndicate, including but not limited to Radow.   This Appraisal, unlike the one included in the Promotional Materials, contained the full Appraisal, rather than simply the summary cover letter.   The

Appraisal falsely and materially stated that the conservation easement had a fair market value of $21,780,000.  The Appraisal falsely and materially stated that "Future employment prospects are not dependent upon producing a specific value," when, in fact, the Defendants had instructed the Weibel Defendants to produce a specific value to coincide with the amount of tax deduction requested by the Defendants and, in fact, their co-conspirators Defendants would not have continued to use the Weibel Defendants if they had not come to the specific value requested by the co-conspirators.  Moreover, the opinions and conclusions offered by the Weibel Defendants in the Appraisal did not follow applicable codes of professional conduct including USPAP (as falsely stated in the Appraisal) because they worked backwards from the value requested.   The certification in the Appraisal also contained numerous false statements, including but not limited to:

- "The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are personal, impartial, and unbiased, professional analyses, opinions, and conclusions" (when, in fact, the Weibel Defendants were conspiring with the other Defendants to come to a predetermined appraisal value);

- "There is no bias with respect to the property that is the subject of this report or to the parties involved with this assignment" (when, in fact,

the Weibel Defendants were biased in favor of the predetermined appraisal value set by their co-conspirators);

- "The engagement in this assignment was not contingent upon developing or reporting predetermined results" (when, in fact, the Weibel Defendants were conspiring with the other Defendants to come to a predetermined appraisal value);

- "This report is a 'qualified appraisal' as that term is defined in the applicable Internal Revenue Service regulations" (Treas. Reg. § 1.170A-13(c)) (when, in fact, the Weibel Defendants knew they were not a qualified appraiser because, among other reasons, they were persons whose relationship with the co-conspirators "would cause a reasonable person to question the independence of such appraiser.

175. The Lucus Defendants provided a separate Appraisal on or about November 19, 2013, to support the valuation of the fee simple donation of the land as well as the conservation easement. The Appraisal falsely and materially stated that the "Fair Market Value" of the conservation easement as of November 18, 2013 was $22,250,000. The Appraisal falsely and materially stated that "Future employment prospects are not dependent upon producing a specific value," when, in fact, the Defendants had instructed the Lucus Defendants to produce a specific value to coincide with the amount of tax deduction requested by the Defendants

and, in fact, their Defendant co-conspirators would not have continued to use Lucus Defendants if they had not come to the specific value requested by the co-conspirators.  Moreover, the opinions and conclusions offered by the Lucas Mason Defendants in the Appraisal did not follow applicable codes of professional conduct (as falsely stated in the Appraisal) because they worked backwards from the value requested.  The certification portion of the Appraisal also contained numerous false statements, including but not limited to:

- "The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are personal, impartial, and unbiased, professional analyses, opinions, and conclusions" (when, in fact, the Lucus Defendants were conspiring with the other Defendants to come to a predetermined appraisal value);

- "There is no bias with respect to the property that is the subject of this report or to the parties involved with this assignment" (when, in fact, the Lucus Defendants were biased in favor of the predetermined appraisal value set by their co-conspirators);

- "The engagement in this assignment was not contingent upon developing or reporting predetermined results" (when, in fact, the

Lucus Defendants were conspiring with the other Defendants to come to a predetermined appraisal value);

- "This report is a 'qualified appraisal' as that term is defined in the applicable Internal Revenue Service regulations (Treas. Reg. § 1.170A-13(c))" (when, in fact, the Lucus Defendants knew they were not a qualified appraiser because, among other reasons, they were persons whose relationship with the co-conspirators "would cause a reasonable person to question the independence of such appraiser.").

176.   The Lucus Defendants sent the Real Property Appraisal to Lakepoint Land II, LLC via U.S. Mail and/or email on or about November 19, 2013 with the knowledge and intent that it would be shared with and relied upon by members and prospective members in the Lakepoint Syndicate, including but not limited to Radow, as evidenced by, among other things, the statement that the "Attached report was prepared for your use and for submission to the Internal Revenue Service as evidence of the fair market value of the charitable deduction."

177.   Rick Kenney wrote an appraisal review of the Weibel Appraisal.  The Weibel Appraisal, the Lucus Mason Appraisal, and the Kenny Review Appraisal for the Lakepoint Syndicate had *inter alia* the following fatal variances[26] from the

---

[26] A fatal variance is a mistake made in an appraisal report that would prevent a credible value conclusion.

applicable standard of care (including USPAP) which are also fraudulent acts or omissions:

(a)     Photos attached to the Lucus Mason and Weibel Appraisal (they are the same) show high wire electric power lines with wide easement and significant topography challenges for development, but there is no discussion of how this could be resolved or mitigated in either report. Considering the high tower electrical easement and topography issues, a developer would be faced with significant surplus of undevelopable land, and this is not considered in either the Lucus Mason Appraisal or the Weibel Appraisal. The 0% topography adjustment is avoiding relevant information and violates the USPAP HBU Physically Possible Standard 1-3(b).

(b)     The property history shows that in 2011, the larger parcel of 1,198 acres of which Lakepoint (275 acres) is a part, sold for $16,937,400 or $14,138 per acre.  In 2013 (Date of Appraisal), Mason appraises the 275 acres at $37,125,000 or $135,000 per acre.  There is no market supported data in either the Lucus Mason Appraisal or the Weibel Appraisal that explains how 275 acres (Lakepoint) is worth *more than* the 1,198 acre purchase. There is no explanation in either the Lucus Mason Appraisal or the Weibel Appraisal as to how the property

could be worth $14,138 per acre in 2011 and only two years later, was allegedly worth $135,000 per acre. *See* USPAP Standard Rule 1-5(a) and (b).  A chart showing the comparison of these valuations is as follows:

| 2011 | 2013 | |
|---|---|---|
| 1,198 acres | 275 acres | (4.3 smaller) |
| $16,937,400 | $37,125,000 | (2.1 X more) |
| $14,138/acre | $135,000/acre | (9.5 X more) |

(c)    The "comparables" used by Lucus Mason are not truly comparable. On page 81, Comparable Land Sales Sale 6 is almost double the other 5 sales and should be treated as an outlier and removed.  A size adjustment of only -10% is not supported by market data when considering Sales 1, 3, 4, and 5 that average 13 acres each. The subject is 13.5 times larger and that size difference alone makes the use of the comparable unreasonable.

(d)    The Weibel report indicates that "No one provided significant real property appraisal assistance", although it appears Weibel copied much of his report from Mason (including the mistakes discussed above), another serious USPAP violation.  See Plagiarism- FAQ-Ethic Rules.

(e)     Weibel uses the same comparables as Mason, though he omits Sale #1. Absorbing 275 acres versus an average comparable size of 19.5 acres for 4 of the 5 comparables should have been addressed. The -10% size adjustment is unreasonable. Making market supported adjustments should make a significant decrease in value.

(f)     Rick Kenney wrote an appraisal review of the Weibel Appraisal. The substance of the report is boiler plate, not meeting the standard of care for either Georgia or federal agencies. By stating, "I have found no deficiencies that would materially affect the values ascertained by the appraiser", Kenney has overlooked all the deficiencies in the Weibel Lakepoint appraisal discussed above. This does not comply with the process and information required in USPAP Standards Rule 3-1(a) nor USPAP's Competency rule.

178.   The Lakepoint Syndicate then voted to place a conservation easement on the entirety of the real estate and to donate the conservation easement to ACC and the fee simple interest to the GTAP.

179.   The Conservation Deed, dated December 12, 2013, was jointly prepared and approved by the MMM, L & G, OSI, and ACC Defendants and sent via U.S. mail and/or email for filing. The Conservation Easement Deed was

verified and signed by Clay Weibel (as the appraiser) and by Robert Keller of ACC (on behalf of ACC).

180.   On or about December 12, 2013, the ACC Defendants prepared and provided a Baseline Documentation Report to the Lakepoint Syndicate, which was verified as accurate by the ACC Defendants and the Lakepoint Syndicate and filed with the Appraisal Summary (Form 8283) and the Lakepoint Syndicate's tax return.  ACC set out the conditions on the property that will be preserved by the conservation easement and concluded that these conditions met the conservation purpose of § 170(h) of the Code.  ACC concluded in this report that it is in the best interest of the Lakepoint Syndicate to place a conservation easement on the property and to donate the easement as a charitable gift to ACC.

181.   The Lakepoint Syndicate conveyed the conservation easement to ACC and the remaining fee simple interest to GTAP on December 16, 2013 and December 19, 2013, respectively.

182.   On December 12, 2013, ACC provided the Lakepoint Syndicate with a letter either through the U.S. mail and/or email documenting the conveyance, which falsely and materially advised the Lakepoint Syndicate that its contribution to ACC "is fully tax deductible," when ACC knew or should have known that the contribution deduction was based on grossly inflated appraisals and would be disallowed by the IRS.  ACC also knew that it had not attempted to question or

verify the appraisals, in callous disregard of industry standards. The L & G Defendants filed the ACC Defendants' letter with the Lakepoint Syndicate's tax return, along with the Baseline Documentation Report and Appraisal Summary (Form 8283).

183.   As a result of these donations, charitable contribution deductions flowed through and were allocated to each of the participants in the Lakepoint Syndicate (including Radow) in proportion to their relative ownership interest in the Lakepoint Syndicate.

184.   The charitable contribution that was allocated to Radow was more than 2.5 times the amount he paid into the Lakepoint Syndicate.

185.   The MMM, L & G, and OSI Defendants selected the Weibel Appraisal to be used to support a charitable contribution deduction for the Lakepoint Syndicate. As required, L & G attached this Appraisal to the tax return it prepared for Lakepoint Syndicate.

186.   At some point in late 2013 or early 2014 prior to the tax return being prepared, the Weibel Defendants prepared the Appraisal Summary (Form 8283). Weibel (as the appraiser and on behalf of the Weibel Defendants) and a representative of the ACC Defendants (on behalf of the ACC Defendants) verified the Appraisal Summary (Form 8283) as accurate and signed it. The L & G Defendants, the Weibel Defendants, and ACC then advised Radow that the

Appraisal Summary (Form 8283) would substantiate the charitable contribution deduction and allow Radow to claim the charitable contribution deduction on his individual tax returns.

187.   The Appraisal Summary falsely represented the appraised fair market value of the conservation easement, when, in fact, no independent appraiser would have appraised the easement at such a high value.  Moreover, Radow submitted the Form 8283 with his 2013 tax return.

188.   On or about March 13, 2014, the L & G Defendants prepared the tax return for the Lakepoint Syndicate.   The tax return reported a charitable contribution deduction of $21,750,000 from the donation of the conservation easement.   As required, the L & G Defendants attached to the Lakepoint Syndicate's return a copy of the Weibel Appraisal, the Appraisal Summary (Form 8283), the Baseline Documentation Report, and the ACC letter confirming the donation.   The L & G Defendants sent the tax return and its attachments to Lakepoint Syndicate via U.S. mail and/or email under a cover letter dated March 13, 2014.  The L & G Defendants further filed the tax return electronically with the IRS.  The L & G Defendants knew and intended for the Lakepoint Syndicate to file the tax return with the IRS, which it did and for the members of Lakepoint, including Radow, to use their pro-rata share of the resulting deduction, which they did.

189.   In addition, the L & G Defendants prepared a K-1 for each member of the Lakepoint Syndicate, including Radow, which reported the amount of charitable contribution deduction allocated to each of the members of the Lakepoint Syndicate.   The K-1 prepared for Radow reported a charitable contribution deduction of $394,194.   The L & G Defendants advised Radow to report this charitable contribution deduction on his individual tax returns for 2013. The L & G Defendants sent the K-1 to Radow via U.S. mail and/or email at some point shortly after preparing the Lakepoint Syndicate's tax return.

190.   Radow followed the advice of the Defendants and reported the charitable contribution deduction of $394,194 on his individual tax returns for 2013.

### ii.     The 2013 Lakepoint Syndicate Tax Return is Audited and the IRS Disallows the Charitable Contribution Deduction at the Partnership Level.

191.   On or about March 16, 2016, the Lakepoint Syndicate received an IRS Notice indicating that the Lakepoint Syndicate partnership tax return for the 2013 tax year was selected for audit.

192.   On or about March 27, 2017, the IRS issued a Federal Partnership Administrative Adjustment ("FPAA") for the Lakepoint Syndicate's tax return for the 2013 tax year.   The FPAA disallowed the charitable contribution deduction from the Lakepoint Syndicate SCE Strategy transaction for a variety of reasons,

including: (i) the lack of a valid conservation purpose, (ii) failure to properly substantiate a conservation purpose in the Conservation Easement Deed and/or the Baseline Documentation Report, (iii) an improper extinguishment proceeds clause causing the gift to not be in perpetuity, (iv) an improper appraisal method resulting in a grossly inflated valuation of the charitable gift, and (v) failure to submit qualified appraisal from a qualified appraiser.

193.   A Tax Court petition was filed by the Lakepoint Syndicate on June 22, 2017, where the case remains pending.

### b.   Radow engages in the FG River Syndicate Transaction in 2015.

#### i.   The Steps of the FG River Syndicate Transaction.

194.   As discussed above,[27] in 2015, OSI (through Galt Development LLC, another OSI affiliate) acquired an interest in real estate located in Florida and obtained an Initial Appraisal of the real estate from the Weibel Defendants.  As part of the "diligence period" (and afterward as well), the MMM and OSI Defendants purported to also receive advice and consultation from Conservation Saves and Galt Mining all for the purpose of supporting the *bona fides* of a charitable contribution deduction from the donation of a conservation easement to a land trust.  All of these Consultants were paid by FG River Partners LLC (discussed below) or another OSI affiliated entity.

---

[27] This includes defects in the Weibel Appraisal and the Blethen Mine Report.

195.   Radow received Promotional Materials on or about October 28, 2015 from Matt Ornstein of OSI via email about participating in the SCE Strategy through FG River Partners LLC (the "<u>FG River Syndicate</u>"), a company formed and managed by an OSI affiliated entity.   The Promotional Materials invited potential participants, including Radow, to purchase an ownership interest in the FG River Syndicate and informed them that the FG River Syndicate would, in turn, purchase an ownership interest in FG River Resources LLC (the "<u>FG River PropCo</u>").

196.   The Promotional Materials were designed to convince potential participants that the SCE Strategy, through the FG River Syndicate, provided a legal and legitimate way to save on taxes through a conservation easement that would be structured and implemented in full compliance with Section 170(h) of the Code.   The sole purpose of the Promotional Materials, which Defendants jointly prepared, was to convince potential participants to participate in the SCE Strategy through the FG River Syndicate, thus generating enormous fees for the Defendants and Other Participants.   The Promotional Materials showed the "Conservation Easement Team" to include the following:

> **Relevant Contact Info:**
>
> **Primary Contact for questions about acquiring membership interests in Investco: Matt Ornstein (Matt@conservation-saves.com), CEO & Manager.**

Property Owner and Investco Managers for the 122 +/- Acres Matt
Ornstein, Manager
Frank Schuler, Manager

Securities Compliance Counsel for Investco: Scott Withrow - Partner
at Withrow, McQuade, & Olsen, LLP

Special Tax Counsel:
Tim Pollock - Partner and Attorney with Morris, Manning, & Martin,
LLP:

Qualified Land Trust and 501c3 -Atlantic Coast Conservancy, Inc.
Robert Keller - President

Qualified Appraisers:
Clay Weibel - President: Weibel & Associates,. Inc. Lucas Von Esh -
President: Lucas Mason, Inc.

Escrow Agent for Membership Interest Subscriptions: Marc Kaufman
- Partner and Attorney, The Vandiver and Kaufman Law Firm

197.    Further, the following were OSI's advisors to the transaction and
performed at least the following actions in support of the transaction:

- ACC – accepted the donation of the conservation easement, provided
  the baseline documentation report for the property, prepared deeds of
  conservation easement, signed the Form 8283 and acknowledge
  acceptance of the donation.

- Galt – assessed the property for strategies to maximize its value,
  including mining and acted as a consultant to locate advisors to carry
  out the SCE Strategy.

- Conservation Saves – assessed the property for conservation purposes and worked to locate and hire the advisors to carry out the SCE Strategy.

- MMM – provided due diligence, reviewed transactional structures, and provided feedback on appraisals, baseline documentation reports, and deeds of conservation easement.

- Blethen Mine – performed research to determine if operating a mine was feasible on the property and developed a business plan for that potential operation.

- Weibel & Associates – provided an appraisal of the property for both the conservation easement donation and the fee simple donation, which appraisal included the conclusions from Blethen's mining analysis about the highest and best use of the property.

- Lucus Mason, Inc. – provided an appraisal of the property for both the conservation easement donation and the fee simple donation, which appraisal included the conclusions from Blethen's mining analysis about the highest and best use of the property.

- Partnership Tax Solutions – provided tax and accounting services related to the transaction.

- Bennett Thrasher – performed a due diligence review of transactional documents and provided other consulting services for the transaction, including discussing the potential investment with their clients.

- Matt Kaynard – provided various consulting services.

- FASMO – provided transaction advisory services.

198.   The Promotional Materials informed Plaintiffs that the FG River Syndicate could choose from one of four options for use of the subject property: (1) holding the property for long term investment, (2) leasing the property to a third party for mining and extraction of minerals, (3) operating the property for mining, extraction, and sale of minerals, or (4) conserve the property by contributing a conservation easement to a tax-exempt land trust and/or contributing a fee simple interest to a tax-exempt entity resulting in a charitable contribution deduction equal to more than 2.5 times the amount Radow paid into the FG River Syndicate (*i.e.*, the Conservation Easement Option).

199.   The Promotional Materials included an Initial Appraisal prepared by the Weibel Defendants dated October 26, 2015, which provided a valuation of the real estate for its purported HBU.   The Initial Appraisal letter falsely and materially stated that the land had a "Fair Market Value" of $17,800,000, when the Weibel Defendants and the other Defendants knew that the land's value was considerably lower than that.   The Weibel Defendants and the other Defendants

knew and intended that the potential investors in the FG River Syndicate, including Radow, would rely on this Initial Appraisal letter in deciding to undertake the SCE Strategy, as evidenced by, among other things, the statement that the "attached report was prepared for your use and for submission to the Internal Revenue Service as evidence of the fair market value of the charitable deduction."

200.   Based on the Promotional Materials, including the Initial Appraisal, and the Defendants' advice and representations, Radow purchased an ownership interest in the FG River Syndicate.  Radow paid a total of $250,000 into the FG River Syndicate.

201.   Marvin Blethen on behalf of Blethen Mine Consultants, LLC prepared a Technical Due Diligence Business Plan for FG River Resources LLC on or about November 24, 2015 and transmitted the Business Plan to FG River Resources LLC by U.S. mail and/or email.  The Business Plan purported to analyze the feasibility of operating a mine on the Property as the HBU.  The Business Plan provided the Weibel Defendants and later the Lucus Defendants with the basis for incorporating a discounted cash flow analysis into their Appraisals because the Plan enabled those Appraisal Defendants to use mining as the HBU and thereby the discounted cash flow for that HBU for valuation purposes.  The Business Plan was materially fraudulent in a number of ways:

- The Blethen Defendants' estimate maintained that all zoning, permitting, and erection of a plan could be set up in a six-month period when that could not feasibly occur;

- The Blethen Defendants willfully failed to discuss the costs of mining personnel and taxes in computing the discounted cash flow;

- The Blethen Defendants willfully failed to address zoning and permitting in determining that mining was the HBU of the subject property because the presence of wetlands and protected species would have made permitting and rezoning challenging at best and more likely, unrealistic.

- The Business Plan was based on numerous assumptions that the Blethen Defendants knew were false, including overstating the then price per ton of limestone by almost 50% because if Blethen had used the actual value, $11.42/ton, the value of the mining operation would be zero after taking into account the mining costs;

- The Blethen Defendants knowingly used the wrong capitalization rate of 12%, which would have been appropriate for an industrial rental property, when it should have used a 20% rate, which would have caused the valuation to be around half of the value determined by Blethen.

105

202. The Weibel Defendants sent a similar Appraisal on or around December 29, 2015 via U.S. mail or email.  This Appraisal, unlike the one included in the Promotional Materials, contained the full Appraisal, rather than simply the summary cover letter.  The Appraisal falsely and materially stated that the fair market value of the property before the easement was placed was $17,800,000 and the conservation easement had a fair market value of $17,360,000.  The Appraisal falsely and materially stated that "Future employment prospects are not dependent upon producing a specific value," when, in fact, the Defendants had instructed the Weibel Defendants to produce a specific value to coincide with the amount of tax deduction requested by the Defendants and, in fact, their co-conspirators Defendants would not have continued to use the Weibel Defendants if they had not come to the specific value requested by the co-conspirators.  Moreover, the opinions and conclusions offered by the Weibel Defendants in the Appraisal did not follow applicable codes of professional conduct (as falsely stated in the Appraisal) because they worked backwards from the value requested.  The certification in the Appraisal also contained numerous false statements, including but not limited to:

- "The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are personal, impartial, and unbiased, professional analyses, opinions, and

conclusions" (when, in fact, the Weibel Defendants were conspiring with the other Defendants to come to a predetermined appraisal value);

- "There is no bias with respect to the property that is the subject of this report or to the parties involved with this assignment" (when, in fact, the Weibel Defendants were biased in favor of the predetermined appraisal value set by their co-conspirators);

- "The engagement in this assignment was not contingent upon developing or reporting predetermined results" (when, in fact, the Weibel Defendants were conspiring with the other Defendants to come to a predetermined appraisal value);

- "This report is a 'qualified appraisal' as that term is defined in the applicable Internal Revenue Service regulations" (Treas. Reg. § 1.170A-13(c)) (when, in fact, the Weibel Defendants knew they were not qualified appraiser because, among other reasons, they were persons whose relationship with the co-conspirators "would cause a reasonable person to question the independence of such appraiser.

203.   The Lucus Defendants then provided a Secondary Appraisal to further support the valuation of the land for its purported HBU, mining/mineral extraction. The Appraisal falsely and materially stated that the "Fair Market Value" of the

conservation easement as of December 29, 2015 was "$17,890,000." The Appraisal falsely and materially stated that "Future employment prospects are not dependent upon producing a specific value," when, in fact, the Defendants had instructed the Lucus Defendants to produce a specific value to coincide with the amount of tax deduction requested by the Defendants and, in fact, their co-conspirators Defendants would not have continued to use Lucus Defendants if they had not come to the specific value requested by the co-conspirators. Moreover, the opinions and conclusions offered by the Lucas Mason Defendants in the Appraisal did not follow applicable codes of professional conduct including USPAP (as falsely stated in the Appraisal) because they worked backwards from the value requested. The certification portion of the Appraisal also contained numerous false statements, including but not limited to:

- "The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are personal, impartial, and unbiased, professional analyses, opinions, and conclusions" (when, in fact, the Lucus Defendants were conspiring with the other Defendants to come to a predetermined appraisal value);

- "There is no bias with respect to the property that is the subject of this report or to the parties involved with this assignment" (when, in fact,

the Lucus Defendants were biased in favor of the predetermined appraisal value set by their co-conspirators);

- "The engagement in this assignment was not contingent upon developing or reporting predetermined results" (when, in fact, the Lucus Defendants were conspiring with the other Defendants to come to a predetermined appraisal value);

- "This report is a 'qualified appraisal' as that term is defined in the applicable Internal Revenue Service regulations (Treas. Reg. § 1.170A-13(c))" (when, in fact, the Lucus Defendants knew they were not qualified appraiser because, among other reasons, they were persons whose relationship with the co-conspirators "would cause a reasonable person to question the independence of such appraiser.").

204. The Lucus Defendants sent the Appraisal to FG River Resources LLC via U.S. mail and/or email on or about March 30, 2016 with the knowledge and intent that it would be shared with and relied upon by members and prospective members in the FG River Syndicate, including but not limited to Radow, as evidenced by, among to things, the statement that the "Attached report was prepared for your use and for submission to the Internal Revenue Service as evidence of the fair market value of the charitable deduction."

205.  The FG River Syndicate then voted to place a conservation easement on the entirety of the real estate and to convey the conservation easement to ACC and the remaining fee simple interest to ACC Properties.

206.  The Conservation Easement Deed, dated on or about December 22, 2015, was jointly prepared and approved by the MMM, OSI, PCLG, and ACC Defendants and sent via U.S. mail and/or email for filing.  The Conservation Easement Deed was verified and signed by Schuler (as the grantor) and by the CEO of ACC (on behalf of ACC). The Deed contained numerous misrepresentations and omissions, including but not limited to, stating that the Deed permits activity that is consistent with a valid conservation purposes (when, in fact, it did not), failing to advise that the Deed permitted activity that is inconsistent with a valid conservation purpose, stating that the Deed protected the land in perpetuity (when, in fact, it did not), and failing to advise that the Deed did not protect the land in perpetuity.

207.  On December 22, 2015, ACC prepared and provided a Baseline Documentation Report to the FG River Syndicate, which was verified as accurate by ACC and the FG River Syndicate and filed with the Appraisal Summary (Form 8283) and the FG River Syndicate's tax return.  The purpose of this report is to ascertain the conservation values of the property at the date of donation and to substantiate the purported conservation purpose.  ACC set out the conditions on the

property that will be preserved by the conservation easement and conclude that these conditions met the conservation purpose of § 170 of the Code. ACC concluded in this report that it is in the best interest of the FG River Syndicate to place a conservation easement on the property and to donate the easement as a charitable gift to ACC.

208.  The FG River Syndicate conveyed the conservation easement to ACC and the remaining fee simple interest to ACC Properties on December 22, 2015 and December 28, 2015, respectively.

209.  On December 22, 2015, ACC provided the FG River Syndicate with a letter either through U.S. mail and or email documenting the conveyance, which falsely and materially advised the FG River Syndicate that its contribution to ACC "is fully tax deductible," when ACC knew or should have known that the contribution deduction was based on grossly inflated appraisals and would be disallowed by the IRS. ACC also knew that it had not attempted to question or verify the appraisals, in callous disregard of industry standards. Partnership Tax Solutions filed this letter with the FG River Syndicate's tax return, along with the Baseline Documentation Report and Appraisal Summary (Form 8283).

