IN IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |  |
|---|---|---|
| WILLIAM N. TURK, et al., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | CIVIL ACTION NO. |
| MORRIS, MANNING & MARTIN, | : | 1:20-cv-2815-AT |
| LLP, et al., | : | |
| | : | |
| Defendants. | : | |

## **ORDER**

This putative class action was brought by investors who claim that they were fraudulently induced to purchase interests in limited liability companies to participate in Syndicated Conservation Easement transactions. Plaintiffs allege that Defendants represented that the transactions were a legitimate tax savings strategy when, in fact, they were not legally supportable. After being subjected to IRS scrutiny, Plaintiffs filed this lawsuit, alleging common-law tort claims and violations of the federal and Georgia RICO statutes.

Currently before the Court are Defendants' Motions to Dismiss Plaintiffs' Third Amended Complaint. [Docs. 355, 356, 357]. Although the Court previously dismissed Plaintiffs' common law and federal RICO claims as untimely under the applicable statutes of limitations, (First MTD Order, Doc. 290), the Court granted Plaintiffs leave to narrowly amend their complaint solely to address the statute-of-limitations issues. (Doc. 340). Plaintiffs' Third Amended Complaint features 24

paragraphs of new allegations meant to remedy those shortcomings. *See* (Redline of TAC, Doc. 294-2 at 223–36).

Upon review, Defendants' Motions [Docs. 355, 356, 357] are **GRANTED IN PART AND DENIED IN PART**. The Court concludes that the new allegations do not cure the previously identified statute-of-limitations issues, and Plaintiffs' state common law claims and federal RICO claims (Counts I, II, V, VI, VII, VIII, IX, X, and XII) are once again **DISMISSED** as time barred. Because the TAC's additions did not—and could not—remedy the separate bases for the untimeliness of Plaintiffs' rescission claim (Count XI), it is also **DISMISSED** for the reasons discussed in the Court's prior Order. *See* (First MTD Order, Doc. 290 at 84–88). Only Plaintiffs' Georgia RICO and RICO conspiracy claims (Counts III and IV) may proceed, in part.

## I.    BACKGROUND[1]

Because Plaintiffs amended their complaint only to address the statute-of-limitations issues in the Second Amended Complaint ("SAC"), the TAC is identical to the SAC, except for 24 new paragraphs—or approximately 12.5 new pages—added to the 496-paragraph, 278-page document. *See* (Doc. 294-2 at 223–36). The parties likewise limited their initial briefing on the pending Motions to addressing whether the common law and federal RICO claims were still time-barred under new allegations in the Third Amended Complaint ("TAC"). *See* (Doc. 340 at 38).

---

[1] For purposes of resolving the pending motions to dismiss, the Court must accept all well-pleaded facts in the TAC as true and construe these facts in the light most favorable to Plaintiffs. *See Powell v. Thomas*, 643 F.3d 1300, 1302 (11th Cir. 2011).

At the Court's request, the parties also filed supplemental briefing on the potential impact of the non-reliance clauses and other disclaimers in Plaintiffs' Investor Agreements on the viability of their fraud-predicated RICO claims. *See* (Docs. 382, 383, 384, 385, 386).[2]

In light of the few amendments to the complaint and the narrow legal issues presented by the pending Motions, the Court need not repeat the exhaustive factual background provided in its prior Order regarding Defendants' Motions to Dismiss Plaintiffs' SAC. *See* (Doc. 290 at 2–26). The Court will instead recount only the factual and procedural history needed to resolve the limited scope of Defendants' Motions to Dismiss the TAC.

### A.    Factual History

#### 1.    The Syndicated Conservation Easement Transactions

Plaintiffs allege that Defendants fraudulently induced them and other investors to buy into Defendants' flawed Syndicated Conservation Easement Strategy (the "SCE Strategy")—a tax-savings strategy involving the donation of conservation easements to land trusts. *See* (TAC, Doc. 341 ¶ 1).

A conservation easement is an encumbrance placed on a land parcel to permanently restrict the use or development of the land to achieve certain conservation or preservation goals. *See* (*id.* ¶¶ 2, 46). It is formalized in a written agreement between the landowner and another party—typically a land trust or

---

[2] Although the parties' supplemental briefing is helpful and raises substantial questions regarding the long-term viability of Plaintiffs' Georgia RICO claims, at this juncture, the Court will not revisit its prior decision to only partially dismiss the Georgia RICO claims. *See* (Doc. 290 at 53–83).

government entity. *See* (*id.* ¶ 46). When properly implemented under Section 170(h) of the Internal Revenue Code, conservation easements confer legitimate tax advantages to the donor and environmental benefits to the public. (*Id.* ¶ 2). Donors of conservation easements may claim a charitable contribution tax deduction for the value by which the easement impairs the fair market value of the property. (*Id.*).

The transactions at issue here donated conservation easements on land collectively owned by the members of a limited liability company—or "Syndicate"— instead of by a single individual. *See* (*id.* ¶ 4). They are therefore known as "syndicated conservation easement transactions."