210.  As a result of these donations, charitable contribution deductions flowed through and were allocated to each of the participants in the FG River

Syndicate (including Radow) in proportion to their relative ownership interest in the FG River Syndicate.

211.   The charitable contribution that was allocated to Radow was more than 2.5 times the amount he paid into the FG River Syndicate.

212.   The MMM and OSI Defendants and PCLG selected the Weibel Defendants' Appraisal to be used to support charitable contribution deduction for the FG River Syndicate.   As required, Partnership Tax Solutions attached this Appraisal to the tax return it prepared for the FG River Syndicate.

213.   On or about March 18, 2016, the Weibel Defendants prepared the Appraisal Summary (Form 8283).   Weibel (as the appraiser) and a representative of ACC (on behalf of ACC) verified the Appraisal Summary (Form 8283) as accurate and signed it.   The Weibel Defendants and the ACC represented to the IRS in the Appraisal Summary (Form 8283) that the easement was placed on the property to protect the property.   Partnership Tax Solutions, the Weibel Defendants, and ACC then advised the Radow Defendants that the Appraisal Summary (Form 8283) would substantiate the charitable contribution deduction and allow Radow to claim the charitable contribution deduction on his individual tax returns.

214.   The Appraisal Summary falsely represented that the appraised fair market value of the conservation easement was $17,360,000, when, in fact, no

independent appraiser would have appraised the easement at such a high value. Moreover, to conceal the grossly inflated appraisal value and to provide the appearance of satisfying IRS holding period requirements, Partnership Tax Solutions and the Weibel Defendants falsely represented that the FG River Syndicate had acquired the underlying property in November 2005, when, in fact, it had acquired the property only a few weeks prior to donating the property to ACC. If the Appraisal Summary had been filled out as required, then the IRS would have learned that the cost basis of the subject property was $690,744 in November 2015, but a month later was allegedly worth $17,360,000. Moreover, Radow submitted the Form 8283 with his 2015 tax return and any competent tax return preparer would have questioned how the land could have increased in value 25X in a few weeks. Falsely reporting the date of acquisition concealed vital information that would otherwise have revealed the scheme.

215. On or about September 1, 2016, Partnership Tax Solutions prepared the tax return for FG River Syndicate. The tax return reported a charitable contribution deduction from the donation of the conservation easement of $17,137,894. As required, Partnership Tax Solutions attached to the FG River Syndicate's return a copy of the Weibel Defendants' Appraisal, the Appraisal Summary (Form 8283), the Baseline Documentation Report, and the ACC letter confirming the donation. Thus, Partnership Tax Solutions adopted and

incorporated the Appraisal Summary into the partnership tax return and K-1s, thereby adopting the misrepresentations described above.   Partnership Tax Solutions sent the tax return and its attachments to FG River Syndicate via U.S. mail and/or email after they prepared the return.  Partnership Tax Solutions further filed the tax return electronically with the IRS.  Partnership Tax Solutions knew and intended for the FG River Syndicate to file the tax return with the IRS, which it did, and for members of FG River Syndicate, including Radow, to use their pro-rata share of the resulting deductions, which they did.

216.   In addition, Partnership Tax Solutions prepared a K-1 for each of the participants in the FG River Syndicate, including Radow, which reported the amount of charitable contribution deduction allocated to each of the members of the FG River Syndicate.   The K-1 prepared for Radow reported a charitable contribution deduction of $1,069,386.  Partnership Tax Solutions advised Radow to report this charitable contribution deduction on his individual tax returns for 2015.  Partnership Tax Solutions sent the K-1 to Radow via U.S. mail and/or email shortly after preparing the FG River Syndicate's tax return.

217.  Radow followed the advice of the Defendants and reported the charitable contribution deduction of $1,069,386 on his individual tax returns for 2015.

ii.      **The 2015 FG River Syndicate Tax Return is Audited and the IRS Disallows the Charitable Contribution Deduction at the Partnership Level.**

218.   On or about October 3, 2017, the FG River Syndicate received an IRS Notice indicating that the FG River Syndicate partnership tax return for the 2015 tax year was selected for audit.

219.   The FG River Syndicate suffered from, *inter alia*, the following defects: (i) an improper appraisal method resulting in a grossly inflated valuation of the charitable gift, (ii) failure to submit a qualified appraisal from a qualified appraiser, (iii) the lack of a valid conservation purpose, (iv) failure to properly substantiate a conservation purpose in the Conservation Easement Deed and/or the Baseline Documentation Report, and (v) an improper extinguishment proceeds clause causing the gift to not be in perpetuity.

c.      **The Turk Plaintiffs engage in the Industrial Syndicate Transaction in 2014.**

i.      **The steps of Industrial Syndicate Transaction.**

220.   In 2014, OSI (through Industrial S&G LLC, an entity formed by OSI) acquired an interest in real estate located in Alabama and obtained an Initial Appraisal of the real estate from the Weibel Defendants.  As part of the "diligence period" (and afterward as well), the MMM, L & G, and OSI Defendants purported to also receive advice and consultation from Conservation Saves, Conservation Pays, Conservation Matters, and Blethen Mine for the purpose of supporting the

*bona fides* of a charitable contribution deduction from the donation of a conservation easement to a land trust.  These Consultants were paid by Industrial S&G Partners LLC (discussed below) or another OSI affiliated entity.

221.   The Turk Plaintiffs received Promotional Materials prepared and sent by OSI through the accounting firm BatesCarter to Plaintiff Turk via email dated December 3, 2014 about participating in the SCE Strategy through Industrial S&G Partners LLC (the "Industrial Syndicate"), a company formed and managed by Big Escambia Ventures, LLC (an OSI affiliated entity).  The Promotional Materials invited potential participants, including the Turk Plaintiffs, to purchase an ownership interest in the Industrial Syndicate and informed them that the Industrial Syndicate would, in turn, purchase an ownership interest in Industrial S&G LLC (the "Industrial PropCo").

222.   The Promotional Materials informed the Turk Plaintiffs that the Industrial Syndicate could choose from one of six options for use of the subject property, one of which was to conserve the property by contributing a conservation easement to a tax-exempt land trust and/or contributing a fee simple interest to a tax-exempt entity resulting in a charitable contribution deduction equal to more than 2.5 times the amount the Turk Plaintiffs paid into the Industrial Syndicate

(*i.e.*, the Conservation Easement Option).[28]   The Promotional Materials also disclosed the following advisors to the Industrial Syndicate:

> Property Owner and Investco Managers for the 353.68 Acres
> Matt Ornstein, Manager
> Frank Schuler, Manager
>
> Accounting and Tax Consultants:
> Matt Kaynard, Tax Counsel
> Large and Gilbert, P.C.
> www.largeandgilbert.com
>
> Special Tax Counsel:
> Tim Pollock –Partner and Attorney with Morris, Manning, & Martin, LLP:
>
> Land Trust –National Wild Turkey Federation
> http://www.nwtf.org
>
> Qualified Conservation Easement Appraisers:
> Clay Weibel –President: Weibel & Associates, Inc.
> Lucas Von Esh –President: Lucas Mason, Inc.
>
> Escrow Agent for Membership Interest Subscriptions:
> Marc Kaufman –Partner and Attorney
> The Vandiver and Kaufman Law Firm

223.   Further, the following were OSI's advisors to the transaction:

---

[28] The other five options were purportedly to: (1) market the property for lease or sale in the near term, (2) hold for long term investment, (3) alternate use and investment proposals for generating long-term investment gains, (4) lease to third party for mining and extraction of surface minerals, and (5) operate the property for mining, extraction, and sale of surface minerals.

- Conservation Saves – assessed the property for conservation purposes and worked to locate and hire the advisors to carry out the SCE Strategy.

- MMM – provided due diligence, reviewed transactional structures, and provided feedback on appraisals, baseline documentation reports, and deeds of conservation easement.

- Blethen Mine – performed research to determine if operating a mine was feasible on the property and developed a business plan for that potential operation.

- Weibel & Associates – provided appraisals of the property for both the conservation easement donation and the fee simple donation, which appraisals included the conclusions from Blethen's mining analysis about the highest and best use of the property.

- Lucus Mason, Inc. – provided appraisals of the property for both the conservation easement donation and the fee simple donation, which appraisals included the conclusions from Blethen's mining analysis about the highest and best use of the property.

- Sklar & Associates – provided accounting services in connection with the transaction.

- Bennett Thrasher – provided a due diligence review of transactional documents and accounting and other consulting services for the transaction.

- Matt Kaynard – provided various consulting services.

- Greencone Investments – provided real estate and geotechnical due diligence services in connection with the transaction.

- National Wild Turkey – accepted the donation of the conservation easement, prepared deed if conservation easement, signed the Form 8283 and acknowledged acceptance of the donation.

- American Upland – accepted the donation of the fee simple, prepared deed if conservation easement, signed the Form 8283 and acknowledge acceptance of the donation.

- Large & Gilbert – provided tax preparation services in connection with the transaction.

224. The Promotional Materials were designed to convince potential participants that the SCE Strategy, through the Industrial Syndicate, provided a legal and legitimate way to save on taxes through a conservation easement that would be structured and implemented in full compliance with §170(h) of the Code. The sole purpose of the Promotional Materials, which the MMM, OSI, and L & G Defendants jointly prepared, was to convince potential participants to participate in

119

the SCE Strategy through the Industrial Syndicate, thus generating enormous fees for the Defendants and Other Participants.

225.   The Promotional Materials falsely and materially stated in the Promotional Materials that: (1) the "Current Estimated Value of the [Industrial Syndicate] Property" was "$15,900,000 ($44,955.89/Acre)"; (2) "If Property Owner elects to place a conservation easement on the Property and make a charitable donation of the conservation easement and/or a charitable donation of the entire Property to a qualified Land Trust and/or qualified 501(c)(3) organization, then the charitable deductions from these donations will equal the appraised value of the Property in the approximate amount of $15,900,000… Assuming the Investco members pay a 39.6% Federal & 6.0% State income tax rate, then the net tax benefit for the new members of Investco would be as follows: **For every $1.00 contributed to Investco, the new member would receive a charitable contribution deduction of approximately $4.39 ($4.38596 to be exact) that should save the new member approximately $2.00 in taxes**."

226.   The Promotional Materials included an Initial Appraisal prepared by the Weibel Defendants, which was sent by the Weibel Defendants to Industrial S&G and OSI via mail and/or email on or about November 12, 2014 with the knowledge and intent that it would be shared with and relied upon by members and prospective members of the Industrial Syndicate, including but not limited to Turk.

The Initial Appraisal provided a valuation of the real estate for its proposed HBU, sand and gravel mining.  This was in large part based on an Analysis, discussed further below, prepared by the Blethen Defendants.  However, both the Initial Appraisal and Blethen Mine's scoping study[29] were fraudulent because, *inter alia*, neither disclosed that Industrial PropCo did not own the right to sand and gravel on the property; thus, it could hardly lease the property out to be mined or mine it itself.  Further, the fact that someone else had those rights also means that preserving the property for conservation purposes was not viable.  The Initial Appraisal further falsely and materially stated that the fair market value of the Industrial Property was $15,900,000, the fair market value of the conservation easement was $11,925,000, and the fair market value of the property after the easement was $3,975,000.

227.   The PCLG Defendants referred clients into the Industrial Syndicate. PCLG was a "Consulting Advisor" and the PCLG Defendants performed the following roles and responsibilities:  provided material aid, assistance, consulting services and/or advice in the transaction and, in particular, performed a due diligence review of the various transaction documentation.

228.   Based on the Promotional Materials, including the Initial Appraisal, and the Defendants' advice and representations, the Turk Plaintiffs purchased an

---

[29] Such "scoping studies" are considered speculative and unproven.

ownership interest in the Industrial Syndicate.  The Turk Plaintiffs paid a total of $75,031 into the Industrial Syndicate.

229.   Marvin Blethen on behalf of Blethen Mine Consultants, LLC prepared an Aggregate Resource Market, Operations, and Valuation Analysis for Industrial S&G LLC on or about November 20, 2014 and transmitted the Analysis to Industrial S&G LLC at its Atlanta, Georgia office by U.S. mail and/or email.  The Analysis purported to analyze the feasibility of operating a mine on the Property as the HBU.  The Analysis provided the Weibel Defendants and later the Lucus Defendants with the false basis for incorporating a discounted cash flow analysis into their Appraisals because the Analysis enabled those Appraisal Defendants to use mining as the purported HBU and thereby the discounted cash flow for that HBU for valuation purposes.  The Analysis was materially fraudulent in a number of ways:

- The Blethen Defendant's claim that mining was the HBU for the Property was false and known to be false because Blethen stated in an interview with an IRS examiner that (a) his analysis was that of a going concern (and the subject is raw land) and (b) he did not consider himself to be a real estate appraiser;

- The Blethen Defendants stated that all zoning, permitting, and erection of a plant could be set up within a three-month period when that could not feasibly occur;

- The Blethen Defendants willfully failed to discuss the costs of mining personnel and taxes in computing the discounted cash flow;

- The Blethen Defendants willfully failed to address zoning and permitting in determining that mining was the HBU of the subject property because the presence of wetlands and protected species (gopher tortoises) would have made permitting and rezoning challenging at best and more likely, unrealistic;

- The Blethen Defendants knowingly used the wrong capitalization rate of 12%, which would have been appropriate for an industrial rental property, when it should have used a 20% rate, which would have caused the valuation to be around half of the value determined by Blethen.

230.    The Weibel Defendants sent a similar Appraisal Report regarding the Industrial Syndicate Property prepared by Defendant Weibel, on behalf of himself and Defendant Weibel Firm via a letter to Industrial S&G LLC sent by U.S. Mail and/or email on or about December 16, 2014 with the knowledge and intent that it would be shared with and relied upon by members and prospective members in the

Industrial Syndicate, including but not limited to Turk.  The Appraisal Report falsely and materially stated that "The Fair Market Value of the conservation easement on the subject property [the Industrial Syndicate Property], subject to the Basic & Extraordinary Assumptions and Limiting & Hypothetical Conditions included herein, and based on market conditions as of December 9, 2014, is: ELEVEN MILLION NINE HUNDRED TWENTY-FIVE THOUSAND DOLLARS ($11,925,000)".  The Appraisal Report further falsely and materially stated that the "Fair Market Value of Property Before Easement" was $15,900,000" and the "Fair Market Value of Property After Easement (Residual)" was "$3,975,000".  The Appraisal Report further falsely and materially stated that "Future employment prospects are not dependent upon producing a specific value," when, in fact, the Defendants had instructed the Weibel Defendants to produce a specific value to coincide with the amount of tax deduction requested by the Defendants and, in fact, their co-conspirators Defendants would not have continued to use the Weibel Defendants if they had not come to the specific value requested by the co-conspirators.  Moreover, the opinions and conclusions offered by the Weibel Defendants in the Appraisal did not follow applicable codes of professional conduct including USPAP (as falsely stated in the Appraisal) because they worked backwards from the value requested.  The certification in the Appraisal also contained numerous false statements, including but not limited to:

- "The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are personal, impartial, and unbiased, professional analyses, opinions, and conclusions" (when, in fact, the Weibel Defendants were conspiring with the other Defendants to come to a predetermined appraisal value);

- "There is no bias with respect to the property that is the subject of this report or to the parties involved with this assignment" (when, in fact, the Weibel Defendants were biased in favor of the predetermined appraisal value set by their co-conspirators);

- "The engagement in this assignment was not contingent upon developing or reporting predetermined results" (when, in fact, the Weibel Defendants were conspiring with the other Defendants to come to a predetermined appraisal value);

- "This report is a 'qualified appraisal' as that term is defined in the applicable Internal Revenue Service regulations" (Treas. Reg. § 1.170A-13(c)) (when, in fact, the Weibel Defendants knew they were not a qualified appraiser because, among other reasons, they were persons whose relationship with the co-conspirators "would cause a reasonable person to question the independence of such appraiser.")

125

231.   The Weibel Defendants sent a similar Appraisal Report regarding the remaining fee simple interest of the Industrial Syndicate Property prepared by Defendant Weibel, on behalf of himself and Defendant Weibel Firm via letter to Industrial S&G LLC via U.S. Mail and/or email on or about December 20, 2014 with the knowledge and intent that it would be shared with and relied upon by members and prospective members in the Industrial Syndicate, including but not limited to Turk.  The Appraisal Report falsely and materially stated that "The Fair Market Value of the subject property [the Industrial Syndicate Property], subject to the Basic & Extraordinary Assumptions and Limiting & Hypothetical Conditions included herein, and based on market conditions as of December 19, 2014, is: THREE   MILLION   NINE   HUNDRED   SEVENTY-FIVE   THOUSAND DOLLARS ($3,975,000)".  The Appraisal further falsely and materially stated that the "Fair Market Value of Property Before Easement" was $15,900,000" and the "Fair Market Value of Conservation Easement (Residual)" was "$3,975,000".  The Appraisal Report further falsely and materially stated that "Future employment prospects are not dependent upon producing a specific value," when, in fact, the Defendants had instructed the Weibel Defendants to produce a specific value to coincide with the amount of tax deduction requested by the Defendants and, in fact, their co-conspirators Defendants would not have continued to use the Weibel Defendants if they had not come to the specific value requested by the co-

conspirators.   Moreover, the opinions and conclusions offered by the Weibel Defendants in the Appraisal did not follow applicable codes of professional conduct (as falsely stated in the Appraisal) because they worked backwards from the value requested.   The certification in the Appraisal also contained numerous false statements, including but not limited to:

- "The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are personal, impartial, and unbiased, professional analyses, opinions, and conclusions" (when, in fact, the Weibel Defendants were conspiring with the other Defendants to come to a predetermined appraisal value);

- "There is no bias with respect to the property that is the subject of this report or to the parties involved with this assignment" (when, in fact, the Weibel Defendants were biased in favor of the predetermined appraisal value set by their co-conspirators);

- "The engagement in this assignment was not contingent upon developing or reporting predetermined results" (when, in fact, the Weibel Defendants were conspiring with the other Defendants to come to a predetermined appraisal value);

- "This report is a 'qualified appraisal' as that term is defined in the applicable Internal Revenue Service regulations" (Treas. Reg. § 1.170A-13(c)) (when, in fact, the Weibel Defendants knew they were not a qualified appraiser because, among other reasons, they were persons whose relationship with the co-conspirators "would cause a reasonable person to question the independence of such appraiser.)

232.   The Lucus Defendants then provided two Secondary Appraisals to further support the valuation of the conservation easement and fee simple of the land for its purported HBU – mining/mineral extraction.  Those Appraisals were fraudulent, *inter alia*, because they likewise failed to disclose that Industrial PropCo did not own the right to sand and gravel on the property.

233.   An Appraisal regarding the Industrial Syndicate Property conservation easement prepared by the Lucus Defendants was sent by the Lucus Defendants to Industrial S&G LLC via U.S. Mail and/or email on or about October 30, 2014 with the knowledge and intent that it would be shared with and relied upon by members and prospective members in the Industrial Syndicate, including but not limited to Turk.  The Appraisal falsely and materially stated that "[T]he Fair Market Value of the conservation easement on the subject property [the Industrial Syndicate Property], subject to the Basic & Extraordinary Assumptions and Limiting & Hypothetical Conditions included herein, and based on market conditions as of

October 7, 2014, is: TWELVE MILLION THREE HUNDRED THOUSAND DOLLARS ($12,300,000)".  The Appraisal further falsely and materially stated that the "Value Before the Easement (100%)" was $16,400,000" and the "Residual Value After the Conservation Easement (25%)" was "$4,100,000".  The Appraisal further falsely and materially stated that "Future employment prospects are not dependent upon producing a specific value," when, in fact, the Defendants had instructed the Lucus Defendants to produce a specific value to coincide with the amount of tax deduction requested by the Defendants and, in fact, their co-conspirators Defendants would not have continued to use the Lucus Defendants if they had not come to the specific value requested by the co-conspirators. Moreover, the opinions and conclusions offered by the Lucus Defendants in the Appraisal did not follow applicable codes of professional conduct (as falsely stated in the Appraisal) because they worked backwards from the value requested.  The certification in the Appraisal also contained numerous false statements, including but not limited to:

- "The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are personal, impartial, and unbiased, professional analyses, opinions, and conclusions" (when, in fact, the Lucus Defendants were conspiring

with the other Defendants to come to a predetermined appraisal value);

• "There is no bias with respect to the property that is the subject of this report or to the parties involved with this assignment" (when, in fact, the Lucus Defendants were biased in favor of the predetermined appraisal value set by their co-conspirators);

• "The engagement in this assignment was not contingent upon developing or reporting predetermined results" (when, in fact, the Lucus Defendants were conspiring with the other Defendants to come to a predetermined appraisal value);

• "This report is a 'qualified appraisal' as that term is defined in the applicable Internal Revenue Service regulations" (Treas. Reg. § 1.170A-13(c)) (when, in fact, the Lucus Defendants knew they were not a qualified appraiser because, among other reasons, they were persons whose relationship with the co-conspirators "would cause a reasonable person to question the independence of such appraiser.)

234.   An Appraisal regarding the Industrial Syndicate Property fee simple after the conservation easement prepared by the Lucus Defendants was sent by the Lucus Defendants to Industrial S&G LLC via U.S. Mail and/or email on or about December 22, 2014 with the knowledge and intent that it would be shared with and

relied upon by members and prospective members in the Industrial Syndicate, including but not limited to Turk. The Appraisal falsely and materially stated that "he [sic] Fair Market Value of the subject property [the Industrial Syndicate Property], subject to the Basic & Extraordinary Assumptions and Limiting & Hypothetical Conditions included herein, and based on market conditions as of December 18, 2014, is: FOUR MILLION ONE HUNDRED THOUSAND DOLLARS ($4,100,000)". The Appraisal further falsely and materially stated that the "Value Before the Easement (100%)" was $16,400,000" and the "Value of the Conservation Easement (75%)" was "$12,300,000". The Appraisal further falsely and materially stated that "Future employment prospects are not dependent upon producing a specific value," when, in fact, the Defendants had instructed the Lucus Defendants had been instructed to produce a specific value to coincide with the amount of tax deduction requested by the Defendants and, in fact, their co-conspirators Defendants would not have continued to use the Lucus Defendants if they had not come to the specific value requested by the co-conspirators. Moreover, the opinions and conclusions offered by the Lucus Defendants in the Appraisal did not follow applicable codes of professional conduct (as falsely stated in the Appraisal) because they worked backwards from the value requested. The certification in the Appraisal also contained numerous false statements, including but not limited to:

- "The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are personal, impartial, and unbiased, professional analyses, opinions, and conclusions" (when, in fact, the Lucus Defendants were conspiring with the other Defendants to come to a predetermined appraisal value);

- "There is no bias with respect to the property that is the subject of this report or to the parties involved with this assignment" (when, in fact, the Lucus Defendants were biased in favor of the predetermined appraisal value set by their co-conspirators);

- "The engagement in this assignment was not contingent upon developing or reporting predetermined results" (when, in fact, the Lucus Defendants were conspiring with the other Defendants to come to a predetermined appraisal value);

- "This report is a 'qualified appraisal' as that term is defined in the applicable Internal Revenue Service regulations" (Treas. Reg. § 1.170A-13(c)) (when, in fact, the Lucus Defendants knew they were not a qualified appraiser because, among other reasons, they were persons whose relationship with the co-conspirators "would cause a reasonable person to question the independence of such appraiser.)

235.   The Weibel Appraisal(s)[30] and the Lucus Mason Appraisal for the Industrial Syndicate had *inter alia* the following fatal variances from the applicable standard of care (including USPAP) which are also fraudulent acts or omissions:

(a)   In the December 2014 report, eight (8) sales comparables were used, but in his later report, Weibel omitted Sales 4, 5, 6 and 7 which were much lower. He obviously knew of those sales, and leaving them out drove up the value in the 2015 report. This is a violation of USPAP Ethics Rule 216-226.

(b)   In the 2014 report, Weibel used three listings as comparables. Listings are not considered in accordance with standard appraisal methodology to be used as a comparable.  However, they can be adjusted and used as support. Weibel refers to them as land sales which is deliberately misleading to a reader. To be considered at all, the listings would need to be adjusted downward to reflect the market ratio of listings versus sales, given that very few properties sell for the listing price.  See USPAP Standard Rule 1-1(b).

(c)   The most significant misrepresentation in the Weibel Appraisal(s) is that the comparables are *operating* mines which have already been permitted, with all of the obstacles related to opening and operating

---

[30] There are multiple Weibel reports.

problems resolved. *See* USPAP Scope of Work Rule Disclosure Obligation 430-432.  On the other hand, the Industrial tract is raw, undeveloped mixed pine/hardwood uplands and wetlands with noted threatened gopher tortoises on site, according to the BDR. Considering the presence of threatened species and jurisdictional wetlands, the possibility of obtaining a permit is questionable and would require significant expensive mitigation if possible and would take much longer than the estimated 3-6 months in the report.

(d)    Weibel states in the last paragraph that Sales 1, 2, 3, and 6 are the best comparables.  However, Sales 1, 2, and 3 are *listings,* not *sales*. Sale 6 is in Florida and is 9.65 acres compared to the Industrial tract of 353.68 acres, which is 3665.1% larger. This is not a comparable, since it would be impossible to make a size adjustment. Absorption of a mining property this size would be much faster than one that is 36 times larger. *See* USPAP Standard Rule 2-1(a)625.

(e)    The remaining Sales 4, 5, 6 and 7 Weibel discusses average $23,377 per acre as compared to his valuation of $35,000 per acre. Again, it obvious that these are permitted, operating mines, and no adjustments are made taking that into consideration. True comparables would be

potential mining sites with no permits, with wetland and threatened species present. *See* USPAP Standard Rule 2-1(a)625.

(f)     Weibel doesn't mention whether he reviewed a title report that proved the Industrial tract has retained mineral rights. It is incumbent upon the appraiser to do so when mining forms the basis of his opinion as to HBU, since if subsurface minerals have been severed, then the proposed mine would be impossible.