As multi-member LLCs, the Syndicates' tax liability is borne by its members. The Syndicate's income, losses, deductions, and credits "flow through" to each member based on their proportionate ownership shares in the LLC. *See* (*id.* ¶¶ 50, 52). Like any other LLC, the Syndicates file an annual Form 1065 tax return on behalf of the organization and issue Schedule K-1s to each member, which identify each member's share of the partnership's income, losses, tax deductions. *See* (*id.* ¶ 51).[3] Copies of the member's K-1s are also filed with the IRS. (*Id.*). The individual members then report their shares of the partnership's income, losses, and deductions on their individual tax returns. *See* (*id.* ¶ 52).

---

[3] *See also Greenberg v. Comm'r of Internal Revenue*, 10 F.4th 1136, 1145 (11th Cir. 2021).

Plaintiffs' allegations concern four syndicated conservation easement transactions in which they participated. Plaintiffs William and Carlita Turk participated in the Industrial S&G Partners LLC transaction, and Plaintiff Norman Radow participated in the FG River Partners LLC, Lakepoint Land Group LLC, and Gulf Land Group LLC transactions. *See* (*id.* ¶¶ 173, 200, 228, 259). Plaintiffs allege that the steps Defendants followed to complete these transactions and the other transactions in which the putative class participated "were uniform . . . in virtually every material way." (*Id.* ¶ 53).

First, the OSI Defendants[4] created an LLC known as the "PropCo," which purchased the subject property from the original landowner. *See* (*id.* ¶ 53(a)). The OSI Defendants then obtained an initial appraisal of the property from the Weibel Defendants,[5] based on its purported "Highest and Best Use." *See* (*id.* ¶ 53(b)).

Next, the OSI Defendants formed a second LLC, known as the "Syndicate," which purchased a 97.5% ownership interest in the PropCo.[6] *See* (*Id.* ¶¶ 53(e)–(f)). The Syndicate then sent "Promotional Materials" to potential investors, which advertised the potential tax benefits of participating in the SCE Strategy. (*Id.* ¶ 53(e)). The materials included the initial appraisal and the representation that

---

[4] The "OSI Defendants" are Ornstein-Schuler Investments, LLC and Ornstein-Schuler Capital Partners, LLC).

[5] The "Weibel Defendants" are appraiser Clay Weibel and his firm, Weibel & Associates, Inc.

[6] The remaining ownership interest was held by the Sponsor (0.5%) and the original landowner (2%). (TAC, Doc. 294 ¶ 53(f)).

investors would realize a tax saving of "more than 2.5 times" what they paid into the Syndicates from placing a conservation easement on the property. *See* (*id.*).

After the participants invested in the Syndicate, the OSI Defendants obtained a second appraisal for the property from the Lucas Defendants.[7] *See* (*id.* ¶ 53(g)). A Conservation Easement Deed was then prepared for the transaction, along with a Baseline Documentation Report that "ascertain[ed] the conservation values, substantiate[d] the purported conservation purpose, and establishe[d] the condition of the property at the time of the gift." *See* (*id.* ¶¶ 53(h)–(i)). Finally, the Syndicate donated the conservation easement on the subject property to a land trust, such as Defendant Atlantic Coast Conservancy, Inc. *See* (*id.* ¶¶ 53(j), 74).

The donation of the conservation easement was reported to the IRS as a charitable contribution on the Syndicate's tax return. (*Id.* ¶ 54). The resulting charitable contribution tax deduction was allocated on each Syndicate member's K-1, based on their ownership share of the Syndicate.[8] *See* (*id.*). Each of the Syndicate members could then report their shares of the charitable contribution on their individual tax returns. *See* (*id.*).

The Named Plaintiffs ultimately took charitable tax deductions on their individual tax returns based on their participation in four syndicated conservation

---

[7] The "Lucas Defendants" are composed of appraiser Lucas Von Esh and his firm, Lucas Mason, Inc.

[8] The "Sklar Defendants" are comprised of Donald R. Sklar and Partnership Tax Solutions, Inc. The "L&G Defendants" are comprised of Large & Gilbert, Inc., Conservation Pays LLC, and Joseph C. Skalaski.

easement transactions. But the IRS later audited the four partnership's tax returns and almost uniformly disallowed the claimed charitable contributions because it concluded that the transaction did not comply with the Internal Revenue Code. *See* (*id*. ¶¶ 191–92, 218–19, 250–51, 278–79). Among other things, the IRS concluded that the transactions used improper appraisal methods—which resulted in grossly inflated valuations of the conservation easement contributions—and that the transactions failed to properly substantiate their conservation purposes. *See* (*id*.).

## B.  Procedural History

### 1.  Overview of Plaintiffs' Claims

Plaintiffs initiated this putative class action in July 2020. (Doc. 1). They allege that Defendants advanced an unlawful scheme in which Defendants "conspired with one another to design, promote, sell, and implement the SCE Strategy for the purpose of receiving and splitting substantial fees." (*Id*. ¶ 300). Plaintiffs claim that Defendants leveraged their "purported expertise, experience, and reputation" to induce Plaintiffs into participating in the SCE Strategy, which they falsely marketed as a "legitimate tax-savings product." (*Id*. ¶ 1). Plaintiffs also allege that Defendants knew that the IRS was heavily scrutinizing syndicated conservation easement transactions and knew or should have known that the "grossly overvalued and ineffectively structured federal tax deductions" sold by plaintiffs would be disallowed. *See* (*Id*. ¶¶ 1, 57, 60, 64).