(g)     The Weibel Appraisal also attaches a Terracon Mineral Remoteness Evaluation that states that "the potential for the subject tract to be disturbed by the removal of minerals other than those listed above is so remote as to be negligible" but lists natural gas condensate as the only mineral.   Nonetheless, Weibel calculates an HBU based on limestone mining.

(h)     The $10,000 fee in the Weibel letter of engagement in the Appendix is suspect. How could Weibel prepare a several hundred page report that should have taken months to prepare for that amount? Upon information and belief, this only makes sense if there were other considerations, such as the promise of multiple reports that could be done on a "cookie cutter" basis.

(i)     The Lucas Mason Appraisal has much of the same contents (and thus the same fatal variances and misrepresentations) as the Weibel report. The date of the Lucas Mason Appraisal was October 30, 2014, while the Weibel reports were in December of 2014. It thus appears that Weibel copied and pasted the Mason report, except Weibel conveniently left out some sales comparables and also made some minor adjustments. Mason's Before Value is $16,400,000 and Weibel's is $15,900,000. Both used the same flawed After Value Method. If Weibel did copy Mason's report, then his statement #12 on page 6 of the Certification page, "that no one provided significant real property appraisal assistance," is false, another serious USPAP violation. *See* Plagiarism- FAQ- Ethic Rules

236.   The Industrial Syndicate then voted to place a conservation easement on the entirety of the real estate and to donate the conservation easement to Wild Turkey Federation and the remaining fee simple interest to American Upland.

237.   The Conservation Deed, dated December 15, 2014, was jointly prepared and approved by the MMM, L & G, and OSI Defendants and the Wild Turkey Federation and sent via U.S. mail and/or email for filing.   The Conservation Easement Deed was verified and signed by a representative of Wild Turkey Federation.

238.   On or about December 15, 2014, Wild Turkey Federation and Conservation Matters prepared and sent a Baseline Documentation Report to the Industrial Syndicate and the L & G Defendants via U.S. mail and/or email, which was verified as accurate by Wild Turkey Federation and the Industrial Syndicate, and filed with the Appraisal Summary (Form 8283) and the Industrial Syndicate's tax return.  The purpose of this report is to ascertain the conservation values of the property at the date of donation and to substantiate the purported conservation purpose.  Wild Turkey Federation set out the conditions on the property that will be preserved by the conservation easement and concluded that these conditions met the conservation purpose of § 170 of the Code.  Wild Turkey Federation concluded in this report that it is in the best interest of the Industrial Syndicate to place a conservation easement on the property and to donate the easement as a charitable gift to Wild Turkey Federation.

239.   The Industrial Syndicate conveyed the conservation easement to Wild Turkey Federation and the remaining fee simple interest to American Upland on December 15, 2014 and December 22, 2014, respectively.

240.   On December 22, 2014, Wild Turkey Federation provided the Industrial Syndicate with a letter via U.S. mail and/or email documenting the conveyance, which falsely and materially advised the Industrial Syndicate that its contribution to Wild Turkey Federation "is fully tax deductible."  L & G filed this

letter with the Industrial Syndicate's tax return, along with the Baseline Documentation Report and Appraisal Summary (Form 8283).

241.   The MMM, L & G, and OSI Defendants selected the Weibel Appraisal to be used to support a charitable contribution deduction for the Industrial Syndicate.  As required, L & G attached this Appraisal to the tax return it prepared for the Industrial Syndicate.

242.   As a result of these donations, charitable contribution deductions flowed through and were allocated to each of the participants in the Industrial Syndicate (including the Turk Plaintiffs) in proportion to their relative ownership interest in the Industrial Syndicate.

243.   The charitable contribution that was allocated to the Turk Plaintiffs was more than 2.5 times the amount they paid into the Industrial Syndicate.

244.   On or about January 12, 2015, the Weibel Defendants prepared an Appraisal Summary (Form 8283) regarding the conservation easement. Clay Weibel (as the appraiser) and a representative of Wild Turkey Federation verified the Appraisal Summary (Form 8283) as accurate and signed it.  The Weibel Defendants, the L & G Defendants, and Wild Turkey Federation then advised the Turk Plaintiffs that the Appraisal Summary (Form 8283) would substantiate the conservation easement charitable contribution deduction and allow the Turk

Plaintiffs to claim the charitable contribution deduction on their individual tax returns.

245.   On or about January 12, 2015, the Weibel Defendants also prepared an Appraisal Summary (Form 8283) regarding the fee simple. Clay Weibel (as the appraiser) and a representative of American Upland Trust, LLC verified the Appraisal Summary (Form 8283) as accurate and signed it.   The Weibel Defendants, the L & G Defendants, and American Upland Trust then advised the Turk Plaintiffs that the Appraisal Summary (Form 8283) would substantiate the fee simple charitable contribution deduction and allow the Turk Plaintiffs to claim a charitable contribution deduction on their individual tax returns.

246.   The Appraisal Summaries falsely and materially represented that the appraised fair market value of the conservation easement was $11,925,000 and the appraised fair market value of the remaining fee simple was $3,975,000, when, in fact, no independent appraiser would have appraised the easement and fee simple at such high values.  Moreover, to conceal the grossly inflated appraisal values and to provide the appearance of satisfying IRS holding period requirements, the Weibel Defendants falsely represented that the Industrial Syndicate had acquired the underlying property in December 2007, when, in fact, it had acquired the property a little over a month prior to donating the property to ACC.  If the Appraisal Summaries had been filled out as required, then the IRS would have

learned that the cost basis of the subject property was $694,820, but a month later the conservation easement was purportedly worth $11,925,000 and the remaining fee simple was purportedly worth $3,975,000, for a total of $15,900,000. Moreover, the Turk Plaintiffs would have submitted the Form 8283s with their 2014 tax return and any competent tax return preparer would have questioned how the land could have increased in value almost 23X in a little over a month. Falsely reporting the date of acquisition concealed vital information that would otherwise have revealed the scheme.

247.   In or about February 2015, the L & G Defendants prepared the tax return for the Industrial Syndicate.   The tax return reported a charitable contribution deduction of $15,154,598 (approximately the total of the purported values of the conservation easement donation plus the fee simple donation, minus the property's purchase cost) and had a loss of $15,188,754.  As required, the L & G Defendants attached to the Industrial Syndicate's return a copy of the Weibel Appraisals, the Appraisal Summaries (Form 8283), the Baseline Documentation Report, and the Wild Turkey Federation letter confirming the donation.  The L & G Defendants sent the tax return and its attachments to Industrial S&G Partners LLC via U.S. Mail and/or email under a cover letter dated February 20, 2015.  The L & G Defendants further filed the tax return electronically with the IRS.  The L & G Defendants knew and intended for the Industrial Syndicate to file the tax return

with the IRS, which it did and for the members of the Industrial Syndicate, including the Turk Plaintiffs, to use their pro-rata share of the resulting deductions, which they did.

248.   In addition, the L & G Defendants prepared a K-1 for each member of the Industrial Syndicate, including the Turk Plaintiffs, which reported the amount of charitable contribution deduction allocated to each of the members of the Industrial Syndicate.   The K-1 prepared for the Turk Plaintiffs falsely and materially stated that Turk was entitled to claim a charitable contribution deduction of $246,808.   The L & G Defendants advised the Turk Plaintiffs to report this charitable contribution deduction on their individual tax returns for 2014, which they did.   The Large & Gilbert Defendant sent the K-1 to Turk via U.S. mail and/or email under a cover letter dated February 20, 2015.

249.   The Turk Plaintiffs followed the advice of the Defendants and reported the charitable contribution deduction of $246,808 on their individual tax returns for 2014.

        **ii.**   **The 2014 Industrial Syndicate Tax Return is Audited and the IRS Disallows the Charitable Contribution Deduction at the Partnership Level.**

250.   On or about January 31, 2017, the Industrial Syndicate received an IRS Notice indicating that the Industrial Syndicate partnership tax return for the 2014 tax year was selected for audit.

251.   On or about February 14, 2019, the IRS issued an FPAA for the Industrial Syndicate's tax return for the 2014 tax year.  The FPAA disallowed the charitable contribution deduction from the Industrial Syndicate SCE Strategy transaction for a variety of reasons, including: (i) the lack of a valid conservation purpose, (ii) failure to properly substantiate a conservation purpose in the Conservation Easement Deed and/or the Baseline Documentation Report, (iii) an improper extinguishment proceeds clause causing the gift to not be in perpetuity, (iv) an improper appraisal method resulting in a grossly inflated valuation of the charitable gift,   and (v) failure to submit qualified appraisal from a qualified appraiser.

252.   A Tax Court petition was filed by the Industrial Syndicate on May 13, 2019, where the case remains pending.

> **d.    Radow engages in the Gulf Land Syndicate Transaction in 2015.**

> **i.    The Steps of the Gulf Land Syndicate Transaction.**

253.   In 2015, OSI (through Gulf Land Group LLC, another entity formed by OSI) acquired an interest in real estate located in Alabama and obtained an Initial Appraisal of the real estate from the Weibel Defendants.  As part of the "diligence period" (and afterward as well), the MMM and OSI Defendants purported to also receive advice and consultation from Conservation Saves and Galt Mining all for the purpose of supporting the *bona fides* of a charitable

contribution deduction from the donation of a conservation easement to a land trust.  All of these Consultants were paid by Gulf Land Group LLC (discussed below) or another OSI affiliated entity.

254.  Radow received Promotional Materials at some point in late 2015 from OSI (directly or through one of OSI's affiliated entities) via email and/or U.S. mail about participating in the SCE Strategy through Gulf Land Group LLC (the "Gulf Land Syndicate"), a company formed and managed by Galt Holdings LLC (an OSI affiliated entity).  The Promotional Materials invited potential participants, including Radow, to purchase an ownership interest in the Gulf Land Syndicate and informed them that the Gulf Land Syndicate would, in turn, purchase an ownership interest in Gulf Land S&G LLC (the "Gulf Land PropCo").

255.  The Promotional Materials were designed to convince potential participants that the SCE Strategy, through the Gulf Land Syndicate, provided a legal and legitimate way to save on taxes through a conservation easement that would be structured and implemented in full compliance with Section 170(h) of the Code.  The sole purpose of the Promotional Materials, which the MMM and OSI Defendants jointly prepared, was to convince potential participants to participate in the SCE Strategy through the Gulf Land Syndicate, thus generating enormous fees for the Defendants and Other Participants.  The Promotional Materials showed the "Conservation Easement Team" to include the following:

143

Primary Contact for questions about acquiring membership interests in Investco: Matt Ornstein, CEO & Manager.
<u>Property Owner and Investco Managers for the 180 <u>+/ -</u> Acres</u> Matt Ornstein, Manager
Frank Schuler, Manager

<u>Securities Compliance Counsel for Investco</u> Scott Withrow - Partner at Withrow, McQuade, & Olsen, LLP

<u>Special Tax Counsel:</u>
Tim Pollock - Partner at Attorney with Morris, Manning, & Martin, LLP

<u>Qualified Land Trust and 501c3 - Atlantic Coast Conservancy, Inc.</u>
Robert Keller - President

<u>Qualified Appraisers:</u>
Clay Weibel-President: Weibel & Associates, Inc
Lucas Von Esh - President: Lucas Mason, Inc.

<u>Escrow Agent for Membership Interest Subscriptions</u>: Marc Kaufman - Partner and Attorney, The Vandiver and Kaufman Law Firm.

256.   Further, the following were OSI's advisors to the transaction:

- ACC– accepted the donation of the conservation easement, provided the baseline documentation report for the property, prepared deeds of conservation easement, signed the Form 8283 and acknowledge acceptance of the donation.

- Galt– assessed the property for strategies to maximize its value, including mining and acted as a consultant to locate advisors to carry out the SCE Strategy.

- Conservation Saves– assessed the property for conservation purposes and worked to locate and hire the advisors to carry out the SCE Strategy.

- MMM– provided due diligence, reviewed transactional structures, and provided feedback on appraisals, baseline documentation reports, and deeds of conservation easement.

- Blethen Mine– performed research to determine if operating a mine was feasible on the property and developed a business plan for that potential operation.

- Weibel & Associates – provided an appraisal of the property for both the conservation easement donation and the fee simple donation, which appraisal included the conclusions from Blethen's mining analysis about the highest and best use of the property.

- Lucus Mason, Inc. – provided an appraisal of the property for both the conservation easement donation and the fee simple donation, which appraisal included the conclusions from Blethen's mining analysis about the highest and best use of the property.

- Partnership Tax Solutions– provided tax and accounting services related to the transaction.

- Bennett Thrasher– performed a due diligence review of transactional documents and provided other consulting services for the transaction.

- Matt Kaynard– provided various consulting services.

- FASMO– provided transaction advisory services.

- Private Client Law Group – provided due diligence services related to the transaction.

257. The Promotional Materials informed Plaintiffs that the Gulf Land Syndicate could choose from one of four options for use of the subject property: (1) holding the property for long term investment, (2) leasing the property to a third party for mining and extraction of surface minerals, (3) operating the property for mining, extraction, and sale of surface minerals, or (4) conserve the property by contributing a conservation easement to a tax-exempt land trust and/or contributing a fee simple interest to a tax-exempt entity resulting in a charitable contribution deduction equal to more than 2.5 times the amount Radow paid into the Gulf Land Syndicate (*i.e.*, the Conservation Easement Option).

258. The Promotional Materials included an Initial Appraisal letter dated October 30, 2015 prepared by the Weibel Defendants, which provided a valuation of the real estate for its purported HBU. The Initial Appraisal letter falsely and materially stated that the property had a "Fair Market Value" of "$17,150,000," when the Weibel Defendants knew that the land's value was considerably lower

than that.  The Weibel Defendants knew and intended that the potential investors in the Gulf Land Syndicate, including Radow, would rely on this Initial Appraisal letter in deciding to undertake the SCE Strategy, as evidenced by, among other things, the statement that the "attached report was prepared for your use and for submission to the Internal Revenue Service as evidence of the fair market value of the charitable deduction."

259.  Based on the Promotional Materials, including the Initial Appraisal, and the Defendants' advice and representations, Radow purchased an ownership interest in the Gulf Land Syndicate.  Radow paid a total of $200,000 into the Gulf Land Syndicate.

260.  Marvin Blethen on behalf of Blethen Mine Consultants, LLC prepared a Technical Due Diligence Business Plan for Gulf Land S&G LLC on or about November 9, 2015 and transmitted the Business Plan to Gulf Land S&G LLC at its Atlanta, Georgia office by U.S. mail and/or email.  The Business Plan purported to analyze the feasibility of operating a mine on the Property as the HBU.  The Business Plan provided the Weibel Defendants and later the Lucus Defendants with the basis for incorporating a discounted cash flow analysis into their Appraisals because the Plan enabled those Appraisal Defendants to use mining as the HBU and thereby the discounted cash flow for that HBU for valuation purposes.  The Business Plan was materially fraudulent in a number of ways:

- The Blethen Defendants' estimate maintained that all zoning, permitting, and erection of a plan could be set up in a six-month period when that could not feasibly occur;

- The Blethen Defendants willfully failed to discuss the costs of mining personnel and taxes in computing the discounted cash flow;

- The Blethen Defendants willfully failed to address zoning and permitting in determining that mining was the HBU of the subject property because the presence of wetlands and protected species would have made permitting and rezoning challenging at best and more likely, unrealistic;

- The Blethen Defendants willfully failed to cite any support for its computation of per person demand in the adjacent 75-mile area;

- The Blethen Defendants willfully included assumptions know by him to be false, including overstating the then price per ton of limestone by more than 80% because if Blethen had use the actual value of $6.99 per ton, the value of the mining operation would have been zero after taking into account the mining costs;

- The Blethen Defendants knowingly used the wrong capitalization rate of 12%, which would have been appropriate for an industrial rental property, when it should have used a much higher rate give the lack of

operations and permitting, which would have caused the valuation to be less than half of the value determined by the Weibel Defendants.

261.   The Weibel Defendants sent a similar Appraisal on or around March 29, 2016 via U.S. mail or email.  This Appraisal, unlike the one included in the Promotional Materials, contained the full Appraisal, rather than simply the summary cover letter.  The Appraisal falsely and materially stated that the fair market value of the property before the easement was placed was $17,150,000 and the conservation easement had a fair market value of $16,650,000.  The Appraisal falsely and materially stated that "Future employment prospects are not dependent upon producing a specific value," when, in fact, the Defendants had instructed the Weibel Defendants to produce a specific value to coincide with the amount of tax deduction requested by the Defendants and, in fact, their co-conspirators Defendants would not have continued to use the Weibel Defendants if they had not come to the specific value requested by the co-conspirators.  Moreover, the opinions and conclusions offered by the Weibel Defendants in the Appraisal did not follow applicable codes of professional conduct (as falsely stated in the Appraisal) because they worked backwards from the value requested.  The certification in the Appraisal also contained numerous false statements, including but not limited to:

- "The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are personal, impartial, and unbiased, professional analyses, opinions, and conclusions" (when, in fact, the Weibel Defendants were conspiring with the other Defendants to come to a predetermined appraisal value);

- "There is no bias with respect to the property that is the subject of this report or to the parties involved with this assignment" (when, in fact, the Weibel Defendants were biased in favor of the predetermined appraisal value set by their co-conspirators);

- "The engagement in this assignment was not contingent upon developing or reporting predetermined results" (when, in fact, the Weibel Defendants were conspiring with the other Defendants to come to a predetermined appraisal value);

- "This report is a 'qualified appraisal' as that term is defined in the applicable Internal Revenue Service regulations" (Treas. Reg. § 1.170A-13(c)) (when, in fact, the Weibel Defendants knew they were not a qualified appraiser because, among other reasons, they were persons whose relationship with the co-conspirators "would cause a reasonable person to question the independence of such appraiser.)

262.   The Lucus Defendants then provided a Secondary Appraisal to further support the valuation of the land for its purported HBU, mining/mineral extraction. The Appraisal falsely and materially stated that the "Fair Market Value" of the conservation easement as of December 22, 2015 was $17,025,000.  The Appraisal falsely and materially stated that "Future employment prospects are not dependent upon producing a specific value," when, in fact, the Defendants had instructed the Lucus Defendants to produce a specific value to coincide with the amount of tax deduction requested by the Defendants and, in fact, their co-conspirators Defendants would not have continued to use Lucus Defendants if they had not come to the specific value requested by the co-conspirators.   Moreover, the opinions and conclusions offered by the Lucas Mason Defendants in the Appraisal did not follow applicable codes of professional conduct (as falsely stated in the Appraisal) because they worked backwards from the value requested.   The certification portion of the Appraisal also contained numerous false statements, including but not limited to:

- "The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are personal, impartial, and unbiased, professional analyses, opinions, and conclusions" (when, in fact, the Lucus Defendants were conspiring

with the other Defendants to come to a predetermined appraisal value);

- "There is no bias with respect to the property that is the subject of this report or to the parties involved with this assignment" (when, in fact, the Lucus Defendants were biased in favor of the predetermined appraisal value set by their co-conspirators);

- "The engagement in this assignment was not contingent upon developing or reporting predetermined results" (when, in fact, the Lucus Defendants were conspiring with the other Defendants to come to a predetermined appraisal value);

- "This report is a 'qualified appraisal' as that term is defined in the applicable Internal Revenue Service regulations (Treas. Reg. § 1.170A-13(c))" (when, in fact, the Lucus Defendants knew they were not a qualified appraiser because, among other reasons, they were persons whose relationship with the co-conspirators "would cause a reasonable person to question the independence of such appraiser.").

263.   The Lucus Defendants sent the Appraisal to Gulf Land S&G LLC via U.S. mail and/or email on or about March 30, 2016 with the knowledge and intent that it would be shared with and relied upon by members and prospective members in the Gulf Land Syndicate, including but not limited to Radow, as evidenced by,

among other things, the statement that the "Attached report was prepared for your use and for submission to the Internal Revenue Service as evidence of the fair market value of the charitable deduction."

264.   The Weibel Appraisal(s) and the Lucus Mason Appraisal(s) for the Gulf Syndicate had *inter alia* the following fatal variances from the applicable standard of care (including USPAP) which are also fraudulent acts or omissions:

    (a)    Lucus Mason states a "Before Value" of $97,000 per acre. Why is this $97,000 per acre with the same HBU (mining) and location (Alabama) as Industrial S & G LLC, which he valued at $35,000/acre?

    (b)    The most significant misrepresentation in the Lucus Mason Appraisal is that the comparables are *operating* mines which have already been permitted, with all of the obstacles related to opening and operating problems resolved, whereas the subject property is undeveloped, wooded and open area. *See* USPAP Scope of Work Rule Disclosure Obligation 430-432.

    (c)    Comparable sales on page 48 do not have the Alabama listing of $36,987 per acre that Lucus Mason used in its October 2014 Industrial S & G, LLC Appraisal. He now adds comparables from Ohio, Illinois, and California.   California is thousands of miles away from the

subject and the adjusted sales price of $475,073 compared to the Alabama adjusted listing # 3 in the December 2014 report of $36,987 is over 10 times more. The California sale is an outlier that should be removed. If used, it increases the conclusion of value inordinately. *See* USPAP Standard 2 Reporting 615, 617.

(d)     The Weibel Appraisal uses sales in Illinois, Wisconsin and Georgia for $147,651, $190,734 and $188,723, respectively, although it also contains a listing in Alabama for $49,316 (adjusted)(used also in Industrial).  These out of state properties are not valid comparables when a buyer could buy a similar property in-state for 3 or 4 times less. *See* USPAP Standard Rule 2-1, 625.

(e)     Indeed, the Weibel Appraisal simply omits some of the sales in his Industrial Report in 2014 because these sales would have brought down the appraised value.

(f)     On page 72 of the Weibel Appraisal, Sales 4 and 5 are 34 and 25 acres respectively. There is no practical way to adjust the sizes to 180.94 acres, the size of the subject property. A 12% adjustment hardly justifies the potential absorption rate of properties that are 6 times smaller (on average).  *See* USPAP Standard Rule 1-6.

(g)     The Weibel Appraisal omits discussion of a critical document—the Warranty Deed, Exhibit VI, with a purchase price of $650,612.29, that was in the Lucus Mason Appraisal and Exhibit V in the Weibel Report.  Failure to discuss and analyze the sales history for the last 3 years results in concealing information that may cause a reader to question a large increase in value. *See* USPAP Standard Rule 1-5(a) and (b).

265.   The Gulf Land Syndicate then voted to place a conservation easement on the entirety of the real estate and to convey the conservation easement to ACC and the remaining fee simple interest to ACC Properties.

266.   The Conservation Easement Deed, dated on or about December 22, 2015, was jointly prepared and approved by the MMM, OSI, PCLG, and ACC Defendants and sent via U.S. mail and/or email for filing.  The Conservation Easement Deed was verified and signed by Weibel (as the appraiser) and by the Deputy Director of ACC (on behalf of ACC).

267.   On December 22, 2015, ACC, working with the MMM, OSI, and PCLG Defendants, prepared and provided a Baseline Documentation Report to the Gulf Land Syndicate, which was verified as accurate by ACC and the Gulf Land Syndicate and filed with the Appraisal Summary (Form 8283) and the Gulf Land Syndicate's tax return.  The purpose of this report is to ascertain the conservation

values of the property at the date of donation and to substantiate the purported conservation purpose.  ACC set out the conditions on the property that will be preserved by the conservation easement and conclude that these conditions met the conservation purpose of § 170 of the Code.  ACC concluded in this report that it is in the best interest of the Gulf Land Syndicate to place a conservation easement on the property and to donate the easement as a charitable gift to ACC.

268.   The Gulf Land Syndicate conveyed the conservation easement to ACC and the remaining fee simple interest to ACC Properties[31] on December 22, 2015 and December 28, 2015, respectively.

269.   On December 22, 2015, ACC provided the Gulf Land Syndicate with a letter documenting the conveyance and advising the Gulf Land Syndicate that its contribution to ACC "is fully tax deductible."  Partnership Tax Solutions filed this letter with the Gulf Land Syndicate's tax return, along with the Baseline Documentation Report and Appraisal Summary (Form 8283).

270.   As a result of these donations, charitable contribution deductions flowed through and were allocated to each of the participants in the Gulf Land

---

[31] The "receipt" letter for the fee simple donation, however, came from ACC, not ACC Properties.  This is, at the least, a "substantiation" problem as to the fee simple donation and if the gift was actually made to ACC itself, there would be a merger of the real property interests, thus eliminating the easement in violation of the perpetuity requirements of Section 170(h) of the Code.

Syndicate (including Radow) in proportion to their relative ownership interest in the Gulf Land Syndicate.

271.   The charitable contribution that was allocated to Radow was over 4 times the $200,000 amount he paid into the Gulf Land Syndicate.  He received a total deduction of $877,193, of which $373,313 was deducted in 2015, $381,856 was deducted in 2016, and the remainder was carried forward to 2017.

272.   The MMM and OSI Defendants and PCLG selected the Weibel Defendants' Appraisal to be used to support charitable contribution deduction for the Gulf Land Syndicate.  As required, Partnership Tax Solutions attached this Appraisal to the tax return it prepared for the Gulf Land Syndicate.

273.   On or about March 18, 2016, the Weibel Defendants prepared the Appraisal Summary (Form 8283).  Weibel (as the appraiser) and a representative of ACC (on behalf of ACC) verified the Appraisal Summary (Form 8283) as accurate and signed it.  The Weibel Defendants and ACC represented to the IRS in the Appraisal Summary (Form 8283) that the easement was placed on the property to protect the property.  Partnership Tax Solutions, the Weibel Defendants, and ACC then advised the Radow Defendants that the Appraisal Summary (Form 8283) would substantiate the charitable contribution deduction and allow Radow to claim the charitable contribution deduction on his individual tax returns.