As a direct and proximate result of Defendants' conduct, the IRS disallowed Plaintiffs claimed deductions, causing them to (1) pay substantial fees and

transaction costs; (2) lose the benefits of their claimed deductions; (3) be exposed to back-taxes, interest, and penalties from the IRS; and (4) incur additional fees and expenses associated with the ensuing IRS fallout. (*Id.* ¶ 13).

Defendants are 21 entities and individuals:  Morris, Manning & Martin, LLP ("MMM"); Timothy Pollock; Large & Gilbert, Inc. ("L&G"); Conservation Pays, LLC; Joseph C. Skalski; Atlantic Coast Conservancy, Inc.; Atlantic Coast Conservancy Properties, LLC; Environmental Research and Mapping Facility, LLC; Robert. D. Keller; Bennett Thrasher, LLC; Ornstein-Schuler Investments LLC; Ornstein-Schuler Capital Partners LLC; Weibel & Associates, Inc.; Clay Weibel; Lucas Mason, Inc.; Lucas Von Esh; Blethen Mine Consultants, LLC; Marvin Blethen; Donald R. Sklar; Partnership Tax Solutions, Inc.; Aaron Kowan; and the Private Client Law Group ("PCLG").

The TAC asserts the following claims:

- Count I: Federal Racketeer Influenced and Corrupt Organizations Act ("federal RICO"), 18 U.S.C. § 1962(c), against all defendants;

- Count II: Federal RICO Conspiracy, 18 U.S.C. § 1962(d), against all defendants;

- Count III: Georgia Racketeer Influenced and Corrupt Organizations Act ("Georgia RICO"), O.C.G.A. § 16-14-1, *et seq*, against all defendants;

- Count IV: Georgia RICO Conspiracy, O.C.G.A. § 16-14-4(c), against all defendants;

- Count V: Professional Malpractice against the MMM Defendants,[9] the Return Preparer Defendants,[10] and the Appraiser Defendants[11];

- Count VI: Negligence Claim against all defendants except the MMM Defendants, the Return Preparer Defendants, and the Appraiser Defendants;

- Count VII: Negligent Misrepresentation against all defendants (as an alternative claim to Plaintiffs' fraud claim, Count IX);

- Count VIII: Breach of Fiduciary Duty against the MMM Defendants, the L&G Defendants,[12] the OSI Defendants,[13] the PCLG Defendants,[14] and Return Preparer Defendants;

- Count IX: Fraud against all defendants;

- Count X: Aiding and Abetting Breaches of Fiduciary Duty against all defendants;

- Count XI: Rescission against all defendants (in the alternative); and

- Count XII: Civil Conspiracy against all defendants.

(Doc. 341 at 238–79).

---

[9] The "MMM Defendants" are Morris Manning & Martin, LLP and Timothy Pollock.

[10] The "Return Preparer Defendants" are the L&G Defendants and the Sklar Defendants (Donald R. Sklar and Partnership Tax Solutions, Inc.). (SAC, Doc. 218 ¶ 78.)

[11] The "Appraiser Defendants" are the Weibel Defendants (appraiser Clay Weibel and his firm, Weibel & Associates, Inc.) and the Lucas Defendants (appraiser Lucas Von Esh and his firm, Lucas Mason, Inc.). (*Id.* ¶ 71.)

[12] The "L&G Defendants" are Large & Gilbert, Inc.; Conservation Pays, LLC; and Joseph C. Skalski.

[13] The "OSI Defendants" are Ornstein-Schuler Investments LLC and Ornstein-Schuler Capital Partners LLC.

[14] The "PCLG Defendants" are The Private Client Law Group and Aaron Kowan.

### 2.    Dismissal of the Second Amended Complaint

In March 2022, the Court dismissed Plaintiffs' federal RICO claims and eight state common-law claims as untimely under the applicable statutes of limitations, but it held that Plaintiffs' Georgia RICO and RICO conspiracy claims (Counts III and IV) could proceed in part. *See* (First MTD Order, Doc. 290).

The Court explained that the statutes of limitations for Plaintiffs' federal RICO claims and state common-law claims were no more than four years, and that the statutes of limitation began to run when Plaintiffs signed their Investor Agreements. *See* (*id.* at 37, 47). This presented a problem, as Plaintiffs purchased their interests in the Syndicates between Fall 2013 and Fall 2015, but this lawsuit was not filed until 2020. (*Id.* at 37). Since more than four years passed between Plaintiffs' investments and the filing of this lawsuit, their common law and federal RICO claims were untimely unless the running of the statutes of limitations was tolled.

Anticipating this issue, Plaintiffs alleged that fraudulent concealment adequately tolled the limitations periods. *See* (SAC, Doc. 218 ¶¶ 365–71). To support this tolling theory, Plaintiffs alleged that Defendants' assurances that the deductions "complied with all applicable tax laws and regulations and would be accepted by the IRS," delayed and deterred Plaintiffs from bringing their claims against Defendants at an earlier date. (SAC, Doc. 218 ¶ 369). Upon review, the Court was not persuaded.