274. The Appraisal Summary falsely represented that the appraised fair market value of the conservation easement was $16,650,000, when, in fact, no independent appraiser would have appraised the easement at such a high value. Moreover, to conceal the grossly inflated appraisal value and to provide the appearance of satisfying IRS holding period requirements, Partnership Tax Solutions and the Weibel Defendants falsely represented that the Gulf Land Syndicate had acquired the underlying property in July 2004, when, in fact, it had acquired the property a little over a month prior to donating the property to ACC. If the Appraisal Summary had been filled out as required, then the IRS would have learned that the cost basis of the subject property was $265,278 in November 2015, but a little over a month later was allegedly worth $16,650,000. Moreover, Radow submitted the Form 8283 with his 2015 tax return and any competent tax return preparer would have questioned how the land could have increased in value 62X in the span of a month. Falsely reporting the date of acquisition concealed vital information that would have otherwise revealed the scheme.

275. On or about September 1, 2016, Partnership Tax Solutions prepared the tax return for Gulf Land Syndicate. The tax return reported a charitable contribution deduction from the donation of the conservation easement of $15,982,335. As required, Partnership Tax Solutions attached to the Gulf Land Syndicate's return a copy of the Weibel Defendants' Appraisal, the Appraisal

Summary (Form 8283), the Baseline Documentation Report, and the ACC letter confirming the donation.   Thus, Partnership Tax Solutions adopted and incorporated the Appraisal Summary into the partnership tax return and K-1s, thereby adopting the misrepresentations described above.   Partnership Tax Solutions sent the tax return and its attachments to the Gulf Land Syndicate via U.S. mail and/or email shortly after preparing the return.   Partnership Tax Solutions further filed the tax return electronically with the IRS.   Partnership Tax Solutions knew and intended for the Gulf Land Syndicate to file the tax return with the IRS, which it did, and for the members of Gulf Land, including Radow, to use their pro-rata share of the resulting deductions, which they did.

276.   In addition, Partnership Tax Solutions prepared a K-1 for each of the participants in the Gulf Land Syndicate, including Radow, which reported the amount of charitable contribution deduction allocated to each of the members of the Gulf Land Syndicate.   The K-1 prepared for Radow reported a charitable contribution deduction of $851,619.   Partnership Tax Solutions advised Radow to report this charitable contribution deduction on his individual tax returns for 2015.   Partnership Tax Solutions sent the K-1 to Radow via U.S. mail and/or email shortly after it prepared the Gulf Land Syndicate's tax return.

277.   Radow followed the advice of the Defendants and reported the charitable contribution deduction of $851,619 on his individual tax returns for 2015.

ii.      **The 2015 Gulf Land Syndicate Tax Return is Audited and the IRS Disallows the Charitable Contribution Deduction at the Partnership Level.**

278.   On or about October 3, 2017, the Gulf Land Syndicate received an IRS Notice indicating that the Gulf Land Syndicate partnership tax return for the 2015 tax year was selected for audit.

279.   The Gulf Land Syndicate suffered from the same defects as the Industrial Syndicate, including: (i) the lack of a valid conservation purpose, (ii) failure to properly substantiate a conservation purpose in the Conservation Easement Deed and/or the Baseline Documentation Report, (iii) an improper extinguishment proceeds clause causing the gift to not be in perpetuity, (iv) an improper appraisal method resulting in a grossly inflated valuation of the charitable gift, and (v) failure to submit qualified appraisal from a qualified appraiser.

**G.     The SCE Strategy was Fatally Flawed.**[32]

280.   The IRS has concluded that the SCE Strategy was fatally flawed from the outset.   The Defendants prepared documents for the structure and implementation of the SCE Strategy that were strewn with errors (as discussed in detail below) and, thus, failed to meet the specific requirements set out in the Code. These critical documents included but were not limited to the Appraisals, Conservation Easement Deeds, and Baseline Documentation Reports.   As purported experts in their respective fields, each of the Defendants and Other Participants was aware or should have been aware of the plethora of misrepresentations, defects and errors that existed in virtually every aspect of the SCE Strategy.

**1.     The SCE Strategy Used Sham Appraisals that Violated USPAP and the Code in Numerous Respect.**

281.   The primary factor in appraising a conservation easement is the comparison of the property's fair market value before and after the contribution of a conservation easement based on the property's HBU, defined as the reasonable and probable use that supports the highest present value of the property.

---

[32] In addition to asserting these arguments and other deficiencies with the SCE Strategy discussed herein, the IRS has also more recently challenged conservation easement transactions on the grounds that  the partnerships created for the SCE Strategies lacked both business purpose and economic substance and were therefore "shams" under Federal tax law.  Such arguments are made, for example, in the Agee criminal case discussed *supra*.

282. The Defendants and Other Participants, including the SCE Appraisers and the Appraisal Defendants themselves, represented to the Plaintiffs and the Class that the SCE Appraisers were professional appraisers who would provide independent and objective valuations of the conservation easements generated by the SCE Strategy based on their independent determination of the HBU for each subject property.

283. In reality, however, the Appraisals were a complete sham. The Defendants hand-picked the SCE Appraisers, who would send drafts of each Appraisal for the MMM, OSI, L & G, Land Trust, and PCLG Defendants to review, revise and approve. Pollock and his team, in particular, reviewed every aspect of the Appraisals and made revisions to the Appraisal as they deemed necessary. Then, Pollock would approve the Appraisal. No Appraisal was considered final and usable until Pollock reviewed and approved it. This was Pollock's mandate and it was followed. In these regards, the SCE Appraisers completely shirked their professional duties and obligations. None of the Defendants and Other Participants ever disclosed to the Plaintiffs and the Class the SCE Appraisers' conflicts of interest and complete dereliction of their professional duties and obligations.

284. To satisfy the Defendants, and particularly the MMM Defendants, the SCE Appraisers were grossly negligent and intentionally deceitful in each of the

Appraisals by making inappropriate assumptions, utilizing inappropriate methodologies, and using various flawed techniques to improperly inflate the value of the conservation easements, as determined by the IRS. These inflated values, in turn, caused Plaintiffs and the Class to unknowingly claim inflated and improper tax deductions arising from their participation in the SCE Strategy. By way of example, each of the SCE Appraisers committed *inter alia* the following errors in the Appraisals prepared from 2013-2018:

(a)   Utilizing "comparable sales" that were not in fact comparable, including property listing rather than sales and properties that were thousands of miles away or that were already fully functional;

(b)   Inaccurately reporting the data from the comparable sales that were used;

(c)   Failing to conduct any financial feasibility analysis, supply and demand analysis, or reasonable probability analysis as required by applicable Code provisions and related regulations;

(d)   Failing to address the additional requirement that the HBU be "reasonably probable";

(e)   Failing to consider or verify existing legal or regulatory restrictions on the development and/or use of the subject property;

(f)     Failing to properly apply the principle of substitution in valuing the land at its HBU;

(g)     Violating numerous standards set by the USPAP; and

(h)     Improperly acting as an advocate rather than as an independent appraiser, such as by failing to disclose unfavorable facts, comparables, and limitations.

285.   With these numerous errors, the SCE Appraisers, including but not limited to the Appraisal Defendants, overstated the fair market value of the conservation easements by millions of dollars, which in turn resulted in the Plaintiffs and the Class unknowingly grossly overstating their tax deduction.

286.   In light of the SCE Appraisers' purported professional experience and education, they knew or should have known that the manner in which they performed the Appraisals and, ultimately, valued the conservation easements was contrary to the regulations promulgated by the IRS, violated the professional standards for real estate appraisers, and resulted in gross valuation overstatements for the easements they appraised.

287.   Under Section 170(f)(11) of the Code, a charitable contribution deduction from the donation of a conservation easement must be supported by a "qualified appraisal."   A "qualified appraisal" is one that "is conducted by a qualified appraiser in accordance with generally accepted appraisal standards and

any regulations or other guidance prescribed."   The numerous egregious errors identified above sufficiently demonstrate that the Appraisals had no chance of satisfying the requirements for a "qualified appraisal."   And the Defendants knew or should have known that the IRS would take the position that the charitable contribution deductions generated from the SCE Strategy should be disallowed on that basis alone.

288.   In sum, the SCE Appraisers knowingly performed and prepared the Appraisals for use by the Defendants in marketing and selling the SCE Strategy to participants (*i.e.*, Plaintiffs and the Class) and knowingly allowed the Defendants to improperly guide and direct the SCE Appraisers in performing and preparing the Appraisals for this purpose.   The SCE Appraisers knew that the Syndicates and the SCE Strategy participants would attach their Appraisals to the tax returns of the Syndicates and participants, as required by the Code, to substantiate the charitable contribution deductions reported by the Syndicates and ultimately claimed by the Plaintiffs and the Class Members on their individual tax returns.

## 2.   The Conservation Easement Deeds Violated the Code's Specific Requirements.

289.   The Conservation Easement Deeds were prepared by the Defendants with full knowledge of the requirements of the Code and related Regulations for a legal and legitimate conservation easement donation.   Despite this knowledge and the explicit nature of the requirements of the Code and the IRS's related

Regulations, the Defendants failed to prepare the Conservation Easement Deeds to conform to the Code and applicable Regulations. As a result, the SCE Strategy failed to generate legitimate and legal charitable contribution deductions for the Plaintiffs and the Class.

290.   In order for a conservation easement donation to comply with the Code, it must be perpetual, as required by Reg. Section 1.170A-14(g)(6)(i).   Thus, a conservation easement donation may only allow permitted uses of the landowner's retained interests that are consistent with the "conservation purposes" set out in the Conservation Easement Deed.   Here, all of the Conservation Easement Deeds for the Syndicates involved in the Plaintiffs' SCE Strategy transactions permitted retained uses by the landowners that were inconsistent with the stated conservation purposes and, thus, on this basis alone, failed to satisfy the perpetuity requirement, as well as the requirement that the conservation easement donation be exclusively for conservation purposes.

291.   A conservation easement donation can also fail to satisfy the perpetuity requirement when the sales proceeds clause in the Conservation Easement Deed does not ensure that the donee (*i.e.*, the Land Trusts) would receive an amount on any sale of the property at least equal to its proportionate share based on the amount of the charitable deduction as compared to the value of the entire property at the time of the donation.   In drafting the Conservation Easement Deeds

for the SCE Strategy, the Defendants made critical errors by deviating from the specific requirements of the IRS regulation and providing that the Land Trusts would get too little of the sales proceeds in the event of a sale. This resulted in another failure to meet the perpetuity requirement.

292.   The Defendants all worked closely together to draft the language of the Conservation Easement Deeds. They were aware that the Plaintiffs and the Class desired for the conservation easement donation to result in a legal and legitimate tax deduction. And Defendants were no doubt aware (or should have been aware) of the perpetuity requirement under the Code and the various ways discussed above by which this requirement could be violated. The Plaintiffs and the Class relied on the Defendants' experience and expertise in effectuating and implementing the SCE Strategy for a valid tax deduction, including in drafting the Conservation Easement Deeds.

293.   Upon information and belief, every SCE Strategy transaction in 2013, 2014, and 2015 (and possibly 2016) suffered from a perpetuity defect that rendered the charitable contribution deduction from the SCE Strategy improper.

**3.      The Baseline Documentation Reports Were Grossly Deficient.**

294.   Where a donor of a conservation easement retains rights to the property subject to the easement, which could impair the conservation interests, the donor is required to document the condition of the property at the time of the gift,

commonly referred to as the "baseline documentation," in a way that presents an accurate representation of the protected property at the time of the transfer.

295.   The Baseline Documentation Reports prepared by the Land Trusts for SCE Strategy transactions from 2013 through 2018 (with the direct assistance and guidance of the other Defendants) were deficient in numerous respects and failed to satisfy the IRS's requirements.   These deficiencies include (1) relying on Appraisals that the Defendants knew were a sham to support the conservation value of the subject property and (2) failing to sufficiently substantiate an exclusive conservation purpose.   Based on the Defendants' expertise in their related fields and knowledge of the sham nature of the Appraisals and the numerous problems with the stated conservation purpose for each of the SCE Strategy transactions, there is no reasonable explanation for the Defendants' failure to properly prepare the Baseline Documentation Reports other than an intentional or grossly negligent act of deceit.   Defendants knew these deficiencies would result in the Plaintiffs and the Class claiming charitable contribution deductions on their individual tax returns that the IRS would claim were invalid and disallow.

### 4.   The Appraisal Summaries Were Deficient.

296.   A conservation easement donation can also fail to satisfy the requirement for substantiation of charitable contributions by failing to provide a complete Appraisal Summary (Form 8283).   The Deficit Reduction Act of 1984 §

155(a)(1)(C) specifically requires the inclusion of several items, including the acquisition date on the Appraisal Summary and relevant regulations and case law make clear that no deduction will be allowed with respect to a charitable contribution unless this requirement is met.

297. Here, the Defendants failed to include the correct acquisition date of the properties on the Appraisal Summaries (by providing a false, years-earlier date of acquisition) in order to prevent the IRS from easily recognizing that the purported astronomical appraisal values for the properties were many times higher than the purchase prices of the properties just weeks or months before. But this purposeful failure to include the acquisition date, or to hide when it occurred, on the Appraisal Summaries also meant that the charitable contribution was invalid.

## IV.
## CONSPIRACY ALLEGATIONS

298. As set out more fully throughout this Complaint, each of the Defendants and the Other Participants (collectively, the "Co-Conspirators") involved in the SCE Strategy executed by Plaintiffs and the Class conspired with one another to design, promote, sell, and implement the SCE Strategy for the purpose of receiving and splitting substantial fees (the "Co-Conspirators' Arrangement"). The receipt of those fees was the Co-Conspirators' primary, if not sole, motive in the development and execution of the SCE Strategy. Further, the amount of fees earned by the Co-Conspirators was not tied to or reflective of the

amount of time and effort they expended in providing professional advice and services.   The Co-Conspirators designed and structured the SCE Strategy and unlawfully agreed to provide a veneer of legitimacy to each other's opinions on the lawfulness and tax consequences of the SCE Strategy.

299.   Each of the Co-Conspirators had particular roles and responsibilities in connection with the design, marketing, sale, and implementation of the SCE Strategy, as discussed, *inter alia*, at Paragraphs 65-121, 161-279.   Each of their roles was related to the common purpose of misrepresenting the basis, terms and consequences of the SCE Strategy or obscuring the defects in it and were directed to the Plaintiffs and members of the Class.   The Defendants shared relationships with each other that included referring and sharing clients as well as producing work product for other Defendants to use when creating promotional materials, producing reports, creating transactional documents, and filling out IRS forms and deeds.   These relationships also had a longevity of several years and involved a similarity in actions and omissions throughout that time period.   The Defendants' coordination therefore rises far beyond the level of mere coincidence and plausibly indicates an agreement by the Defendants to act in concert and thereby join the fraudulent conspiracy alleged herein.

300.   The Co-Conspirators each had a financial, business and property interest in inducing the Plaintiffs and the Class to enter into the SCE Strategy and

to do so, fraudulently promised, opined and assured that the SCE Strategy would legally reduce Plaintiffs' and the Class's income taxes.   Further, the Co-Conspirators' Arrangement gave each of the participating Co-Conspirators a significant pecuniary interest in the advice and professional services they rendered.

301.   The Co-Conspirators entered into the Co-Conspirators' Arrangement, whereby they agreed and had a meeting of the minds that they would work together as a team—with each team member assigned certain roles and responsibilities—to develop, market, sell, and implement the SCE Strategy.

302.   Here, the Co-Conspirators conspired to perpetrate a fraud on Plaintiffs and the Class and to breach duties owed to Plaintiffs and the Class, each with knowledge of the object of the conspiracy.   In addition, the Co-Conspirators authorized, ratified and/or affirmed the fraudulent misrepresentations and/or omissions made by each of the Co-Conspirators.   Each Co-Conspirator committed at least one overt act in furtherance of the unlawful conspiracy.

303.   The MMM Defendants, with assistance from the L & G Defendants, spearheaded the recruitment and organization of the team members necessary to carry out the development, promotion, sale, and implementation of the SCE Strategy.   The MMM, L & G, OSI, Bennett Thrasher, and PCLG Defendants also utilized their connections and networks to identify potential clients as "targets" for the SCE Strategy.

304.  In accordance with the pre-planned scheme, the OSI Defendants effectively owned and/or controlled all PropCos, Managers, and Consultants. Despite this common ownership and control, the OSI Defendants either directly or through an affiliate paid fees to each of these entities.

305.  As part of this pre-planned scheme, MMM (through 2016), L & G (through the first Quarter of 2015) and OSI Defendants worked together to form each of the Syndicates used in the SCE Strategy.  At times, however, each of them also formed Syndicates independently of the others.

306.  The MMM Defendants also recruited the SCE Appraisers for their critical role in the SCE Strategy.  Although each of the SCE Appraisers purported to act independently and provide a good faith valuation of the parcels at issue in accordance with applicable professional standards, each of the SCE Appraisers were aware that the Co-Conspirators would use the Appraisals in the promotion, sale, and implementation of the SCE Strategy.  Thus, the SCE Appraisers were in no way independent and willingly joined into the Co-Conspirators' Arrangement.

307.  As part of the pre-planned scheme, the MMM Defendants also recruited the Land Trusts to accept the donation of the easements and fee simple interests in connection with the SCE Strategy.

308.  The Land Trusts knew that the purpose of these donations was to implement the SCE Strategy.  The Land Trusts also knew that the SCE Strategy, as

structured and implemented, would not and could not serve its intended purpose of providing a legitimate and legal tax deduction, but nonetheless stood willing and ready to fulfill their role in the Co-Conspirators' Arrangement and benefited by receipt of the contributed properties.

309.   The OSI, MMM, and L & G Defendants worked closely with the other Defendants regarding all aspects of the design and development of the SCE Strategy, the structuring of each Syndicate and transaction, tax compliance, and the purported due diligence on the SCE Strategy and each SCE Strategy transaction in which they participated with the OSI Defendants.  These Defendants also drafted and/or approved the SCE transaction documents beginning with the purchase of property from Landowners, continuing with the Promotional Materials provided to potential participants, and all the documents necessary to complete the SCE Strategy and execute the donations to the Land Trusts, including the Conservation Easement Deeds, Baseline Documentation Reports, Appraisals, Appraisal Summaries (Form 8283), Syndicate tax returns, and the K-1s issued to each Plaintiff and member of the Class.  As previously mentioned, the OSI Defendants continued to utilize these documents in the SCE Strategy transactions in which the OSI Defendants worked with professional advisors other than the MMM Defendants.

310.   The MMM Defendants were also involved as promoters of the SCE Strategy, identified potential targets, and made themselves available to speak to any potential participants or referral sources who had questions about the SCE Strategy.

## V.
## CLASS ACTION ALLEGATIONS

311.   Plaintiffs bring this action on their own behalf and, pursuant to Rule 23(b)(l)(A), (b)(2), and/or (b)(3) of the Federal Rules of Civil Procedure, as a class action on behalf of themselves and the nationwide class of all persons (the "Class Members," the "Class") defined below against all Defendants:

> All Persons, from January 1, 2012 to the present, inclusive, (i) who have been assessed back-taxes, penalties, and/or interest (via a settlement with the IRS, an amended tax return renouncing the SCE deduction accepted by the IRS, a final Tax Court decision, or a Notice of Computational Adjustment from the IRS) or (ii) for which the IRS has made its final determination (via a Statutory Notice of Deficiency or FPAA) that the Person (or the entity through which they participated in the SCE Strategy) is liable for back-taxes, penalties, and/or interest, as a result of their involvement, either directly or indirectly through an ownership stake in another entity, in a Syndicated Conservation Easement designed, marketed sold, implemented or managed by the OSI Defendants.  Excluded from the Class are: Defendants; Defendants' parents, subsidiaries, and affiliates; anyone receiving referral fees from the SCE Strategy transactions; and federal governmental entities.

312.   Plaintiffs believe the Class consists of over 2,000 Class Members geographically dispersed throughout the United States such that joinder is

impracticable. These Class Members may be identified from information and records maintained by the Defendants or third parties.

313.   The Individual Plaintiffs and the Class Members each and all have tangible and legally protectable interests at stake in this action.

314.   The claims of the Individual Plaintiffs and the Class Members have a common origin and share a common basis. The claims of all Class Members originate from the same fraudulent transaction predicated by the Defendants.

315.   The Individual Plaintiffs state a claim for which relief can be granted that is typical of the claims of the Class Members. Thus, the class representatives have been the victims of the same unlawful acts as each class member.

316.   If brought and prosecuted individually, each of the Class Members would necessarily be required to prove the instant claims upon the same material and substantive facts, upon the same remedial theories and would be seeking the same relief.

317.   The claims and remedial theories pursued by the Individual Plaintiffs are sufficiently aligned with the interests of the Class Members to ensure that the universal claims of the alleged class will be prosecuted with diligence and care by the Plaintiffs as representatives of the Class.

318.   There are questions of law and fact common to the alleged class. Such common questions include, *inter alia*:

(a)   Whether the Defendants and the Other Participants defrauded Plaintiffs by advising and recommending that Plaintiffs and members of the Class engage in an illegal and abusive tax shelter, the SCE Strategy and then implementing same;

(b)   Whether the Defendants and the Other Participants defrauded Plaintiffs by advising Plaintiffs and members of the Class that all or a portion of the "value" of the donated property interest as set out in the respective Appraisals was deductible as a charitable contribution under the Code;

(c)   Whether the Defendants and the Other Participants defrauded Plaintiffs by advising Plaintiffs and members of the Class that the charitable contribution deductions from the SCE Strategy would comply with Section 170(h) of the Code and therefore would reduce the taxable income of Plaintiffs and the Class;

(d)   Whether the Defendants and the Other Participants defrauded Plaintiffs by advising Plaintiffs and members of the Class that the SCE Strategy complied with the applicable tax laws, rules, regulations, common law doctrines, and court decisions;

(e)   Whether the Defendants and the Other Participants conspired and/or aided and abetted each other in furtherance of the unlawful acts alleged herein and incorporated by reference;

(f)     Whether the Defendants and the Other Participants engaged in a

pattern of racketeering activity in violation of RICO and/or Georgia's

RICO statute ("Georgia RICO"), codified at O.C.G.A. §16-4-1, *et seq.,*

based on the unlawful acts alleged herein and incorporated by

reference;

(g)     Whether the Defendants' and the Other Participants' overt and/or

predicate acts in furtherance of the conspiracy and/or aiding and

abetting, based on the unlawful acts alleged herein and incorporated by

reference, resulted in or proximately caused and continues to directly

cause injury to the Plaintiffs' and Class Members' business or property

or irreparably harmed and harms the Plaintiffs and the alleged class

and if so, the appropriate relief to which they are entitled;

(h)     Whether the Defendants' and Other Participants' actions, based on the

unlawful acts alleged herein and incorporated by reference, constitute

mail and/or wire fraud; and

(i)     Whether the Defendants have been unjustly enriched through the

unlawful acts alleged herein and incorporated by reference.

319.   The Defendants have acted or refused to act on grounds generally

applicable to the Class, making appropriate final relief with respect to the Class as

a whole. The prosecution of separate actions by individual members of the Class

would create a risk of inconsistent or varying adjudications with respect to individual members of the alleged Class which could establish incompatible standards of conduct for the parties opposing the Class. Such incompatible standards, inconsistent or varying adjudications on what, of necessity, would be the same essential facts, proof and legal theories, would create and allow to exist inconsistent and incompatible rights within the Class. Further, the failure to permit this cause to proceed as a class action under Rule 23(b)(1)(A) would be contrary to the beneficial and salutary public policy of judicial economy in avoiding a multiplicity of similar actions. The Plaintiffs also allege questions of law and fact applicable to the Class that predominate over individual questions and thus a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Therefore, certification is appropriate under Rule 23(b)(3). Failure to permit this action to proceed under Rule 23 would be contrary to the public policy encouraging the economies of attorney and litigant time and resources.

320.   The named Plaintiffs allege that they are willing and prepared to serve the Court and proposed Class in a representative capacity with all of the obligations and duties material thereto.

321.   The self-interests of the named Class representatives are co-extensive with and not antagonistic to those of the absent Class Members. The proposed

representatives will undertake to well and truly protect the interests of the absent Class Members.

322.   The named Plaintiffs have engaged the services of counsel indicated below. Plaintiffs' counsel are experienced in complex litigation, including class litigation, involving *inter alia* tax issues and will adequately prosecute this action and will assert, protect, and otherwise represent well the named Class representatives and absent Class Members.

323.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable. There will be no difficulty in the management of this action as a class action.

324.   The Plaintiffs will fairly and adequately protect the interests of the Class and have no interests adverse to or which directly and irrevocably conflict with the interests of other Class Members.

## VI.
## ALLEGATIONS RELATING TO RICO AND GEORGIA RICO

325.   Plaintiffs are "persons" within the meaning of 18 U.S.C. §1964(c) and O.C.G.A. § 16-14-6(c).

326.   At all times relevant hereto, each of Plaintiffs and the Defendants and Other Participants were and are "persons" within the meaning of 18 U.S.C. §1961(3).

## A.     Enterprise

327.   An enterprise need not be a specific legal entity but rather may be "any union or group of individuals associated in fact although not a legal entity."

328.   In this case, the enterprise ("Enterprise") for RICO and Georgia RICO purposes consists of (1) the Defendants; (2) the Other Participants; and (3) all other persons and entities that associated to solicit persons to participate in the fraudulent SCE Strategy for the purpose of generating and sharing fees and commissions derived from the SCE Strategy and alleged tax liability reduction it purported to provide.[33]

329.   These individuals and entities individually and through their agents represented to their victims that the charitable contribution deduction purportedly generated by the SCE Strategy qualified as a *bona fide* conservation easement entitling Plaintiffs and members of the Class to a noncash charitable contribution deduction under Section 170(h) and relevant regulations.  In reality, the noncash charitable contribution deductions purportedly generated by the SCE Strategy did not qualify as legitimate tax deductions under the Code and the SCE Strategy, as structured, could not support the promised tax benefits.  The SCE Strategy and the Co-Conspirators' Arrangement to design, promote, sell, and implement it by means of the numerous fraudulent acts and omissions set out herein, were devised solely

---

[33] Not coincidentally, the Department of Justice also uses the language of RICO (such as Enterprise) in the Agee charges.

to facilitate the generation of significant fees and commissions to the Defendants without regard to the best interests of their clients (*i.e.*, the Plaintiffs and the Class). The Defendants and the Other Participants have made millions of dollars orchestrating the Co-Conspirators' Arrangement.