It found that there were "virtually no allegations in the SAC that could support Plaintiffs' theory that they were fraudulently deterred from bringing suit despite the clear 'storm warnings' contained in the Investor Agreements." (First MTD Order, Doc. 290 at 46). These storm warnings had identified the risks Plaintiffs now claim were not disclosed, including "the risks that the IRS may challenge the value of the appraisal, the 'substantial risks' of conservation easement donations, the increased scrutinization of conservation easements by the IRS, the risk of an audit and attendant expenses, the risk that the IRS may challenge the appraisal as a qualified appraisal, the risk that any deduction may be reduced, and the risk of substantial penalties if a deduction was disallowed." (*Id.* at 41–42) (cleaned up). Likewise, the Promotional Materials that Plaintiffs received before buying into the Syndicates "contained warnings that no return on investment was guaranteed" and directed Plaintiffs to "rely upon their independent examination and judgment" in making their investment decision. (*Id.* at 43–44) (citing OSI Defs. MTD, Doc. 240-1 at 6).

The Court concluded that these disclaimers and warnings undercut Plaintiffs' claim that they "could not discover the alleged wrongful acts of Defendants" or their related injuries until "shortly before the filing of this lawsuit," as Plaintiffs had been put on "inquiry notice" that these deductions would not be allowed. *See* (*id.* at 43) (citing SAC, Doc. 218 ¶ 368 and *Brumbaugh v. Princeton Partners*, 985 F.2d 157, 159 (4th Cir. 1993)). The Court therefore held that

Plaintiffs had not adequately alleged tolling by fraudulent concealment and that their common law and federal RICO claims were untimely. *See* (*id.* at 47).

However, the Court separately held that Plaintiffs' Georgia RICO and RICO conspiracy claims were not time barred because a question of fact remained as to when the limitations period began running for those claims. *See* (*id.* at 47). The Court found that Plaintiffs' Georgia RICO claim could proceed against the OSI Defendants, the Weibel Defendants, and the Blethen Defendants[15]; and that Plaintiffs' Georgia RICO conspiracy claim could proceed against the OSI Defendants, the Weibel Defendants, the Blethen Defendants, the MMM Defendants, the ACC Defendants, and Bennett Thrasher. (*Id.* at 91). All other claims and defendants were dismissed. *See* (*id.* at 88–91).

### 3.    Third Amended Complaint

Months later, Plaintiffs were granted leave to narrowly amend their complaint to address the statute-of-limitations issues with their common law and federal RICO claims. (Doc. 340). Plaintiffs' TAC features 24 paragraphs of new allegations meant to better plead that fraudulent concealment tolled the running of the limitations periods. *See* (Redline of TAC, Doc. 294-2 at 223–36). Defendants moved to dismiss the TAC, [Docs. 355, 356, 357], and this review followed.

---

[15] The "Blethen Defendants" are Marvin Blethen and Blethen Mine Consultants, LLC.

## II.    LEGAL STANDARD

### A.    Rule 12(b)(6)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). For the purposes of a motion to dismiss, the court must accept all factual allegations in the complaint as true, but the court is not bound to accept as true a legal conclusion couched as a factual allegation. *Twombly*, 550 U.S. at 555. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. Although the plaintiff need not provide "detailed factual allegations" to survive dismissal, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678; *Twombly*, 550 U.S. at 555.

It is proper to dismiss a claim on statute of limitations grounds under Rule 12(b)(6) "only if it is 'apparent from the face of the complaint' that the claim is time-barred." *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004) (quoting *Omar v. Lindsey*, 334 F.3d 1246, 1251 (11th Cir. 20013)).

### B. Equitable Tolling by Fraudulent Concealment

#### 1.    State Law

Georgia law provides that when a plaintiff "has been debarred or deterred from bringing an action" through an act of fraud "the period of limitation shall run

only from the time of the plaintiff's discovery of the fraud." O.C.G.A. § 9-3-96. To sufficiently plead tolling by fraudulent concealment under Georgia law, a plaintiff must plausibly allege three elements: (1) "that a defendant committed 'actual fraud'"; (2) "that the 'actual fraud' concealed the cause of action;" and (3) that the plaintiff "exercise[d] reasonable diligence to discover the cause of action despite his failure to do so within the statute of limitations." *Overstreet v. Worth Cnty. Georgia*, 2022 WL 4007460, at *4 (11th Cir. Sept. 2, 2022) (citations omitted).

"'Actual fraud' under Georgia law consists of five elements: (1) false representation or omission of a material fact, (2) scienter, (3) intention to induce the party claiming fraud to act or refrain from acting, (4) justifiable reliance, and (5) damages." *Id.* (citing *Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1288 (11th Cir. 2007)).

Where actual fraud is the gravamen of the action, "[n]o independent fraudulent act is required to toll the statute." *Garland v. Advanced Med. Fund, L.P. II*, 86 F. Supp. 2d 1195, 1207–08 (N.D. Ga. 2000) (quoting *Shipman v. Horizon Corp.,* 267 S.E.2d 244, 246 (Ga. 1980)). But "[w]here the gravamen of the action is other than actual fraud, . . . there must be a separate independent actual fraud involving moral turpitude which debars and deters the plaintiff from bringing his action." *Overstreet*, 2022 WL 4007460, at *5 (quoting *Shipman*, 267 S.E.2d at 246).