330. Defendants sought out as clients those persons, like Plaintiffs and other Class Members, that had high taxable income and sufficient cash flow available to participate in the Syndicates; the Defendants and Other Participants then capitalized on the Co-Conspirators' Arrangement to convince the clients, by means of the numerous fraudulent acts and omissions set out herein, to execute the SCE Strategy, for the primary purpose of providing significant revenue for Defendants. Unbeknownst to Plaintiffs and the Class, there was no legitimate basis for the large noncash charitable contribution deductions resulting from highly inflated appraisals essential for the success of the Co-Conspirators' Arrangement that purportedly supported the value of the deductions generated by the SCE Strategy.

331. The Defendants and the Other Participants engaged in a common fraudulent plan, transaction and course of conduct, as described herein, in connection with the design, promotion, sale and implementation of the SCE Strategy. The Defendants and the Other Participants knowingly or recklessly engaged in acts, transactions, practices and a course of business that operated as a

fraud upon the Plaintiffs and the Class, the primary purpose and effect of which was to generate huge fees and commissions by fraudulently selling a series of transactions under the guise of generating a legal and legitimate noncash charitable contribution deduction.

332.   While the Defendants and the Other Participants participated in the Enterprise and were a part of it, the Defendants and the Other Participants also had an existence separate and distinct from the Enterprise.

333.   Defendants and the Other Participants maintained an interest in and control of the Enterprise and also conducted or participated in the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

334.   Defendants and the Other Participants' control and participation in the Enterprise were necessary for the successful operation of Defendants' scheme. The Enterprise had an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engaged.

**B.    Operation of the RICO Enterprise**

335.  Syndicated conservation easement deals caught the attention of unscrupulous professionals for three reasons: (1) these deals purported to generate tax deductions that, due to provisions in the Code, could substantially reduce an

individual's tax liability;[34] (2) the rules involved were highly technical and thus unlikely to be understood by laypersons, like the Plaintiffs and members of the Class, who were thus also unlikely to question the advice being offered by reputable professionals who were alleged experts in the area; (3) due to a rampant oversupply of unproductive real estate that was devalued in the 2008-2009 recession, a vast supply of deals was available to participants in a buffet-like fashion,[35] and (4) a group of eager under-employed real estate appraisers, short on engagements in the wake of the 2008-2009 recession, that were willing to engage in fictitious valuations under the guise of a subject property's HBU that was wildly inflated.

336.   Tax deductible conservation easements are allowed for taxpayers that meet the requirements of Code Section 170(h).  However, Section 170(h) has a rigorous set of qualification criteria that Defendants did not meet with respect to the SCE Strategy, as set out in detail herein.  Nevertheless, conservation easements are spelled out in the Tax Code itself, specifically Code Section 170(h), giving professional advisors a hook upon which to lure potential investors that would

---

[34] The deduction for a qualified conservation easement under Code Section 170(h) is a noncash charitable contribution deduction. A noncash charitable contribution deduction is unique and especially valuable because, unlike most itemized deductions, it is not subject to the alternative minimum tax ("AMT"), although it is subject to Adjusted Gross Income ("AGI") limitations.

[35] Some states like Georgia also had the presence of a state tax credit for conservation easements.  Credits, unlike deductions, offer participants a dollar for dollar reduction of tax.

otherwise steer clear of these transactions.  Conservation easement promoters had no difficulty convincing potential participants of the validity of the deduction because they pointed to Code Section 170(h).  This "illusion of validity" is what the Defendants fraudulently used to persuade and mislead the Plaintiffs to agree to participate in SCE Strategy.

337.   The Defendants and the Other Participants had to convince the clients and prospective clients of the validity of the SCE Strategy, which was easy since it is specifically allowed and described in Section 170(h) of the Code.

338.   Each of the Defendants were vital to the implementation of the SCE Strategy, played an important role in the success of the Enterprise, and either controlled the Enterprise or knowingly implemented the decisions of others in the Enterprise; thus, each had some part in directing the enterprise's affairs, not just their own.  Each was involved in either or both of the following: (i) in marketing the SCE Strategy to Plaintiffs and the Class or (ii) in providing incomplete and misleading legal opinions, tax returns, appraisals and other documents designed to promote or implement the SCE Strategy. Further, they were not merely performing ordinary business services.  Rather, the Defendants were part of the operation and direction of the Enterprise because they performed tasks they do not ordinarily perform.  These tasks include, among other things, providing information for promotional pitches of the Syndicates; inserting false conservation purposes into

the Baseline Documentation Reports and other documents; commissioning and preparing fraudulent business plans for development or mining; commissioning and preparing grossly inflated appraisals; signing IRS Appraisal Summaries and other IRS filings that reflect these grossly inflated appraised values; and prioritizing fees and director compensation over land conservation. Furthering a fraud in these manners is not operating as they ordinarily would. A further description of the role each played is as follows:

(a)   <u>The MMM and L & G Defendants:</u> These Defendants held themselves out as the "experts" in conservation easements (and specifically syndicated conservation easements). These Defendants used this self-promotion not only to ensnare potential participants in the SCE Strategy, but to also build the team of co-conspirators that were necessary to implement the SCE Strategy, resulting in enormous fees and commissions to these Defendants and other members of the conspiracy. In fact, the L & G Defendants introduced the MMM Defendants to the OSI Defendants and laid the entire foundation for the SCE Strategy to move forward. Of course, the MMM Defendants were willing and eager to partner with the OSI Defendants to have access to the OSI Defendants' experience with real estate transactions and its huge stable of potential clients. The MMM and L & G

Defendants played numerous roles in the conspiracy to design, promote, sell and implement the SCE Strategy. First, these Defendants actively sought out firms and professionals to join their team for purposes of promoting, selling, and implementing the SCE Strategy. Second, these Defendants directly participated in the preparation, drafting, revision, and ultimate approval of the Promotional Materials and all other documents utilized in the promotion, sale, and implementation of the SCE Strategy, including Appraisals, Conservation Easement Deeds, Appraisal Summaries (Form 8283), and Baseline Documentation Reports. Third, these Defendants made themselves available to directly answer questions from potential participants in the SCE Strategy. Fourth, these Defendants prepared (in the case of the L & G Defendants), reviewed and approved the tax returns prepared for each of the Syndicates and the K-1s that were ultimately issued to each Plaintiff and member of the Class. Simply stated, these Defendants played a critical role in the SCE Strategy from the beginning to the end and every point in between. Plaintiffs incorporate herein Paragraphs 65-69, 84-101, 107-10, 114-17, 121, 161-279, 283-84, 303-10 of the Complaint, which

further set out more details of the MMM[36] and L & G Defendants' involvement in the operation of the alleged RICO enterprise.

(b)  <u>The OSI Defendants:</u>      The OSI Defendants were experienced in syndicated land ownership transactions and they began doing conservation easements in 2012.  The MMM Defendants and the L & G Defendants saw the OSI Defendants as a perfect partner for the SCE Strategy due to this prior experience, as well as the OSI Defendants' reputation for finding clients for real estate transactions. The OSI Defendants were more than willing to serve in this role and act as a Sponsor of the SCE Strategy.  The OSI Defendants also assisted in the preparation of all of the SCE Strategy transaction documents, including the Promotional Materials, Conservation Easement Deeds, Appraisal Summaries (Form 8283), and Baseline Documentation Reports.  The OSI Defendants, with the MMM and L & G Defendants' assistance, hand-selected the other "experts" (discussed below) to join the conspiracy to promote and implement the SCE Strategy.  Plaintiffs incorporate herein Paragraphs 69-70, 80-81, 91, 93-94, 100-04, 107-12, 115-17, 121, 161-279, 283, 303-05, 309 of the Complaint, which further set out more details of the OSI

---

[36]  Moreover, several MMM lawyers, including Pollock, participated in transactions, including Lakepoint, for which Pollock wrote an opinion for OSI.

Defendants' involvement in the operation of the alleged RICO enterprise.

(c)     <u>The SCE Appraisers:</u>     The SCE Appraisers prepared the Appraisals that purported to support the conservation purpose of the conservation easement donation, as well as the value of the donation.  The SCE Appraisers also prepared the Appraisals with full knowledge and the intent that the valuations contained in the Appraisals would be used by the Plaintiffs to claim charitable contribution deductions on their tax returns.  The SCE Appraisers violated their professional obligations and duties.  The SCE Appraisers further knew that the Appraisals were flawed and the valuations contained therein were grossly inflated, as determined by the IRS.  Plaintiffs incorporate herein Paragraphs 7-8, 59, 71-72, 114, 161-279, 282-88, and 306 of the Complaint, which further set out more details of the SCE Appraisers' involvement in the operation of the alleged RICO enterprise.

(d)     <u>The Return Preparers:</u>     These accounting firms/accountants prepared the partnership returns for each of the Syndicates used in the SCE Strategy, as well as the K-1s that were sent to each Plaintiff and member of the Class that set forth each such individual's

proportionate share of the Syndicate's charitable contribution deduction to be reported on their individual tax returns. These Defendants prepared these partnership tax returns and K-1s with full knowledge of the fact that these documents were being used in connection with the SCE Strategy and would result in the Plaintiffs and members of the Class claiming charitable contribution deductions from the SCE Strategy on their individual tax returns. Plaintiffs incorporate herein Paragraphs 9, 52, 54, 63, 67-68, 78, 93, 96-100, 115-17, 121, 160, 197, 209, 212-16, 256, 269, 272-76, 338, and 438 of the Complaint, which further set out more details of the Return Preparers' involvement in the operation of the alleged RICO enterprise.

(e)     The PCLG Defendants: The PLCG Defendants performed two distinct roles in connection with the marketing, sale, and implementation of the SCE Strategy. First, they recruited clients to buy into a fund for purposes of participating in the SCE Strategy and provided these clients with comfort letters in connection with the SCE Strategy. Second, they provided legal advice and services to the OSI Defendants and members of the SCE Syndicates (*i.e.*, Plaintiffs and members of the Class) regarding all aspects of the SCE Strategy,

189

including document preparation, review, and analysis and due diligence on the bona fides of the purported tax benefits of the SCE Strategy. Plaintiffs incorporate herein Paragraphs 75, 109-13, 115-17, 172, 206, 212, 227, 266-67, 272, 283, and 303 of the Complaint, which further set out more details of the PCLG Defendants' involvement in the operation of the alleged RICO enterprise.

(f)   Bennett Thrasher:   Bennett Thrasher is an accounting firm that performed several roles in connection with the marketing, sale, and implementation of the SCE Strategy. First, it referred its own clients for the SCE Strategy and, in doing so, utilized its clients' confidential financial information to identify potential targets. With respect to these clients. Bennett Thrasher also purported to conduct its own independent "due diligence" on the SCE Strategy *for each separate client* and charged each separate client a fee for this due diligence (in addition to the fee that Bennett Thrasher charged each client for preparation of the client's individual tax return and each Syndicate for preparation of the partnership returns and K-1s). Plaintiffs incorporate herein Paragraphs 76-77, 102-08, 121, 153, 197, 223, 256, and 303 of the Complaint, which further set out more details of

Bennett Thrasher's involvement in the operation of the alleged RICO enterprise.

(g)     <u>The Greencone Consultants:</u>     Bennett Thrasher also introduced the Greencone Consultants to the OSI Defendants.   The Greencone Consultants convinced the OSI Defendants to focus on mining as the purported investment use for the properties the OSI Defendants purchased in connection with the SCE Strategy.   The Greencone Consultants, in turn, introduced the OSI Defendants to the Blethen Defendants.   Plaintiffs incorporate herein Paragraphs 77 and 107 of the Complaint, which further set out more details of Bennett Thrasher's and the Greencone Consultants' involvement in the operation of the alleged RICO enterprise.

(h)     <u>The Land Trusts:</u> The Land Trusts assisted in the implementation of the SCE Strategy by providing assistance in drafting the deed language for the donation of the conservation easement and preparing the Baseline Documentation Reports that purported to support the conservation purpose of the conservation easement.   These entities also worked alongside the MMM and L & G Defendants and the Appraisal Defendants in making promotional presentations to prospective clients and referral sources.   These entities profited

enormously from the SCE Strategy by accepting huge donations of interests in real estate in connection with the SCE Strategy, together with substantial amounts of cash that were used to compensate the officers of the Land Trusts and affiliated companies.   They also profited from the large fees paid to their affiliates for preparation of Baseline Documentation Reports.  For instance, Keller formed ERMF for the specific purpose of generating enormous fees for each SCE Strategy transaction that involved ACC.   The ACC Defendants required the OSI Defendants to utilize the services of ERMF and to pay a consulting fee to ERMF for each such transaction.  Plaintiffs incorporate herein Paragraphs 46, 53, 73-74, 115-20, 148-53, 163, 166, 168-70, 178-82, 186, 194, 196-98, 205-09, 213-20, 222-23, 225, 236-40, 244-45, 253-54, 257, 265-69, 273, 283, 291, 295, and 307-09 of the Complaint, which further set out more details of the Land Trust's involvement in the operation of the alleged RICO enterprise.

(i)     The PropCos and the Syndicates:      These entities were created by the OSI Defendants as the vehicle through which the subject property was purchased and the vehicle through which Plaintiffs and the Class participated in the SCE Strategy.

(j)    <u>The Managers:</u>  These entities were all created by, affiliated with, and controlled by the OSI Defendants to act as Managers for each Syndicate and take the necessary actions on behalf of each such Syndicate to effect the steps of the SCE Strategy.

(k)    <u>The Consultants:</u>  These entities completed assessments of certain parcels of land used in the SCE Strategy to determine the alleged merits of conservation of each such parcel.  These entities also performed market research and analysis, real estate and geotechnical consulting services, conservation consulting, due diligence, and/or mining engineering and consulting services for various parcels of land used in the SCE Strategy to determine the feasibility of operating a mine on and/or developing each such parcel.  These entities also worked as consultants to locate and hire legal and professional advisors to compile necessary documentation for the investments in the Syndicates.  Conservation Pays, Conservation Saves, Conservation Matters, Site Services Group, LLC, and Southwest Capitol Management, LLC performed consulting services regarding whether the subject properties could support a valid conservation purpose and other conservation consulting services.  From 2014 through 2018, the Blethen Defendants, Galt Mining, and Greencone Consultants

provided geotechnical services and other consulting services in connection with the feasibility of operating a mine on each parcel as the HBU.  Plaintiffs incorporate herein Paragraphs 7, 56, 59, 65, 67, 69-70, 77, 81-82, 99, 107, 121, 140, 142, 144, 147, 155, 158, 166, 170, 194, 197, 201, 220, 223, 225-26, 229, 238, 253-54, 256, 260, 304, and 338 of the Complaint, which further set out more details of the Consultants' involvement in the operation of the alleged RICO enterprise.

339.   The Defendants intended to commit wire and/or mail fraud in connection with the design, promotion, sale and implementation of the SCE Strategy because the IRS has made it clear to professional advisors, including the Defendants, that it intends to disallow any deductions for conservation easement donations implemented in the manner the SCE Strategy was implemented, as further set out in detail herein.  Defendants' racketeering activity in designing, promoting, selling, and implementing the SCE Strategy involved numerous false and misleading misrepresentations and omissions that amount to a scheme or artifice to defraud.

340.   Unfortunately, the IRS has concluded that the charitable deductions at the partnership (*i.e.*, the Syndicate) level are disallowed and made clear its intent to

also disallow the charitable contribution deductions at the individual level and assess Plaintiffs and the Class with back taxes, interest, and penalties.

341. Plaintiffs and the Class, who were fully reliant on the advice and representations of the credentialed professionals like the Defendants, were "collateral damage" of the Co-Conspirators' scheme to extract huge fees and commissions for themselves. Plaintiffs trusted they were being advised, counseled and directed by those professionals who represented themselves as experts who were highly experienced with these types of transactions. However, Defendants and their co-conspirators received large amounts of fees and commissions for personal use/gain while at all times assuring Plaintiffs they were in full compliance with the applicable IRS rules and regulations, and other applicable legal requirements.

## C. Predicate Acts

342. With respect to the activities alleged herein, the Defendants and Other Participants acted at all times with malice toward the Plaintiffs and the Class, intending to engage in the conduct complained of for the benefit of Defendants and their co-conspirators and with knowledge that such conduct was unlawful. Such conduct was done with actionable wantonness and reckless disregard for the rights of Plaintiffs and the Class, as well as the laws to which the Defendants and their co-conspirators are subject, the same amounting to actionable wantonness.

343.   With respect to the activities alleged herein, each Defendant and each of their co-conspirators agreed to the operation of the transaction or artifice to deprive Plaintiffs and the Class of property interests.   In furtherance of these agreements, each Defendant also agreed to interfere with, obstruct, delay or affect interstate commerce by attempting to obtain and/or actually obtaining property interests to which the Defendants were not entitled.

344.   With respect to the overt acts and activities alleged herein, each Defendant conspired with each other, the Other Participants, and with others not named as Defendants herein, to violate 18 U.S.C. §1962(c) and O.C.G.A. §16-4-4(b), all in violation of 18 U.S.C. §1962(d) and Georgia law.   Each Defendant agreed and conspired with each other Defendant and their co-conspirators to participate, directly or indirectly, in interfering with, obstructing, delaying or affecting commerce by attempting to obtain and/or actually obtaining property interests to which the Defendants and their co-conspirators were not entitled.

345.   The numerous predicate acts of wire and/or mail fraud in addition to other fraudulent acts, are part of separate fraudulent transactions by Defendants and their co-conspirators designed to defraud the Individual Plaintiffs and the Class of money and property interests under false pretenses. As victims of these unlawful patterns of illegal activity, Plaintiffs and members of the Class have and continue

to suffer losses as a result of these activities.  The acts that caused injuries to the Plaintiffs and members of the Class were performed for financial gain.

346.  In carrying out the overt acts and fraudulent transactions described above, the Defendants and their co-conspirators engaged in, *inter alia*, conduct in violation of federal laws, including 18 U.S.C. §§1343-1346, and 18 U.S.C. §1961 *et seq*.  *See also* O.C.G.A. §16-4-3(5)(C).

347.  Section 1961(1) of RICO provides that "racketeering activity" means any act indictable under any of the following provisions of Title 18, United States Code: §1341 (relating to mail fraud), §1343 (relating to wire fraud) and §1346 (relating to scheme or artifice to defraud).

348.  Section 16-4-3(5)(C) of the Official Code of Georgia Annotated provides that "racketeering activity" means, *inter alia*, "any conduct defined as 'racketeering activity' under 18 U.S.C. Section 1961(1)."

**D.   Violations of 18 U.S.C. §§ 1341 and 1343.**

349.  Plaintiffs repeat and reallege each and every prior allegation in this Complaint as if fully set forth herein.

350.  For the purpose of executing and/or attempting to execute their transaction to defraud and to obtain money by means of false pretenses, representations or promises, the Defendants and their co-conspirators, in violation of 18 U.S.C. §§ 1341 and 1343, transmitted and received by wire and/or mail

matter and things therefrom including but not limited to contracts, instructions, correspondence, and other transmittals.

351.   The Defendants' and their co-conspirators' violations of 18 U.S.C. §§ 1341 and 1343 and acts taken by mail and/or wire in support of these violations are too numerous to list.   Upon information and belief, the Defendants and Other Participants engaged in predicate act violations as early as 2012 and Plaintiffs will obtain evidence of such violations through discovery in this case.   However, by way of illustration but not limitation, Plaintiffs provide representative examples below of predicate acts related to these 18 U.S.C. §§ 1341 and 1343 violations of which they currently have knowledge.   These predicate acts are further detailed in Section III.F.2, *supra*.

(a)   Initial Appraisal in the form of a letter prepared and sent by the Weibel Defendants to Lakepoint Syndicate via U.S. mail and/or email on or about August 3, 2013 and which was included in the Promotional Materials for the Lakepoint Syndicate;

(b)   August 5, 2013 email from Matthew Ornstein of OSI, on behalf of the OSI Defendants, to Norman Radow containing promotional material regarding participation in the Lakepoint Syndicate;

(c)   September 24, 2013 email from Matthew Ornstein of Conservation Saves to Norman Radow regarding the Lakepoint Syndicate

containing spreadsheets with tax analysis pertaining to the Lakepoint Syndicate;

(d)     October 22, 2013 email from Matthew Ornstein of Conservation Saves, on its own behalf and on behalf of the OSI Defendants, to Norman Radow and all potential members of the Lakepoint Syndicate containing Promotional Materials that summarize the Lakepoint Syndicate, its professional advisors and that the tax benefit for the Lakepoint Syndicate is $4.39 for every dollar invested;

(e)     October 31, 2013 emails from Matthew Ornstein of Conservation Saves to Norman Radow asking about sending paperwork for the Lakepoint Syndicate to Norman Radow at his office and instructing Norman Radow to remit payment by November 8, 2013;

(f)     November 13, 2013 delivery of documents to Norman Radow and other Lakepoint Syndicate participants containing Investor Agreement of Lakepoint Land Group LLC for the signature of the participants;

(g)     Appraisal for the Lakepoint Syndicate Property sent by the Weibel Defendants to the Lakepoint Syndicate via U.S. mail and/or email on or about November 17, 2013;

(h)    Appraisal for the Lakepoint Syndicate Property sent by the Lucus Defendants to Lakepoint Land II, LLC via U.S. mail and/or email on or about November 19, 2013;

(i)    December 3, 2013 email from Conservation Saves to all Lakepoint Syndicate participants containing a Member Approval Form to adopt the easement strategy;

(j)    December 5, 2013 email from Frank Schuler of Conservation Saves to Norman Radow and all Lakepoint Syndicate participants of the vote to conserve the subject property;

(k)    Conservation Deed concerning the Lakepoint Syndicate, jointly prepared and approved by MMM, L & G, OSI, and ACC Defendants and sent via U.S. mail and/or email for filing on or about December 12, 2013;

(l)    Baseline Document Report sent to the Lakepoint Syndicate via U.S. mail and/or email on or about December 12, 2013, prepared and verified by the ACC Defendants and filed by the L & G Defendants with the Appraisal Summary Form (8283) and the Lakepoint Syndicate's tax return;

(m)    Letter documenting the conveyance from the ACC Defendants the Lakepoint Syndicate, sent via U.S. mail and/or email to the Lakepoint

Syndicate and the L & G Defendants on or about December 12, 2013 and filed by the L & G Defendants with the Lakepoint Syndicate's tax return;

(n)   March 13, 2014 tax return for the Lakepoint Syndicate prepared by the L & G Defendants and sent to the Lakepoint Syndicate by U.S. mail and/or email and corresponding K-1s sent via U.S mail and/or email to Radow by the L & G Defendants.

(o)   Letter and email in March 2014 from L & G providing Norman Radow and all Lakepoint Syndicate participants with K-1s containing the charitable contribution deduction arising from the Lakepoint Syndicate;

(p)   Initial Appraisal in the form of a letter prepared and sent by the Weibel Defendants to FG River Syndicate via U.S. mail and/or email on or about October 26, 2015 and which was included in the Promotional Materials for the Lakepoint Syndicate;

(q)   Promotions Materials sent by Matt Ornstein on behalf of OSI to Radow on or about October 28, 2015 via email regarding participation in the FG River Syndicate;

(r)   Technical Due Diligence Business Plan prepared by the Blethen Defendants and sent to FG River Resources LLC on November 24,

2015 via U.S. mail and/or email, which was relied on by the Weibel Defendants and the Lucus Defendants in preparing their Appraisals;

(s)     An appraisal sent by the Weibel Defendants to the FG River Syndicate on or about December 29, 2015 via U.S. mail and/or email;

(t)     Secondary Appraisal sent by the Lucus Defendants to the FG River Syndicate on or about March 30, 2016 via U.S. mail and/or email;

(u)     Conservation Easement Deed regarding the FG River Syndicate dated December 22, 2015, jointly prepared and approved by the MMM, OSI, PCLG, and ACC Defendants and sent via U.S. mail and/or mail for filing;

(v)     Baseline Documentation Report prepared by ACC and sent to the FG River Syndicate via U.S. mail and/or email on or about December 22, 2015 and filed by Partnership Tax Solutions with the Appraisal Summary (Form 8283) and the FG River Syndicate's tax return;

(w)     Conveyance letter sent either by U.S. mail or email by ACC to the FG River Syndicate on December 22, 2015;

(x)     September 1, 2016 tax return for the FG River Syndicate prepared by Partnership Tax Solutions and sent to the FG River Syndicate by U.S. mail and/or email and corresponding K-1s sent via U.S mail and/or email to Radow by Partnership Tax Solutions;

(y)   Letter from Frank Schuler of Conservation Saves to William N. Turk and all Industrial S&G Partners Participants on or about December 5, 2014 containing various documents relating to the Industrial S&G Syndicate containing various documents for execution including an Operating Agreement, Investor Agreement, Member Approval Form, Member Information and pre-addressed FedEx envelope;

(z)   OSI sent Promotional Materials regarding the Industrial Syndicate to Plaintiff Turk through the accounting firm BatesCarter via email dated December 3, 2014;

(aa)  Initial Appraisal in the form of a letter prepared and sent by the Weibel Defendants to Industrial S&G LLC via U.S. mail and/or email on or about November 12, 2014;

(bb)  Aggregate Resource Market, Operations, and Valuations Analysis prepared by the Blethen Defendants and sent to Industrial S&G LLC on November 20, 2014 via U.S. mail and/or email, which was relied on by the Weibel Defendants and the Lucus Defendants in preparing their Appraisals

(cc)  Appraisal Report for the Industrial Syndicate Property sent by the Weibel Defendants to Industrial S&G LLC via U.S. mail and/or email

on or about December 16, 2014 and which the L & G Defendants filed electronically with the Industrial Syndicate's tax return;

(dd)   Appraisal Report for the Industrial Syndicate Property sent by the Weibel Defendants to Industrial S&G LLC via U.S. mail and/or email on or about December 20, 2014 and which the L & G Defendants filed electronically with the Industrial Syndicate's tax return;

(ee)   Appraisal for the Industrial Syndicate Property sent by the Lucus Defendants to Industrial S&G LLC via U.S. mail and/or email on or about October 30, 2014;

(ff)   Appraisal for the Industrial Syndicate Property sent by the Lucus Defendants to Industrial S&G LLC via U.S. mail and/or email on or about December 22, 2014;

(gg)   Conservation deed dated December 15, 2014, jointly prepared and approved by the MMM, L & G, and OSI Defendants and the Wild Turkey Federation, and sent via U.S. mail and/or email for filing;

(hh)   December 15, 2014 Baseline Documentation Report prepared and sent by Wild Turkey Foundation and Conservation Matters and sent to the Industrial Syndicate and L & G Defendants via U.S. mail and/or email and which the L & G Defendants filed electronically with the Industrial Syndicate's tax return;

(ii)    December 22, 2014 Wild Turkey Foundation letter regarding the Industrial Syndicate Property to Industrial S&G LLC via U.S. mail and/or email which the L & G Defendants filed with the Industrial Syndicate's tax return;

(jj)    February 2015 tax return for the Industrial Syndicate prepared and sent by the L & G Defendants to Industrial S&G Partners LLC via U.S. mail and/or email and filed with the IRS electronically by the L & G Defendants;

(kk)    February 20, 2015 cover letter from the L & G Defendants to Plaintiff Turk and attached Industrial Syndicate K-1 for Turk, sent by the L & G Defendants to Turk via U.S. mail and/or email;

(ll)    Promotional Materials sent by OSI at some point in late 2015 via U.S. mail and/or email about participating in the Gulf Land Syndicate.