### 2.    Federal Law

Federal RICO claims may also be equitably tolled by fraudulent concealment. *See Rotella v. Wood*, 528 U.S. 549, 560 (2000); *Curtis Inv. Co. v. Bayerische Hypo-Und Vereinsbank, 2007 WL 4564133*, at *9 (N.D. Ga. Dec. 20, 2007). "But 'the very nature of such tolling' is that it be 'the exception, not the rule.'" *Pac. Harbor Cap., Inc. v. Barnett Bank, N.A.*, 252 F.3d 1246, 1252 (11th Cir. 2001) (quoting *Rotella*, 528 U.S. at 561).

A plaintiff alleging fraudulent concealment under federal law must plausibly allege (1) "successful concealment of the cause of action"[16] by the defendant; (2) that "fraudulent means" were used to achieve that concealment; and (3) that plaintiff "has pursued his rights diligently." *Fedance v. Harris*, 1 F.4th 1278, 1287 (11th Cir. 2021). There is no equitable tolling when "the plaintiffs had notice sufficient to prompt them to investigate and that, had they done so diligently, they would have discovered the basis for their claims." *Pac. Harbor Capital, Inc. v. Barnett Bank, N.A.,* 252 F.3d 1246, 1252 (11th Cir. 2001) (cleaned up); *see Bakos v. UNUM Life Ins. Co. of Am.*, 2022 WL 3696648, at *2 (11th Cir. Aug. 25, 2022). Thus, tolling applies only "because of extraordinary circumstances that are both beyond [the plaintiff's] control and unavoidable even with diligence." *Sandvik v. United States*, 177 F.3d 1269, 1271 (11th Cir. 1999).

---

[16] "The defendant must have actively concealed facts such that the plaintiff remained ignorant of a potential claim, not merely ignorant of evidence." *Fedance*, 1 F.4th at 1287 (cleaned up).

Since Plaintiffs claim tolling by fraudulent concealment, their allegations of fraudulent conduct must satisfy the heightened pleading standards of Rule 9(b). *See Summer v. Land & Leisure, Inc.*, 664 F.2d 965, 970 (5th Cir. 1981); *Pedraza v. United Guar. Corp.*, 114 F. Supp. 2d 1347, 1356 (S.D. Ga. 2000); *Jones v. Gen. Motors LLC*, 2023 WL 2877706, at *4 (N.D. Ga. Mar. 8, 2023), *aff'd*, 2024 WL 861064 (11th Cir. Feb. 29, 2024); *Von Der Werth v. Manville*, 2009 WL 10669723, at *3 & n.4 (N.D. Ga. Mar. 23, 2009) (Carnes, C.J.). "To meet this standard, plaintiffs must allege (1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; and (4) what the defendants gained by the alleged fraud." *Otto Candies, LLC v. Citigroup Inc.*, 137 F.4th 1158, 1178 (11th Cir. 2025) (cleaned up).

## III.  DISCUSSION

### A.    Timeliness of the Common Law and Federal RICO Claims

Defendants argue that despite the new allegations, Plaintiffs' state common law and federal RICO claims are still untimely because the TAC again fails to sufficiently plead fraudulent concealment.[17] *See* [Joint MTD, Doc. 355]. Upon review, the Court agrees. Despite Plaintiffs' new allegations, Plaintiffs have not plausibly alleged that they were fraudulently deterred from bringing suit despite

---

[17] As before, Defendants do not argue that Plaintiffs Georgia RICO claims are time barred.

the clear warnings contained in the Syndicates' Investor Agreements and Promotional Materials.

In their new allegations, Plaintiffs describe more than a dozen instances where the OSI Defendants assured them of the legality of the SCE transactions, the propriety of investors' tax deductions, the accuracy of the property appraisals, or the quality of the team running the SCE Strategy, while also downplaying IRS audits of the Syndicates and media reports criticizing syndicated conservation easement transactions. *See* (TAC, Doc. 341 ¶¶ 367–95). Plaintiffs allege that these pre- and post-investment reassurances "about the legality of their SCE Strategy transaction[s] and deductions" deterred them from timely filing their lawsuit. *See* (*id.* 341 ¶ 386).

There are several problems with this argument. First, in signing the Investor Agreements, Turk and Radow explicitly disclaimed their reliance on any prior written or oral representations about the transactions, including by OSI personnel representing the Syndicates.[18] *See* (Lakepoint I.A., Doc. 223-6 at 2) ("In connection with Investor's purchase of the membership interest, no oral or written representations or warranties have been made to the Investor."); (Industrial S&G I.A., Doc. 223-7 at 2) ("In connection with Investor's purchase of the membership interest, no oral or written representations or warranties have been made to the

---

[18] For the reasons provided in its prior order, the Court will consider the Investor Agreements and Promotional Materials for the purposes of resolving the pending motions to dismiss. *See* (First MTD Order, Doc. 290 at 28–31).