(mm)    Initial Appraisal in the form of a letter prepared and sent by the Weibel Defendants to Gulf Land Syndicate via U.S. mail and/or email on or about October 30, 2015 and which was included in the Promotional Materials for the Gulf Land Syndicate;

(nn)    Technical Due Diligence Business Plan prepared on November 9, 2015 by the Blethen Defendants and sent via U.S. mail and/or email to

Gulf Land S&G LLC, which was relied on by the Weibel Defendants and the Lucus Defendants in preparing their Appraisals.

(oo)    Another Appraisal sent by the Weibel Defendants to Gulf Land S&G LLC on or about March 29, 2016 via U.S. mail or email.

(pp)    Secondary Appraisal sent by the Lucus Defendants to Gulf Land S&G LLC on or about March 30, 2016 via U.S. mail and/or email with knowledge and intent that it would be shared with and relied upon by members and prospective members in Gulf Land Syndicate, including Radow.

(qq)    Conservation Easement Deed regarding the Gulf Land Syndicate dated December 22, 2015, jointly prepared and approved by the MMM, OSI, PCLG, and ACC Defendants and sent via U.S. mail and/or mail for filing.

(rr)    Baseline Documentation Report prepared by ACC and sent to Gulf Land Syndicate via U.S. mail and/or email on or about December 22, 2015 and filed by Partnership Tax Solutions with the Appraisal Summary (Form 8283) and the Gulf Land Syndicate's tax return.

(ss)    Conveyance letter sent either by U.S. mail or email by ACC to the Gulf Land Syndicate on December 22, 2015.

(tt)    September 1, 2016 tax return for Gulf Land Syndicate prepared by Partnership Tax Solutions and sent to Gulf Land Syndicate by U.S. mail and/or email and corresponding K-1s sent via U.S mail and/or email to Radow by Partnership Tax Solutions

(uu)    May 8, 2014 email from Matt Ornstein of OSI to Jeff Call of Bennett Thrasher and Norman Radow regarding an introduction call;

(vv)    Letter dated February 20, 2015 from L & G to William N. Turk containing K-1 with a deduction of $246,808 from Industrial S&G Partners;

(ww)   December 18, 2015 email from Frank Schuler of OSI to Norman Radow and other participants regarding IRS audit of Lakepoint Syndicate informing the participants that OSI has hired former IRS attorney Randy Bampfield;

(xx)    August 18, 2017 email from Matthew Kaynard of OSI to Norman Radow regarding "Reportable Transaction Numbers for Your IRS Forms 8886";

(yy)    September 5, 2017 email from Paul Stachiewicz of OSI to Norman Radow regarding OSI client portal for Forms 8886;

(zz)    June 4, 2017 email from Matt Ornstein of OSI to Norman Radow regarding audit letters wherein Ornstein indicated stated: "And please

rest assured that we have complete confidence in the valuations and have the resources to defend through tax court if we have to;"

(aaa)   August 18, 2017 emails from Matthew Kaynard of OSI to Norman Radow regarding "Reportable Transaction Numbers for Your IRS Forms 8886;"

(bbb)   August 23, 2017 email from Matthew Kaynard of OSI to Norman Radow regarding "Corrected Reportable Transaction Numbers Due to IRS Glitch;"

(ccc)   March 2, 2018 email from OSI to Norman Radow and other "Clients and Advisors" regarding "Ornstein-Schuler Update:   K-1 and Tax Document Delivery Date;"

(ddd)   Emails from Matt Ornstein of OSI to Norman Radow between May 4, 2018 and May 16, 2018 regarding "Important Update from the Ornstein-Schuler Group;"

(eee)   June 15, 2018 email from Matt Ornstein of OSI to Norman Radow regarding "June Update from Ornstein-Schuler;"

(fff)   July 19, 2018 email from Matt Ornstein of OSI to Norman Radow regarding "July Update from Ornstein-Schuler;"

(ggg)   November 1, 2018 email from Matt Ornstein of OSI to Norman Radow regarding "November 1st Update from Ornstein-Schuler;"

(hhh) November 12, 2018 email from Matt Ornstein of OSI to Norman Radow regarding "November 12th Update from Ornstein-Schuler;"

(iii) November 19, 2018 email from Matt Ornstein of OSI to Norman Radow regarding "November 19th Update from Ornstein-Schuler;"

(jjj) November 26, 2018 email from Matt Ornstein of OSI to Norman Radow regarding "November 26th Update from Ornstein-Schuler;"

(kkk) February 5, 2019 email from OSI to Norman Radow regarding "Ornstein-Schuler Update:   K-1 and Tax Document Delivery Timing;"

(lll) February 13, 2019 email from Matthew Kaynard of OSI to Norman Radow regarding "Important steps regarding your 2018 tax documents;"

(mmm)     The Blethen Defendants prepared and transmitted by U.S. mail and/or email Technical Due Diligence Business Plans for all Syndicates that undertook a SCE Strategy from 2014-2018 in the same manner as described in more detail for the FG River, Industrial, and Gulf Land Syndicates.  These Business Plans were transmitted by U.S mail and/or email to the Syndicates and were relied on by the applicable Appraisal Defendants to prepare their appraisals.

(nnn) Any other K-1s (not mentioned already in this list of predicate acts) prepared by the Return Preparers for members of any SCE Syndicate sponsored or managed by OSI or any of its affiliates and sent by email or mail to any potential or actual member of such Syndicate;

(ooo) All Appraisals (not mentioned already in this list of predicate acts) prepared by any of the SCE Appraisers on property owned by any SCE Syndicate sponsored or managed by OSI or any of its affiliates and sent by email or mail to any potential or actual member of such Syndicate;

(ppp) All template Form 8886s sent by email from any Defendant or Other Participant to any member of any SCE Syndicate sponsored or managed by OSI or any of its affiliates;

(qqq) All Form 8886s prepared by any Defendant or Other Participant and transmitted via mail or wire for any SCE Syndicate sponsored or managed by OSI or any of their affiliates;

(rrr) All other mailed or emailed communications between any of the Defendants or Other Participants and any potential or actual member of any SCE Syndicate sponsored or managed by OSI or any of its affiliates regarding the promotion of the SCE Strategy;

(sss)   All other mailed or emailed communications between any of the Defendants or Other Participants and any potential or actual member of any SCE Syndicate sponsored or managed by OSI or any of its affiliates regarding the implementation of the SCE Strategy; and

(ttt)   All other mailed or emailed communications between any of the Defendants or Other Participants and any potential or actual member of any SCE Syndicate sponsored or managed by OSI or any of its affiliates regarding the audit of any such Syndicate.

352.   Each of the documents that Defendants and their co-conspirators sent by wire and/or mail to Plaintiffs and members of the Class served one of two roles in the Enterprise (if not both).  First, many of these documents, standing alone, were fraudulent.  Defendants and their co-conspirators knew the tax treatment contemplated by their communications was inaccurate.  Second, all of these documents were used to advance the fraudulent scheme that Defendants and their co-conspirators perpetrated on Plaintiffs and the Class.

353.   Defendants' and their co-conspirators' efforts in executing or attempting to execute their transactions to defraud and to obtain money by means of false pretenses, representations or promises, including without limitation acts done in violation of 18 U.S.C. §§ 1341 and 1343, also fall within the definition of racketeering activity under O.C.G.A. §16-4-3(5)(C).

354.   In those matters and things sent or delivered by wire, through other interstate electronic media, and/or by mail, Defendants and their co-conspirators falsely and fraudulently misrepresented and fraudulently suppressed material facts from Plaintiffs and the Class as described above, in violation of 18 U.S.C. §§ 1341 and 1343. These various communications are related to the purpose of misrepresenting the basis, terms and consequences of the SCE Strategy and were directed to the Plaintiffs and members of the Class; further, the similarity in the misrepresentations over a period of time plausibly indicates participation by the Defendants in the fraudulent enterprise.   These acts, in addition to false and fraudulent misrepresentations communicated outside the interstate wire and mail systems, also fall within the definition of racketeering activity under O.C.G.A. §16-4-3(5)(C).   Defendants' and their co-conspirators' fraudulent statements and omissions include but are not limited to the following:

(1)     Orchestrating from a tax standpoint the design, development, implementation, operation, and management of the SCE Strategy;

(2)     Advising Plaintiffs and the members of the Class to engage in the SCE Strategy in order to receive favorable tax benefits;

(3)     Advising and recommending that Plaintiffs and members of the Class engage in an illegal and abusive tax shelter;

(4)     Failing to advise Plaintiffs and members of the Class that the SCE Strategy was an illegal and abusive tax shelter;

(5)     Failing to disclose existing published authority that indicated the purported tax benefits of the SCE Strategy were improper and not allowable for federal income tax purposes because of the failure of the SCE Strategy to strictly conform to Code Section 170(h);

(6)     Advising Plaintiffs and members of the Class that the SCE Strategy complied with the applicable tax laws, rules, regulations, common law doctrines, and published court decisions;

(7)     Failing to advise Plaintiffs and members of the Class that the SCE Strategy did not comply with the applicable tax laws, rules, regulations, common law doctrines, and published court decisions;

(8)     Failing to advise Plaintiffs and members of the Class that the SCE Strategy did not meet the strict requirements for a qualified conservation easement under Section 170(h) of the Code;

(9)     Advising Plaintiffs and the members of the Class that the donations of the conservation easements met the requirements of Section 170(h) of the Code and therefore provided lawful and legitimate tax benefits for the Plaintiffs and the Class;

(10)    Failing to advise Plaintiffs and the members of the Class that the donations of the conservation easements did not meet the requirements of Section 170(h) of the Code and therefore did not provide lawful and legitimate tax benefits for the Plaintiffs and the Class;

(11)    Advising Plaintiffs and members of the Class that they would receive substantial tax advantages in the form of charitable contribution deductions by engaging in the SCE Strategy;

(12)    Failing to advise Plaintiffs and members of the Class that the IRS had expressed its clear intent to disallow the tax benefits that were promised from the SCE Strategy;

(13)    Advising Plaintiffs and members of the Class that the SCE Strategy complied with Section 170(h) of the Code and therefore the donations of conservation easements would provide legal and allowable tax deductions;

(14)    Failing to advise Plaintiffs and members of the Class that the IRS had expressed its clear intent to conclude that the SCE Strategy did not comply with Section 170(h) of the Code and therefore the donations of conservation easements would not provide legal and allowable tax deductions;

214

(15)     Failing to advise Plaintiffs and members of the Class that the Appraisals were significantly inflated, thereby grossly inflating the Section 170(h) deduction;

(16)     Advising Plaintiffs and members of the Class that the Appraisals complied with Section 170(h) of the Code, applicable tax laws and regulations, USPAP and other appraisal industry standards, regulations and rules;

(17)     Failing to advise Plaintiffs and members of the Class that the Appraisals did not comply with Section 170 of the Code, applicable tax laws and regulations, and USPAP and other appraisal industry standards, regulations and rules;

(18)     Advising Plaintiffs and the members of the Class to sign and file tax returns, based on the Form 1065s and K-1s prepared by the Return Preparer Defendants, reporting the tax deductions and benefits of the SCE Strategy;

(19)     Failing to advise Plaintiffs and the members of the Class not to sign and file tax returns, based on the Form 1065s and K-1s prepared by the Return Preparer Defendants,  reporting the tax deductions and benefits of the SCE Strategy because the IRS had expressed its clear intent to disallow them as improper and illegal;

215

(20)      Advising, instructing, and assisting in the preparation of the tax returns for Plaintiffs and members of the Class that reported the donations of the conservation easements as charitable contribution deductions;

(21)      Failing to advise Plaintiffs and members of the Class not to report the donations of the conservation easements as charitable contribution deductions;

(22)      Advising Plaintiffs and members of the Class that their tax returns, based on the Form 1065s and K-1s prepared by the Return Preparer Defendants which reported the charitable contribution deductions, were prepared pursuant to and/or complied with IRS guidelines and established legal authorities;

(23)      Failing to advise Plaintiffs and members of the Class that their tax returns, based on the Form 1065s and K-1s prepared by the Return Preparer Defendants, which reported the charitable contribution deductions, did not comply with IRS guidelines and established legal authorities;

(24)      Failing to disclose to Plaintiffs and members of the Class that if they filed tax returns that reported the charitable contribution deductions,

216

the IRS would take the position that Plaintiffs and members of the Class would be liable for taxes, penalties and/or interest, if audited;

(25)     Failing to advise Plaintiffs and members of the Class that the tax benefits of the SCE Strategy would be disallowed, if audited;

(26)     Making and endorsing the statements and representations contained in the Defendants' and their co-conspirators' written advice, instructions, and recommendations; and

(27)     Failing to advise Plaintiffs and members of the Class that each of the Defendants and the Other Participants were not "independent" of one another and in fact were involved in a conspiracy to design, market, sell, and implement the SCE Strategy, a strategy that largely depended upon the IRS not auditing a particular transaction for it be successful.

355.   The predicate acts, including the predicate acts of wire and mail fraud, are continuing. The Defendants and their co-conspirators, on their own and as part of a common fraudulent scheme and conspiracy, defrauded Plaintiffs as set out above.

356.   The Defendants and their co-conspirators intentionally and knowingly made these material misrepresentations and intentionally and knowingly suppressed material facts from Plaintiffs and the Class for the purpose of deceiving them and thereby obtaining financial gain. The Defendants and their co-

conspirators either knew or recklessly disregarded that the misrepresentations and omissions described above were material.  Plaintiffs and the Class were injured as a result of the Defendants' and their co-conspirators' misrepresentations and omissions in carrying out the transactions and subsequently filing tax returns based on the Defendants' (and their co-conspirators') improper advice and their fraudulent and false misrepresentations and omissions.

357.   The Defendants and their co-conspirators made continual use of wire transmissions, in addition to communications made outside the interstate wire systems, to effectuate their fraudulent scheme.  In addition to using in person, telephonic, and other means of communication to make fraudulent statements, the Defendants and their co-conspirators transmitted numerous specific fraudulent statements to Plaintiffs and the Class through the mail, by fax, and/or by email.

358.   The Defendants and their co-conspirators intentionally and knowingly made these material misrepresentations and intentionally and knowingly suppressed material facts from Plaintiffs and the Class for the purpose of deceiving them and thereby obtaining financial gain. The Defendants and their co-conspirators either knew or recklessly disregarded that the misrepresentations and omissions described above were material. Plaintiffs and the Class were injured as a result of the misrepresentations and omissions in carrying out the SCE Strategy

and subsequently filing tax returns based on the Defendants' (and their co-conspirators') fraudulent and false misrepresentations and omissions.

359.   As set forth above, there are numerous specific examples of the predicate acts of fraud, including wire and mail fraud, committed by Defendants and their co-conspirators pursuant to their transactions to defraud Plaintiffs.

360.   Plaintiffs have therefore been injured in their business or property as a result of the Defendants' and their co-conspirators' overt acts and racketeering activities.

**E.    Pattern of Racketeering Activity**

361.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

362.   As set forth above, the Defendants and their co-conspirators have engaged in a "pattern of racketeering activity," as defined in §1961(5) of RICO and O.C.G.A. §16-14-3(4), by committing and/or conspiring to commit at least two such acts of racketeering activity, as described above, within the past ten years (and within the past five years with respect to the Georgia RICO Statute).  Each such act of racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results impacting upon similar victims, including Plaintiffs and the Class.

363.   The multiple acts of racketeering activity committed and/or conspired to by Defendants and their co-conspirators, as described above, were related to each other and amount to and pose a threat of continued racketeering activity, and, therefore, constitute a "pattern of racketeering activity," as defined in 18 U.S.C. §1961(5) and O.C.G.A. §16-14-3(4).   Plaintiffs allege that the course of conduct engaged in by the Defendants constituted both "continuity" and "relatedness" of the racketeering activity, thereby constituting a pattern of racketeering activity, as that term is defined in 18 U.S.C. §1961(5) and O.C.G.A. §16-14-3(4).   Plaintiffs can show the relatedness prong because the predicate acts have "similar purposes, results, participants, or methods of commission or are related to the affairs of the Enterprise."   All predicate acts had the same purpose of utilizing the Enterprise to misrepresent the nature of the transactions underlying the SCE Strategy so that the Defendants and their co-conspirators could defraud Plaintiffs.   Plaintiffs allege that the continuity of the pattern of racketeering activity is "closed-ended" inasmuch as a series of related predicate offenses extended for at least 8 years (a substantial period of time).   Moreover, the continuity of the pattern of racketeering can also be established under "open-ended continuity" as the predicate offenses are part of the Enterprise's regular way of doing business, and the predicate offenses are attributed to Defendants' and their co-conspirators' operations as part of a long-term association that existed for criminal purposes.   Further, the last act of

racketeering activity that is alleged as the basis of Plaintiffs' claims occurred within four years of a prior act of racketeering.

364.   Plaintiffs and the Class therefore have been injured in their business or property as a result of Defendants' and their co-conspirators' overt acts and racketeering activities as described above and throughout this Complaint.  More specifically, Defendants' misrepresentations and material omissions described in this Complaint, expressed both directly and indirectly with the Defendants' intent that the misrepresentations would be communicated to and acted upon by Plaintiffs and members of the Class, induced Plaintiffs and members of the Class both to enter into the transactions and professional relationships that make up the SCE Strategies and to take positions with the IRS regarding the tax and financial implications of the SCE Strategies.  But for Defendants' misrepresentations and omissions, Plaintiffs and members of the Class would not have entered into the SCE Strategies and/or would not have taken the positions that they did with the IRS regarding the tax and financial implications of the SCE Strategies.  And as a direct result of entering into the SCE Strategies and taking positions with the IRS that the Defendants recommended and endorsed, Plaintiffs suffered injuries in that they paid fees and invested funds to participate in the SCE Strategies, bypassed the opportunity to participate in other tax-advantaged investments, paid professional

fees in connection with proceedings before the IRS, and incurred back taxes, penalties, and interest imposed by the IRS.

## VII.
## PLAINTIFFS' CLAIMS WERE TIMELY FILED OR, ALTERNATIVELY, THE DISCOVERY RULE AND EQUITABLE TOLLING DEFERRED ACCRUAL OF STATUTES OF LIMITATIONS AS TO ALL DEFENDANTS

365.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

366.   The causes of action asserted by Plaintiffs against Defendants herein are timely filed because Plaintiffs' claims first accrued within the applicable limitation period for each claim.

367.   In the alternative, the causes of action asserted by Plaintiffs against Defendants herein are timely filed as the discovery rule and/or equitable tolling deferred accrual of the respective statutes of limitation for such causes of action.

368.   Plaintiffs did not and could not discover the wrongful acts of the Defendants or the injuries caused by the wrongful acts of the Defendants alleged herein shortly before the filing of this lawsuit.

369.   Prior to and up until the timeframe referenced in the immediately preceding paragraphs, Defendants and their co-conspirators continued to advise Plaintiffs that the charitable contribution deductions generated by the SCE Strategy complied with all applicable tax laws and regulations and would be accepted by the

IRS.  In making these representations and providing this advice, the Defendants and their co-conspirators made false representations and concealed material facts relating to Defendants' wrongdoing and the numerous flawed aspects of the SCE Strategy.  In reliance on these representations and advice, Plaintiffs and the members of the Class were delayed and deterred from bringing their claims against Defendants at an earlier date.  Defendants and their co-conspirators' concealment therefore prevented Plaintiffs and the members of the Class from discovery of the nature of their claims.

370.  Plaintiffs and the members of the Class exercised due diligence in pursuing discovery of their claims during the time period that commenced with Defendants rendering faulty advice and continued through the filing of this Complaint.

371.  In the alternative, Plaintiffs claims are timely filed under the fraudulent concealment and/or continuing tort/continuous representation doctrines.

## VIII.
## ADDITIONAL ALLEGATIONS

372.  As set forth at length throughout this Complaint, the MMM Defendants advised the OSI Defendants about the substance of representations regarding the legality of the SCE Strategies that would be made to potential members and members in the Syndicates.  Further, the MMM Defendants knew

and intended that representations such as the following would be made to Turk, Radow, and the members of the Syndicates.

## A.   Additional Representations Relied Upon by the Turk Plaintiffs.

373.   In late 2014, prior to engaging in the Industrial Syndicate Transaction, Plaintiff William Turk and his accountant, Ronald Bracewell, met with Frank Schuler of OSI to discuss the SCE Strategy and the details of the Industrial Syndicate Transaction.  At that meeting Schuler, on behalf of the OSI Defendants, stated that the Industrial Syndicate Transaction would provide a "legal and proper deduction."  And when asked if the transaction was legal and legitimate, Shuler responded "yes."  Schuler further stated that OSI "couldn't wait [for their Syndicates' conservation easement deductions] to get challenged" so they could "prove" their legality.

374.   The Turk Plaintiffs relied upon the foregoing representations in deciding to invest in the Industrial Syndicate Transaction and in claiming the charitable deduction from the Industrial Syndicate Transaction.

## B.   Additional Representations Relied Upon by Radow.

375.   On multiple occasions both prior to and after Radow's purchase of an interest in the Lakepoint, FG River, and Gulf Land Syndicates, Radow had conversations with Matt Ornstein of the OSI Defendants, who told Radow that the SCE Strategy transactions that Radow ultimately invested in were designed by the

"best lawyers," that OSI had assembled the "best team", and stated that Radow "should have every confidence" in the transactions.  When Radow asked Ornstein prior to his first investment in the first transaction whether "we are taking a risk here," Ornstein replied "no."  And both before and after Radow invested in the SCE Strategy transactions, Ornstein told Radow that the valuations of the appraisals for the SCE Strategy transactions were "rock solid."

376.   On August 5, 2013, Matt Ornstein, on behalf of the OSI Defendants, sent an email to Radow in which he represented the tax savings Radow could legally gain from OSI's conservation easement transactions by stating that "[a]ll of our potential Conservation Easements will be structured the same way this year to provide $4.39 of deductions for every $1.00 of membership share cost.  If someone is at the 39.6% Federal rate and the 6% Georgia rate, then $1.00 of membership share cost should save them $2.00 in taxes that won't have to be paid."

377.   On December 5, 2013, Frank Shuler, on behalf of the OSI Defendants, sent an email to the members of the Lakepoint Syndicate, including Radow, wherein Shuler noted that the members of Lakepoint had voted to approve the donation of the Lakepoint conservation easement and stated that "you and the other Members qualify for significant tax deductions."

378.   Radow relied upon the foregoing representations in deciding to invest in the Lakepoint Syndicate, FG River Syndicate, and Gulf Land Syndicate

Transactions and in claiming the charitable deductions from the Lakepoint Syndicate, FG River Syndicate, and Gulf Land Syndicate transactions.

**C.    Defendants Fraudulently Deterred Plaintiffs From Bringing a Lawsuit.**

379.   Plaintiffs were fraudulently delayed and deterred from bringing their claims against Defendants at an earlier date, *inter alia*, based upon the following communications from Defendants, which served to reassure Plaintiffs about the legality of their SCE Strategy transactions and deductions and/or which delayed Plaintiffs from filing a lawsuit.

380.   In an email dated December 23, 2016 that was sent to Adrian Grant, Radow's Certified Public Accountant, Matt Ornstein of the OSI Defendants addressed IRS Notice 2017-10, which designated donations of certain conservation easements as "listed transactions," in which Ornstein reassured Plaintiffs and class members about the purported legality of the SCE Strategy transactions in which Radow participated and invited delay by the members in filing lawsuits against Defendants by stating that (1) "the IRS has unfairly chosen to designate already highly disclosed charitable contributions as 'tax avoidance transactions,'" (2) "this notice countermands a clear Congressional mandate favoring conservation," (3) "publishing this Notice weeks before a new president takes office seems to reflect IRS concern that the next administration will not look at the contents of this notice as favorably as the current administration," and (4) "Partnership for Conservation

[an entity supported financially by Ornstein and other OSI principals including Frank Shuler, Matthew Kaynard, and Ryan Ellison and in which at least Frank Shuler held a leadership position]… plans to work with both the President-Elect's Transition Team and Congressional allies to have this notice withdrawn".