Investor. . . . Investor is not acquiring the membership interest based on any representation, oral or written, by the [Syndicate] or any representative of the [Syndicate] with respect to the future value of, income from or tax consequences related to the membership interest . . . ."); (Gulf Land I.A., Doc. 223-8 at 2) ("Investor is not acquiring the membership interest based on any representation, oral or written, by the [Syndicate] or any representative of the [Syndicate] with respect to the future value of, income from or tax consequences related to the membership interest . . . ."); (FG River I.A., Doc. 223-9 at 2) (same).

These disclaimers echoed the non-reliance provisions found in the Promotional Materials that the Syndicates sent to Plaintiffs and other potential investors. *See* (Lakepoint P.M., Doc. 223-2 at 10) ("Prospective members are not entitled to rely on this material or on any representation, oral or written, by [the promoter] regarding any particular investment, but rather are expected to rely upon their independent examination and judgment as to the prospects of any particular business venter with [the promoter]."); (Industrial S&G P.M., Doc. 223-3 at 3–4) ("Prospective members are not entitled to rely on this material or on any representation, oral or written, by [the Syndicate] or [its manager] regarding this particular investment, but rather are expected to rely upon their independent examination and judgment as to the prospects of this particular investment. . . . No projections or values contained in this material should be relied on by the recipient. This material is being delivered by [the promoter] to a limited number of

accredited potential investors for informational purposes only."); (Gulf Land P.M., Doc. 223-4 at 3–4) (same); (FG River P.M., Doc. 223-5 at 3–4) (same).

Such disclaimers in the Investor Agreements render Plaintiffs' reliance on OSI Defendants' pre-investment statements unreasonable as a matter of law. *See Curtis Inv. Co., LLC v. Bayerische Hypo-und Vereinsbank, AG*, 341 F. App'x 487, 491–92 (11th Cir. 2009); *Raysoni v. Payless Auto Deals, LLC*, 766 S.E.2d 24, 26 (Ga. 2014); *First Data POS, Inc. v. Willis*, 546 S.E.2d 781, 784–85 (Ga. 2001).

Second, as explained in the Court's prior Motion to Dismiss Order, the Promotional Materials and Investment Agreements contain robust disclaimers concerning the very risks that Plaintiffs claim were concealed. In many cases, the disclaimers directly contradict the OSI Defendants' alleged pre- and post-investment assurances.[19] Among other things, the Promotional Materials cautioned:

- "Neither [the Syndicate] nor [its manager] makes any representations or warranties with respect to the exact nature of the investment or the expected return of this particular investment. No investment, or return on any investment, is guaranteed."

- "This investment may lose money."

- "The forecasts and estimates of values included in this material are merely projections. They are compiled based on assumptions by [the Syndicate] and its management and are not a guarantee or warranty of actual results or values. Actual

---

[19] Where the Investment Agreement terms clearly "contradict precontractual representations, any reliance on those precontractual representation [is] deemed unreasonable as a matter of law." *Raysoni*, 766 S.E.2d at 26; *see Curtis Inv. Co., LLC*, 341 F. App'x at 491 (quoting *First Data POS,* 546 S.E.2d at 784)).

investment results or business operating results may vary materially from those reflected in the forecasts herein."

- "Prospective investors in [the Syndicate] should carefully read the assumptions accompanying the forecasts recognizing that the forecasts do not include an evaluation of the assumptions accompanying the forecasts, and do not include an evaluation of the support for such assumptions."

- "In all cases interested parties should conduct their own investigation and analysis of this material, [the Syndicate's] management team, and the data set forth in this material."

*See* (Lakepoint P.M., Doc. 223-2 at 10); (Industrial S&G P.M., Doc. 223-3 at 3–4);

Doc. 223-4 at 3–4); (FG River P.M., Doc. 223-5 at 3–4). Likewise, the Investment

Agreements warned:

- "[T]here are substantial risks associated with the granting of conservation easements, including, but not limited to, the valuation of the easement itself."

- "[T]here is no assurance of the potential tax impact on a particular Investor in the event that the conservation easement is granted."

- "[N]o guarantees have been given directly or indirectly to the Investors with respect to any tax benefit to be derived from an investment in the [Syndicate]. In addition, each Investor's entire investment is at risk of loss."

- "PROSPECTIVE INVESTORS SHOULD RECOGNIZE THAT APPRAISALS BY THEIR NATURE ARE VERY SUBJECTIVE AND THAT THE VALUATION OF CONSERVATION EASEMENTS MAY BE CONSIDERED ESPECIALLY PROBLEMATIC AND HIGHLY SPECULATIVE . . . ."

- "Qualified appraisals are not to be construed as a guarantee of value, or as an assurance that the value could be sustained on an audit by the IRS."

- "If [the Syndicate] grants a conservation easement, neither the Company nor the Manager have guaranteed the amount of the

appraisal or the amount of the contribution deduction to be allocated to the Investors."

- "You should be aware that conservation easements, the appraisal methodologies and techniques used in establishing the value thereof, and the tax laws applicable thereto, have come under significant scrutiny and criticism by Treasury officials in recent years . . . ."