381.   Ryan Ellison of the OSI Defendants sent an email on January 5, 2017 to Turk and Radow and other investors in OSI's SCE Strategy transactions.  The email was based upon and quoted representations and conclusions by Pollock and MMM, which Pollock and MMM knew and intended would be transmitted to the investors. Ellison's email addressed IRS Notice 2017-10 and reassured Turk and Radow and other class members about the legality of the SCE Strategy transactions and invited delay by the members in filing lawsuits by stating that (1) "**you will still be awarded (and can use) any charitable deductions that you are entitled to receive as a member of one of our partnerships**" (emphasis in original), (2) "[t]his Notice was issued because the IRS incorrectly assumes that conservation easements through pass-thru entities like partnerships are more likely to contain inflated appraisals and take inappropriately supported deductions", (3) "**[t]his is an Unfortunate and Poor Decision by the IRS which Countermands Congressional Intent**" (emphasis in original), (4) the listed transaction designation was "improperly appl[ied]" to syndicated conservation easements, (5) "[w]e believe this 11th hour effort of the IRS will not be viewed as favorably by the

227

next administration", (6) the Notice suffered from a "lack of justification," and (7) "many believe that this Notice may be immediately repealed once the new administration takes office."

382.   Frank Shuler of the OSI Defendants sent an email on March 29, 2017 to Radow and other investors in OSI's SCE Strategy Transactions.  Shuler's email addressed a Wall Street Journal article regarding IRS Notice 2017-10 (which Notice identified conservation easement transactions wherein "[t]he promoters obtain an appraisal that purports to be a qualified appraisal… but that greatly inflates the value of the conservation easement based on unreasonable conclusions about the development potential of the real property").   The email reassured Radow and other class members about the purported legality of the SCE Strategy transactions and invited delay by the members in filing lawsuits against Defendants by stating that (1) IRS Notice 2017-10 was "wrongful," (2) the appraisals for syndicated conservation easements were "independent and expert, qualified appraisals which produce accurate and well-substantiated valuations," (3) Notice 2017-10 was an "historically over-reaching action of the IRS," and (4) "the IRS issued Notice 2017-10 without evidence of any significant valuation abuse".

383.   In a letter dated May 25, 2017 that was sent via U.S. Mail and/or email to all members of Industrial Syndicate, including but not limited to Turk, Matthew Kaynard of the OSI Defendants notified the members of the Industrial

Syndicate that the IRS was auditing the Syndicate for its tax year 2014 regarding its conservation easement deduction. *Inter alia*, the letter reiterated and reassured Industrial Syndicate members that they "should have claimed their proportional share of the charitable contribution deductions" and reassured the Syndicate members by stating that "[w]e are prepared to defend our positions [regarding the conservation easement deduction] before the IRS Office of Appeals, the IRS Office of Chief Counsel and, if necessary, the United States Tax Court". The letter further offered reassurance and invited delay by the members in filing lawsuits by stating that "[t]his audit is only the first stage in the process" (emphasis in original) and that "[b]ecause of limited resources and large caseloads, we expect that the IRS engineers will take a long time to complete their report" and that "[f]or this reason, we cannot currently provide an estimate for when the audit will be over."

384.   In an email dated August 24, 2017 that was sent to Radow, Frank Shuler of the OSI Defendants referenced and attached a Bloomberg news article regarding conservation easements, which he stated was "a more balanced article" on the "controversy of the minority abuses that occur with conservation easement donations" and the "need for a well-substantiated, qualified appraisal of a conservation easement donation." Through this email, Shuler purported to distinguish the Defendants' SCE Strategy transactions (that, as explained

throughout this Complaint were not based on "well substantiated, qualified appraisals") from the "minority abuses" described in the article.

385.   In a letter dated February 8, 2018 that was sent via U.S. Mail and/or email to all members of the FG River Syndicate, including but not limited to Radow, Matthew Kaynard of the OSI Defendants notified the members of the FG River Syndicate that the IRS was auditing the Syndicate for its tax year 2015 regarding its conservation easement and fee simple deductions.  *Inter alia*, the letter reiterated and reassured Syndicate members that they "should have claimed their proportional share of the charitable contribution deductions" and reassured Syndicate members by stating that "[w]e are prepared to defend our positions [regarding the conservation easement and fees simple deductions] before the IRS Office of Appeals, the IRS Office of Chief Counsel and, if necessary, the United States Tax Court".  The letter further offered reassurance and invited delay by the members in filing lawsuits by stating that "[t]his audit is only the first stage in the process" (emphasis in original) and that "[b]ecause of limited resources and large caseloads, we expect that the IRS engineers will take a long time to complete their report" and that "[f]or this reason, we cannot currently provide an estimate for when the audit will be over."

386.   In a letter dated February 8, 2018 that was sent via U.S. Mail and/or email to all members of the Gulf Land Syndicate, including but not limited to

Radow, Matthew Kaynard of the OSI Defendants notified the members of the Gulf Land Syndicate that the IRS was auditing the Syndicate for its tax year 2015 regarding its conservation easement and fee simple deductions. *Inter alia*, the letter reiterated and reassured Syndicate members that they "should have claimed their proportional share of the charitable contribution deductions" and reassured Syndicate members by stating that "[w]e are prepared to defend our positions [regarding the conservation easement and fees simple deductions] before the IRS Office of Appeals, the IRS Office of Chief Counsel and, if necessary, the United States Tax Court". The letter further offered reassurance and invited delay by the members in filing lawsuits by stating that "[t]his audit is only the first stage in the process" (emphasis in original) and that "[b]ecause of limited resources and large caseloads, we expect that the IRS engineers will take a long time to complete their report" and that "[f]or this reason, we cannot currently provide an estimate for when the audit will be over."

387.   Matt Ornstein of the OSI Defendants sent an email on November 26, 2018 to Radow. The email reassured Radow about the legality of the SCE Strategy after Radow had received an audit letter regarding one of his Syndicate's conservation easement donations and invited delay by Radow in filing lawsuits against the Defendants by stating that (1) "[t]he IRS ruling is just their position at this point in the audit and their standard operating procedure regarding

conservation easement audits," (2) "[n]o adjustments can be made/effectuated without a mutually agreed to settlement or via a tax court ruling," (3) "[w]e won't have any updates for probably 6 – 18 months," and (4) "[w]e will do our best to reach an acceptable 'settlement' and if we can't then we have the right to go to tax court and let a judge decide on the valuation."

388. The foregoing misrepresentations and omissions contained in paragraphs 373-387 were false when made and were made with knowledge of falsity for the reasons set forth at length throughout this Complaint. Moreover, during the period outlined in those Complaint paragraphs, MMM and Pollock advised the OSI Defendants about the substance of the representations, knowing the representations would be false when made, knowing and intending that the representations would be communicated directly to the clients—including Radow, Turk, and the other class members—and knowing and intending that the representations would conceal the Defendants' wrongdoing.

**D.     Defendants Were Plaintiffs' Tax Advisors.**

389. Defendants were the Turk Plaintiffs' tax advisors. *Inter alia*, as set forth above, the OSI Defendants advised the Turk Plaintiffs that the deduction from the Industrial Syndicate's donation of its conservation easement resulted in a "legal and proper deduction" and that, in the face of IRS Notice 2017-10, investors in OSI's SCE Strategy Transactions "will still be awarded (and can use) any

232

charitable deductions that you are entitled to receive as a member of one of our partnerships." The Turk Plaintiffs credited and followed the OSI Defendants' tax advice in claiming the charitable deduction for the Industrial Syndicate and in not filing an amended tax return disclaiming the deduction.

390. *Inter alia*, as set forth above in paragraph 248, the L & G Defendants sent Turk a K-1 for the Industrial Syndicate via U.S. mail and/or email under a cover letter dated February 20, 2015. The K-1 stated that Turk was entitled to claim a charitable deduction of $246,808. Along with the other items on the K-1, the L & G Defendants advised and instructed Turk to claim the deduction on his tax return, stating "[t]hese items are to be reported on your federal income tax return". The Turk Plaintiffs credited and followed the L & G Defendants' tax advice in claiming the foregoing charitable deduction and in not filing an amended tax return disclaiming the deduction.

391. *Inter alia*, as set forth above, MMM and Pollock reviewed and approved the K-1 for the Industrial Syndicate (*supra*, ¶¶ 65, 93) and advised the Turk Plaintiffs in January 2017 that "you will still be awarded (and can use) any charitable deductions that you are entitled to receive as a member of one of [OSI's] partnerships". The Turk Plaintiffs credited and followed the MMM and Pollock's tax advice in claiming the charitable deduction for the Industrial Syndicate and in not filing an amended tax return disclaiming the deduction.

392.   Defendants were also Radow's tax advisors.  *Inter alia*, as set forth above in paragraph 189, the L & G Defendants sent Radow a K-1 for the Lakepoint Syndicate via U.S. Mail and/or email shortly after preparing the Lakepoint Syndicate's tax return in March 2014, which stated that Radow was entitled to claim a charitable deduction of $394,194 and advised and instructed Radow to claim this deduction on his tax return.  Radow credited and followed the L & G Defendants' tax advice in claiming the charitable deductions for the Lakepoint Syndicate and in not filing an amended tax return disclaiming the deductions.

393.   As set forth above in paragraphs 216 and 276, Partnership Tax Solutions sent Radow a K-1 for the FG River Syndicate via U.S. Mail and/or email shortly after preparing the FG River Syndicate's tax return in September 2016 which stated that Radow was entitled to claim a charitable deduction of $1,069,386 and advised and instructed Radow to claim this deduction on his tax return. Partnership Tax Solutions also sent Radow a K-1 for the Gulf Land Syndicate via U.S. Mail and/or email shortly after preparing the Gulf Land Syndicate's tax return in September 2016 which stated that Radow was entitled to claim a charitable deduction of $851,619 and advised and instructed Radow to claim this deduction on his tax return.  Radow credited and followed Partnership Tax Solutions' tax

advice in claiming the charitable deductions for the FG River and Gulf Land Syndicates and in not filing amended tax returns disclaiming the deductions.

394.   *Inter alia*, as set forth above, the OSI Defendants advised Radow that (1) all of the conservation easements for 2013 would provide "4.39 of deductions for every $1.00 of membership cost," (2) the members of Industrial S&G "should have claimed their proportional share of the charitable contribution deductions," (3) the members of FG River "should have claimed their proportional share of the charitable contribution deductions," (4) the members of Gulf Land "should have claimed their proportional share of the charitable contribution deductions," (5) in the face of IRS Notice 2017-10, investors in OSI's SCE Strategy Transactions "will still be awarded (and can use) any charitable deductions that you are entitled to receive as a member of one of our partnerships," and (6) IRS Notice 2017-10 was "wrongful."  Radow credited and followed the OSI Defendants' tax advice in claiming the charitable deductions for the Lakepoint, FG River, and Gulf Land Syndicates and in not filing amended tax returns disclaiming the deductions.

395.   *Inter alia*, as set forth above, MMM and Pollock reviewed and approved the K-1 for the Lakepoint, FG River, and Gulf Land Syndicates (*supra*, ¶¶ 65, 93) and advised Radow in January 2017 that "you will still be awarded (and can use) any charitable deductions that you are entitled to receive as a member of one of [OSI's] partnerships".  Radow credited and followed the MMM and

Pollock's tax advice in claiming the charitable deduction for the Lakepoint, FG River, and Gulf Land Syndicates and in not filing amended tax returns disclaiming the deductions.

**IX.**
**CAUSES OF ACTION**

**COUNT I.**
**VIOLATIONS OF RICO 18 U.S.C. §1962(c)**

**(By All Plaintiffs And The Class Against All Defendants)**

396.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

397.   Section 1962(c) of RICO provides that it "shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

398.   Plaintiffs incorporate, as though fully set out herein, their allegations regarding the Enterprise.

399.   Plaintiffs incorporate, as if fully set forth herein, their allegations that Defendants have engaged in a pattern of racketeering activity.

400.   The Defendants, who are associated with and are part of the Enterprise, conduct and have conducted the Enterprise's affairs through a pattern

236

of racketeering activity, as set forth in this Complaint.  Through the fraudulent and wrongful conduct described in this Complaint, Defendants seek and have sought to deprive Plaintiffs and members of the Class of money and property rights. In order to successfully execute their scheme in the manner set forth in this Complaint, Defendants must have a system that allows Defendants to access their victims in a manner to effectuate the fraudulent transactions. The Enterprise allows the Defendants this access.

401.  With respect to the activities alleged herein, the Defendants have acted at all times with malice toward Plaintiffs and members of the Class in their efforts to acquire and maintain an interest in an Enterprise that affects interstate commerce.

402.  In carrying out the overt acts and fraudulent scheme described above, the Defendants have engaged in conduct in violation of federal laws, including *inter alia* 18 U.S.C. §§ 1341, 1343 and 1346, and 18 U.S.C. §1961, *et seq*. as set forth more fully above.

403.  Therefore, Defendants have each engaged in "racketeering activity" which is defined in §1961(1) of RICO to mean "any act which is indictable under," *inter alia*, 18 U.S.C. §1341 (relating to mail fraud) and 18 U.S.C. §1343 (relating to wire fraud).

404.   As a proximate result of Defendants' unlawful pattern of illegal fraudulent conduct as described above, Plaintiffs and members of the Class have been injured in their business or property as described above.

## COUNT II.
## VIOLATIONS OF RICO 18 U.S.C. §1962(D)
## BY CONSPIRING TO VIOLATE 18 U.S.C. §1962(C)

### (<u>By All Plaintiffs and The Class Against All Defendants</u>)

405.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

406.   This claim for relief arises under 18 U.S.C. §1964(a) of RICO and seeks relief from the Defendants' activities described herein for violations of 18 U.S.C. §1962(d) for their conspiracy to violate 18 U.S.C. §1962(c).

407.   Plaintiffs incorporate, as if fully set forth herein, their allegations regarding the Enterprise.

408.   Plaintiffs incorporate, as if fully set forth herein, their allegations that Defendants have engaged in a pattern of racketeering activity.

409.   Absent Defendants' conspiracy and joint efforts with their co-conspirators, Defendants' scheme would not be successful. Acting jointly, Defendants and their co-conspirators have possessed greater power, have been able to exert greater influence, have been able to successfully engage in the activities set forth herein, and have had greater ability to conceal their activities.

410.   Defendants have also violated §1962(d) by conspiring to violate 18 U.S.C. §1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the §1962(c) Enterprise(s) described previously through a pattern of racketeering activity.

411.   Defendants, their employees, and multiple agents have been joined in the conspiracies to violate 18 U.S.C. §1962(c) in violation of §1962(d) by various third parties not named as Defendants herein, including but not limited to the Other Participants.

412.   As demonstrated in detail above, the Defendants and their co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including systemic fraudulent practices designed to defraud the Plaintiffs and the Class of money and other property interests.

413.   The nature of the above-described acts, material misrepresentations, and omissions in furtherance of the conspiracy give rise to an inference that Defendants not only agreed to the objective of a violation of 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. §1962(c), but also they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

414. The Defendants and their co-conspirators have engaged in the commission of and continue to commit overt acts and the following described unlawful racketeering predicate acts that have generated and continue to generate income or proceeds received by Defendants from such pattern of racketeering activity, including:

(a)   Multiple instances of mail fraud violations of 18 U.S.C. § 1341;

(b)   Multiple instances of wire fraud violations of 18 U.S.C. § 1343; and

(c)   Multiple instances of travel in interstate commerce to attempt to and to actually commit mail fraud and wire fraud.

415. As a proximate result of Defendants' and their co-conspirators' conduct as described above, Plaintiffs and the Class have been injured in their business or property as described herein.

## COUNT III.
## VIOLATIONS OF GEORGIA RICO

### (By All Plaintiffs And The Class Against All Defendants)

416.  Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

417.  O.C.G.A. §§ 16-14-4(a) and (b) provides that "[i]t shall be unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money"

and "it shall be unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity."

418.   Plaintiffs incorporate, as though fully set out herein, their allegations regarding the Enterprise.

419.   Plaintiffs incorporate, as if fully set forth herein, their allegations that Defendants have engaged in a pattern of racketeering activity.

420.   The Defendants, who are employed by and/or associated with and a part of the Enterprise, conduct the Enterprise's affairs through racketeering, as set forth in this Complaint. Through the fraudulent and wrongful conduct described in this Complaint, Defendants sought to obtain financial gain by depriving Plaintiffs and the Class of money and property rights.  In order to successfully execute their scheme in the manner set forth in this Complaint, Defendants needed a system that allowed Defendants to access their victims in a manner to effectuate the fraudulent transactions. The Enterprise allowed the Defendants this access.

421.   With respect to the activities alleged herein, the Defendants have acted at all times with malice toward Plaintiffs and the Class in their efforts to acquire and maintain an interest in an Enterprise that affects interstate commerce.

422.   In carrying out the overt acts and fraudulent scheme described above, the Defendants have engaged in conduct in violation of Georgia state law as set forth more fully above.

423.   Therefore, Defendants have each engaged in "racketeering activity" as set out in §16-14-3(5)(C) of Georgia RICO.

424.   As a proximate result of Defendants' unlawful pattern of illegal fraudulent conduct as described above, Plaintiffs and the Class have been injured in their business or property as described above in an amount in excess of $5 million.

## COUNT IV.
## CONSPIRACY TO VIOLATE GEORGIA RICO (O.C.G.A. §16-14-4(C))

### (By All Plaintiffs And The Class Against All Defendants)

425.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

426.   This claim for relief arises under and seeks relief from the Defendants' activities described herein as part of their conspiracy to violate O.C.G.A. §§ 16-14-4(a) and (b).

427.   Plaintiffs incorporate, as if fully set forth herein, their allegations regarding the Enterprise.

428.   Plaintiffs incorporate, as if fully set forth herein, their allegations that Defendants have engaged in a pattern of racketeering activity.

429.   Absent Defendants' conspiracy and joint efforts, Defendants' scheme would not be successful. Acting jointly with their co-conspirators, Defendants have possessed greater power, have been able to exert greater influence, have been able to successfully engage in the activities set forth herein, and have had greater ability to conceal their activities.

430.   The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the Enterprise(s) described previously through racketeering activity.

431.   Defendants, their employees, and multiple agents have been joined in the conspiracies to violate O.C.G.A. §§ 16-14-4(a) and (b) by various third parties not named as Defendants herein, such as the Other Participants.

432.   As demonstrated in detail above, the Defendants and their co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including systemic fraudulent practices designed to defraud the Individual Plaintiffs and the Class of money and other property interests.

433.   The nature of the above-described acts, material misrepresentations, and omissions in furtherance of the conspiracy give rise to an inference that Defendants not only agreed to the objective of conspiring to violate the Georgia

racketeering statute, but they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

434.   The Defendants have sought to and have engaged in the commission of and continue to commit overt acts and unlawful racketeering predicate acts that have generated and continue to generate income or proceeds received by Defendants from such pattern of racketeering activity, including acts that involve a scheme or artifice to defraud as set forth more fully above.

435.   As a proximate result of Defendants' conduct as described above, Plaintiffs and the Class have been injured in their business or property as described herein in an amount in excess of $5 million.

**COUNT V.**
**PROFESSIONAL MALPRACTICE**

**(By All Plaintiffs Against MMM,**
**The Return Preparer Defendants, and the Appraisal Defendants)**

436.   Plaintiffs repeat and reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

437.   As professional advisors who provided professional services and advice to Plaintiffs and the members of the Class in connection with the SCE Strategy, as set forth herein, MMM, the Return Preparer Defendants, and the Appraisal Defendants (collectively, the "Professional Defendants") owed Plaintiffs and the members of the Class a duty to comply with their respective applicable

standards of care and the applicable provisions of their respective codes of professional responsibility.

438.   With respect to the Tax Return Preparers, the Tax Return Preparers prepared the K-1s with the intent that each Plaintiff and member of the Class would utilize their respective K-1 to claim a charitable contribution deduction from the SCE Strategy.   And, in fact, the Return Preparers instructed Plaintiffs and members of the Class to report the amount set out in the K-1 as a charitable contribution deduction on their individual tax returns.   Furthermore, the impact of the items from the K-1 on each of Plaintiff's tax returns was so substantial that the Return Preparer for that K-1 and corresponding entity return should be considered under Federal law as that Plaintiff's "tax return preparer" regardless of who entered the item on the Plaintiff's Form 1040 or schedules.

439.   In any event, regardless of privity, Plaintiffs and the members of the Class are foreseeable persons or among the limited class of persons for whom the information was intended, either directly or indirectly, and thus a duty was owed by each of the Professional Defendants.

440.   The Professional Defendants failed to meet those applicable standards of care.   The Professional Defendants' failure to meet the standard of care proximately caused damages to the Plaintiffs as set forth elsewhere in this Complaint.

441. The Professional Defendants' failures to meet the applicable standards of care constitute negligence.

442. The Professional Defendants' actions rise to the level of gross negligence. Accordingly, Plaintiffs and the members of the Class seek punitive/exemplary damages against the Professional Defendants, jointly and severally.

443. The Professional Defendants' negligence/gross negligence was a proximate cause of the damages for Plaintiffs and members of the Class. In reasonable reliance on the Professional Defendants' professional advice regarding the SCE Strategy, Plaintiffs and members of the Class: (1) did not avail themselves of legitimate tax savings opportunities; (2) filed federal and state tax returns that reflected charitable contribution deductions in connection with the SCE Strategy; and (3) failed to file a qualified amended return.

444. But for the Professional Defendants' negligence/gross negligence, Plaintiffs and members of the Class would not have agreed to engage in the SCE Strategy, filed and signed federal and state tax returns that reported charitable contribution deductions in connection with the SCE Strategy, failed to avail themselves of other legitimate tax savings opportunities, failed to file qualified amended returns, and spent substantial funds in connection with IRS audits and Tax Court proceedings.

445.   As a result of the Professional Defendants' negligent and grossly negligent acts and omissions, Plaintiffs and members of the Class incurred substantial additional costs in hiring new tax and legal advisors to rectify the situation.

446.   The Professional Defendants' negligence/gross negligence proximately caused damages to Plaintiffs and members of the Class in that they (1) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties, (2) spent substantial funds in connection with the audits and Tax Court proceedings, (3) lost the opportunity to avail themselves of other legitimate tax-savings opportunities, and (4) have incurred and will continue to incur substantial additional costs to rectify the situation.

447.   As a proximate cause of the foregoing, Plaintiffs and members of the Class have been injured in an actual amount to be proven at trial but in excess of $5 Million and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## COUNT VI.
## NEGLIGENCE
### (By All Plaintiffs And The Class Against All Defendants Other than MMM, The Return Preparer Defendants, and the Appraisal Defendants)

448.   Plaintiffs repeat and reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

449.  As advisors who provided services and advice to Plaintiffs and the members of the Class in connection with the SCE Strategy, these Defendants (the "Negligence Defendants") owed Plaintiffs and the members of the Class a duty to comply with the applicable standards of care.  Regardless of privity, Plaintiffs and the members of the Class are foreseeable persons or among the limited class of persons for whom the information was intended, either directly or indirectly, and thus a duty was owed by each of the Negligence Defendants.

450.  The Negligence Defendants failed to meet their applicable standards of care.  The Negligence Defendants' failure to meet their respective standards of care proximately caused damages to the Plaintiffs as set forth elsewhere in this Complaint.

451.  The Negligence Defendants' failures to meet the applicable standards of care constitute negligence.

452.  The Negligence Defendants' negligence/gross negligence was a proximate cause of the damages for Plaintiffs and members of the Class.  In reasonable reliance on the Negligence Defendants' advice regarding the SCE Strategy, Plaintiffs and members of the Class: (1) paid substantial sums of money to participate in the SCE Strategy; (2) paid fees to the Defendants and Other Participants for advice and services; (3) lost the tax savings that could have been provided had the SCE Strategy been properly implemented in compliance with

Section 170(h) of the Code; (4) filed federal and state tax returns that reflected charitable contribution deductions in connection with the SCE Strategy; and (5) failed to file a qualified amended return.

453.  The Negligence Defendants' actions rise to the level of gross negligence.  Accordingly, Plaintiffs and the members of the Class seek punitive/exemplary damages against the Negligence Defendants, jointly and severally.

454.  The Negligence Defendants' negligence/gross negligence proximately caused damages to Plaintiffs and members of the Class in that they (1) paid substantial funds to participate in the SCE Strategy, (2) paid significant fees to the Defendants and Other Participants, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties, (4) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; and (5) have incurred and will continue to incur substantial additional costs to rectify the situation.

455.  As a proximate cause of the foregoing, Plaintiffs and members of the Class have been injured in an actual amount to be proven at trial but in excess of $5 million and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## COUNT VII.
## NEGLIGENT MISREPRESENTATION

### (By All Plaintiffs And The Class Against
### All Defendants, In The Alternative To The Fraud Claim)

456.  Plaintiffs and members of the Class repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

457.  During the course of their representation of Plaintiffs and members of the Class, Defendants each negligently made affirmative representations, including those misrepresentations and omissions detailed in Count IX below, that were incorrect, improper, or false; negligently made misleading omissions of material fact; and negligently gave improper, inaccurate, and wrong recommendations, advice, instructions, and opinions to Plaintiffs and members of the Class.  In addition, each Defendant is liable for each negligent misrepresentation and omission made by each of their co-conspirators.

458.  Defendants either knew or reasonably should have known that their representations, recommendations, advice and instructions were improper, inaccurate, or wrong.  Defendants either knew or reasonably should have known that their failures to disclose material information to Plaintiffs and members of the Class were improper and wrong and would mislead Plaintiffs and members of the Class.

459.  As advisors who provided services and advice to Plaintiffs and the members of the Class in connection with the SCE Strategy, the Defendants owed Plaintiffs and the members of the Class a duty to correctly state all facts regarding the SCE Strategy.  Regardless of privity, Plaintiffs and the members of the Class are foreseeable persons or among the limited class of persons for whom the information was intended, either directly or indirectly, and thus a duty was owed by each of the Defendants.

460.  Plaintiffs and members of the Class reasonably relied upon the Defendants' misrepresentations and advice.

461.  The Defendants' (and their co-conspirators') negligent and grossly negligent misrepresentations were a proximate cause of the damages of the Plaintiffs and members of the Class.  In reasonable reliance on Defendants' advice regarding the SCE Strategy, Plaintiffs and members of the Class: (1) paid substantial sums to participate in the SCE Strategy; (2) paid substantial fees to the Defendants and Other Participants for professional advice and services; (3) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; (4) filed federal and state tax returns that reflected charitable contribution deductions in connection with the SCE Strategy; (5) did not file a qualified amended return;

and (6) spent substantial funds in connection with IRS audits and Tax Court proceedings.