- "Recent scrutiny of conservation easement transactions, as well as recent and proposed changes to IRS form and reporting requirements for such transactions, may increase the likelihood that [the Syndicate's] return might be reviewed for possible audit."

- "An audit of [the Syndicate's] income tax returns, or your individual returns, may result in an audit of the individual tax returns of some or all of the Investors."

- "In the event of any audit adjustments, a Member might incur attorney's fees, court costs, and other expenses in connection with contesting a proposed deficiency asserted by the IRS."

*See* (Lakepoint I.A., Doc. 223-6 at 5–8; Industrial S&G I.A., Doc. 223-7 at 5–8; Gulf Land I.A., Doc. 223-8 at 6–11; FG River I.A., Doc. 223-9 at 6–11) (emphasis original). Thus, instead of concealing the risks of the SCE Strategy, these storm warnings notified Plaintiffs before they signed their Investor Agreements that the advertised tax benefits were not guaranteed, the appraisals were highly speculative, IRS scrutiny was very possible, their claimed deductions might be disallowed, and IRS challenges to their tax positions may cause them to incur additional expenses.

Besides giving Plaintiffs notice of these risks, the Promotional Materials and Investment Agreements explicitly directed Plaintiffs to independently investigate

the risks with the assistance of their own tax advisors. For instance, the

Promotional Materials stated:

- "**Disclaimer:** The information contained herein assumes certain State & Federal tax rates for the investor members. Please have your tax advisor or CPA review the information contained herein to determine the effects for your personal tax return situation." (Lakepoint P.M., Doc. 223-2 at 10; Industrial S&G P.M., Doc. 223-3 at 12; Gulf Land P.M., Doc. 223-4 at 14; FG River P.M., Doc. 223-5 at 14).

- "In all cases, interested parties should conduct their own investigation and analysis of this material, [the Syndicate's] management team, and the data set forth in this material." (Industrial S&G P.M., Doc. 223-3 at 4; Gulf Land P.M., Doc. 223-4 at 4; FG River P.M., Doc. 223-5 at 4).

Likewise, in the Investment Agreements, Plaintiffs represented that they had read

the agreement, understood the stated risks of the SCE Strategy, consulted their

attorneys and tax advisors, and had the opportunity to ask questions and verify the

accuracy of the information provided by the Syndicate:

- "Investor . . . has read and understood the risks set forth" in the Investor Agreement.

- "Investor is fully aware of the problems and risks involved in making an investment of this type, and that Investor is capable of evaluating the merits and risks of this investment."

- "Investor has consulted with Investor's attorney, financial advisors and others regarding all financial securities and tax aspects of the proposed investment, and that said advisors have reviewed this Agreement and all documents relating thereto on Investor's behalf."

- "Investor and Investor's advisors have sufficient knowledge and experience in business and financial matters to evaluate the [Syndicate], to evaluate the risks and merits of an investment in the [Syndicate], to make an informed investment decision with respect thereto, and to protect Investor's interest in connection with Investor's subscription . . . ."

- "Investor and Investor's advisors have had an opportunity to ask questions of and to receive answers from the officers of the [Syndicate] and to obtain additional information in writing to the extent that the [Syndicate] possesses such information or could acquire it without unreasonable effort or expense: (i) relative to the [Syndicate] and the offering of the membership interests and (ii) necessary to verify the accuracy of any information, documents, books and records furnished. All such materials and information requested by Investor and Investor's advisors (including information requested to verify information previously furnished) have been made available and examined by Investor or Investor's advisors."

See (Lakepoint I.A., Doc. 223-6 at 1–3; Industrial S&G I.A., Doc. 223-7 at 1–3; Gulf Land I.A., Doc. 223-8 at 1–3; FG River I.A., Doc. 223-9 at 1–3).

Despite being on inquiry notice of the SCE Strategy's risks, Plaintiffs do not identify what specific steps they took to investigate the basis for their claims. Instead, they vaguely allege that they "exercised due diligence" to discover their claims during the years before they filed this lawsuit. See (TAC, Doc. 341 ¶ 372).

Even so, Plaintiffs argue that their lack of diligence should be excused because "Defendants" were their tax advisors and therefore they were in a confidential relationship. See (id. ¶ 396); (Pl. Resp. Br., Doc. 358 at 5–8). To support this theory, Plaintiffs allege that they "credited and followed" the tax advice of the OSI Defendants, MMM Defendants, and L&G Defendants in claiming their charitable deductions. See (TAC, Doc. 341 ¶¶ 396–402).

Yet the terms of the Promotional Materials and Investor Agreements undercut Plaintiffs' characterization of their relationship, as they clearly directed Plaintiffs to consult their own attorneys and tax advisors to independently evaluate the risks and potential tax benefits of the SCE transactions. Further, Plaintiffs cite

no legal authority supporting the existence of a confidential "tax advisor" relationship under these circumstances. To the contrary, courts have more generally held that it is patently unreasonable for a taxpayer to rely on the tax advice of "a promoter of the transaction" or anyone else who "otherwise had a conflict of interest about which the taxpayer knew or should have known." *See Gustashaw v. Comm'r*, 696 F.3d 1124, 1139 (11th Cir. 2012) (citing *Stobie Creek Invs. LLC v. United States,* 608 F.3d 1366, 1381–82 (Fed. Cir. 2010) and *Chamberlain v. Comm'r,* 66 F.3d 729, 732–33 (5th Cir. 1995)).