462.  The Defendants' conduct set forth herein proximately and directly caused Plaintiffs and members of the Class to suffer injury in that Plaintiffs and members of the Class (1) paid substantial sums to participate in the SCE Strategy, (2) paid  significant fees to the Defendants and Other Participants for advice and services, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties, (4) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; and (5) have and will continue to incur substantial additional costs to rectify the situation.

463.  As a proximate cause of the foregoing, Plaintiffs and members of the Class have been injured in an actual amount to be proven at trial but in excess of $5 million and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest and costs.

## COUNT VIII.
## BREACH OF FIDUCIARY DUTY AND DISGORGEMENT

**(By All Plaintiffs And The Class Against MMM, L & G, OSI,
PCLG And Return Preparer Defendants)**

464.  Plaintiffs and members of the Class repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

465.  As professional advisors who provided services and advice to Plaintiffs and the members of the Class in connection with the SCE Strategy, the MMM, L & G, OSI, and Return Preparer Defendants became fiduciaries of the Plaintiffs and the members of the Class.  Plaintiffs and the members of the Class placed their trust and confidence in these Defendants and these Defendants had influence and superiority over the Plaintiffs and the members of the Class.  Thus, these Defendants owed Plaintiffs and the members of the Class the duties of honesty, loyalty, care, and compliance with the applicable codes of professional responsibility.  These Defendants breached these duties and caused Plaintiffs and members of the Class harm and injury, including but not limited to their failures to disclose their conflicts of interest.

466.  These Defendants' breaches were a proximate cause of damages to Plaintiffs and the Class.  In reasonable reliance on these Defendants' advice regarding the SCE Strategy, Plaintiffs and the Class:  (1) paid substantial sums of

money to participate in the SCE Strategy; (2) paid fees to the Defendants and Other Participants for professional advice and services; (3) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; (4) filed federal and state tax returns that reflected charitable contribution deductions in connection with the SCE Strategy; (5) failed to file a qualified amended return; and (6) spent substantial funds in connection with IRS audits and Tax Court proceedings.

467.   The Defendants' conduct set forth herein proximately and directly caused Plaintiffs and members of the Class to suffer injury in that Plaintiffs and members of the Class (1) paid substantial sums to participate in the SCE Strategy, (2) paid  significant fees to the Defendants and Other Participants for advice and services, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties, (4) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; and (5) have and will continue to incur substantial additional costs to rectify the situation.

468.   As a proximate cause of the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial but in excess of $5 million, and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

469.   Further, as a result of these Defendants' breach of their fiduciary duties, including but not limited to their failures to disclose their conflicts of interest, they should be required to disgorge all payments received by them from any party including Plaintiffs, any member of the Class, any other Defendants, and/or any Other Participant for work performed in connection with the SCE Strategy.

470.   Accordingly, these Defendants must disgorge all such payments in favor of Plaintiffs and members of the Class in an amount far in excess of $5 million.   In addition, Plaintiffs and members of the Class seek an award of attorneys' fees, interest, and costs.

## COUNT XI.
## FRAUD

### (By All Plaintiffs And The Class Against All Defendants)

471.   Plaintiffs and members of the Class repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

472.   In order to induce Plaintiffs and members of the Class to participate in the SCE Strategy and pay substantial fees and other monies to the Defendants and the Other Participants, Defendants directly and indirectly—through the Other Participants—made numerous knowingly false affirmative misrepresentations and

intentional omissions of material fact to Plaintiffs and members of the Class, as set forth above and the following:

(1)    Misstating, in light of published authorities, the tax treatment Plaintiffs and members of the Class would receive from the purported charitable contribution made for tax purposes by each Syndicate in the SCE Strategy;

(2)    Advising Plaintiffs and members of the Class that the donation of the conservation easement is fully tax deductible as a qualified charitable contribution deduction;

(3)    Advising Plaintiffs and members of the Class that the Syndicate contributed a qualified real property interest as required to be a valid "qualified conservation contribution";

(4)    Failing to advise Plaintiffs and members of the Class that the alleged value of the conservation easement and associated tax benefits in the SCE Strategy constituted a gross valuation overstatement, thus subjecting Plaintiffs to penalties;

(5)    Advising Plaintiffs and members of the Class that the appraisal commissioned by the Defendants relied on appropriate assumptions, data, and methodology;

(6)     Failing to advise Plaintiffs and members of the Class that the appraisal commissioned by the Defendants relied on inappropriate assumptions, data, and methodology;

(7)     Advising Plaintiffs and members of the Class that the appraisal commissioned by the Defendants complied with §170 of the Code, applicable regulations thereunder, the USPAP, and with general and substantive real property appraisal standards and practices;

(8)     Failing to advise Plaintiffs and members of the Class that the appraisal commissioned by the Defendants did not comply with §170 of the Code and regulations thereunder, the USPAP, and with general and substantive real property appraisal standards and practices;

(9)     Advising Plaintiffs and members of the Class that the appraisal commissioned by the Defendants provided accurate valuation statements, including the fair market value of the conservation easement;

(10)    Providing false valuation statements to Plaintiffs and members of the Class, including the fair market value of the conservation easement;

(11)    Failing to advise the Plaintiffs and members of the Class that the Syndicate did not donate a "qualified real property interest" because

the property that was the subject of the conservation easement could be modified;

(12)    Failing to advise Plaintiffs and members of the Class that the Syndicates retained or reserved rights to the property that were inconsistent with the conservation purposes of the conservation easement;

(13)    Failing to advise Plaintiffs and members of the Class that the Syndicates did not properly document the condition of the property at the time of the donation;

(14)    Failing to advise Plaintiffs and members of the Class that the SCE Appraisers were not "qualified appraisers" and did not prepare "qualified appraisals" as required by the Code and Regulations thereunder;

(15)    Advising Plaintiffs and members of the Class that the Syndicates donated a "qualified real property interest";

(16)    Advising Plaintiffs and members of the Class that the Syndicates properly documented the condition of the property at the time of the donation;

(17)     Advising Plaintiffs and members of the Class that the SCE Appraisers were "qualified appraisers" and prepared "qualified appraisals" as required by the Code and Regulations thereunder;

(18)     Failing to advise Plaintiffs and members of the Class that the SCE Appraisers relied upon inappropriate assumptions, utilized inappropriate methodology, and used various techniques to improperly inflate the value of the conservation easements;

(19)     Failing to advise Plaintiffs and members of the Class that the SCE Appraisers incorrectly reached unsupportable and/or predetermined HBU conclusions;

(20)     Failing to advise Plaintiffs and members of the Class that the SCE Appraisers arrived at the unsupportable HBUs by ignoring local zoning rules and other legal restrictions on purported developments, physical and financial feasibility, market conditions, and market data;

(21)     Failing to advise Plaintiffs and members of the Class that the SCE Appraisers ignored the sale or donation of conservation easements in the area of the property in determining the value of the conservation easement;

(22)     Failing to advise Plaintiffs and members of the Class that the SCE Appraisers ignored the proceeds received by the Syndicate by its sale

of membership interests to investors in determining the fair market value of the conservation easement contribution;

(23)     Failing to advise Plaintiffs and members of the Class that the SCE Appraisers failed to employ recent, local or similar sales that competed with the subject property or would have been considered "substitutes" for the subject property by potential buyers when employing the "comparable sales method";

(24)     Advising Plaintiffs and members of the Class that the Appraisals conformed with USPAP;

(25)     Failing to advise Plaintiffs and members of the Class that the Appraisals did not follow the USPAP because of the appraisal's flawed methodology, inappropriate data and unsupportable assumptions, among other things;

(26)     Advising Plaintiffs and members of the Class that the Appraisals complied with the Code and Regulations thereunder for valuing conservation easements and preparing qualified appraisals;

(27)     Failing to advise Plaintiffs and members of the Class that the Appraisals failed to comply with the Code and Regulations thereunder for valuing conservation easements and preparing qualified appraisals;

(28)     Advising Plaintiffs and members of the Class that the charitable deduction was based on the fair market value of the conservation easement;

(29)     Failing to advise Plaintiffs and members of the Class that the charitable deduction was not based on the fair market value of the conservation easement;

(30)     Advising Plaintiffs and members of the Class that the property has specific conservation values that satisfy the Code;

(31)     Failing to advise Plaintiffs and members of the Class that the property did not have specific conservation values that satisfy the Code;

(32)     Advising Plaintiffs and members of the Class that the conservation easement restrictions complied with the Code requirement that they must be perpetual;

(33)     Failing to advise Plaintiffs and members of the Class that the conservation easement restrictions did not comply with the Code requirement that they must be perpetual;

(34)     Advising Plaintiffs and members of the Class that the conservation easement met the requirement that it was exclusively for conservation purposes in perpetuity and met at least one of the conservation purposes set out in §170 of the Code;

261

(35)     Failing to advise Plaintiffs and members of the Class that the conservation easement did not accomplish any of the permissible conservation purposes set out in §170 of the Code and permitted destruction of other significant conservation easements and, as a result, did not meet the requirement that the conservation easement be exclusively for conservation purposes in perpetuity and meet at least one of the conservation purposes set out in §170 of the Code;

(36)     Advising Plaintiffs and members of the Class that the Appraisals met Treasury Regulations that establish the standards for the valuation of conservation easements for the purposes of claiming a non-cash charitable contribution of a partial interest;

(37)     Failing to advise Plaintiffs and members of the Class that the Appraisals did not meet Treasury Regulations that establish the standards for the valuation of conservation easements for the purposes of claiming a non-cash charitable contribution of a partial interest;

(38)     Advising Plaintiffs and members of the Class that the HBU of the Property was determined based on the standards for the valuation of a conservation easement for the purposes of claiming a non-cash charitable contribution of a partial interest, when in fact it was not;

(39)     Advising Plaintiffs and members of the Class that the "after easement" analysis met Treasury Regulations establishing the standards for the valuation of conservation easements, when in fact it did not because it (a) used an incorrect and unsupportable HBU conclusion; (b) failed to employ recent, local and similar sales; (c) lacked objectivity and appropriate analysis of after easement sales; (d) lacked consideration of easement sales; and (e) advocated a loss in value due to lost development rights when the market data indicates there is no market for the residential development;

(40)      Failing to advise Plaintiffs that the "before value" is hypothetical and unreasonable and is not an estimate of the fair market value of the land at its HBU as of the date of the valuation before the easement conveyance;

(41)     Advising Plaintiffs and members of the Class that the appraisal was done by a qualified appraiser when in fact it was not due to the abundant acceptance of direction by the appraiser from the Syndicate which resulted in an inflated fair market value of the conservation easement;

(42)     Advising Plaintiffs and members of the Class that the value of the conservation easement and thus the value of the charitable

contribution deduction that should be used on the income tax return was proper;

(43)     Failing to advise Plaintiffs and members of the Class that the value of the conservation easement and thus the value of the charitable contribution deduction to be used on the income tax return was improper;

(44)     Failing to advise Plaintiffs and members of the Class that the subject of valuation was not financially feasible and, therefore, improper;

(45)     Failing to advise Plaintiffs and members of the Class that the Appraisals did not comply with Notice 2006-96, which provides guidance related to the definition of "qualified appraisal" and "qualified appraiser";

(46)     Failing to advise Plaintiffs and members of the Class that the Appraisals were not qualified appraisals under §170 of the Code because the HBU was improperly determined by the property owner's intent and assumption that the property would be developed without any supporting data or any analysis of financial feasibility;

(47)     Failing to advise the Plaintiffs and members of the Class that the Appraisals were not "qualified appraisals" under §170 of the Code

because the appraiser did not address nor analyze the likelihood that the property could be utilized according to the appraiser's HBU;

(48)   Advising Plaintiffs and members of the Class that the conservation easement substantiated a valid conservation purpose;

(49)   Advising Plaintiffs and members of the Class that the Deed of Conservation Easement substantiated a valid conservation purpose;

(50)   Failing to advise Plaintiffs and members of the Class that the Deed of Conservation Easement did not substantiate a valid conservation purpose;

(51)   Advising Plaintiffs and members of the Class that the Baseline Documentation Report supported a valid conservation purpose on the property;

(52)   Failing to advise Plaintiffs and members of the Class that the Baseline Documentation Report did not support a valid conservation purpose on the property;

(53)   Advising Plaintiffs and members of the Class that the Deed of Conservation protected the land in perpetuity and therefore qualified for a federal charitable deduction;

(54)     Failing to advise Plaintiffs and members of the Class that the Deed of Conservation did not protect the land in perpetuity and therefore did not qualify for a federal charitable deduction;

(55)     Advising Plaintiffs and members of the Class that the Deed of Conservation permits activity that is consistent with a valid conservation purpose, including preserving habitat and open space;

(56)     Failing to advise Plaintiffs and members of the Class that the Deed of Conservation permits activity that is inconsistent with a valid conservation purpose and therefore did not qualify for a federal charitable deduction;

(57)     Advising Plaintiffs and members of the Class that the substantiation requirements were met and therefore the charitable contribution deduction would be allowed;

(58)     Failing to advise Plaintiffs and members of the Class that the substantiation requirements were not met and, therefore, the charitable contribution deduction would be disallowed;

(59)     Advising Plaintiffs and members of the Class to report the charitable contribution deduction on their individual tax returns;

(60)     Advising Plaintiffs and members of the Class that the K-1 reporting the charitable contribution deduction allocated to each Plaintiff was

proper and accurate and should be used to report the deduction on their individual return;

(61)     Failing to advise Plaintiffs and members of the Class that the K-1 reporting the charitable contribution deduction allocated to each Plaintiff was not accurate and should not be relied upon in reporting the charitable contribution deduction on their individual tax return;

(62)     Preparing and signing the Syndicate's tax return and individual investors' K-1s reporting the charitable contribution deduction based on the fair market value of the conservation easement determination in the appraisal;

(63)     Advising Plaintiffs and members of the Class that the tax benefits of the SCE Strategy would be allowed if audited;

(64)     Failing to advise Plaintiffs and members of the Class that the tax benefits of the SCE Strategy would be disallowed if audited;

(65)     Advising Plaintiffs and members of the Class, both before and after the IRS audit, that the SCE Strategy they executed was different and distinguishable from other SCE Strategies that the IRS and/or Tax Court had disallowed;

(66)     Failing to advise Plaintiffs and members of the Class, both before and after the IRS audit, that the SCE Strategy they executed was not

different and distinguishable from other SCE Strategy that the IRS and/or Tax Court had disallowed;

(67)     Advising Plaintiffs and members of the Class that they should challenge the IRS in the audits and/or Tax Court proceedings because Plaintiffs and members of the Class would prevail and the SCE Strategy would be allowed;

(68)     Failing to advise Plaintiffs and members of the Class that they should not challenge the IRS in audits and/or Tax Court proceedings because Plaintiffs and members of the Class would not prevail and the SCE Strategy would be disallowed;

(69)     Making and endorsing the statements and representations contained in the Defendants' and the Other Participants' written advice, instructions, and recommendations; and

(70)     Failing to advise Plaintiffs and members of the Class that each of the Defendants and the Other Participants were not "independent" of one another and in fact were involved in a conspiracy to design, market, sell, and implement the SCE Strategy.

(71)     Failing to disclose, at least in the case of the FG River and Industrial Syndicate, that the tract of real estate being syndicated was part of a much larger tract and that development or mining on any portion of

that larger tract might destroy or reduce the ability to place a conservation easement on the individual tracts.

473. The above affirmative misrepresentations and/or intentional omissions of material fact made by each Defendant were false when made, and the Defendants knew these representations to be false when made with the intention that Plaintiffs and members of the Class rely upon them to enter into the SCE Strategy, pay substantial funds to participate in the SCE Strategy, and pay substantial fees to the Defendants and the Other Participants. In addition, the above affirmative misrepresentations and/or intentional omissions of material fact were committed knowingly by the Defendants with the intent to induce Plaintiffs and members of the Class to enter into the SCE Strategy, pay substantial funds to participate in the SCE Strategy, and pay substantial fees to the Defendants and Other Participants.

474. In reasonable reliance on the Defendants' false affirmative misrepresentations and intentional omissions of material facts regarding the SCE Strategy, Plaintiffs and members of the Class engaged in the SCE Strategy, paid substantial sums to participate in the SCE Strategy, paid substantial fees to the Defendants and the Other Participants, lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code, and filed federal and state tax returns

269

that reflected charitable contribution deductions in connection with the SCE Strategy.

475.   But for Defendants' intentional misrepresentations and material omissions described above, Plaintiffs and members of the Class would not have hired Defendants and the Other Participants for advice and services on the SCE Strategy, engaged in the SCE Strategy, paid substantial sums to participate in the SCE Strategy, paid substantial fees to the Defendants and the Other Participants in connection with the SCE Strategy, signed and filed federal and state tax returns that reported charitable contribution deductions in connection with the SCE Strategy, failed to file a qualified amended return, and incurred professional fees and expenses in connection with the IRS and Tax Court disputes.

476.   As a direct and proximate result of Defendants' conduct set forth herein, Plaintiffs and members of the Class have suffered injury in that they (1) paid substantial funds to participate in the SCE Strategy, (2) paid significant fees to the Defendants and Other Participants, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties,  (4) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; and (5) incurred professional fees and expenses in connection with the IRS and Tax Court disputes.

477. As a proximate cause of the foregoing injuries, Plaintiffs and members of the Class have been injured in an actual amount to be proven at trial but in excess of $5 million and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## COUNT X.
## AIDING AND ABETTING BREACHES OF FIDUCIARY DUTY

### (By All Plaintiffs And The Class Against All Defendants)

478. Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

479. As described more fully through this Complaint, each of the Defendants aided and abetted the breaches of fiduciary duty of each of the other Defendants and Other Participants. Each aiding Defendant was aware of and agreed to its respective role and responsibility in the overall tortious activity and intentionally provided aid and substantial assistance in the other Defendants' tortious activity.

480. Each of the aiding Defendants acted to procure the breach of the other Defendants' fiduciary duties through improper conduct and without privilege. Each of the aiding Defendants did this with knowledge that the primary wrongdoer owed Plaintiffs a fiduciary duty. Each of the aiding Defendants also acted purposely and with malice and the intent to injure. Each of the Defendants' wrongful conduct procured the breach of the primary wrongdoer's fiduciary duty

and each of the aiding Defendants' tortious conduct proximately caused damage to the Plaintiffs.

481.   As a direct and proximate result of Defendants' conduct set forth herein, Plaintiffs and members of the Class have suffered injury in that they (1) paid substantial sums to participate in the SCE Strategy, (2) paid significant fees to the Defendants and Other Participants, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties, (4) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; and (5) have and will continue to incur substantial additional costs to rectify the situation.

482.   As a direct and proximate cause of Defendants' conduct set forth herein, Plaintiffs have suffered injury and damages.  Plaintiffs and members of the Class have been injured in an actual amount to be proven at trial, but in excess of $5 million and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

483.   Further, as a result of these Defendants' aiding and abetting the breach of fiduciary duties by others, including but not limited to their failures to disclose their conflicts of interest, they should be required to disgorge all payments received by them from any party including Plaintiffs, any member of the Class, any other

Defendants, and/or any Other Participant for work performed in connection with the SCE Strategy.

## COUNT XI.
## RESCISSION

### (In the Alternative, By All Plaintiffs And The Class Against All Defendants)

484.   Plaintiffs and members of the Class reallege and incorporate each and every prior factual allegation set forth in the preceding paragraphs as if fully set forth herein.

485.   In connection with the SCE transactions, Plaintiffs and members of the Class were provided by Defendants (the "Rescission Defendants") with documents purporting to disclaim or limit the rights of Plaintiffs and members of the Class (collectively "Purported Disclaimers").  In deciding to engage in the SCE transactions, Plaintiffs and members of the Class relied on numerous material knowingly false affirmative representations and intentional omissions of material fact the Rescission Defendants made to Plaintiffs and members of the Class, including but not limited to those set forth (or incorporated) in Count IX.  Had the Rescission Defendants not made those misrepresentations or omissions, Plaintiffs and members of the Class would not have engaged in the SCE transactions.  The Rescission Defendants made those misrepresentations and omissions with the intent that Plaintiffs and members of the Class would rely on them.  Further, the concealment is of intrinsic qualities of the features of the SCE Strategy (such as,

highly technical issues about the adequacy and legitimacy of appraisals and other transaction documents and whether the SCE satisfied Code 170 and regulations promulgated thereunder) which the Plaintiffs by the exercise of ordinary prudence and caution could not discover and, because they related to Federal tax consequences, under well-established law had no duty to seek to discover. Alternatively, the Rescission Defendants had a duty to disclose these matters.

486.  Thus, the Rescission Defendants fraudulently induced Plaintiffs and members of the Class to enter into the SCE transactions in furtherance of the conspiracy between and among the Rescission Defendants, the Other Defendants, and the Other Participants.

487.  Plaintiffs and members of the Class seek rescission of all agreements they entered into and all documents they received in connection with entering into the SCE transactions, including the Purported Disclaimers.  In addition, Plaintiffs and members of the Class seek an award of attorneys' fees, interest, and costs. Collectively, there is more than $5 million at issue.

488.  Plaintiffs had no duty to rescind before filing, nor to restore any consideration because it would be unreasonable to require them to do so, if not impossible, given disposition of all of the assets of the PropCos/LLCs and the years of tax returns already filed and under audit.

## COUNT XII.
## CIVIL CONSPIRACY

### (By All Plaintiffs And The Class Against All Defendants)

489.   Plaintiffs and members of the Class repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

490.   As described more fully above, the Defendants and the Other Participants knowingly acted in concert to design, market, sell, and implement the SCE Strategy.   In furtherance of their conspiracy, the Defendants and the Other Participants conspired to perpetrate fraud on the Plaintiffs and members of the Class and to breach fiduciary duties owed to Plaintiffs and members of the Class. In doing so, the Defendants and the Other Participants acted with full knowledge and awareness that the transactions were designed to give the false impression that a complex series of financial transactions were legitimate business transactions, when the transactions in fact lacked those features that were necessary for a legitimate conservation easement charitable contribution deduction.

491.   The Defendants and the Other Participants acted in the respective roles as described above according to a predetermined and commonly understood and accepted plan of action to perpetrate fraud on Plaintiffs and to breach fiduciary duties owed to Plaintiffs, all for the purpose of convincing Plaintiffs and members of the Class to participate in the SCE Strategy and pay substantial fees.   The

Defendants and the Other Participants authorized, ratified, and/or affirmed the fraudulent misrepresentations and omissions of material fact that each Defendant and/or Other Participant made to Plaintiffs and members of the Class.

492.  The acts of the Defendants and the Other Participants were contrary to numerous provisions of law, as stated above, and constitute a conspiracy to perpetrate fraud on Plaintiffs and members of the Class and a conspiracy to breach fiduciary duties owed to Plaintiffs and members of the Class.

493.  There was a meeting of the minds between and among the Defendants and the Other Participants to commit the unlawful acts alleged herein, including a conspiracy to perpetrate fraud on and to breach fiduciary duties owed to Plaintiffs and members of the Class.   The conspiracy to commit these unlawful and fraudulent acts proximately caused and continues to cause damages to Plaintiffs and members of the Class as previously set forth herein.

494.  As a direct and proximate result of Defendants' conduct set forth herein, Plaintiffs and members of the Class have suffered injury in that they (1) paid substantial sums to participate in the SCE Strategy, (2) paid significant fees to the Defendants and Other Participants, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties,  (4) lost the tax savings that could have been provided had the SCE Strategy been properly structured and

implemented in compliance with Section 170(h) of the Code; and (5) have and will continue to incur substantial additional costs to rectify the situation.

495.  Plaintiffs and members of the Class have been injured in an actual amount to be proven at trial but in excess of $5 million and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## X.
## PRAYER FOR RELIEF

496.  Based upon the foregoing, Plaintiffs request that Defendants be summoned to appear and answer; that the requested class be certified for trial and/or settlement; and that on final hearing Plaintiffs and the members of the Class have judgment against Defendants, jointly and severally for:

     a.    actual, consequential, and incidental damages;

     b.    rescission and disgorgement as sought herein;

     c.    pre- and post-judgment interest at the highest legal rate allowed by law;

     d.    all attorneys' fees and costs in pursuing this matter;

     e.    punitive and/or enhanced damages in an amount to be determined at trial; and

f.    such other and further relief, both at law and in equity, to which Plaintiffs and the Class may show themselves to be justly entitled.

Respectfully submitted,

/s/ *David R. Deary*

David R. Deary (admitted *pro hac vice*)
davidd@ldsrlaw.com
W. Ralph Canada, Jr. (admitted *pro hac vice*)
ralphc@ldsrlaw.com
Jeven Sloan (GA Bar No. 652727)
jevens@ldsrlaw.com
Wilson E. Wray, Jr. (admitted *pro hac vice*)
wilsonw@ldsrlaw.com
John McKenzie (admitted *pro hac vice*)
johnm@ldsrlaw.com
Donna Lee (admitted *pro hac vice*)
donnal@ldsrlaw.com
Tyler M. Simpson (admitted *pro hac vice*)
tylers@ldsrlaw.com
**LOEWINSOHN DEARY SIMON RAY LLP**
12377 Merit Drive, Suite 900
Dallas, Texas 75251
(214) 572-1700 Telephone
(214) 572-1717 Facsimile

Edward J. Rappaport (GA Bar No. 594841)
erappaport@saylorlaw.com
**THE SAYLOR LAW FIRM LLP**
1201 W. Peachtree Street
Suite 3220
Atlanta, GA 30309
(404) 892-4400 Telephone

*Attorneys for Plaintiffs*

## **<u>CERTIFICATE OF SERVICE</u>**

The undersigned certifies that on April 21, 2022, a true and correct copy of the foregoing document was filed with the Clerk of the Court by using the CM/ECF system.

*/s/ Wilson E. Wray*
Wilson E. Wray