Here, the OSI, MMM, and L&G Defendants were not independent professionals that the Plaintiffs retained to evaluate the propriety of the SCE transactions. *See id.* at 1139–40. They were instead the very entities and individuals involved in designing, promoting, and implementing those transactions. Thus, these defendants "labored under a conflict of interest" and it was apparent that any advice they provided was not necessarily objective. *Gustashaw*, 696 F.3d at 1141. It is therefore unreasonable for Plaintiffs to claim that Defendants were their confidential tax advisors when in fact they were parties on the other side of an arm's-length investment transaction. *See id.*

Finally, even if Plaintiffs were in a confidential relationship, their obligation to exercise reasonable diligence was not "entirely extinguished." *See My24HourNews.com, Inc. v. AT&T Corp.*, 791 F. App'x 788, 799 (11th Cir. 2019) (citing *Cochran Mill Assocs. v. Stephens*, 648 S.E.2d 764, 769 (Ga. Ct. App. 2007)). Plaintiffs were still required to read and be aware of the terms of their Investor

Agreements, and it was unreasonable for them to rely on representations and "advice" that was contradicted by the clear terms of the agreements. *See My24HourNews.com*, 791 F. App'x at 799; *C&C Fam. Tr. 04/04/05 ex rel. Cox-Ott v. AXA Equitable Life Ins. Co.*, 44 F. Supp. 3d 1247, 1260 (N.D. Ga. 2014). Thus, regardless of the nature of their relationship with Defendants, Plaintiffs cannot claim that they were "wholly excused from exercising some level of diligence in its dealings" with them. *See My24HourNews.com*, 791 F. App'x at 799.

* * *

In sum, Plaintiffs have not plausibly alleged that Defendants fraudulently concealed their state common law and federal RICO claims or that these claims were untimely filed despite Plaintiffs' exercise of reasonable diligence. Equitable tolling therefore does not apply, and Plaintiffs' state common law and federal RICO claims are time barred.

## IV. CONCLUSION

Accordingly, Defendants' Motions to Dismiss, [Docs. 355, 356, 357] are **GRANTED IN PART AND DENIED IN PART**. Plaintiffs' state common law claims and federal RICO claims (Counts I, II, V, VI, VII, VIII, IX, X, and XII) are once again **DISMISSED** as time barred. Because the TAC's additions did not—and could not—remedy the separate bases for the untimeliness of Plaintiffs' rescission claim (Count XI), it is also **DISMISSED** for the reasons discussed in the Court's prior Order. *See* (First MTD Order, Doc. 290 at 84–88).

Only Plaintiffs' Georgia RICO claims (Counts III and IV) remain, in part. As discussed in the Court's prior order, *see* (Doc. 290 at 53–83), Plaintiffs' Georgia RICO claim (Count III) may proceed against the OSI Defendants (Ornstein-Schuler Investments, LLC and Ornstein-Schuler Capital Partners, LLC), the Weibel Defendants (Clay Weibel and Weibel & Associates, Inc.), and the Blethen Defendants (Marvin Blethen and Blethen Mine Consultants, LLC); and Plaintiffs' Georgia RICO conspiracy claim (Count IV) may proceed against the OSI Defendants, the Weibel Defendants, the Blethen Defendants, the MMM Defendants (Morris Manning & Martin, LLP and Timothy Pollock), the ACC Defendants (Atlantic Coast Conservancy, Inc.; Atlantic Coast Conservancy Properties, LLC; Robert D. Keller; and Environmental Research and Mapping Facility, LLC), and Bennett Thrasher, LLC. (*Id.* at 91).

All other claims and defendants are **DISMISSED**. The Clerk is **DIRECTED** to terminate Large & Gilbert, Inc.; Conservation Pays, LLC; Joseph Skalski; Donald R. Sklar; Partnership Tax Solutions, Inc.; Aaron Kowan; The Private Client Law Group; Lucas Von Esh; and Lucas Mason, Inc. as defendants in this case.

Although at this juncture Plaintiffs' Georgia RICO claims may proceed, the disclaimer and non-reliance provisions in Plaintiffs' Investor Agreements cast a long shadow over this already five-year-old case. Under the circumstances, the Court believes that a serious effort to reach a negotiated settlement of this matter would be beneficial. Thus, Plaintiffs and the remaining Defendants are

**ORDERED** to engage in private mediation.  The parties will advise the Court by **October 21, 2025** if they cannot agree on a private mediator, in which case the Court will appoint one. Mediation will conclude by **December 10, 2025**, and the parties will file a joint status report by no later than **December 17, 2025**.  The Clerk is **DIRECTED** to **ADMINISTRATIVELY CLOSE** this case pending the outcome of mediation and to resubmit this case to the undersigned on **December 17, 2025**.

 **IT IS SO ORDERED** this 30th day of September, 2025.

                   _____

**Honorable Amy Totenberg**
**United States District Judge**